# EXHIBIT C

Execution Version
December 28, 2010

# SENIOR SECURED CREDIT AGREEMENT

**dated as of
December 29, 2010,**

**among**

## ESSAR STEEL MINNESOTA LLC,

**ICICI BANK LIMITED, New York Branch, as Initial Lender,**

**ICICI BANK LIMITED, New York Branch,
the Issuing Bank Party Hereto,**

**ICICI BANK LIMITED, Singapore Branch,
as Facility Agent,**

**WELLS FARGO BANK NORTHWEST, N.A., as Security Agent,**

**ICICI BANK LIMITED, New York Branch, as Escrow Agent and Account Bank,**

**and**

**ICICI BANK LIMITED, New York Branch, as Mandated Lead Arranger**

TABLE OF CONTENTS

Page

ARTICLE I

Definitions

SECTION 1.01   Defined Terms ............................................................................ 2
SECTION 1.02   Terms Generally........................................................................ 34
SECTION 1.03   Accounting Terms; GAAP; IFRS ............................................. 35

ARTICLE II

The Facilities

SECTION 2.01   Term Loans ............................................................................... 35
SECTION 2.02   Tranches; Purpose.................................................................... 35
SECTION 2.03   Loans and Borrowings ............................................................. 36
SECTION 2.04   Requests for Borrowings.......................................................... 37
SECTION 2.05   Funding of Borrowings ............................................................ 38
SECTION 2.06   Letters of Credit ....................................................................... 38
SECTION 2.07   Interest Elections...................................................................... 41
SECTION 2.08   Termination and Reduction of Commitments............................ 42
SECTION 2.09   Repayment of Loans ................................................................ 42
SECTION 2.10   Evidence of Debt...................................................................... 43
SECTION 2.11   Prepayment of Loans ............................................................... 44
SECTION 2.12   Fees .......................................................................................... 47
SECTION 2.13   Interest...................................................................................... 48
SECTION 2.14   Market Disruption; Alternate Rate of Interest ......................... 48
SECTION 2.15   Increased Costs ........................................................................ 49
SECTION 2.16   Break Funding Payments ......................................................... 51
SECTION 2.17   Taxes ........................................................................................ 51
SECTION 2.18   Payments Generally; Pro Rata Treatment; Sharing of Setoffs...... 54
SECTION 2.19   Mitigation Obligations; Replacement of Lender ........................ 55
SECTION 2.20   Accession Project Financing .................................................... 56
SECTION 2.21   Common Project Financing Facility ......................................... 58

ARTICLE III

Representations and Warranties

SECTION 3.01   Organization; Powers................................................................ 58
SECTION 3.02   Authorization; Enforceability ................................................... 59
SECTION 3.03   Governmental Approvals; No Conflicts .................................... 59
SECTION 3.04   Financial Condition; No Material Adverse Change.................... 59
SECTION 3.05   Properties .................................................................................. 60

SECTION 3.06    Litigation and Environmental Matters ............................................... 60
SECTION 3.07    Compliance with Laws and Agreements ..................................................... 60
SECTION 3.08    Investment Company Status ........................................................................ 60
SECTION 3.09    Taxes ........................................................................................................... 61
SECTION 3.10    ERISA .......................................................................................................... 61
SECTION 3.11    Disclosure .................................................................................................... 61
SECTION 3.12    Subsidiaries ................................................................................................. 61
SECTION 3.13    Insurance ..................................................................................................... 61
SECTION 3.14    Labor Matters .............................................................................................. 62
SECTION 3.15    [Intentionally Omitted] ............................................................................... 62
SECTION 3.16    Federal Reserve Regulations ....................................................................... 62
SECTION 3.17    Solvency ...................................................................................................... 62
SECTION 3.18    Senior Indebtedness .................................................................................... 62
SECTION 3.19    Interested Persons ....................................................................................... 62
SECTION 3.20    Prohibited Activities .................................................................................... 62

## ARTICLE IV

### Conditions

SECTION 4.01    Effective Date ............................................................................................. 63
SECTION 4.02    Initial Lender Tranche A-2 Event ................................................................ 65
SECTION 4.03    Initial Lender Tranche B and Accession Project Financing Event .............. 67
SECTION 4.04    Each Credit Event ........................................................................................ 68

## ARTICLE V

### Affirmative Covenants

SECTION 5.01    Financial Statements and Other Information ............................................... 69
SECTION 5.02    Notices of Material Events; Certain Litigation ........................................... 71
SECTION 5.03    Information Regarding Collateral ................................................................ 72
SECTION 5.04    Existence; Conduct of Business ................................................................... 72
SECTION 5.05    Payment of Obligations ............................................................................... 72
SECTION 5.06    Maintenance of Properties ........................................................................... 73
SECTION 5.07    Insurance ..................................................................................................... 73
SECTION 5.08    Casualty and Condemnation ........................................................................ 73
SECTION 5.09    Books and Records; Inspection and Audit Rights ........................................ 73
SECTION 5.10    Compliance with Laws; Environmental Reports .......................................... 74
SECTION 5.11    Use of Proceeds and Letters of Credit ......................................................... 74
SECTION 5.12    Subsidiaries ................................................................................................. 75
SECTION 5.13    Further Assurances ...................................................................................... 75
SECTION 5.14    Security Documents ..................................................................................... 75
SECTION 5.15    DSRA ........................................................................................................... 77

ARTICLE VI

Negative Covenants

SECTION 6.01  Indebtedness ................................................................................. 78
SECTION 6.02  Liens ............................................................................................ 79
SECTION 6.03  Fundamental Changes ................................................................. 80
SECTION 6.04  Asset Sales ................................................................................... 81
SECTION 6.05  Sale and Leaseback Transactions ................................................ 81
SECTION 6.06  Permitted Hedging Agreements ................................................... 82
SECTION 6.07  Restricted Payments; Certain Payments of Indebtedness ............ 82
SECTION 6.08  Transactions with Affiliates ......................................................... 82
SECTION 6.09  Restrictive Agreements ................................................................ 83
SECTION 6.10  Amendment of Material Documents ............................................ 83
SECTION 6.11  Fiscal Year .................................................................................. 83
SECTION 6.12  Financial Covenants .................................................................... 84
SECTION 6.13  Ownership and Control of Borrower ........................................... 85

ARTICLE VII

Events of Default

ARTICLE VIII

The Agents

ARTICLE IX

Miscellaneous

SECTION 9.01  Notices ........................................................................................ 93
SECTION 9.02  Waivers; Amendments ................................................................ 94
SECTION 9.03  Expenses; Indemnity; Damage Waiver ....................................... 95
SECTION 9.04  Successors and Assigns ............................................................... 97
SECTION 9.05  Survival ....................................................................................... 99
SECTION 9.06  Counterparts; Integration; Effectiveness .................................. 100
SECTION 9.07  Severability ............................................................................... 100
SECTION 9.08  Right of Set off .......................................................................... 100
SECTION 9.09  Governing Law; Jurisdiction; Consent to Service of Process; Sovereign
              Immunity ..................................................................................... 100
SECTION 9.10  WAIVER OF JURY TRIAL ..................................................... 102
SECTION 9.11  Headings .................................................................................... 102
SECTION 9.12  Confidentiality .......................................................................... 102
SECTION 9.13  Interest Rate Limitation ............................................................. 103
SECTION 9.14  Judgment Currency ................................................................... 103
SECTION 9.15  Patriot Act ................................................................................. 103
SECTION 9.16  No Fiduciary Relationship ........................................................ 104

SECTION 9.17    Nonpublic Information.................................................................. 104

SCHEDULES:

Schedule 1.01A      Confidential Information Material
Schedule 1.01B      Project Contracts requiring Consent and Agreement
Schedule 1.01C      (Intentionally Omitted)
Schedule 1.01D      Mortgaged Properties
Schedule 1.01E      Types of Project Contracts Not Requiring Consent and Agreement
Schedule 3.03       Governmental Approvals
Schedule 3.06       Litigation
Schedule 3.11       Project Contracts
Schedule 3.13       Insurance
Schedule 4.02(f)    Material Project Approvals
Schedule 6.01       Supplier Financing Agreements
Schedule 6.02       Existing Liens

EXHIBITS:

Exhibit A      Form of Assignment and Assumption
Exhibit B      Form of Collateral Account Agreement
Exhibit C      Form of Issuing Bank Agreement
Exhibit D-1    Form of Security Agreement
Exhibit D-2    Form of Consent and Agreement
Exhibit D-3    [Intentionally Omitted.]
Exhibit E-1    Form of Parent Guarantee Agreement
Exhibit E-2    Form of EGL Guarantee Agreement
Exhibit F-1    Form of Accession Project Financing Notice
Exhibit F-2    Form of Accession Agreement
Exhibit G      Form of Borrowing Request
Exhibit H      Forms of Facility Agent's New York, Mauritius and Cayman Counsel Opinions
Exhibit I      Forms of Borrower's New York and Minnesota Counsel Opinions
Exhibit J      [Intentionally Omitted.]
Exhibit K      Form of Subordination Agreement
Exhibit L      Form of Exemption Certificate

SENIOR SECURED CREDIT AGREEMENT dated as of December 29, 2010 (this "Agreement"), among ESSAR STEEL MINNESOTA LLC, a limited liability company organized under the laws of the State of Minnesota, U.S.A., ICICI BANK LIMITED, Singapore Branch, as Facility Agent, WELLS FARGO BANK NORTHWEST, N.A., as Security Agent for the Secured Parties, ICICI BANK LIMITED, New York Branch, as a Lender, ICICI BANK LIMITED, New York Branch, as an Issuing Bank party hereto, ICICI BANK LIMITED, New York Branch (or any of its overseas branches or subsidiaries party hereto), as Escrow Agent and Account Bank, and ICICI BANK LIMITED, New York Branch, as Mandated Lead Arranger.

RECITALS

The Borrower is undertaking in the State of Minnesota, U.S.A. (i) the extraction of iron ore and the development and operation of iron ore mines, and (ii) the establishment and operation of a beneficiation and pellet plant with an approximately 4.1 million tons per annum iron ore pellet manufacturing capacity and the capacity to produce related products and by-products in connection with the mining and processing of iron ore, and (iii) the sale of the iron ore pellets and related products and by-products produced therefrom, and the Borrower will own, operate and maintain such mining, processing and related facilities (collectively, the "Project"), for which the Borrower needs financing. Term loan lenders (including the Initial Lender and one or more Subsequent Project Lenders) shall provide to the Borrower approximately five hundred thirty million Dollars (US$530,000,000) and together with providers of supplier's credit to the Project (collectively, together with the Initial Lender and any Subsequent Project Lenders, the "Project Lenders") shall provide Project financing of approximately seven hundred thirteen million Dollars (US$713,000,000). The total cost for the Project is currently estimated to be approximately one billion ninety seven million Dollars (US$1,097,000,000). As part of the Project's financing, the Borrower has requested that a term loan facility of two hundred fifty million Dollars (US$250,000,000): consisting of Initial Lender Tranche A – one hundred fifty million Dollars (US$150,000,000) and Initial Lender Tranche B – one hundred million Dollars (US$100,000,000), be provided by the Initial Lender under this Agreement (as such amount may be increased upon any Accession Project Financing, the "Term Loan Facility"), and that one or more Issuing Banks provide a letter of credit facility (the "Letter of Credit Facility" and together with the Term Loan Facility, the "Facilities"), to meet the Project's costs and expenses and other costs and expenses in relation to the Facilities and the transactions contemplated by this Agreement, and to secure indebtedness of the Borrower incurred for the Project. Following the date of this Agreement, Subsequent Project Lenders may desire to provide additional financing for the Project and include their Accession Project Financing under this Agreement or, together with the financing provided by the Initial Lender under this Agreement, participate in a Common Project Financing Facility. This Term Loan Facility is guaranteed in accordance with the terms of the Guarantee Agreements by Essar Steel Holdings Limited, an overseas company incorporated in Mauritius (the "Parent"), and by Essar Global Limited, a company incorporated in the Cayman Islands ("EGL"). The Initial Lender is willing to provide the Facilities in the form hereof, upon the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01     Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"Accession Agreement" has the meaning ascribed thereto in Section 2.20(b).

"Accession Project Financing" means any additional Term Loan Commitments provided hereunder by Subsequent Project Lenders as contemplated under Section 2.20(b).

"Accession Project Financing Effective Date" has the meaning ascribed thereto in Section 2.20(c).

"Accession Project Financing Notice" has the meaning ascribed thereto in Section 2.20(a).

"Additional Collateral Date" means each of the dates following the Effective Date on which the Borrower acquires any material property or assets or enters into any additional Project Contracts or Offtake Contracts and Agreements pertaining to the Project.

"Additional Indebtedness" has the meaning ascribed thereto in Section 6.01.

"Additional Indebtedness Holder's Pro Rata Interest" means with respect to each holder of Additional Indebtedness, on the date that the Borrower is required to make a mandatory prepayment (and not an optional prepayment) of the Additional Indebtedness in accordance with Section 2.11(f) hereof, the percentage determined by the quotient of (a) the principal amount of the then Additional Indebtedness outstanding owed to such holder of Additional Indebtedness divided by (b) the sum of (i) the principal amount of the Loans outstanding on such date to all Lenders, (ii) the principal amount of the Supplier Financing outstanding on such date, and (iii) the principal amount of any Additional Indebtedness, outstanding on such date, under which the creditors thereof share on a *pari passu* basis the security interest of the Lenders in the relevant Collateral affected by such mandatory prepayment, on such date, if and to the extent the Upstream Supplier Financing Creditors or the creditors under any Additional  Indebtedness on such date require a mandatory prepayment (and not an optional prepayment) on the same terms as the required by the Loans.

"Additional Obligations" means, with respect to the Borrower,  the obligations under the Supplier Financing, including, without limitation, (a) the due and punctual payment by the Borrower of (i) the principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or similar proceeding, regardless of whether allowed or allowable in such proceeding) on the loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of the Borrower under the Supplier Financing and the loan documents in connection therewith, including in respect of fees, costs, expenses and indemnities (including any monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or similar proceeding, regardless of whether allowed or allowable in such proceeding), in each case to the

extent arising in connection with the Additional Obligations, and (b) the due and punctual performance of all other obligations of the Borrower under or pursuant to the Supplier Financing and the loan documents in connection therewith, in each case to the extent arising in connection with the Additional Obligations.

"Additional Security Documents" means any additional or supplemental Security Document, additional consent security agreement, and any control agreement required to be provided hereunder following the Effective Date and delivered pursuant to the provisions of Section 5.14 and each other security agreement or other security instrument or document executed and delivered to the reasonable satisfaction of the Security Agent.

"Adjusted Net Income" means, for any period, the net income of Borrower for such period determined in accordance with GAAP; *provided, however*, that there shall not be included in the calculation of such Adjusted Net Income:

(1)    any net income of any Person (other than Borrower), except that: (A) subject to the limitations contained in clause (4) below, Borrower's equity in the net income of any such person for such period shall be included in such Adjusted Net Income up to the aggregate amount of cash actually distributed by such Person during such period to Borrower as a dividend or other distribution; and (B) Borrower's equity in a net loss of any such Person for such period shall be included in determining such Adjusted Net Income;

(2)    any net income (or loss) of any Person acquired by Borrower in a pooling of interests transaction (or any transaction accounted for in a manner similar to a pooling of interests) for any period prior to the date of such acquisition;

(3)    any gain (or loss) realized upon the sale or other disposition of any asset of Borrower (including pursuant to any sale and leaseback transaction) that is not sold or otherwise disposed of in the ordinary course of business and any gain (or loss) realized upon the sale or other disposition of any Equity Interest in any Person;

(4)    any extraordinary, unusual or nonrecurring gain or loss;

(5)    the cumulative effect of a change in accounting principles;

(6)    any noncash gain or loss attributable to any Hedging Agreement relating to commodity prices until such time as it is settled, at which time the net gain or loss shall be included;

(7)    accruals and reserves that are established within twelve (12) months after the Effective Date and that are so required to be established as a result of the Transactions in accordance with GAAP, and any accrual or reserve that is established in the event of the filing of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting Borrower that would reasonably be expected to result in a Material Adverse Effect that occurs prior to the Commercial Operations Date, with respect to which a contribution to the Borrower's Equity Interests or other capital contribution, or an advance of an Unsecured Subordinated Promoter Loans, has been

made with respect to such accrual or to fund such reserve in respect of any liability or Indebtedness (or the creation of any reserve) arising as a result of such action, suit or proceeding;

(8) any increase in amortization, depletion, depreciation and depletion, cost of goods sold attributable to metal inventories or any one-time noncash charges resulting from purchase accounting in connection with the Transactions or any acquisition that is consummated after the Effective Date;

(9) any noncash impairment charges resulting from the application of Statement of Financial Accounting Standards No. 142 and No. 144 and any amortization of intangibles pursuant to Statement of Financial Accounting Standards No. 141;

(10) any net after-tax income or loss from discontinued operations and any net after-tax gain or loss on disposal of discontinued operations;

(11) any noncash compensation expense recognized from grants of stock appreciation or similar rights, stock options, restricted stock, restricted stock units or other rights to officers, governors and employees of the Borrower; and

(12) any premiums, fees and expenses (and any amortization thereof) paid in connection with the Transactions, in each case, for such period.

"Adjusted Tangible Net Worth" means, in each case and without double counting, (a) amounts paid up as issued ordinary share capital (or equivalent for limited liability companies); plus (b) amounts standing to the credit of the reserves, including any amount credited to the share premium account (or equivalent for limited liability companies); minus (c) any debit balance on the profit and loss account; plus (d) any credit balance on the profit and loss account; minus (e) any amount shown in respect of goodwill or other intangible assets, such as patents; minus (f) bad or doubtful expenses not provided for; minus (g) any provision for deferred Taxes; plus (h) any deferred Tax refund or other Tax asset; minus (i) any amounts arising from an upward revaluation of assets made; minus (j) any amount in respect of any dividend or distribution declared, recommended or made and to the extent such distribution is not provided for in the most recent financial statements; minus (k) any investments or loans or advances provided to any Affiliate; plus (l) amounts in respect of the principal amount of Unsecured Subordinated Promoter Loans; minus (m) in the event of the filing of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting Borrower that would reasonably be expected to result in a Material Adverse Effect that occurs prior to the Commercial Operations Date, any contribution to the Borrower's Equity Interests or other capital contribution, or advance of an Unsecured Subordinated Promoter Loans, in respect of any liability or Indebtedness (or the creation of any reserve) arising as a result of such action, suit or proceeding.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agents" means, collectively, the Facility Agent, Security Agent, the Intercreditor Agent and the Escrow Agent and Account Bank.

"Agreement" has the meaning assigned to such term in the preamble hereto.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Facility Agent, in the form of Exhibit A attached hereto or any other form approved by the Facility Agent.

"Attributable Debt" means, on any date, in respect of any lease Borrower enters into as permitted pursuant to Section 6.01 or a sale and leaseback transaction subject to Section 6.05, (i) if such lease is a Capital Lease Obligation, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (ii) if such lease is not a Capital Lease Obligation, the capitalized amount of the remaining lease payments under such lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease Obligation.  For the avoidance of doubt, the term "Attributable Debt" excludes operating leases entered into the ordinary course of business that are not required under GAAP to be treated as a Capital Lease Obligation.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means Essar Steel Minnesota LLC, a limited liability company organized under the laws of the State of Minnesota U.S.A., and its successor as may be permitted hereunder.

"Borrowing" means (a) a Term Loan or (b) an LC Exposure.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.04.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in the Hibbing, Minnesota, New York, New York, and Singapore are authorized or required by law to remain closed; *provided* that, when used in connection with a Eurodollar Rate Borrowing, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market, and *provided, further*, that, when used in reference to payment obligations of the Parent, the term "Business Day" shall also exclude any day on which commercial banks in Mauritius are authorized or required by law to remain closed, and when used in reference to payment obligations of EGL, the term "Business Day" shall also exclude any day on which commercial banks in the Cayman Islands are authorized or required by law to remain closed.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and

the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash" means at any time with respect to the Borrower, cash on hand or cash at reputable banks or financial institutions, acceptable to the Lenders, credited to an account in the name of the Borrower and to which the Borrower is alone beneficially entitled and for so long as (a) that cash is repayable on demand, (b) repayment of that cash is not contingent on the prior discharge of any other Indebtedness of the Borrower or any other Person whatsoever or on the satisfaction of any other condition, (c) there is no Lien over that cash (other than pursuant to the Security Documents, and (d) such cash is freely and immediately available to be applied in repayment or prepayment of the Borrowings under this Agreement.

"Cash Available" means for any period, as applicable to the Borrower, (a) standalone net profits after taxation, plus (b) amounts attributable to amortization or goodwill, plus (c) amounts attributable to depreciation and depletion of tangible assets, plus (d) Net Finance Charges, plus (e) noncash write-offs.

"Cash Equivalent Investments" means Investments that are marketable securities with a maturity of less than twelve (12) months from the date of their acquisition by the Borrower, issued or fully guaranteed by the government of the United States of America or by any member state of the European Union and certificates of deposit or time deposits with a maturity of less than six (6) months, issued by a commercial bank, in each case, in freely convertible currency, which is not issued by the Borrower or Affiliate of the Borrower, and which are readily convertible into Cash without incurring any significant premium or penalty.

"Cash Sweep Cash Available" means, without double counting, for any period, as applicable to the Borrower, (a) standalone net profits after taxation, plus (b) amounts attributable to amortization or goodwill, plus (c) amounts attributable to depreciation and depletion of tangible assets, plus (d) Net Finance Charges, plus (e) noncash write-offs, and minus (f) the lesser of actual maintenance capital expenditures and US$12,500,000, provided, however, as a clarification of the foregoing, to the extent an amount has been or is to be paid as a mandatory prepayment in accordance with Section 2.11(c), such amount shall not be included in Cash Sweep Cash Available for purposes of determining the Cash Sweep DSCR, if such amount would otherwise be included therein, but any amount arising from an event or receipt referred to in Section 2.11(c) that is not so applied as a mandatory prepayment will be included in Cash Sweep Cash Available, if such amount would otherwise be included therein.

"Cash Sweep Debt Service" means, for any period, (a) Cash Sweep Net Finance Charges, plus (b) all scheduled repayments of Loans to Project Lenders pursuant to Section 2.09 hereof, corresponding scheduled repayments of any Supplier Financing, and scheduled repayments of any Permitted Capex Additional Indebtedness.

"Cash Sweep DSCR" means the amount of Cash Sweep Cash Available divided by Cash Sweep Debt Service.

"Cash Sweep Mechanism" means:

(i)     for the First Sweep Period, on each Sweep Payment Date for each Sweep Date occurring in such period, if the Reference Cash Sweep DSCR for the Sweep Date immediately preceding such Sweep Payment Date results in an amount in excess of 1.25, the Lenders and the Upstream Supplier Financing Creditors shall have the right to receive an aggregate  amount (a "First Sweep Period Sweep Amount") equal to fifty percent (50%) of (x) Reference Cash Sweep DSCR minus 1.25, multiplied by (y) the amount of Reference Cash Sweep Debt Service;

(ii)    for the Second Sweep Period, on each Sweep Payment Date for each Sweep Date occurring in such period, if the Reference Cash Sweep DSCR for the Sweep Date immediately preceding such Sweep Payment Date results in an amount (a "Second Sweep Period Sweep Amount") in excess of 1.15, the Lenders and the Upstream Supplier Financing Creditors shall have the right to receive an aggregate amount equal to fifty percent (50%) of (x) Reference Cash Sweep DSCR minus 1.15, multiplied by (y) the amount of Reference Cash Sweep Debt Service;

(iii)   the Lenders and Upstream Supplier Financing Creditors shall have the right to receive on each Sweep Payment Date the Sweep Amount for such Sweep Payment Date, first out of cash available in the Escrow Account for such payment, and then, to the extent of any deficiency in cash available in the Escrow Account on a Sweep Payment Date to fully pay the Sweep Amount, out of cash in the DSRA.  The Sweep Amount shall be applied for prepayment of the Loans then outstanding pro rata to each Lender in accordance with its Lender's Pro Rata Interest in accordance with Section 2.11(c)(vii), and in repayment of the Supplier Financing then outstanding in accordance with each Upstream Supplier Financing Creditor's Pro Rata Interest in accordance with Section 2.11(f); and

(iv)   calculations made with respect to unaudited results for the fourth fiscal quarter shall be retroactively adjusted in the event the audited results for such period require a different Sweep Amount, and such adjustment shall be made in the distributions with respect to the Sweep Amount for the first fiscal quarter and paid on the Sweep Payment Date for such period.

In this definition:

"First Sweep Period" means the period commencing on the date that is nine (9) months following the Scheduled Commercial Operations Date, to but excluding April 1, 2014.

"Reference Cash Sweep DSCR" means for any Sweep Date the actual Cash Sweep DSCR determined as at the last day of, and for, the fiscal quarter immediately preceding such Sweep Date.

"Reference Cash Sweep Debt Service" means for any Sweep Date the actual Cash Sweep Debt Service determined as at the last day of, and for, the fiscal quarter immediately preceding such Sweep Date.

"Sweep Amount" means a First Sweep Period Sweep Amount or a Second Sweep Period Sweep Amount.

"Second Sweep Period" means the period commencing on and including April 1, 2014 to and including the Term Loan Maturity Date.

"Sweep Date" means each date that is one (1) Business Day following the last day of each full fiscal quarter during the applicable Sweep Period, including the fourth fiscal quarter.

"Sweep Payment Date" means each date that is one (1) Business Day following the last day of the fiscal quarter, including the fourth fiscal quarter, in which a Sweep Date occurs (that is, for example, if the Sweep Date occurs on April 1 for the preceding fiscal quarter ending March 31, the Sweep Payment Date for such Sweep Date shall be July 1 or the first Business Day thereafter if July 1 is not a Business Day).

"Sweep Period" means the First Sweep Period or the Second Sweep Period, as the case may be.

"Cash Sweep Net Finance Charges" means, with respect to any period and without any double counting, the aggregate of interest, commission, fees, discounts, prepayment penalties or premiums and other finance payments in respect of any Loans, Supplier Financing or Permitted Capex Additional Indebtedness, whether accrued or paid for such period and whether or not capitalized, including for such period the net amount accrued or paid, or reduced by the net amount accrued or received, by the Borrower under any interest rate Hedging Agreements entered into in respect of any of such Loans or Supplier Financing, minus the amounts received by the Borrower as interest on Permitted Investments for such period.

"Change in Control" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), other than by EGL or its Affiliates, of Equity Interests representing more than 49% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in the Borrower; or (b) occupation of a majority of the seats (not counting vacant seats) on the board of governors, managers or similar governing body of the Borrower by Persons who were not appointed as, or nominated for election as, governors, managers or members of management committees of the Borrower by EGL or its Affiliates.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or Issuing Bank (or, for purposes of Section 2.14(b), by any lending office of such Lender or by such Lender's or Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all "Collateral", as defined in any applicable Security Document, or any asset or right in which a Lien is granted in favor of the Secured Parties pursuant to any Security Document, and shall also include the Mortgaged Properties.

"Collateral Account Agreement" means the Collateral Account Agreement between the Borrower and the Escrow Agent and Account Bank established for purposes of the DSRA and the Escrow Account, substantially in the form of Exhibit B.

"Commercial Operations Date" means the date on which the last of the following events shall occur:  (i) the Borrower has provided written notice of completion of the Project and that the Project has commenced commercial production to the Facility Agent, the Lenders and the Lenders' Engineering Consultant, and (ii) the Lenders' Engineering Consultant has certified that commercial production has commenced in a written certificate to the Facility Agent with a copy to the Borrower.

"Commitment Percentage" means, at any time with respect to any Lender, the percentage of the aggregate Total Commitment represented by such Lender's Term Loan Commitment at such time.

"Common Project Financing Facility" means Project financing lent to the Borrower by a Subsequent Project Lender or Subsequent Project Lenders, and in which the Lenders under this Agreement become a party, the loans under which, including the Terms Loans hereunder, shall be on a senior secured *pari passu* basis, and may be subject to an Intercreditor Agreement.

"Confidential Information Material" means the information with respect to the Project or the Borrower that has been disclosed in writing to any Lender or the Facility Agent, on or prior to the Effective Date, which is contained in (a) the Information Memorandum dated July 2010 by SBI Capital Markets Limited, (b) the executed documents  included by or on behalf of the Borrower in the IntraLinks electronic data site (*provided, however*, Borrower represents and warrants as to any such material only that the document included is a correct copy, and Borrower makes no other representation or warranty with respect to any such document, unless the subject matter of such document is otherwise included in a representation or warranty set forth in Article III hereof, in which case, such other representation and warranty shall govern such subject matter) and (c) the information listed on Schedule 1.01A hereto.

"Consent and Agreement" means a Consent and Agreement pursuant to which parties to Project Contracts and Offtake Contracts and Agreements acknowledge and consent to the Lien of the Security Agent in favor of the Secured Parties in and to Collateral consisting of Project Contracts and Offtake Contracts and Agreement, and Borrower's related rights and interests therein, any instrument or document related thereto and any proceeds thereof, and agree to make any and all payments due the Borrower, upon notice from the Security Agent directly to the Security Agent for deposit under the Collateral Accounts Agreement, substantially in the form of Exhibit D-2, provided, however, in the event any counterparty to any contract or agreement and the Borrower desire that the laws of the State of Minnesota, U.S.A. or the laws of the jurisdiction that governs the subject contract or agreement should govern the Consent and Agreement and not the laws of the State of New York, U.S.A., as are provided in Exhibit D-2,

such laws may be inserted instead in the Consent and Agreement without the consent of the Required Lenders or the Security Agent being required..

"Construction Contract" means the Construction Contract between Essar Constructions Limited, UAE and the Borrower, dated as of March 22, 2010.

"Consultants" means the Engineering Consultant, the Environmental Consultant and the Insurance Consultant, including any additional or successor Consultant or Consultants.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Current Assets" means cash, inventory and accounts receivable, including all contracts, instruments and documents related thereto, and other assets that are due, or likely to be converted into cash, sold, exchanged, or expensed in the normal course of business, within one (1) year.

"Debt Service" means, for any period, without duplication, (a) Net Finance Charges, plus (b) the amount of the principal component of any payments payable under any finance lease or hire purchase entered into, plus (c) all scheduled amortization repayments of any other Indebtedness, and minus (d) any amounts falling due under the Working Capital Bank Financing and which were available for simultaneous redrawing according to the terms thereof to the extent such amounts are included in clause (c) above.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, becomes an Event of Default.

"Disclosed Matters" means any matters disclosed in the Confidential Information Material.

"Dollar" or "US$" refers to lawful money of the United States of America.

"DSCR" or "Debt Service Coverage Ratio" means Cash Available divided by Debt Service.

"DSRA" means the Debt Service Reserve Account maintained by the Borrower with the Escrow Agent and Account Bank under the Collateral Account Agreement in accordance with Section 5.15 below.

"EBITDA" means, for any period, Adjusted Net Income for such period plus, without duplication and to the extent deducted in determining such Adjusted Net Income for such period, (a) Net Finance Charges, (b) any items treated as exceptional or extraordinary items, (c) amounts attributable to amortization of goodwill or depreciation and depletion of tangible assets, and (d) Taxes, all determined in accordance with GAAP.

"Effective Date" means the date on which the conditions specified in Section 4.01 and Section 4.04 are satisfied (or waived in accordance with Section 9.02).

"EGL" has the meaning set forth in the Recitals above.

"EGL Guarantee Release Date" has the meaning set forth in the Guarantee Agreement.

"Engineering Consultant" means Noramco Engineering Corporation, or such other independent, professional and reputable engineering firm appointed in connection with the determining the Commercial Operations Date and other matters pursuant to and as set forth in Section 5.04(b).

"Entitled Person" has the meaning set forth in Section 9.14.

"Environmental Consultant" means such independent, professional and reputable environmental advisory firm appointed in connection with the report required pursuant to Section 4.02(k) and matters pursuant to and as set forth in Section 5.10(d).

"Environmental Laws" means all applicable laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of or exposure to any hazardous or toxic substances, materials or wastes.

"Environmental Liability" means, without duplication, any liability, contingent or actual (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of Borrower directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"EPC Contractor" means a counterparty to an EPC Contract and excludes the Borrower.

"EPC Contracts" means each of the Supply & Engineering Contract, the Supply Contract, the Project Management Contract, the Construction Contract, and any other material contract entered into by the Borrower with respect to any engineering, procurement or construction services in connection with the Project, as the same may be amended from time to time.

"EPIL" means Essar Projects (India) Limited.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity

ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Equity Proceeds" shall mean the Net Proceeds received by Borrower from the issuance or sale by Borrower of Equity Interests in the Borrower or preferred equity of Borrower (other than sales of such Equity Interests to governors, directors, officers or employees of Borrower in connection with employee compensation and incentive arrangements).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) the existence of any unpaid "minimum required contribution" (as such term is defined in Section 430 of the Code or Section 303 of ERISA) by the due date for such contribution with respect to any Plan whether or not waived, (c) a determination that any Plan is in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA), (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (e) the incurrence by Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, (f) the receipt by Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (g) the incurrence by Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan, or (h) the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Escrow Account" means the escrow account established by the Borrower with the Escrow Agent and Account Bank into which the Borrower shall deposit all Cash and receivables arising out of any contracts of the Borrower with any Person or payments otherwise received by Borrower, to be applied in accordance with the Cash Sweep Mechanism as set forth in the Collateral Account Agreement.

"Escrow Agent and Account Bank" means ICICI Bank Limited, New York Branch, in its capacity as escrow agent and account bank for the Secured Parties, and any successor collateral agent appointed pursuant to the Collateral Account Agreement or as set forth hereunder.

"Eurodollar Rate Borrowing", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the LIBO Rate.

"Eurodollar Reserve Requirement" means, with respect to Eurodollar Rate Borrowings, the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Rate Borrowings shall be deemed to constitute Eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Eurodollar Reserve Requirement shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Taxes" means, with respect to the Facility Agent, any Lender, any Issuing Bank or any other recipient of any payment by or on account of any obligation of the Borrower or any other Obligor hereunder or under any Loan Document, (i) branch profits or similar Taxes, or Taxes imposed on or measured by its net income, profits, net worth or capital, and franchise Taxes imposed on it (in each case, however denominated), as a result of a present or former connection between the Facility Agent, such Lender or such Issuing Bank (or such other recipient) and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Facility Agent, such Lender or such Issuing Bank (or such other recipient) having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any Loan Document); (ii) other than in the case of an assignee pursuant to a request by the Borrower under Section 2.19, any withholding Tax that is imposed on amounts payable to such recipient under any Laws in effect at the time such recipient acquires its ownership interest in the applicable Loan (or designates a new lending office), except to the extent that such recipient (or its assignor, if any) was entitled, at the time of the designation of a new lending office (or assignment) to receive additional amounts from Borrower with respect to such withholding Tax pursuant to Section 2.17(a); (iii) any withholding Tax that is imposed as a result of a failure by the Facility Agent, any Lender or any Issuing Bank (or such other recipient) or any foreign financial institution or other Person through which payments hereunder (or under the Loans or any Guaranty) are made to comply with the requirements of Sections 1471 through 1474 of the Code and any Treasury regulations or other administrative guidance promulgated thereunder ("FATCA") to establish an exemption from withholding thereunder; (iv) any U.S. federal backup withholding Tax; (v) any Tax resulting from a Lender's failure or inability to comply with Section 2.17(f) (other than as a result of a change of law occurring after the date such Lender first becomes a party to any Loan Document); and (vi) any interest, penalties or additions to Tax in respect of the foregoing.

"Existing Credit Agreement" the Credit Agreement dated September 22, 2010 between the Borrower and Union Bank of India.

"Facilities" has the meaning set forth in the Recitals above.

"Facility Agent" means ICICI Bank Limited, Singapore Branch, and any successor facility agent appointed pursuant to this Agreement.

"FACR" means the Fixed Assets Coverage Ratio, calculated as (a) the aggregate book value of the fixed assets of the Borrower (tangible assets not expected to be converted to cash within the current fiscal year, including property, plant and equipment), to be calculated utilizing the then most recent prior quarterly financial statements and determined in accordance with GAAP, over which the Secured Parties have a first priority security interest (subject only to Permitted Liens thereon), divided by (b) the aggregate amount of the Loans and LC Exposure hereunder at such time, including under any Accession Project Financing, plus the principal amount of any Supplier Financing owing to any Upstream Supplier Project Financing Creditor, plus the principal amount of any Additional Indebtedness having a first priority security interest in such fixed assets and sharing *pari passu* in the first priority security interest of the Secured Parties over such fixed assets.

"FATCA" has the meaning set forth in the definition of Excluded Taxes.

"Financial Closure" means the date on which the Total Commitments in effect hereunder, taking into account any Accession Project Financing that may come in effect in accordance with Section 2.20, equal in the aggregate five hundred thirty million Dollars (US$530,000,000), and Supplier Financing has been made available to the Borrower in an aggregate amount equal to one hundred eighty two million seven hundred fifty thousand Dollars (US$182,750,000).

"Financial Covenants" means the covenants set forth in Section 6.12

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or financial controller of Borrower.

"Force Majeure Event" means any one of the following which would reasonably be expected to result in a delay in completion of the Project and the occurrence of the Commercial Operations Date of the Project by more than ninety (90) days from the Scheduled Commercial Operations Date as set forth in the opinion, report or certificate of the Engineering Consultant: acts of God; labor strikes, labor lockouts or other industrial disturbances; acts of public enemies; orders or restraints of any kind of the Government of the United States or any State or any of their departments, agencies or officials or any civil or military authority; insurrection, riots; landslides; earthquakes; fires; storms, droughts, floods, blizzards or other severe or prolonged bad weather conditions; or explosions, breakages or accidents to major components of machinery, transmission pipes or canals, or other similar acts beyond the reasonable control of the Borrower.

"Foreign Lender" means any Lender that is organized or resident under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction. If a Borrower is located in more than one jurisdiction, a Lender's status as a Foreign Lender shall be tested separately with respect to each jurisdiction.

"GAAP" means with respect to any Person generally accepted accounting principles in the United States of America.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"Great Lakes Contract" means the Transportation Services Agreement (Contract Identification FT6496) dated September 6, 2006 between the Borrower and Great Lakes gas Transmission Limited Partnership ("Great Lakes") in connection with the transportation of natural gas by Great Lakes to the Borrower, which contract is at present the subject of the Great Lakes Litigation.

"Great Lakes Litigation" means the litigation Great Lakes Gas Transmission Limited Partnership v. Essar Steel Minnesota, LLC, Essar Steel Holdings Limited, Essar Steel Limited, and Essar Global Limited, filed in the United States District Court for the District of Minnesota on October 29, 2009, and related proceedings thereto that may be filed elsewhere in Federal or state court.

"Guarantee Agreements" means the Guarantee Agreements provided by the Guarantors on or prior to the Effective Date in favor of the Lenders and the other Secured Parties with respect to the Obligations in substantially the forms of Exhibit E-1 for EGL and Exhibit E-2 for the Parent, respectively.

"Guarantor" means either of (i) the Parent or (ii) EGL, as the case may be.

"Guaranty" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing any Indebtedness (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof in each case for the purpose of assuring the owner of such Indebtedness of the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; *provided* that the term Guaranty shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon

gas, and all other hazardous or toxic substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hedging Agreement" means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement or other derivative transaction of any kind or nature.

"IFRS" means, with respect to any Person, International Financial Reporting Standards applied on a consistent basis both as to classification of items and amounts, as in effect from time to time, including (a) where appropriate, generally accepted auditing standards and (b) the pronouncements and interpretations of the International Accounting Standards Board (IASB).

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding trade accounts payable and other accrued expenses incurred in the ordinary course of business and deferred compensation), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guaranties by such Person of Indebtedness of others, and any put options, shortfall undertakings, letters of comfort or any obligation undertaken by such Person in the nature of a payment obligation, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party (including reimbursement obligations to the issuer) in respect of letters of credit and letters of guaranty, which support or secure Indebtedness, (i) all obligations in respect of any Working Capital Bank Facility and all other obligations in respect of prepaid production arrangements, prepaid forward sale arrangements or derivative contracts in respect of which such Person receives upfront payments in consideration of an obligation to deliver product or commodities (or make cash payments based on the value of product or commodities) at a future time, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, and (k) all obligations of a Person under any Hedging Agreement. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes other than Excluded Taxes and Other Taxes.

"Initial Lender" means ICICI Bank Limited, New York Branch.

"Initial Lender Tranche A" means the Borrowings under the Term Loan Facility to be provided in accordance with Section 2.02(a) by the Initial Lender.

"Initial Lender Tranche A Total Commitment" means one hundred fifty million Dollars (US$150,000,000).

"Initial Lender Tranche B" means the Borrowings under the Term Loan Facility to be provided in accordance with Section 2.02(b) by the Initial Lender.

"Initial Lender Tranche B Total Commitment" means one hundred million Dollars (US$100,000,000).

"Insurance and Other Proceeds Account" means the Insurance and Other Proceeds Account established by the Borrower with the Escrow Agent and Account Bank pursuant to the Collateral Account Agreement into which the Borrower shall deposit all proceeds from any Equity Interest proceeds, insurance, expropriation the proceeds of the sale of assets and other proceeds and amounts in respect of events set forth in clauses (i) through (vi) of Section 2.11(c) which may give rise to a mandatory prepayment. Funds deposited in the Insurance and Other Proceeds Account shall be allocated and distributed as set forth in the Collateral Account Agreement.

"Insurance Consultant" means Intech Risk Management GmbH, or such other independent, professional and reputable insurance advisory firm appointed in connection with a report with respect to the insurance policies and other matters as set forth in Section 4.01(j) and insurance matters pursuant to and as set forth in Section 5.07(b).

"Insurance Premium Financing" means Indebtedness owed to institutional providers (other than Affiliates of the Borrower) of financing of annual or longer premium payments required under any of the Borrower's insurance policies in the ordinary course of the Borrower's business.

"Intercreditor Agent" means any financial institution appointed by the Lenders under an Intercreditor Agreement, and acceptable to the Borrower and the Upstream Supplier Financing Creditors which are parties to such Intercreditor Agreement at such time, not in its individual capacity, but solely as intercreditor agent for the Secured Parties, and any successor intercreditor agent appointed pursuant to the Intercreditor Agreement.

"Intercreditor Agreement" means an intercreditor agreement, in form and substance satisfactory to the Borrower and the Required Lenders, and entered into among the Borrower, the Security Agent, the Facility Agent, the Lenders, EPIL, as the provider of Supplier Financing to the Borrower, the Upstream Supplier Financing Creditors, and the Intercreditor Agent, if and when appointed under such Intercreditor Agreement (as such intercreditor agreement may be supplemented, amended or modified in connection with the accession of any other party thereto, including any Working Capital Bank, any holder of Additional Indebtedness or otherwise).

"Interest Election Request" means the one-time request by the Borrower with respect to the duration of Interest Periods in accordance with Section 2.07.

"Interest Margin" means five percent (5.00%).

"Interest Payment Date" means with respect to any Eurodollar Rate Borrowing, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part.

"Interest Period" means (a) with respect to the initial Borrowing hereunder, the period commencing on the date of such initial Borrowing and ending on the numerically corresponding day in the calendar month that is three (3) or six (6) months thereafter, as the Borrower may elect in its Interest Election Request in accordance with Section 2.07, and (b) with respect to all subsequent Borrowings after the initial Borrowing hereunder, (i) the first Interest Period of each such subsequent Borrowing shall end on the last day of the Interest Period applicable to the initial Borrowing hereunder falling immediately after the date such subsequent Borrowing is made, and may be for a period shorter than the three (3) or six (6) month period elected by the Borrower in order that the Interest Periods of all Borrowings hereunder shall be concurrent, and (iii) thereafter each subsequent Interest Period shall be for an Interest Period and shall end on the same day as the Interest Period with respect to the initial Borrowing hereunder; *provided* that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period, and (c) no Interest Period shall end after the Term Loan Maturity Date.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Investment" means purchasing, holding or acquiring (including pursuant to any merger with any Person that was not a Wholly Owned Subsidiary prior to such merger) any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, or making or permitting to exist any capital contribution or loans or advances to, guaranteeing any obligations of, or making or permitting to exist any investment in, any other Person, or purchasing or otherwise acquiring (in one transaction or a series of transactions) any assets of any Person constituting a business unit.  The amount, as of any date of determination, of any Investment shall be the original cost of such Investment (including any Indebtedness of a Person existing at the time such Person becomes a Subsidiary in connection with any Investment and any Indebtedness assumed in connection with any acquisition of assets), plus the cost of all additions, as of such date, thereto and minus the amount, as of such date, of any portion of such Investment repaid to the investor in cash as a repayment of principal or a return of capital, as the case may be, but without any other adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.  In determining the amount of any Investment involving a transfer of any property other than cash, such property shall be valued at its fair market value at the time of such transfer.

"Issuing Bank" means ICICI Bank Limited, New York Branch, and each other Lender designated by the Borrower, in each case in its capacity as an issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.06(a).  Each Issuing Bank may, in its discretion but with the consent of Borrower, arrange for one or more Letters of Credit

to be issued by Affiliates of such Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"Issuing Bank Agreement" means the agreement in the form attached hereto as Exhibit C, or such other agreement as may be proposed by an Issuing Bank (including any additional Issuing Bank pursuant to which a Lender agrees to act as an Issuing Bank), and reasonably acceptable to the Borrower.

"LC Disbursement" means a payment made by an Issuing Bank pursuant to a Letter of Credit following receipt of the required documentation under the Letter of Credit.

"LC Exposure" means, at any time, (a) when referring to all Letters of Credit, the sum of (i) the aggregate undrawn amount of all outstanding Letters of Credit at such time, plus (ii) the aggregate amount of all LC Disbursements outstanding at such time that have not been converted to Term Loans pursuant to Section 2.06(e); and (b) when referring to the LC Exposure of any Lender in respect of any Letter of Credit that is issued hereunder, the sum of (i) the aggregate undrawn amount of all outstanding Letters of Credit issued by the Issuing Bank (or its Affiliate) for which such Lender is obligated to reimburse LC Disbursements in accordance with Section 2.06(e), plus the aggregate amount of all LC Disbursements outstanding at such time that have not been converted to Term Loans pursuant to Section 2.06(e).

"Lender" means, for so long as they are parties hereto, the Initial Lender and the Subsequent Project Lenders which become parties to this Agreement pursuant to an Accession Project Financing and any assignee of any thereof that becomes a Project Lender pursuant to an Assignment and Assumption.

"Lender Affiliate" means (a) with respect to any Lender, (i) an Affiliate of such Lender or (ii) any entity (whether a corporation, partnership, trust or otherwise) that is engaged in making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and is administered or managed by a Lender or an Affiliate of such Lender and (b) with respect to any Lender that is a fund which invests in bank loans and similar extensions of credit, any other fund that invests in bank loans and similar extensions of credit and is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Lender's Pro Rata Interest" means with respect to each Lender, on the date that the Borrower is required to make a mandatory prepayment of the Loans in accordance with Section 2.11(b), the percentage determined by the quotient of (a) the principal amount of the then Loans outstanding owed to such Lender divided by (b) the sum of (i) the principal amount of the Loans outstanding on such date to all Lenders, (ii) the principal amount of the Supplier Financing, and (iii) the principal amount of any Additional Indebtedness under which the creditors thereof share on a *pari passu* basis the security interest of the Lenders in the relevant Collateral affected by such mandatory prepayment, on such date, if and to the extent the Upstream Supplier Financing Creditors or the creditors under any Additional Indebtedness on such date require a mandatory prepayment (and not an optional prepayment) on the same terms as the required by the Loans.

"Letter of Credit" means a usance, sight or advance, transferable or non-transferable, letter of credit, issued by an Issuing Bank in US Dollars, subject to the conditions for issuance hereunder, for the procurement of capital goods, services, civil works or otherwise in connection with the Project from entities providing such goods, services, and the like, issued on or prior to June 30, 2013 and which shall expire no later than the earlier of (i) thirty-six (36) months from the date of issuance, or (ii) four (4) years from the date of this Agreement, and, in addition, (1) foreign letters of credit will be opened as per the provisions of exchange control and import trade regulations of the relevant jurisdictions; (2) import letters of credit will be opened against valid import licenses, wherever applicable; (3) each letter of credit will be subject to terms and conditions of Uniform Customs and Practice for Documentary Credits, 2007 Revision, International Chamber of Commerce Publication No. 600; and (4) the last date of negotiation of any letter of credit shall not be later than December 30, 2014, issued pursuant to this Agreement and an Issuing Bank Agreement.

"Letter of Credit Facility" has the meaning set forth in the Recitals above.

"LIBO Rate" means, with respect to any Eurodollar Rate Borrowing for any Interest Period, the rate appearing on the Reuters "LIBOR01" screen displaying British Bankers' Association Interest Settlement Rates (or on any successor or substitute page for such screen, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such screen, as determined by the Facility Agent, from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period.  In the event that such rate is not available at the time of determination for any other Interest Period for any reason, then the "LIBO Rate" with respect to such Eurodollar Rate Borrowing for such Interest Period shall be the rate at which dollar deposits of five million Dollars (US$5,000,000) and for a maturity comparable to such Interest Period are offered by the principal London office of the Facility Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"LLC Pledge Agreement" means the Pledge Agreement between the Parent and the Security Agent pursuant to which the Parent pledges to the Security Agent for the benefit of the Secured Parties fifty-one percent (51%) of the outstanding Equity Interests of the Borrower, in form and substance reasonably satisfactory to the Parent, the Borrower, the Facility Agent and the Lenders.

"Loan Documents" means this Agreement, any Accession Agreement, the Security Agreement, any Additional Security Document, the Guarantee Agreements, the Collateral Account Agreement, the LLC Pledge Agreement, the Consent and Agreements, the

other Security Documents, the fee and mandate letters entered into between the Borrower and the Agents as contemplated by Section 2.12, each Issuing Bank Agreement and any other document designated from time to time as a Loan Document by the Lenders or the Facility Agent.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Long-Term Debt" means (a) Indebtedness the maturity of which is greater than one (1) year, including terms loans, whether secured or unsecured, debentures, outstanding convertible Indebtedness, nonconvertible and optionally convertible preference shares, deferred payment guaranties, shortfall undertakings or payment undertakings or any nature whatsoever, and other term liabilities, plus (b) the net amount of any Guaranty of any Indebtedness excluding installments due within one (1) year, plus (c) put option obligations or other payment obligations under any Permitted Hedging Agreement excluding installments due within one (1) year, minus (d) Indebtedness under the Working Capital Bank Financing with a maturity of greater than one (1) year to the extent included in clause (a) above, and minus (e) Unsecured Subordinated Promoter Loans.

"Mandated Lead Arranger" means ICICI Bank Limited, New York Branch, in its capacity as Mandated Lead Arranger for the Lenders hereunder.

"Market Disruption Event" means an event that Required Lenders determine:

(i)    by reason of circumstances affecting the London interbank market generally, adequate and fair means do not exist for ascertaining the LIBO Rate for the relevant Interest Period; or

(ii)    for the relevant Interest Period the Reuters "LIBO01" screen rate is not available or such screen rate is zero or negative, and none or only one of the Reference Banks supplies a rate to determine the LIBO Rate for Dollars for the relevant Interest Period; or

(iii)    for the relevant Interest Period, the cost to such Required Lenders of obtaining matching deposits in the London interbank market would be in excess of the LIBO Rate; or

(iv)    at any time, deposits in Dollars in the required amount are not available to such Required Lenders.

"Material Adverse Effect" means a material adverse effect on (a) the business, financial condition, operations or performance or properties of the Borrower since March 31, 2010, (b) the ability of the Borrower to perform its material obligations under any Loan Document, the transactions contemplated thereby, or with respect to the Project, or (c) the rights of or remedies available to the Lenders under the Loan Documents.

"Material Project Approvals" means all material approvals and consents by any Person, including any Governmental Authority, required in connection with the Project or any Project Contract or Offtake Contract and Agreement, including those listed in Schedule 4.01(f)

and including, but not limited to, environmental permits, rights for developing mines and extracting ore, or a mining plan, if required.

"Members Control Agreement" shall have the meaning set forth in the LLC Pledge Agreement.

"Minnesota State Loan" means the Loan Agreement between the State of Minnesota (acting through its Office of the Commissioner of the Iron Range Resources and Rehabilitation) and the Borrower on February 2, 2005, amended on October 3, 2007 and further amended on November 13, 2007, and the related "Security Document", "Security Agreement" and "Note" (as such terms are defined in such Loan Agreement) issued thereunder.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means a mortgage, deed of trust, assignment of leases and rents, leasehold mortgage or other security document granting a Lien on any Mortgaged Property to secure the Obligations. Each Mortgage shall be reasonably satisfactory in form and substance to the Lenders and the Security Agent.

"Mortgaged Property" means each parcel of real property and the improvements thereto owned by the Borrower on the date hereof and identified on Schedule 1.01D, or acquired hereafter by the Borrower on any Additional Collateral Date, with respect to which a Mortgage is to be granted hereunder pursuant to the Section 5.14, and includes (i) each other parcel of real property and the improvements thereto owned by the Borrower with respect to which a Mortgage is granted pursuant to the Security Documents, and (ii) any and all mining rights and leases of the Borrower with acknowledgment from the relevant Government Authorities or other Person which is a lessor consenting to such Mortgage and security interest.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Debt" means the amount, if any, by which (i) the sum of (A) the aggregate principal amount of Indebtedness permitted in Section 6.01 (and any permitted refinancing of any thereof), minus, (B) the aggregate principal amount of any Unsecured Subordinated Promoter Loans, and (C) minus mark-to-market amounts under any Permitted Hedging Agreement, to the extent included in Indebtedness under clause (i)(A) above, that, individually or in the aggregate, are less than twenty five million Dollars (US$25,000,000), exceeds (ii) the sum of (A) Cash and Cash Equivalent Investments, plus (B) the amount, if any, deposited at such time in the DSRA, the Escrow Account or the Unrestricted Account established in accordance with the Collateral Account Agreement to the extent such amount has not been applied and remains available to reduce the principal amount of the Indebtedness referred to in clause (i)(A) above.

"Net Equity" means, for any period and at any time, Total Assets minus Total Debt.

"Net Finance Charges" means, with respect to any period and without any double counting, the aggregate of interest, commission, fees, discounts, prepayment penalties or

premiums and other finance payments in respect of any Indebtedness, whether accrued or paid for such period and whether or not capitalized, and including the interest element of leasing and hire purchase payments, and including for such period the net amount accrued or paid, or reduced by the net amount accrued or received, by the Borrower under any interest rate Hedging Agreements, minus the amounts received by the Borrower as interest on Permitted Investments for such period.

"Net Proceeds" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any noncash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all fees and out-of-pocket expenses paid by Borrower to third parties in connection with such event, plus (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), (A) the amount of all payments required to be made by Borrower as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (B) if such sale, transfer or other disposition includes the sale of one or more operating businesses, divisions or operating units, the amount of all liabilities, including accounts payable, directly arising from the operations of such business, division or operating unit that are retained by Borrower, plus (iii) the amount of all taxes paid (or reasonably estimated to be payable) (including, in the case of any such event in respect of any Foreign Subsidiary, taxes payable upon the repatriation of such proceeds to the United States) by Borrower, and (without duplication for the amount of any liability netted under clause (ii)(B) above) the amount of any reserves established by Borrower to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer).

"Obligations" means the obligations of the Borrower hereunder and under the other Loan Documents, including, without limitation, (a) the due and punctual payment by the Borrower of (i) the principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) each payment required to be made under this Agreement in respect of any Letter of Credit, when and as due, including payments in respect of reimbursement of disbursements, interest thereon, and any obligation to provide cash collateral, and (iii) all other monetary obligations of the Borrower under this Agreement or any other Loan Document, including in respect of fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including any monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or similar proceeding, regardless of whether allowed or allowable in such proceeding), in each case to the extent arising in connection with the Obligations, and (b) the due and punctual performance of all other obligations of the Borrower under or pursuant to this Agreement and each other Loan Document, in each case to the extent arising in connection with the Obligations.

"Obligor" means any of the Borrowers or any Guarantor.

"Offtake Contracts and Agreements" means each of the operative contracts and agreements entered into by the Borrower for the sale of goods and products produced by the Project, or with respect to the sale or disposition of ores or minerals or products thereof produced by the mining, concentrating and related operations of the Borrower, excluding any spot sale contract providing for payment within forty-five (45) days from the date of the Borrower's invoice for such goods, ores, minerals or products thereof.

"Other Taxes" means any and all present or future recording, stamp, documentary, excise, transfer, sales, property or similar taxes, charges or levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Parent" has the meaning set forth in the Recitals above.

"Participant" has the meaning set forth in Section 9.04(c).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Capex Additional Indebtedness" means Additional Indebtedness as permitted under Section 6.01(x) that is incurred in order to finance capital expenditures that are for de-bottlenecking and other similar performance and operational and efficiency enhancing modifications to the Project, up to a maximum aggregate amount in any fiscal year of fifty million Dollars (US$50,000,000).

"Permitted Encumbrances" means:

(a)    Liens for taxes, assessments and other governmental charges or levies not at the time delinquent or which are being contested in compliance with Section 5.05 or secure amounts that are not material to the value of the properties to which such Liens attach (it being understood that for purposes of this paragraph (a) all the Mortgaged Properties covered by a single Mortgage shall be deemed to be a single real property);

(b)    Liens imposed by law, including landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in compliance with Section 5.05 or secure amounts that are not material to the value of the properties to which such Liens attach (it being understood that for purposes of this paragraph (b) all the Mortgaged Properties covered by a single Mortgage shall be deemed to be a single real property);

(c)    pledges, deposits or Liens under workmen's compensation laws, unemployment insurance laws, social security laws or similar legislation, or insurance related obligations (including pledges or deposits securing liability to insurance carriers

under insurance or self-insurance arrangements), or in connection with bids, tenders, contracts (other than for borrowed money) or leases, or to secure utilities, licenses, public or statutory obligations, or to secure surety, indemnity, judgment, appeal or performance bonds, guaranties of government contracts (or other similar bonds, instruments or obligations), or as security for contested taxes or import or customs duties or for the payment of rent, or other obligations of like nature, in each case incurred in the ordinary course of business;

(d)    judgment liens in respect of judgments that do not constitute an Event of Default under clause (j) of Article VII;

(e)    Liens in favor of issuers of surety, performance or other bonds, statutory obligations, guaranties or letters of credit or bankers' acceptances (not issued to support Indebtedness or Attributable Debt) issued pursuant to the request of and for the account of Borrower in the ordinary course of its business;

(f)    encumbrances, ground leases, easements (including reciprocal easement agreements), survey exceptions, or reservations of, or rights of others for, licenses, rights of way, sewers, canals, ditches, water rights, highways, roads, railroads, fences, oil and gas leases, electric lines, data communications and telephone lines and other similar purposes, or zoning, building codes or other restrictions (including minor defects or irregularities in title and similar encumbrances) as to the use of the real properties or Liens incidental to the conduct of the business of Borrower or to the ownership of its properties which do not in the aggregate materially adversely affect the value of said properties or materially adversely interfere with the operations  of the business of Borrower (it being understood that for purposes of this paragraph (f) all the Mortgaged Properties covered by a single Mortgage shall be deemed to be a single real property);

(g)    contractual Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, partnership agreements, leases, area of mutual interest agreements, royalty agreements, marketing agreements, processing agreements, development agreements, and other agreements which are usual and customary in the mining business;

(h)    leases, licenses, subleases and sublicenses of assets (including real property and intellectual property rights), in each case entered into in the ordinary course of business;

(i)    Liens arising by virtue of any statutory or common law provisions relating to banker's Liens, rights of setoff or similar rights and remedies as to deposit accounts or other funds maintained with a depositary or financial institution;

(j)    Liens arising from Uniform Commercial Code financing statement filings (or similar filings in other applicable jurisdictions) regarding operating leases entered into by Borrower in the ordinary course of business;

(k)    any interest or title of a lessor under any operating lease;

(l)   (i) mortgages, liens, security interests, restrictions, encumbrances or any other matters of record that have been placed by any government, statutory or regulatory authority, developer, landlord or other third party on property over which Borrower has easement rights or on any leased property and subordination or similar arrangements relating thereto and (ii) any condemnation or eminent domain proceedings affecting any real property;

(m)   any encumbrance or restriction (including put and call arrangements) with respect to Equity Interests of any joint venture or similar arrangement pursuant to any joint venture or similar agreement that does not violate the provisions of the LLC Pledge Agreement;

(n)   Liens on property or assets under construction (and related rights) in favor of a contractor or developer or arising from progress or partial payments by a third party relating to such property or assets;

(o)   Liens securing or arising by reason of any netting or setoff arrangement entered into in the ordinary course of banking or other trading activities or Liens over cash accounts securing cash pooling arrangements;

(p)   Liens arising out of conditional sale, title retention, hire purchase, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(q)   Liens created under the Minnesota State Loan (but not any change in any collateral thereunder or any increase in the amount of Indebtedness in respect of such Lien, other than the capitalization of interest accruing thereunder); and

(r)   to the extent not included in any of the foregoing clauses, Liens in existence on the date hereof as set forth in Schedule 6.02;

*provided* that, except for Permitted Encumbrances referred to in clause (e), (h), (j) or (p) above, the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness on Attributable Debt.

"Permitted Hedging Agreements" has the meaning ascribed thereto in Section 6.06.

"Permitted Indebtedness" means any Indebtedness permitted to be incurred by the Borrower pursuant to Section 6.01.

"Permitted Investments" means:

(a)   direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one (1) year from the date of acquisition thereof;

(b)    Investments in commercial paper maturing within two hundred seventy (270) days from the date of acquisition thereof and having, at such date of acquisition, a credit rating from S&P of A-2 or higher or from Moody's of P-2 or higher;

(c)    Investments in certificates of deposit, banker's acceptances and time deposits maturing within one (1) year after the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any commercial bank organized under the laws of India, any overseas branches or any subsidiaries of any commercial bank organized under the laws of India or any commercial bank which has a short-term deposit rating issued by Moody's of P-2 or higher or by S&P of A-2 or higher;

(d)    short-term tax-exempt securities rated not lower than MIG-1/+1 by either Moody's or S&P with provisions for liquidity or maturity accommodations of one hundred eighty three (183) days or less;

(e)    repurchase agreements relating to securities described in clause (a), (b), (c) and (d) above and with a maturity not less than one (1) year thereafter; and

(f)    Investments in money market or similar funds not less than 95% of the assets of which are comprised of assets of the types described in clause (a), (b), (c), (d) and (e) above.

"Permitted Project Change" means a material change in the scope of works of the Project to include, *inter alia*, increasing the manufacturing capacity of the Borrower or increasing crushing capacity, including acquiring any additional crusher, grizzly, screening, scalping, storage, and related facilities and for which such change the Borrower has received the prior written consent of the Required Lenders; *provided, however,* except with respect to Permitted Capex Additional Indebtedness following the Commercial Operations Date in respect of de-bottlenecking and other performance and operational and efficiency enhancing modifications, if Borrower intends to incur Additional Indebtedness which is to rank pari passu with the Indebtedness of the Secured Parties, or any other Indebtedness in respect of any such change in scope, the prior written consent of the Required Lenders is required with respect thereto; and *provided, further,* in respect of de-bottlenecking and other performance and operational and efficiency enhancing modifications that may be undertaken at any time, the prior written consent of the Required Lenders shall not be required if such modifications are financed solely from additional contributions of capital to the Borrower, the issuance by Borrower of Equity Interests permitted hereunder and under the LLC Pledge Agreement, advances under any Unsecured Subordinated Promoter Loans, or from unapplied proceeds that are available for withdrawal by Borrower from the Unrestricted Account.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were

terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pledged Borrower LLC Interests" means the Pledged LLC Interests (as defined in the LLC Pledge Agreement) constituting at all times not less than fifty-one percent (51%) of the aggregate limited liability company membership Equity Interests in the Borrower, owned by the Parent, which are required to be pledged pursuant to the LLC Pledge Agreement.

"Project" has the meaning set forth in the Recitals above, and includes any Permitted Project Change subject to the receipt of approval, if any, required in the definition of Permitted Project Change has been approved as set forth in the definition of that term.

"Project Contract" means (a) any EPC Contract and any other contract between the Borrower and an Affiliate of EGL related to the Project or the business operations of the Borrower (including any replacement contract thereof), and (b) any other contract or agreement entered into by the Borrower with any Person at any time in connection with the Project and falling within the meaning of the term "Contract Rights" in the Security Agreement, including those contracts in effect on the date hereof listed on Schedule 3.11 as "Project Contracts"; provided, however, notwithstanding any other provision to the contrary in this Agreement, except for Offtake Contracts and Agreements, where a Consent and Agreement needs to be provided (and, for avoidance of doubt, a Consent and Agreement also needs to be provided for any contract described under clause (a) of this definition), contracts otherwise included under clause (b) of this definition: (i) with an aggregate contract amount for all periods thereof (together with the aggregate amount under all related contracts for the same or similar products or materials with the same contract counterparty and with any entity affiliated with such contract counterparty for the same products or materials) less than four million Dollars (US$4,000,000) or its equivalent (the "Contract Threshold"), and (ii) certain types of contracts whose contract value is in excess of the Contract Threshold in clause (i) of this proviso that are listed on Schedule 1.01E, in each case, shall not be deemed "Project Contracts" for purposes of requiring the Borrower to provide a Consent and Agreement for such contract as would otherwise be required under Section 5.14(i) or Section 4.02, provided, further, however, the Borrower shall be obligated to use commercially reasonable efforts to obtain the consent of such counterparties to a Consent and Agreement even with respect to the contracts listed on Schedule 1.01E, and provided, further, for purposes of Sections 6.09 and 6.10, the term "Project Contracts" as used therein means Project Contracts whose contract value is in excess of the Contract Threshold.

"Project Lender" has the meaning set forth in the Recitals above.

"Project Management Contract" means the Project Management Contract between Essar Project Management Company Limited and the Borrower, dated as of March 22, 2010.

"Reference Banks" means the principal London office of Barclays PLC, The Royal Bank of Scotland Group plc, Standard Chartered Bank PLC and Citibank N.A. and/or such other banks as may be appointed by the Facility Agent with the consent of the Borrower, such consent not to be unreasonably withheld.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective governors, directors, officers, employees, agents, and advisors of such Person.

"Relevant Date" means the date specified in the Financial Covenants as the date as at (or to) which a particular financial ratio or limitation is being tested.

"Relevant Period" means:

(a)    each fiscal year of the Borrower;

(b)    each period beginning on the first day of the second half of a Borrower's fiscal year and ending on the last day of the first half of its next fiscal year.

"Required Amount" has the meaning set forth in Section 5.15 below.

"Required Lenders" means, at any time prior to the making of any Term Loans hereunder and the issuance of any Letter of Credit, Lenders at such time having aggregate Commitment Percentages representing at least fifty-one percent (51%) at such time, and thereafter, Lenders at such time having Term Loan Exposure representing at least fifty-one percent (51%) of the total Term Loan Exposure outstanding of all Lenders at such time.

"Responsible Officer" means, with respect to any Person, chief executive officer, president, general manager, the treasurer, the chief financial officer, the general counsel or any vice president.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Borrower, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancelation or termination of any Equity Interests (including any payment under a Synthetic Purchase Agreement related to any Equity Interests) in Borrower or any option, warrant or other right to acquire any such Equity Interests in Borrower; *provided* that the term "Restricted Payment" shall not include any Tax Distribution.

"S&P" means Standard & Poor's.

"Scheduled Commercial Operations Date" means the fixed date, mutually determined by the Required Lenders and the Borrower at the time of Financial Closure, when the Borrower is to achieve final completion of the Project and commence commercial production; but, notwithstanding any such determination, such fixed date shall not be later than June 30, 2013.

"Second Currency" has the meaning set forth in Section 9.14.

"Secured Obligations" shall mean, collectively (without duplication), (a) the Obligations, and (b) the Additional Obligations, in each case owed to any Secured Party.

"Secured Party" means each of the Lenders, each Issuing Bank and each of the Upstream Supplier Financing Creditors (sharing *pari passu* in respect of the security interests of the Lenders in the Collateral, directly or through EPIL under the Supplier Financing), as their interests may appear in respect of the Secured Obligations.

"Security Agent" means Wells Fargo Bank Northwest, N.A., not in its individual capacity, but as security agent for the Secured Parties and any successor security agent appointed hereunder or pursuant to the Security Agreement.

"Security Agreement" means the Security Agreement entered into on or prior to the Effective Date between the Borrower and the Security Agent pursuant to which the Borrower grants a first perfected security interest in the Collateral (as defined therein) for the ratable benefit of the holders of the Secured Obligations, including all assets and properties of the Borrower over which a security interest may be created, substantially in the form of Exhibit D-1; *provided*, *however*, with respect to the security interest in the Current Assets, such security interest granted by the Borrower will be junior to the security interest of any lender under the Working Capital Bank Financing from and after the date such Working Capital Bank Financing is permitted under Section 6.01.

"Security Documents" means the Security Agreement, the LLC Pledge Agreement, the Mortgages, the Collateral Account Agreement, the Consent and Agreements, each control agreement delivered pursuant to any Security Document and each other security agreement or other instrument or document executed and delivered pursuant to Section 4.01 and Section 5.14 to secure any of the Secured Obligations.

"Short-Term Debt" means (a) Indebtedness payable on demand or the maturity of which is within one year, including terms loans, whether secured or unsecured, debentures, outstanding convertible Indebtedness, preference shares, deferred payment guaranties, shortfall undertakings or payment undertakings or any nature whatsoever, installments on Long-Term Debt due within one (1) year and other obligations and liabilities maturing within one (1) year, plus (b) the net amount of any Guaranty of any Indebtedness due on demand or within one (1) year, plus (c) put options or other payment obligations under any Permitted Hedging Agreement due within one (1) year, minus (d) Working Capital Bank Financing payable on demand or due within one (1) year included in clause (a) above.

"Subordination Agreement" means a subordination agreement for Unsecured Subordinated Promoter Loans in the form and substance of Exhibit K or otherwise in form and substance reasonably acceptable to the Required Lenders.

"Subsequent Project Lender" means any Person (other than an Affiliate of the Borrower) that agrees, following the date of this Agreement, (i) to become a party hereto as a Lender (or an existing Lender that increases its Commitment Percentage), pursuant to Section 2.20, or (ii) to provide Common Project Financing Facility together with the Lenders hereunder, as the case may be; *provided*, *however*, if such Person is not a bank, financial institution or governmental export credit agency or similar governmental finance entity, then such Person shall not become a Subsequent Project Lender unless the Facility Agent and the Lenders give their prior written consent to such Person to become a Subsequent Project Lender.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the equity or more than fifty percent (50%) of the general partnership interests are, as of such date, owned, Controlled or held by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of Borrower.  For purposes of the representations and warranties made herein on (and the conditions to borrowing on) the date hereof and on the Effective Date, the Borrower has no Subsidiary.

"Successor Company" has the meaning set forth in Section 6.03(a).

"Supplier Financing" means the supplier financing arrangements on a senior secured *pari passu* basis with the Facilities entered into between the Borrower and EPIL, an Affiliate of the Borrower, as lender, providing financing related to the procurement of materials, equipment and supplies for the Project for which the principal amount does not exceed in the aggregate one hundred eighty three million Dollars (US$183,000,000), the terms of which do not require a repayment schedule earlier than that set out in Section 2.09 of this Agreement and shall be substantially on the same terms and provisions as are set forth in Schedule 6.01, the rights under which, including rights in respect of security, shall be assigned by EPIL to the Upstream Supplier Financing Creditors, and which shall be subject to an Intercreditor Agreement.

"Supply & Engineering Contract" means the Supply & Engineering Agreement between Essar Projects (India) Ltd. and the Borrower dated as of May 5, 2010.

"Supply Contract" means the Supply Contract between Global Supplies (UAE) FZE and the Borrower dated as of May 5, 2010.

"Synthetic Purchase Agreement" means any swap, derivative or other agreement or combination of agreements pursuant to which Borrower is or may become obligated to make (i) any payment in connection with a purchase by any third party from a Person other than Borrower of any Equity Interest or (ii) any payment (other than on account of a permitted purchase by it of any Equity Interest) the amount of which is determined by reference to the price or value at any time of any Equity Interest; *provided* that no phantom stock or similar plan providing for payments only to current or former officers, directors or employees of Borrower shall be deemed to be a Synthetic Purchase Agreement.

"Tax Distributions" means, with respect to any taxable period during which the Borrower is treated as a partnership or disregarded as an entity for U.S. federal income tax purposes, distributions to any Person who holds Equity Interests of the Borrower solely to the extent actually necessary to permit such Person (or, if such Person is treated as a partnership or disregarded entity for U.S. federal income tax purposes, the owners of such Person) to discharge

any actual tax liabilities payable by such Person (or the owners of such Person, as applicable) with respect to such Person's allocable share of the net income of the Borrower for such taxable period.

"Taxes" means any and all present or future taxes, levies, imposts, duties and deductions, charges or withholdings in the nature of a tax imposed by any Governmental Authority.

"Term Loan" means a Loan made pursuant to Section 2.06 or Section 2.01.

"Term Loan Availability Period" means the period from and including the Effective Date to and including September 30, 2013, unless terminated earlier in accordance with Article VII.

"Term Loan Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make Term Loans and to undertake LC Exposure that is converted to a Term Loan in accordance with Section 2.06, as such commitment may be reduced from time to time pursuant to Section 2.08 and reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04. The amount of the Initial Lender's Term Loan Commitment is the initial Total Commitment on the date hereof. The Term Loan Commitment of each Subsequent Project Lender shall be set forth or in the Assignment and Assumption or Accession Agreement pursuant to which such Lender shall have assumed its Term Loan Commitment, as the case may be.

"Term Loan Exposure" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Term Loans and its LC Exposure at such time.

"Term Loan Facility" has the meaning set forth in the Recitals above.

"Term Loan Lender" means a Lender with a Term Loan Commitment or, if the Term Loan Commitments have terminated or expired, a Lender with Term Loan Exposure.

"Term Loan Maturity Date" means January 1, 2020.

"Total Assets" means, as of any date, the total assets of Borrower, as set forth in the most recent balance sheet of Borrower, determined in accordance with GAAP, minus, to the extent otherwise included in total assets, funds provided pursuant to, or any reserve created with the proceeds of, any contribution to the Borrower's Equity Interests or other capital contribution, or any Unsecured Subordinated Promoter Loans advanced to the Borrower, in respect of the filing of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting Borrower thereof that would reasonably be expected to result in a Material Adverse Effect that occurs prior to the Commercial Operations Date.

"Total Commitment" means two hundred fifty million Dollars (US$250,000,000), as such amount may be increased from time to time by the amount specified in each Accession Agreement, if any, entered into in accordance with Section 2.20; *provided*, *however*, in no event

shall the Total Commitment exceed in the aggregate five hundred thirty million Dollars (US$530,000,000).

"Total Debt" means, without duplications as of any date, the sum as of such date of (a) Long-Term Debt, plus (b) Short-Term Debt and Working Capital Bank Finance, in each case, of the Borrower outstanding as of such date, prepared as of such date in accordance with GAAP, plus (c), without duplication of amounts included in the preceding clauses, the aggregate amount of Attributable Debt of Borrower outstanding as of such date, minus, to the extent included in Long-Term Debt or Short-Term Debt, any Unsecured Subordinated Promoter Loans.

"Transaction Costs" means all fees, costs and expenses (including fees paid for consulting and financial services) incurred or payable by Borrower in connection with the Transactions.

"Transactions" means (a) the negotiation, execution and delivery of the Loan Documents, the creation of the Liens pursuant to the Security Documents, the borrowing of Loans on or after the Effective Date, the use of the proceeds thereof and the issuance of Letters of Credit on or after the Effective Date, and (b) the completion and operations of the Project and any matters related thereto.

"Unsecured Subordinated Promoter Loans" means any unsecured Indebtedness of the Borrower owed to either Guarantor or any Affiliate thereof, which is subject to a Subordination Agreement, and any payment under which shall be restricted as set forth in such Subordination Agreement, and under Section 6.07 which restricts payments in respect of Unsecured Subordinated Promoter Loans only out of amounts in the Unrestricted Account or out of the proceeds of a replacement Unsecured Subordinated Promoter Loan, and certain of which Unsecured Subordinated Promoter Loans are excluded from certain definitions as used herein, and for purposes of meeting the test set forth in Section 4.04(e).

"Unused Commitment" means, with respect to each Lender, at any time, the Term Loan Commitment of such Lender at such time minus the sum of (i) the aggregate principal amount of the Term Loans made by such Lender to such time, and (ii) the aggregate principal amount of the then-outstanding LC Exposure of such Lender at such time.

"Upstream Supplier Financing Creditors" means the providers of supplier financing to EPIL, namely, the Export-Import Bank of India and the Central Bank of India, in order for EPIL to be able to provide Supplier Financing to the Borrower, and which shall be or shall become Secured Parties, provided, however, such supplier financing (a) meets all of the terms and requirements set forth in the definition of the term Supplier Financing hereunder, and (b) is on the same terms and conditions and has the same provisions as the Supplier Financing provided by EPIL to the Borrower, including principal amount, interest rate, repayment and prepayment terms and events of default thereunder.

"Upstream Supplier Financing Creditor's Pro Rata Interest" means with respect to each Upstream Supplier Financing Creditor, on the date that the Borrower is required to make a mandatory prepayment (and not an optional prepayment) of the Supplier Financing in accordance with Section 2.11(f) hereof, the percentage determined by the quotient of (a) the

principal amount of the then Supplier Financing outstanding owed to such Upstream Supplier Financing Creditor <u>divided</u> by (b) the sum of (i) the principal amount of the Loans outstanding on such date to all Lenders, (ii) the principal amount of the Supplier Financing, and (iii) the principal amount of any Additional Indebtedness under which the creditors thereof share on a *pari passu* basis the security interest of the Lenders in the relevant Collateral affected by such mandatory prepayment, on such date, if and to the extent the Upstream Supplier Financing Creditors or the creditors under any Additional Indebtedness on such date require a mandatory prepayment (and not an optional prepayment) on the same terms as the required by the Loans.

"<u>Wholly Owned Subsidiary</u>" means a subsidiary of a Person of which securities or other ownership interests (except for governors' qualifying shares and other *de minimis* amounts of outstanding securities or ownership interests) representing one hundred percent (100%) of the ordinary voting power and one hundred percent (100%) of equity or one hundred percent (100%) of the general partnership interests are, at the time any determination is being made, owned, Controlled or held by such Person or one or more Wholly Owned Subsidiaries of such Person.

"<u>Withdrawal Liability</u>" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"<u>Working Capital Bank</u>" means a bank, financial institution or other institutional lender which is not an Affiliate of the Borrower that is a counterparty (other than the Borrower) to the Working Capital Bank Financing.

"<u>Working Capital Bank Financing</u>" means a secured or unsecured working capital facility, including one or more financings by way of a sale, transfer or pledge of receivables of the Borrower, obtained from or committed by a Working Capital Bank.

SECTION 1.02    <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein); (b) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time and to any successor law or regulation; (c) any reference herein to any Person shall be construed to include such Person's successors and assigns; (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof; (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to,

this Agreement; and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.03    Accounting Terms; GAAP; IFRS. Except as otherwise expressly provided herein, all terms of an accounting or financial nature applicable to a Person shall be construed in accordance with GAAP as applicable to such Person, as in effect from time to time and in accordance with and consistent with prior years practice; *provided* that, if the Borrower notifies the Lenders or the Facility Agent, that the Borrower requests an amendment to any provision hereof (other than Section 5.01(a) or 5.01(b)) to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Facility Agent notifies Borrower that the Required Lenders request an amendment to any provision hereof (other than Section 5.01(a) or 5.01(b)) for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; *provided further* that if at any time of delivery of financial statements under Section 5.01(a) or 5.01(b) GAAP as applied under the other provisions hereof shall as a result of the operation of this Section 1.03 be different from that used in such financial statements, the Borrower shall deliver together with such financial statements a reconciliation in reasonable detail of such financial statements to such different GAAP.  With respect to either Guarantor, all terms of an accounting or financial nature shall be construed in accordance with IFRS, as in effect from time to time and in accordance with prior years practice of such Guarantor. Notwithstanding the foregoing, all of the financial calculations, computations and definitions hereunder shall not include any double counting of items.

ARTICLE II

The Facilities

SECTION 2.01    Term Loans.  Subject to the terms and conditions set forth herein, the maximum aggregate principal amount of the Term Loan Facility available to the Borrower during the Term Loan Availability Period is the Total Commitment.  The Total Commitment, with respect to the Initial Lender is divided into the Initial Lender Tranche A and the Initial Lender Tranche B as set out in Section 2.02, and with respect to any Subsequent Project Lender is as provided in its Accession Agreement in accordance with the provisions of Section 2.20; *provided, however*, the aggregate principal amount of any Term Loan requested hereunder from any Lender or arising by the automatic conversion of an LC Disbursement shall not exceed the Unused Commitment of such Lender. The undrawn amount of the Term Loan Commitment under this Agreement shall lapse automatically at the end of the Term Loan Availability Period.  No re-borrowing of any Term Loan paid or repaid shall be permitted hereunder.

SECTION 2.02    Tranches; Purpose.  (a) *Initial Lender Tranche A*.  The maximum aggregate principal amount of Initial Lender Tranche A is the

Initial Lender Tranche A Total Commitment.  The Initial Lender Tranche A Total Commitment shall be divided into two sub-facilities as follows:

      (i)    *Initial Lender Tranche A-1*.  An amount up to, but not exceeding forty million Dollars (US$40,000,000) out of the Initial Lender Tranche A Total Commitment shall be available to the Borrower from time to time on any Business Day on and after the Effective Date on which each of the conditions as set forth in Sections 4.01 and 4.04 is satisfied (or waived in accordance with Section 9.02); and

      (ii)    *Initial Lender Tranche A-2*.  An amount up to, but not exceeding the remaining amount of the Initial Lender Tranche A Total Commitment, to the extent not previously borrowed as contemplated by clauses (i) above, shall be available to the Borrower from time to time on any Business Day on and after the Business Day on which each of the conditions set forth in Sections 4.02 and 4.04 is satisfied (or waived in accordance with Section 9.02).

      (b)    *Initial Lender Tranche B*.  The maximum aggregate principal amount of the Initial Lender Tranche B is the Initial Lender Tranche B Total Commitment.  An amount up to but not exceeding the Initial Lender Tranche B Total Commitment (and any remaining amount of the Initial Lender Tranche A Total Commitment to the extent not previously borrowed) shall be available to the Borrower from time to time  on any Business Day on and after the Business Day on which Financial Closure shall occur and each of the conditions set forth in Section 4.03 and Section 4.04 is satisfied (or waived in accordance with Section 9.02).

      (c)    *Accession Project Financing*.  The maximum aggregate principal amount of the Term Loan Commitment of any Subsequent Project Lender and any limitation on availability or conditions thereto shall be as set forth in the related Accession Agreement for such Subsequent Project Lender in accordance with Section 2.20.

      (d)    *Purpose.*  Borrowings of Term Loans hereunder shall be utilized by the Borrower for the payment of the Project's costs and Transaction Costs amounts; *provided, however*, no proceeds shall be used to fund or maintain the DSRA.  Borrowings of Term Loans also may arise from LC Disbursements in accordance with Section 2.06(e) below, subject to the foregoing tranches and other limitations as set forth above.

      SECTION 2.03   <u>Loans and Borrowings</u>.  (a)  Term Loan Borrowings by the Borrower need not be ratable, and the Borrower in its discretion, subject to Section 2.03(c), may request a Loan from one or more Lenders in different amounts during the Term Loan Availability Period as it may deem appropriate; *provided* the Term Loan Commitment of any such Lender or Lenders (including with respect to its LC Exposure) to which a request is made by the Borrower is not exceeded by such Borrowing.

      (b)    The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the Term Loan Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.  The rights and obligations of the Lenders hereunder are several and accordingly the amount at any time owing to each Lender shall be a separate and

independent debt and, subject to the other provisions of this Agreement and the other Loan Documents, each Lender shall be entitled to protect and enforce its respective rights arising under this Agreement.

(c)    Subject to Section 2.14, each Borrowing shall be comprised entirely of Eurodollar Rate Borrowings.  Each Lender at its option may fund a Eurodollar Rate Borrowing by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(d)    Each Borrowing of a Term Loan shall be in an amount of not less than ten million Dollars (US$10,000,000) (or the balance of the Unused Commitment of the Lender(s) from which the Borrowing is requested, or portion thereof available in accordance with Section 2.02 above, then remaining) in not more than fifteen (15) Borrowings; *provided, however*, there shall be no minimum amount or number of Borrowings in respect of LC Disbursements that are converted to Term Loans in accordance with Section 2.06, and an Accession Agreement may set forth a different number or no minimum amount in respect of any Accession Project Financing.

SECTION 2.04    Requests for Borrowings.  To request a Term Loan Borrowing, the Borrower shall notify the Facility Agent and the Escrow Agent and Account Bank of such request and in writing not later than 1:00 p.m., New York City time, five (5) Business Days before the date of the proposed Borrowing, *provided, however*, with respect to the first Borrowing on the Effective Date, such notice, may be given less than five (5) Business Days before the date of that proposed Borrowing.  Each such Borrowing Request shall be irrevocable and shall be substantially in the form attached as Exhibit G hereto and signed by the Borrower.  Each such Borrowing Request shall be certified by a Responsible Officer, or other officer or director reasonably acceptable to the Facility Agent and shall specify the following information:

(i)    the Lender or Lenders from whom a Borrowing is requested;

(ii)    the aggregate amount of such Borrowing;

(iii)    the date of such Borrowing, which shall be a Business Day;

(iv)    the end use of funds for such Borrowing; and

(v)    in the case of the first Borrowing hereunder, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period."

Each requested Term Loan Borrowing shall be a Eurodollar Rate Borrowing.  If such Eurodollar Rate Borrowing is not available to the Borrower in accordance with the provisions of Section 2.14, then the Lenders may make the requested Borrowing as provided in Section 2.14 but they shall have no obligation to do so (except a conversion of an LC Disbursement into a Term Loan as contemplated by Section 2.06), and any such funding at a different rate of interest shall be in their complete discretion.  If no Interest Period is specified with respect to the first

Borrowing hereunder, then the Borrower shall be deemed to have selected an Interest Period of three (3) months' duration. Promptly following receipt of a Borrowing Request in accordance with this Section, the Facility Agent, shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.05    Funding of Borrowings. Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer (or "on us" funding in the case of the Initial Lender) of immediately available funds by 1:00 p.m., New York City time, to the Escrow Account established by the Borrower with the Escrow Agent and Account Bank under the Collateral Account Agreement. The Escrow Agent and Account Bank will make such funds transferred to it available to the Borrower for the purposes specified by the Borrower in its applicable Borrowing Request. Under no circumstances shall any Lender or Agent be liable to the Borrower in respect of any consequential damages in respect of any Borrowing requested by Borrower that is not funded by a Lender in accordance with this Agreement.

SECTION 2.06    Letters of Credit. (a) General. Subject to the terms and conditions set forth herein, including the applicable limitations on the Initial Lender Tranche A Commitment set forth in Section 2.02(a) above, and in any Accession Agreement, at any time and from time to time from the Effective Date to and including June 30, 2013, the Borrower may request the issuance of one or more Letters of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit) from one or more Issuing Banks, for its own account. The stated amount of any such Letter of Credit (or amendment, renewal or extension of an outstanding Letter of Credit) requested from any Issuing Bank that is available for drawing under such Letter of Credit shall not exceed the applicable Unused Commitment of the Lender which shall be obligated to reimburse the LC Disbursements under such Letter of Credit and convert any such LC Disbursement thereunder into a Term Loan in accordance with Section 2.06(e), (in respect of the Initial Lender, its Unused Commitment is limited as set forth in Section 2.02(a) above) as reduced by any Borrowings under Section 2.02(a) or (b); *provided*, *however*, if any Letter of Credit issued pursuant to this Section 2.06 is not drawn and no LC Exposure results therefrom prior to its expiration, the Borrower may request a Letter of Credit in the same or less amount as long as the amount of such Letter of Credit at such time does not exceed the applicable Unused Commitment of the Lender which shall be obligated to reimburse the LC Disbursements under such Letter of Credit and convert any such LC Disbursement thereunder into a Term Loan in accordance with Section 2.06(e).

(b)    Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), a Borrower shall hand deliver or telecopy (or transmit by electronic communication) to the Issuing Bank and the Facility Agent, reasonably in advance of (but in any event not less than three (3) Business Days prior to) the requested date of issuance, amendment, renewal or extension of such Letter of Credit, a notice, which, in each case, shall be in a manner and form reasonably acceptable to the Issuing Bank, requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section),

the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit. In connection with each Letter of Credit, the Borrower shall have furnished to the Issuing Bank at the time of submitting such notice or documentary credit application for such Letter of Credit: (i) a duly completed purchase order together with the purchase order confirmation of the provider of the goods or services related thereto, if required by the underlying purchase contract; or (ii) a duly completed pro forma invoice of the provider of the goods or services related thereto, duly countersigned by the Borrower; or (iii) the underlying contract signed by the Borrower and provider of goods, services, civil works etc. related to Projects specifying the terms of payment of advances along with a request for opening a Letter of Credit for payment of such advances; or (iv) an indent/offer from the provider of the goods or services related thereto or its authorized agent together with the exchange control copy of the relative import license; or (v) in the case of an advance Letter of Credit, the guaranty of the supplier of goods related thereto in form and substance satisfactory to such Issuing Bank, or (vi) such other documents as may be specified by the Issuing Bank from time to time. All such information and requirements shall be reasonably acceptable in form and substance to the Issuing Bank. If requested by an Issuing Bank, the Borrower also shall submit a letter of credit application in the form of an Issuing Bank Agreement in the form of Exhibit C hereto or otherwise on such Issuing Bank's standard form in connection (as accepted by the Borrower) with any request to it for a Letter of Credit. The Borrower shall be deemed to represent and warrant that with respect to each Letter of Credit as requested by the Borrower to be issued, amended, renewed or extended by any Issuing Bank, after giving effect to such issuance, amendment, renewal or extension, that the LC Exposure of the Lender which is obligated to reimburse the Issuing Bank in respect of such Letter of Credit and convert any LC Disbursement thereunder into a Term Loan in accordance with Section 2.06(e), shall not, taken together with the "LC Exposure" under all other Letters of Credit by such Issuing Bank, exceed the Unused Commitment of such Lender.

(c)    Expiration Date. No Letter of Credit shall expire later than the first to occur of (i) the date thirty-six (36) months after the date of the issuance of such Letter of Credit and (ii) the date that is four (4) years from the date of this Agreement.

(d)    [Intentionally omitted.]

(e)    Reimbursement. If an Issuing Bank shall make or shall be required to make any LC Disbursement in respect of a Letter of Credit, the Issuing Bank shall provide notice to the Facility Agent, promptly upon receiving the appropriate documentation for such LC Disbursement. On the date of any LC Disbursement, such LC Disbursement shall automatically convert into a Term Loan by such Issuing Bank, if it is a Lender, or if the Issuing Bank is an Affiliate of a Lender as contemplated by the definition of the term "Issuing Bank," then, by Lender that is the Affiliate of the Issuing Bank, on such day if such day is a Business Day and the Issuing Bank has had not less than five (5) Business Days' prior notice of such LC Disbursement. If the Issuing Bank has not had at least five (5) Business Days' notice of the LC Disbursement or the LC Disbursement is not on a Business Day, then, the LC Disbursement shall automatically convert into a Term Loan on the succeeding Business Day that is five (5) Business Days after the Issuing Bank shall have received the appropriate documentation for such LC Disbursement. The Facility Agent shall promptly notify the Lenders and the Borrower any such

notice received by the Facility Agent and the identity of the Lender and amount of the Term
Loan of the Lender deemed made hereunder.

(f)    Obligations Absolute. The Borrower's obligations hereunder in respect of
the Term Loan arising upon the conversion of LC Disbursements as provided in paragraph (e) of
this Section, shall be absolute, unconditional and irrevocable, and shall be performed strictly in
accordance with the terms of this Agreement under any and all circumstances whatsoever and
irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement,
or any term or provision therein, (ii) any draft or other document presented under a Letter of
Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being
untrue or inaccurate in any respect, or (iii) any other event or circumstance whatsoever, whether
or not similar to any of the foregoing, that would, but for the provisions of this Section,
constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's
obligations hereunder. Neither the Facility Agent, the Lenders nor the Issuing Banks, nor any of
their Affiliates, shall have any liability or responsibility by reason of or in connection with the
issuance or transfer of any Letter of Credit or any payment or failure to make any payment
thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any
error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or
other communication under or relating to any Letter of Credit (including any document required
to make a drawing thereunder), any error in interpretation of technical terms or any consequence
arising from causes beyond the control of the applicable Issuing Bank; *provided* that the
foregoing shall not be construed to excuse an Issuing Bank from liability to the Borrower to the
extent of any direct damages (as opposed to consequential damages, claims in respect of which
are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the
Borrower that are caused by such Issuing Bank's failure to exercise care when determining
whether drafts and other documents presented under a Letter of Credit comply with the terms
thereof. The parties hereto expressly agree that, in the absence of gross negligence, willful
misconduct or fraud on the part of an Issuing Bank (as finally determined by a court of
competent jurisdiction), such Issuing Bank shall be deemed to have exercised care in each such
determination. In furtherance of the foregoing and without limiting the generality thereof, the
parties agree that, with respect to documents presented which appear on their face to be in
substantial compliance with the terms of a Letter of Credit, an Issuing Bank may, in its sole
discretion, either accept and make payment upon such documents without responsibility for
further investigation, regardless of any notice or information to the contrary, or refuse to accept
and make payment upon such documents if such documents are not in strict compliance with the
terms of such Letter of Credit. An Issuing Bank may include such other terms as are set out in
Exhibit C hereto in its Issuing Bank Agreement.

(g)    Disbursement Procedures. Each Issuing Bank shall, promptly following
its receipt thereof, examine all documents purporting to represent a demand for payment under a
Letter of Credit and shall promptly provide notice to the Facility Agent as set forth in
Section 2.06(e); *provided* that any failure to give or delay by the Issuing Bank in giving such
notice, or by the Facility Agent in giving notice as required by Section 2.06(e) to be provided to
the Borrower and the Lenders, shall not relieve the Borrower of its obligation hereunder in
respect of the Term Loan arising upon the conversion of the LC Disbursements as provided in
paragraph (e) of this Section with respect to any such LC Disbursement. The Issuing Bank will
have the final word on determining whether the documents are credit compliant or not and if, or

if not, determined credit compliant the Borrower will not question its decision in the absence of gross negligence, willful misconduct or fraud on the part of an Issuing Bank.

(h)    Interim Interest.  If an Issuing Bank shall make any LC Disbursement and such LC Disbursement does not convert into a Term Loan in accordance with Section 2.06(e) on the date such LC Disbursement is made by the Issuing Bank, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that such LC Disbursement converts into a Term Loan, at the rate per annum equal to the LIBO Rate applicable to an Interest Period of three (3) months calculated as of the date such LC Disbursement is made plus the Interest Margin.  Interest accrued pursuant to this paragraph shall be for the account of the applicable Issuing Bank and shall be payable immediately on demand by the Borrower.

(i)    [Intentionally omitted.]

(j)    Cash Collateralization.  If any Event of Default shall occur and be continuing, and the Loans hereunder have been accelerated and declared to be due and payable or upon the occurrence of any Event of Default with respect to the Borrower described in clause (g) or (h) of Article VII, in accordance with Article VII, the Borrower shall immediately be obligated to pay to the Facility Agent on behalf of each Lender which has at such time an LC Exposure with respect to any outstanding Letter of Credit, an amount in cash equal to the LC Exposure as of such date plus any accrued and unpaid interest thereon, without demand or other notice of any kind.  The Facility Agent shall deposit any such amount so received by it in like funds into the DSRA (as supplemental to the Required Amount thereunder) with the Escrow Agent and Account Bank to be held by the Escrow Agent and Account Bank as collateral for the payment and performance of the Obligations of the Borrower under this Agreement, and the Borrower hereby grants the Lenders a security interest in all funds and investments in such account to secure such Obligations.  Such deposit shall be administered by the Escrow Agent and Account Bank in accordance with the Collateral Accounts Agreement.  If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not already applied in repayment of the Obligations as aforesaid) shall be returned to the Borrower, within three (3) Business Days after all Events of Default have been cured or waived.

SECTION 2.07    Interest Elections. (a)  The Borrower may elect an Interest Period of three (3) or six (6) months in respect of the initial Borrowing hereunder.  With respect to all subsequent Borrowings after the initial Borrowing hereunder, (i) the first Interest Period of each such subsequent Borrowing shall end on the last day of the Interest Period applicable to the initial Borrowing hereunder falling immediately after such subsequent Borrowing, and may be for a period shorter than the three (3) or six (6) month period elected by the Borrower, in order that the Interest Periods of all Borrowings hereunder shall be concurrent, and (iii) thereafter each subsequent Interest Period shall be for an Interest Period and shall end on the same day as the Interest Period with respect to the initial Borrowing hereunder.

(b)    To make its election pursuant to this Section, the Borrower shall notify the Facility Agent of such election in writing in its first Borrowing Request required under

Section 2.04.  The Interest Election Request and each Borrowing Request shall be irrevocable and signed by the Borrower.

(c)     Promptly following receipt of the Interest Election Request with respect to the first Borrowing hereunder, the Facility Agent, shall advise the Initial Lender of the details thereof.  Thereafter, for each Borrowing, the Facility Agent shall advise the relevant Lender or Lenders required to fund a Borrowing requested by the Borrower of the Interest Period applicable to such Borrowing.

(d)     Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Facility Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing interest shall be determined in accordance with Section 2.13(c).

SECTION 2.08    Termination and Reduction of Commitments.  (a)  Unless previously terminated, the Term Loan Commitments shall terminate on the last day of the Term Loan Availability Period. Notwithstanding the foregoing, without the consent of the Borrower being required, but upon prior written notice to the Borrower, on any Business Day, the Lenders, or any Lender at its discretion, may cancel their or its then-outstanding Unused Commitment under the Facilities immediately upon such notice to the Borrower, with a copy to the Facility Agent, for any reason, including the deterioration in the Borrower's creditworthiness due to (i) the inclusion of the Borrower and/or any of its governors, managers or officers in the Reserve Bank of India's willful defaulters list, (ii) closure of a significant portion of the Borrower's operating capacity, or (iii) failure of the Borrower or any Guarantor, or any Person acting on their behalf, to comply with the terms and conditions of the Loan Documents.  Except where such termination is due to a deterioration in the Borrower's creditworthiness, the terminating Lenders or Lender shall endeavor to provide prior notice to the Borrower of its or their decision.  Upon a partial termination of the Unused Commitments, the Total Commitments shall be adjusted accordingly.

(b)     The Borrower may not terminate or reduce the Term Loan Commitments without the prior written consent of the Lenders and the Facility Agent prior to Financial Closure.  Following Financial Closure, if the Project costs shall have been reduced below one billion ninety seven  million Dollars (US$1,097,000,000), then the Borrower without the consent of the Lenders or the Facility Agent being required, but upon prior written notice to the Facility Agent and the Lenders, on any Business Day, may terminate the Term Loan Commitments or reduce the Term Loan Commitments of the Lenders ratably among the Lenders in proportion to their then Unused Commitments.

SECTION 2.09    Repayment of Loans.  The Borrower shall repay to the Facility Agent, for the ratable account of the Lenders the aggregate principal amount of all Term Loans outstanding on the last day of the Term Loan Availability Period in twenty-three (23) approximately equal installments, and with the remaining amount outstanding in the twenty-fourth (24th) installment, in accordance with the following table:

| Payment No. | Repayment Date | % of Facility Repaid |
|---|---|---|
| 1 | 1 April 2014 | 4.17% |

| | | |
|---|---|---|
| 2 | 1 July 2014 | 4.17% |
| 3 | 1 October 2014 | 4.17% |
| 4 | 1 January 2015 | 4.17% |
| 5 | 1 April 2015 | 4.17% |
| 6 | 1 July 2015 | 4.17% |
| 7 | 1 October 2015 | 4.17% |
| 8 | 1 January 2016 | 4.17% |
| 9 | 1 April 2016 | 4.17% |
| 10 | 1 July 2016 | 4.17% |
| 11 | 1 October 2016 | 4.17% |
| 12 | 1 January 2017 | 4.17% |
| 13 | 1 April 2017 | 4.17% |
| 14 | 1 July 2017 | 4.17% |
| 15 | 1 October 2017 | 4.17% |
| 16 | 1 January 2018 | 4.17% |
| 17 | 1 April 2018 | 4.17% |
| 18 | 1 July 2018 | 4.17% |
| 19 | 1 October 2018 | 4.17% |
| 20 | 1 January 2019 | 4.17% |
| 21 | 1 April 2019 | 4.17% |
| 22 | 1 July 2019 | 4.17% |
| 23 | 1 October 2019 | 4.17% |
| 24 | 1 January 2020 | 4.09% (or such lesser or greater principal amount as shall be outstanding on such date); |

(*provided* that if such date is not a Business Day, then such payment shall be made on the next preceding Business Day); *provided*, *however*, that the final principal repayment installment of the Term Loans shall be paid on the Term Loan Maturity Date and in any event shall be in an amount equal to the aggregate principal amount of all Term Loans outstanding on such date, and *provided*, *further* that no payment shall be required under Section 2.16 in respect of any payment required under this Section 2.09. In addition, upon the occurrence of each prepayment pursuant to Section 2.11, each of the remaining installments of principal as set forth in the Section 2.09 at the time such prepayment is received by the Lenders shall be equally and ratably reduced by a portion of such prepayment equal to the amount of such prepayment divided by the then number of remaining installments (with any rounding amount reducing the last installment in the foregoing table).

SECTION 2.10    Evidence of Debt. (a) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(b)    The Facility Agent, shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the tranche thereof and the Interest Period applicable

thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Facility Agent hereunder for the account of the Lenders and each Lender's share thereof.

(c)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; *provided* that the failure of any Lender or the Facility Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(d)     Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Facility Agent.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.11    Prepayment of Loans.  (a)  The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, without premium or penalty on any Interest Payment Date, in an amount of not less than five million Dollars (US$5,000,000) (or the balance of the Loans then outstanding) subject to the requirements of this Section.  No amount repaid or prepaid may be re-borrowed by the Borrower.

(b)     [Intentionally omitted.]

(c)     The Borrower shall be obligated, upon the occurrence of any of the events set forth below in clauses (i) through (vi), to deposit into the Insurance and Other Proceeds Account under the Collateral Account Agreement the full amount of any proceeds received in respect of such event as set forth below, and to direct the Escrow Agent and Account Bank to apply such funds in such Account to prepay the Loans, in whole or in part, without premium or penalty in connection with the occurrence of such other events described below, at such time described in such clause, and in such amount as is set forth below, subject to the requirements of this Section (however, no payment shall be required under Section 2.16 in respect of such prepayment):

(i)     immediately on the next Business Day following receipt by Borrower from the Parent (or any successor holder of Equity Interests of the Borrower affiliated with the Parent), seventy-five percent (75%) of the net proceeds paid to Parent (or any successor holder of Equity Interests of the Borrower affiliated with the Parent) from any sale by Parent (or any successor holder of Equity Interests of the Borrower affiliated with the Parent) of all or any portion of the Parent's or such successor affiliated holder's Equity Interest in the Borrower to a Person that is not an Affiliate of the Parent, the Borrower shall make a prepayment of the Term Loans to each Lender in an amount equal to the Lender's Pro Rata Interest of such net proceeds, *provided*, *however*, the Lender's

Pro Rata Interest shall be calculated without including in the denominator thereof any Additional Indebtedness (for clarification purposes, the Parent shall be obligated to pay to Borrower seventy-five percent (75%) of the net proceeds received by Parent as a result of any such sale by Parent from a Person not an Affiliate of the Parent pursuant to its obligations under paragraph (n) of Article III of the Guarantee Agreement provided by the Parent; and any fresh issuance of Equity by the Borrower shall not be subject to any mandatory prepayment trigger, subject to the maintenance by Parent of its required ownership percentage as required by Section 6.13);

(ii)     if the Borrower receives insurance proceeds in excess of ten million Dollars (US$10,000,000) per claim pertaining to the Project (other than those in respect of loss of revenue or third-party liability) under insurance policies maintained by the Borrower and the Borrower has not either used or committed to use in a demonstrable manner such funds within six (6) months after receipt thereof for repairing, refurbishing or replacing the damaged assets, then, immediately on the next Business Day following such six (6) month period, the Borrower shall make a prepayment of the Term Loans to each Lender in an amount equal to the Lender's Pro Rata Interest of such unused or uncommitted insurance proceeds;

(iii)     if the Borrower receives any expropriation proceeds or proceeds upon a condemnation or other taking or restriction of any material property of the Borrower by any Governmental Authority, and the Borrower has not either used or committed to use in a demonstrable manner such funds within six (6) months after receipt thereof for the replacement of such property or for expenses resulting from such expropriation, then, immediately on the next Business Day following such six (6) month period, the Borrower shall make a prepayment of the Term Loans to each Lender in an amount equal to the Lender's Pro Rata Interest of such unused or uncommitted  proceeds;

(iv)     if the Borrower receives any liquidated damages under any Project Contract or any Offtake Contract and Agreements and the Borrower has not either used or committed to use in a demonstrable manner such funds within six (6) months after receipt thereof to meet any costs of the Project arising out of the nonperformance by the applicable EPC Contractor or other counterparty thereto under such Project Contract or arising under any Offtake Contract and Agreement (other than in compensation of replacement of current year revenue of the Borrower in respect of such nonperformance) or to cover any other expenses resulting from such default or other related costs of the Project, then, immediately on the Business Day following such six (6) month period, the Borrower shall make a prepayment of the Term Loans to each Lender in an amount equal to the Lender's Pro Rata Interest of such liquidated damages received under any Project Contract or Offtake Contract and Agreement and not so used;

(v)     if the Borrower receives proceeds resulting from an arbitral or judicial award in connection with any of the Project Contracts or Offtake Contract and Agreements  (other than damages contemplated in clause (iv) above), then, if the Borrower has not either used or committed to use in a demonstrable manner such funds within six (6) months after receipt thereof to meet any costs of the Project arising out of the nonperformance by the applicable contract party under such contract or to cover any

other expenses resulting from such default, then, immediately on the Business Day following such six (6) month period, the Borrower shall make a prepayment of the Term Loans to each Lender in an amount equal to the Lender's Pro Rata Interest of the net proceeds received by the Borrower and not so used;

   (vi) If the Borrower receives cash proceeds from any asset sale as permitted under Section 6.04(b) and such proceeds are not used to replace the asset so sold and subject to the payment of any Indebtedness to any creditor that has a Permitted Lien on such asset (other than under the Security Agreement or any Additional Security Document), then, immediately on the next Business Day following receipt thereof, the Borrower shall make a prepayment of the Term Loans to each Lender in an amount equal to the Lender's Pro Rata Interest of the net proceeds received by the Borrower and not used for replacement of such asset;

   (vii) If the Borrower is required to make a prepayment of the Term Loans by application of the Cash Sweep Mechanism under Section 2.02 of the Collateral Account Agreement, then, immediately on the next Business Day following a determination of the amount of prepayment under the Collateral Account Agreement, the Escrow Agent and Account Bank, on behalf of the Borrower, shall make a prepayment of the Term Loans to each Lender in an amount equal to the Lender's Pro Rata Interest of such amount under the Cash Sweep Mechanism; *provided*, *however*, the Lender's Pro Rata Interest shall be calculated without including in the denominator thereof any Additional Indebtedness unless approved by the Required Lenders.

   (d) The Borrower shall notify the Facility Agent, in writing (confirmed by telecopy) of any prepayment hereunder not later than 12:00 noon, New York City time, ten (10) calendar days before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid. Promptly following receipt of any such notice, the Facility Agent shall advise the Lenders of the contents thereof; and

   (e) Each prepayment shall be applied ratably to the Loans, except a prepayment under Section 2.19(b), which shall be made solely to such prepaid Lender.

   (f) To the extent that any of the amounts referred to in subclauses (i) through (vii) of paragraph (c) above are not applied solely to prepayment of the Loans:

   (i) because a portion of the amounts received by the Borrower in respect of any of such events is payable as a mandatory (but not optional) prepayment of the Supplier Financing (and as long as such Supplier Financing does not require a repayment schedule earlier than that set out in this Agreement), and/or

   (ii) because a portion of the amounts received by the Borrower in respect of any of such events is payable as a mandatory (but not optional) prepayment of Additional Indebtedness (and as long as such Additional Indebtedness does not require a repayment schedule earlier than that set out in this Agreement) under which the creditors thereof

share on a *pari passu* basis the first priority security interest of the Lenders in the relevant Collateral affected by such event as referred to therein, <u>then</u>,

      (iii)    if and to the extent the Upstream Supplier Financing Creditors or the creditors under any Additional Indebtedness on such date require a mandatory prepayment (and not an optional prepayment) on the same terms as required by the Lenders hereunder, a portion of such unapplied amount shall be paid by the Borrower to each Upstream Supplier Financing Creditor and/or each creditor of such Additional Indebtedness as a prepayment of such Upstream Supplier Financing Creditors' Pro Rata Interest of the applicable Supplier Financing, or such Additional Indebtedness Holder's Pro Rata Interest of the applicable Additional Indebtedness, as the case may be;

        *provided*, *however*, the Upstream Supplier Financing Creditors' Pro Rata Interest shall be calculated without including in the denominator thereof any Additional Indebtedness in respect of amounts referred to in subclauses (i) and (vii) of paragraph (c) above, unless approved by the Upstream Supplier Financing Creditors, and *provided*, *further*, the creditors of Additional Indebtedness shall not share in any prepayment referred to in subclauses (i) and (vii) of paragraph (c) above unless approved by the Required Lenders and the Upstream Supplier Financing Creditors.

      In order to make any prepayments, when permitted under this paragraph (f), the Borrower shall direct the Escrow Agent and Collateral Agent to pay such unapplied amount to and in the manner as may be directed by each Upstream Supplier Creditor and/or each creditor of applicable Additional Indebtedness, as set forth in the Collateral Account Agreement. If any amount remains unapplied following such applications in the paragraph (f) because the Upstream Supplier Financing Creditors and/or creditors of Additional Indebtedness agree not to share in any such prepayment, such remaining amount shall be paid by the Borrower as a prepayment of the Term Loans to each Lender in an amount equal to the Lender's Pro Rata Interest of such remaining amount.

      SECTION 2.12   <u>Fees</u>. (a) The Borrower agrees to pay the Facility Agent, for the account of the Initial Lender a processing fee of 2.25% of the Initial Lender's Term Loan Commitment on or prior to the date of the first Borrowing hereunder. The Borrower shall pay the Facility Agent for the account of each Subsequent Project Lender a processing fee of 2.25% of such Subsequent Project Lender's Term Loan Commitment on or prior to the date of the first Borrowing under the Accession Project Financing provided by such Subsequent Project Lender's Term Loan Commitment (or such other date as may be agreed by such Subsequent Project Lender).

      (b)    The Borrower agrees to pay to each Issuing Bank a commission or fronting fee in respect of each Letter of Credit issued by such Issuing Bank equal to 0.75% per annum on the stated amount of such Letter of Credit, payable to such Issuing Bank annually in advance. Any other fees payable to an Issuing Bank pursuant to any agreement between the Borrower and such Issuing Bank shall be payable on the demand of such Issuing Bank or as otherwise agreed in writing. All such fees shall be computed on the basis of a year of three

hundred sixty (360) days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

        (c)      The Borrower agrees to pay to the Facility Agent, the Security Agent, the Escrow Agent and Account Bank and the Intercreditor Agreement, for its own account, such fees as may be agreed upon between the Borrower and such Agents, payable in the amounts and at the times separately agreed upon between the Borrower and such Agents.

        (d)      All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Facility Agent (or to the Initial Lender, an Issuing Bank or Agent, in the case of fees payable to it) for distribution, in the case of the processing fee to the Lenders.  Fees paid shall not be refundable under any circumstances.

        SECTION 2.13    Interest.  (a)  The Loans comprising each Eurodollar Rate Borrowing shall bear interest at the LIBO Rate for the Interest Period in effect for such Borrowing plus the Interest Margin.

        (b)      Any Loans pursuant to the provisions of Section 2.14 shall bear interest at the rate determined thereunder plus the Interest Margin.

        (c)      Notwithstanding the foregoing, (i) if any principal of or interest on any Loan, or any fee or other amount payable by the Borrower hereunder, is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount or fee amount shall bear interest, after as well as before judgment, at a rate per annum equal to one percent (1%) plus the rate otherwise applicable to the Loans or such fee as provided in the preceding paragraphs of this Section or otherwise in this Agreement, and (ii) if a Default occurs in respect to compliance with any Financial Covenant or upon the occurrence and during the continuation of any other Event of Default, on and after the date of such noncompliance or Event of Default to and until such Event of Default is cured, or waived by the Lenders in accordance with this Agreement, the Loans and all other outstanding Obligations hereunder shall bear interest, after as well as before judgment, at a rate per annum of one percent (1%) plus the rate otherwise applicable to the Loans as provided in the preceding paragraphs of this Section or otherwise in this Agreement.

        (d)      Accrued interest on each Loan made to the Borrower shall be payable by the Borrower in arrears on each Interest Payment Date for each such Loan and on the Term Loan Maturity Date; *provided* that interest accrued pursuant to paragraph (c) of this Section shall be payable on demand.

        (e)      All interest hereunder shall be computed on the basis of a year of three hundred sixty (360) days and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable LIBO Rate shall be determined by the Facility Agent, and such determination shall be conclusive absent manifest error.

        SECTION 2.14    Market Disruption; Alternate Rate of Interest.  (a)  Subject to any alternative basis agreed and consented to in accordance with Section 2.14(b) and (c) below, if a Market Disruption Event

occurs in relation to a Loan for any Interest Period on or before the Business Day on which interest thereon is to be determined, then the rate of interest on that Loan for the Interest Period shall be the rate per annum which is the sum of:

> (i)        the Interest Margin; and

> (ii)       the rate notified by the affected Lenders to the Borrower as soon as practicable and in any event before interest is due to be paid in respect of that Interest Period, to be that which expresses, as a percentage rate per annum, the cost to such Lender of funding that Loan from whatever source it may reasonably select.

> (b)        If a Market Disruption Event occurs and the affected Lenders or the Borrower so requires, such Lenders and the Borrower shall enter into negotiations (for a period of not more than thirty (30) days) with a view to agreeing a substitute basis for determining the rate of interest.

> (c)        Any alternative basis agreed pursuant to paragraph (b) above shall be binding on such Lenders and the Borrower.

> (d)        For the avoidance of doubt, in the event that no substitute basis is agreed at the end of the thirty (30) day period, the rate of interest shall continue to be determined in accordance with the terms of this Agreement.

SECTION 2.15    Increased Costs.  (a)  If any Change in Law shall:

> (i)        impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in Eurodollar Reserve Requirements) or any Issuing Bank; or

> (ii)       impose on any Lender or any Issuing Bank any other condition affecting this Agreement or Eurodollar Rate Borrowings made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Borrowing (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or such Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or such Issuing Bank hereunder (whether of principal, interest or otherwise), in each case by or in an amount which such Lender in its sole judgment deems material in the context of this Agreement and its Loans or participations in Letters of Credit hereunder, then, the Borrower will pay to such Lender or such Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.  In such event, the prepayment and other provisions of Section 2.19(b) may also apply.

(b)     If any Lender shall give notice to the Facility Agent, and the Borrower, at any time to the effect that Eurodollar Reserve Requirements are, or are scheduled to become, effective and that such Lender is or will be generally subject to such Eurodollar Reserve Requirements as a result of which such Lender will incur additional costs, then such Lender shall, for each day from the later of the date of such notice and the date on which such Eurodollar Reserve Requirements become effective, be entitled to additional interest on each Eurodollar Rate Borrowing made by it at a rate per annum determined for such day (rounded upward, if necessary, to the nearest one hundredth (100th) of one percent (1%) equal to the remainder obtained by subtracting (i) the LIBO Rate for such Eurodollar Rate Borrowing from (ii) the rate obtained by dividing such LIBO Rate by a percentage equal to one hundred percent (100%) minus the then-applicable Eurodollar Reserve Requirements.  Such additional interest will be payable in arrears to the Facility Agent, for the account of such Lender, on each Interest Payment Date relating to such Eurodollar Rate Borrowing and on any other date when interest is required to be paid hereunder with respect to such Loan.  Any Lender which gives notice under this paragraph (b) shall promptly withdraw such notice (by written notice of withdrawal given to the Lenders, the Facility Agent, and the Borrower) in the event Eurodollar Reserve Requirements cease to apply to it or the circumstances giving rise to such notice otherwise cease to exist.

(c)     If any Lender or any Issuing Bank determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or such Issuing Bank's capital or on the capital of such Lender's or such Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender or the Letters of Credit issued by such Issuing Bank, to a level below that which such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuing Bank's policies and the policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy), by an amount which such Lender in its sole judgment deems to be material in the context of this Agreement and its Loans, Commitments and participations in Letters of Credit hereunder, then, from time to time the Borrower will pay to such Lender or such Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company for any such reduction suffered.

(d)     A certificate of a Lender or an Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or such Issuing Bank or its holding company, as the case may be, as specified in paragraph (a) or (c) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower (or the Borrower in respect of the Loan or Letter of Credit, if any, to which such compensation request is attributable) shall pay such Lender or such Issuing Bank the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

(e)     Failure or delay on the part of any Lender or any Issuing Bank to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such Lender's or such Issuing Bank's right to demand such compensation.

(f)     The provisions of this Section 2.15 shall not apply with respect to Taxes, which shall be governed solely by Section 2.17 hereof.

(g)    Notwithstanding Section 2.19(b), if a Lender requests compensation under this Section 2.15 (other under than paragraph (b) hereof), the Borrower may, at its sole expense and effort, without premium or penalty, upon notice to such Lender and the Facility Agent, within sixty (60) days of its receiving notice of such request, prepay in full the Borrowings of such Lender or require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04).

SECTION 2.16    <u>Break Funding Payments</u>.  In the event of (a) the payment of any principal of any Eurodollar Rate Borrowing by the Borrower other than on an Interest Payment Date applicable thereto (including any optional prepayment or as a result of acceleration upon an Event of Default, but not including any mandatory prepayment or any scheduled payment of principal in accordance with Section 2.09), (b) the failure by a Borrower to borrow, convert, continue or prepay any Eurodollar Rate Borrowing on the date specified in any notice delivered pursuant hereto, or (c) the assignment of any Eurodollar Rate Borrowing of the Borrower other than on the last day of the Interest Period applicable thereto as a result of a request by Borrower pursuant to Section 2.19, <u>then</u>, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the interest rate pursuant to Section 2.13 that would have been applicable to such Loan, for the period from the date of such event to the last day of the then-current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

SECTION 2.17    <u>Taxes</u>.  (a)  Any and all payments by or on account of any obligation of the Borrower or any other Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; *provided* that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable by the Borrower shall be increased as necessary so that after all such required deductions have been made for Indemnified Taxes or Other Taxes (including any such deductions applicable to additional sums payable under this Section 2.17(a)) the Facility Agent, Lenders or Issuing Bank (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make, or cause to be made, such deductions, and (iii) the Borrower shall pay, or cause the payment of, the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     The Borrower shall indemnify the Facility Agent, each Lender and each Issuing Bank, within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Facility Agent, such Lender or such Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of a Borrower hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; *provided, however*, that the Borrower shall not be obligated to make payment to the Facility Agent or any Lender or Issuing Bank pursuant to this Section in respect of penalties, interest and other liabilities attributable to any Indemnified Taxes or Other Taxes if such penalties, interest and other liabilities are attributable to the gross negligence or willful misconduct of the Facility Agent, Lenders or Issuing Bank.  A certificate as to the amount of such payment or liability delivered to a Borrower by a Lender or an Issuing Bank, or by the Facility Agent on its own behalf or on behalf of a Lender or an Issuing Bank, shall be conclusive absent manifest error.  Such Facility Agent, Lenders or Issuing Bank, as the case may be, will, at the Borrower's request, provide the Borrower with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts, and shall include reasonable supporting documentation.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Facility Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Facility Agent.

(e)     If the Facility Agent, a Lender or an Issuing Bank receives a refund with respect to any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.17 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Facility Agent, such Lender or such Issuing Bank and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that the Borrower, upon the request of the Facility Agent, such Lender or such Issuing Bank, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority), net of any reasonable incremental additional costs, to the Facility Agent, such Lender or such Issuing Bank if it receives written notice from the applicable Facility Agent, Lenders or Issuing Bank that the Facility Agent, such Lender or such Issuing Bank is required to repay such refund to such Governmental Authority.

(f)     Any Lender that is entitled to an exemption from or reduction of tax under the law of the jurisdiction in which the Borrower is resident for Tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Facility Agent), at the time or times prescribed by applicable law, if reasonably requested by the Borrower or the Facility Agent, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower

or the Facility Agent as will permit such payments to be made free of such tax or at a reduced rate.  Without limiting the foregoing:

       (i)     Each Foreign Lender shall deliver to the Borrower and the Facility Agent two copies of either U.S. Internal Revenue Service Form W-8BEN, Form W-8ECI or Form W-8IMY (together with any applicable underlying IRS forms), or, in the case of a Foreign Lender claiming exemption from U.S. federal withholding Tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest" a statement substantially in the form of Exhibit L and a Form W-8BEN, or any subsequent versions thereof, successors thereto or new forms required by U.S. Tax law properly completed and duly executed by such Foreign Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding Tax on all payments of interest by the Borrowers under this Agreement and the other Loan Documents.  Such forms shall be delivered by each Foreign Lender on or before the date it becomes a party to any Loan Document (or changes its applicable lending office).  In addition, each Foreign Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Foreign Lender or otherwise upon the written request of the Borrower.  Each Foreign Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose).

       (ii)    Each Lender that is (A) a citizen or resident of the United States of America, (B) a corporation, partnership or other entity created or organized in or under the laws of the United States of America (or any jurisdiction thereof) or (C) an estate or trust that is subject to federal income taxation regardless of the source of its income (a "U.S. Lender") if requested by the Borrower or Facility Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or Facility Agent as will enable the Borrower or Facility Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

       (iii)   If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and Facility Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or Facility Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or Facility Agent as may be necessary for the Borrower or Facility Agent to comply with its obligations under FATCA, to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.

Notwithstanding any other provision of this paragraph, a Lender shall not be required to deliver any form pursuant to this paragraph that such Lender is not legally able to deliver.

(g)    Nothing contained in this Section 2.17 shall require the Facility Agent, the Security Agent, any Issuing Bank or any Lender (or permitted assignee or Participant) to make available any of its income tax returns or any other information that it reasonably deems to be confidential or proprietary.

SECTION 2.18    Payments Generally; Pro Rata Treatment; Sharing of Setoffs. (a) The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, fees or reimbursements of LC Disbursements, or of amounts payable under Section 2.12, 2.15, 2.16 or 2.17 or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 12:00 noon, New York City time), on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Lenders or the Facility Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made directly to the Lenders or Agents as they may specify in writing to the Borrower, or to the Facility Agent at an office designated by the Facility Agent in New York City, except payments to be made directly to an Issuing Bank as expressly provided in Section 2.06(h), payments to be made to the Agents in respect of fees pursuant to Section 2.12 shall be made directly to such Agents, and except that payments pursuant to Section 2.15 (other than paragraph (b) thereof), 2.17, 2.19 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Facility Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Except as provided in Section 2.19(b), all repayments of Borrowings and other Obligations hereunder to the Lenders shall be made ratably among the Lenders in accordance with the amounts due to them. If any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in dollars.

(b)    If at any time insufficient funds are received by and available to the Facility Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)    If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loan Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loan Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loan Loans and participations in LC Disbursements of other Lenders

to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loan Loans and participations in LC Disbursements; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or Affiliate thereof (as to which the provisions of this paragraph shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    If any Lender shall fail to make any payment required to be made by it pursuant to this Agreement, then the Facility Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Facility Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

SECTION 2.19    Mitigation Obligations; Replacement of Lender.  (a)  If any Lender requests compensation under Section 2.15 (other than paragraph (b) thereof), or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 (other than paragraph (b) thereof) or 2.17, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    (i) If any Lender requests compensation under Section 2.15 (other than paragraph (b) thereof), (ii) if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, (iii) if any Lender defaults in its obligation to fund Loans hereunder, or (iv) if any Lender determines that as a result of  a Change in Law it has become illegal for such Lender to make or maintain any Borrowing, then Borrower may (and in the case of a Change in Law referred to in clause (iv), the Borrower shall), at its sole expense and effort, upon notice to such Lender and the Facility Agent, within sixty (60) days of its receiving notice of such request (or such earlier time as may be required under any such Change in Law) prepay in full the Borrowings of such Lender or require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another

Lender, if a Lender accepts such assignment); *provided* that (i) if a Term Loan Commitment is being assigned, the Borrower shall have received the prior written consent of the Facility Agent, which consent shall not unreasonably be withheld; (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, including Loans arising from its participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts); (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment will result in a material reduction in such compensation or payments; and (iv) in the case of any such assignment resulting from the failure to provide a consent, the assignee shall have given such consent and the fee required under Section 9.04(b)(i)(C) shall have been paid by such assignee or by a Borrower.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver, consent or approval by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

SECTION 2.20    Accession Project Financing.  (a) From time to time prior to the end of the Term Loan Availability Period, the Borrower may notify the Facility Agent that one or more Subsequent Project Lenders have agreed to provide Accession Project Financing in addition to and as a supplement to the Term Loans to be provided by the then Lenders, subject to the terms and provisions of this Agreement; *provided* that the aggregate Term Loan Commitments of all Subsequent Project Lenders shall not exceed a total aggregate principal amount of two hundred eighty million Dollars (US$280,000,000) and *provided*, *further*, that no more than fifty million Dollars (US$50,000,000) of Accession Project Financing, singly or in the aggregate, may be made available to the Borrower prior to the date on which each of the conditions set forth in Sections 4.01 through 4.03 of the Credit Agreement (other than completion of Financial Closure) is satisfied (or waived in accordance with Section 9.02 of the Credit Agreement).  Such notice shall specify (i) the identity of each Subsequent Project Lender and the fulfillment of the conditions set forth in the definition of the term "Subsequent Project Lender" herein, (ii) the intended Accession Project Financing Effective Date, (iii) the amount of each Subsequent Project Lender's Term Loan Commitment, (iv) whether the Subsequent Project Lender's Term Loan Commitment will be made available in tranches, and the number, amount and conditions to the availability of each such tranche, and (v) if the Subsequent Project Lender or its Affiliate will be designated as an Issuing Bank hereunder (the "Accession Project Financing Notice").  Such Accession Project Financing Notice shall be in the form of Exhibit F-1 hereto, and shall be delivered by the Borrower in accordance with Section 9.01.

(b)    Upon receipt of a duly completed Accession Project Financing Notice, the Facility Agent shall inform the Lenders and the other Agents of such receipt.  Subject to the conditions and limitations set forth in the first sentence of Section 2.20(a) above, the parties hereto agree that, by execution of a supplement to this Agreement, substantially in the form of Exhibit F-2 (each an "Accession Agreement"), conforming to the terms and conditions set forth in the related Accession Project Financing Notice, executed by the relevant Subsequent Project Lender and the Borrower and acknowledged by the Facility Agent, such Subsequent Project Lender shall become a party to this Agreement.

(c)     The Term Loan Commitment of each Subsequent Project Lender shall become effective on or as of the first date (the "Accession Project Financing Effective Date") on which the following conditions precedent have been satisfied with respect to such Subsequent Project Lender (and the obligation of each Subsequent Project Lender to make a Term Loan is subject to the following conditions precedent being satisfied before or concurrently with the relevant Accession Project Financing Effective Date):

(i)     such Subsequent Project Lender and the Borrower shall have executed and delivered to the Facility Agent an Accession Agreement;

(ii)    the following statements shall be true and correct and the Borrower shall have delivered an Officer's Certificate certifying as to the accuracy of each of the following:

(A)     no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the relevant Accession Project Financing Effective Date; and

(B)     the representations and warranties in the Loan Documents are true and correct in all material respects on and as of such date and after the relevant Accession Project Financing Effective Date.

(d)     A Subsequent Project Lender may request copies of the agreements, certificates, reports, legal opinions and other documents delivered to the Facility Agent in fulfillment of the conditions set forth in Sections 4.01 through 4.04, and may rely upon such documents as of the date they were delivered to the Facility Agent (or such earlier date as may be specified therein) in satisfaction of such conditions.  Neither the then-current Lenders nor the Facility Agent shall make any representation or warranty and neither the then-current Lenders nor the Facility Agent assume any responsibility to any Subsequent Project Lender for (i) the legality, validity, effectiveness, adequacy or enforceability of the Loan Documents or any other documents; (ii) the financial condition of the Borrower or any Guarantor; (iii) the performance and observance by the Borrower or any Guarantor of its obligations under the Loan Documents or any other documents; (iv) the accuracy of any statements (whether written or oral) made in or in connection with any Loan Document or any other document; or (v) any representations or warranties of the Borrower, any Guarantor or implied by applicable law.

(e)     Each Subsequent Project Lender confirms to the Lenders and the Facility Agent that it (i) has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of the Borrower and its related entities in connection with its participation in this Agreement; (ii) has not relied on any information provided to it by any Lender or the Facility Agent in connection with any Loan Document; and (iii) will continue to make its own independent appraisal of the creditworthiness of the Borrower and the other Obligors while any amount is or may be outstanding under the Loan Documents or any Term Loan Commitment is in force.  In addition each Subsequent Project Lender confirms and represents to the Lenders and the Facility Agent that it has not received any security, guaranty, collateral or other inducement to provide its Term Loan hereunder other than pursuant

to the Loan Documents and other than its right to a processing fee equal to that provided in
Section 2.11(a) to the Lenders.

(f)    The Subsequent Project Lenders will rank *pari passu* in all respects with
the Term Loans of the other Lenders as of the Accession Project Financing Effective Date.  The
Subsequent Project Lender shall be a Lender under this Agreement and the Loan Documents,
and shall make Term Loan, and may issue Letters of Credit and incur LC Exposure, and shall be
entitled to payments and repayments as a Lender or Issuing Bank, as the case may be, in
accordance with the provisions of Article II hereof.

SECTION 2.21    Common Project Financing
Facility.  In the event a potential Subsequent Project Lender shall
determine not to provide Accession Project Financing, but instead proposes to the Borrower a
Common Project Financing Facility that is acceptable to the Borrower, the Borrower shall notify
the Facility Agent and the Lenders under this Agreement of such proposal, including all of the
terms and conditions of the proposed Common Project Financing Facility, and may request that
the parties hereto shall become parties to such Common Project Financing Facility.  If the
Lenders determine in their sole discretion to participate in such Common Facilities Financing,
they shall thereupon mutually agree with the Borrower and such Subsequent Project Lender or
Lenders upon common loan documentation for such Common Project Financing Facility to
replace and supersede this Agreement and the other Loan Documents; *provided* that nothing
therein shall affect the rights and priorities of the Lenders in, to and under the Loans and to the
Collateral under the Loan Documents.  Any such Common Project Financing Facility, when the
Lenders become parties thereto, shall be deemed and amendment, supplement and continuation
of the Loan Documents.  In the event the Lenders shall not agree to become parties to the
Common Project Financing Facility, the Borrower shall not enter into any such Common Project
Financing Facility or any other Indebtedness as financing for the Project, and any Subsequent
Project Lender may provide financing for the Project only as Accession Project Financing.

ARTICLE III

Representations and Warranties

The Borrower represents and warrants to the Lenders on the date hereof, on the
Effective Date and on each other date on which representations and warranties are made or
deemed made hereunder that:

SECTION 3.01    Organization; Powers.  The
Borrower is duly organized and validly existing and, to the extent applicable, except where the
failure to do so, individually or in the aggregate, would not reasonably be expected to result in a
Material Adverse Effect, in good standing under the laws of the jurisdiction of its organization,
has, except where the failure to do so, individually or in the aggregate, would not reasonably be
expected to result in a Material Adverse Effect, all requisite limited liability company power and
authority to carry on its business as now conducted and to execute, deliver and perform its
obligations under each Loan Document to which it is a party and, except where the failure to do
so, individually or in the aggregate, would not reasonably be expected to result in a Material

Adverse Effect, is qualified to do business in, and is, to the extent applicable, in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02    Authorization; Enforceability. The performance by the Borrower of the Loan Documents to which it is or is to be party, the Borrowings and its obligations in respect of the issuances of Letters of Credit hereunder and the Transactions to be entered into by it are within Borrower's limited liability company powers and have been duly authorized by all necessary limited liability company and, if required, member action.  This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document to which the Borrower is to be a party, when executed and delivered by the Borrower, will constitute a valid and binding obligation of the Borrower enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, concepts of reasonableness and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03    Governmental Approvals; No Conflicts.  The performance by the Borrower of the Loan Documents to which it is to be party, the Borrowings and its obligations in respect of the issuances of Letters of Credit hereunder and the Transactions (a) do not, as at the time this representation is made or deemed made, require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect as at the time this representation is made or deemed made, (ii) filings necessary to perfect Liens created under the Loan Documents, or (iii) the Material Project Approvals; (b) will not violate the charter, by-laws or other organizational documents of the Borrower or any control agreement in respect of the Borrower; (c) will not violate any applicable law or regulation or any order of any Governmental Authority, or violate or result in a default under any indenture, agreement or other instrument binding upon the Company or its assets, except to the extent that any such violations or defaults would not, individually, or in the aggregate, reasonably be expected to result in a Material Adverse Effect; and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower, except Liens created under the Loan Documents and Permitted Liens.

SECTION 3.04    Financial Condition; No Material Adverse Change.  (a)  Borrower has heretofore furnished to the Lenders the Borrower's unaudited balance sheet and statements of income, stockholders' equity and cash flows as of and for the fiscal year ended March 31, 2010, and Borrower's unaudited balance sheet and statement of income, stockholders' equity and cash flows of Borrower as of and for the fiscal quarter ended September 30, 2010.  The financial statements of the Borrower that have been furnished to the Lenders pursuant to this Agreement present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower included therein as of the date thereof and for the period reported upon in accordance with GAAP.

(b)    Except as disclosed in the financial statements referred to above or the notes thereto, or in the Confidential Information Materials and except for the Disclosed Matters, after giving effect to the Transactions, the Borrower does not have any material contingent liabilities, unusual long-term commitments or unrealized losses.

(c)     Since March 31, 2010, there has been no material adverse change in (i) the business, operations or financial condition of Borrower, taken as a whole, (ii) the ability of the Borrower to perform its obligations under any Loan Document or (iii) the rights of or remedies available to the Lenders under the Loan Documents.

SECTION 3.05   Properties. (a) In all material respects, Borrower has good title to, or valid leasehold interests in, all of its real and personal property material to its business (including the Mortgaged Properties), except for Liens permitted by Section 6.02.

(b)     Except to the extent the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, Borrower owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other intellectual property material to its business, and to its knowledge, the use thereof by Borrower does not infringe upon the rights of any other Person.

(c)     Except to the extent that any such violations or defaults would not, individually, or in the aggregate, reasonably be expected to result in a Material Adverse Effect, the Borrower has not received notice of, or has no knowledge of, any pending or contemplated condemnation proceeding affecting any Mortgaged Property or any sale or disposition thereof in lieu of condemnation.

SECTION 3.06   Litigation and Environmental Matters. (a) Except for the Disclosed Matters or as listed on Schedule 3.06, there are no material actions, suits or proceedings by or before any Governmental Authority pending against or, to the knowledge of Borrower, threatened against or affecting Borrower that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)     In all material respects, the Borrower (i) has not failed to comply with any applicable Environmental Law or to obtain, maintain or comply with any permit, license or other approval required for its operations or properties under any applicable Environmental Law, (ii) is not obligated to remediate contamination resulting from releases of Hazardous Materials or (iii) has not received written notice of any claim with respect to any Environmental Liability.

(c)     Since the date of this Agreement, there has been no change in the status of the Disclosed Matters, individually or in the aggregate, which is continuing and has resulted in a Material Adverse Effect.

SECTION 3.07   Compliance with Laws and Agreements. The Borrower is in compliance in all material respects with all laws, regulations and orders of any Governmental Authority applicable to them or their properties and all indentures, agreements and other instruments binding upon them or their properties. No Default has occurred and is continuing.

SECTION 3.08   Investment Company Status. The Borrower is not an "investment company" under the Investment Company Act of 1940.

SECTION 3.09    Taxes.  The Borrower has timely filed or caused to be filed all Tax returns and reports required to have been filed by it and has paid or caused to be paid all Taxes shown on such Tax returns and reports, except (i) any Taxes that are being contested in good faith by appropriate proceedings and for which Borrower has, to the extent required by GAAP, set aside on its books adequate reserves and (ii) returns and reports the non filing of which, and Taxes the non payment of which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  There is no requirement on the Borrower, the Lenders or any Agent to file or pay any stamp duty, registration charges or any other statutory duties and levies in respect of any Loan Document except for those already paid.

SECTION 3.10    ERISA.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect. Except as would not reasonably be expected to result in a Material Adverse Effect, the present value of all accumulated benefit obligations under all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans.

SECTION 3.11    Disclosure.  The information contained in the Confidential Information Material (other than forecasts, projections, forward-looking information, assumption, conclusions, estimates, and pro forma calculations contained therein) when taken as a whole are true in all material respects as of the date of the Confidential Information Material; *provided*, *however*, that with respect to any forecasts, projections, forward-looking information, assumption, conclusions, estimates and pro forma calculations contained therein, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.  No factual information was omitted from the Confidential Information Material so as to make the Confidential Information Material, when taken as a whole, misleading in any material respect as of the date of the Confidential Information Material.  The Borrower makes no representation and warranty about the accuracy of any market or industry data that the Facility Agent or any Lender may have received or to which reference is made in the Confidential Information Material.  All Project Contracts and Offtake Contracts and Agreements to which the Borrower is a party as of the date of this Agreement are set forth in Schedule 3.11.

SECTION 3.12    Subsidiaries.  On the date hereof and on the Effective Date the Borrower has no Subsidiary, and as of any date following the Effective Date, the Borrower has a Subsidiary only as permitted under Section 5.12.  No outstanding options, warrants, rights of conversion or purchase and similar rights exist on the material Subsidiaries of the Borrower by third parties.

SECTION 3.13    Insurance.  Schedule 3.13 sets forth a description of all material insurance maintained by or on behalf of Borrower as of the Effective Date, including with respect to applicable fire, earthquake, floods and similar casualty events.  All material premiums in respect of such insurance listed in Schedule 3.13, or thereafter obtained by the Borrower, are current and such insurance is in full force and effect.  Borrower

has provided as part of the Confidential Information Materials evidence that all such insurance listed in Schedule 3.13 is in full force and effect, including copies of applicable insurance policies or confirmations from applicable insurers.  Borrower believes that the insurance maintained by or on behalf of Borrower is adequate.

SECTION 3.14    Labor Matters.  In all material respects, there are no strikes, lockouts or slowdowns against Borrower pending or, to the knowledge of Borrower, threatened.  In all material respects, the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Borrower is party.

SECTION 3.15    [Intentionally Omitted].

SECTION 3.16    Federal Reserve Regulations.  No part of the proceeds of the Loans will be used, whether directly or indirectly, for any purpose which entails a violation (including on the part of any Lender) of Regulation U or X of the Board.

SECTION 3.17    Solvency.  Immediately after the making of each Loan made on the Effective Date and after giving effect to the application of the proceeds of such Loans and to all rights of reimbursement, contribution and subrogation, (a) the fair value of the consolidated assets of Borrower, at a fair valuation, will exceed its consolidated debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the consolidated property of Borrower will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such consolidated debts and other liabilities become absolute and matured; (c) Borrower will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) Borrower will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted following the Effective Date.

SECTION 3.18    Senior Indebtedness.  The Obligations of the Borrower in respect of the Facility shall at all time rank at least *pari passu* in right of payment in insolvency with all its other present and future senior Indebtedness.

SECTION 3.19    Interested Persons.  No governor, director, managing member, manager, or employee of the Borrower is a director of a Lender and no director of a Lender holds a substantial Equity Interest in the Borrower.  Except to the extent disclosed in the Disclosed Matters, none of the or governors or managers of the Borrower is a director of a banking company (as defined under the Banking Regulation Act, 1949 of India) or specified near relation (as specified by the Reserve Bank of India) of a director of a banking company or a near relative of any senior officer of the Lenders.

SECTION 3.20    Prohibited Activities.  In addition to the requirements of Section 9.15, neither the Borrower nor any of its governors or managers has been declared to be a willful defaulter under the Banking Regulation Act, 1949 of India.  In the event of a Person being identified as a willful defaulter, the Borrower shall take expeditious

and effective steps for the removal of such person as a governor or manager and this obligation shall be a covenant of the Borrower during the term of this Agreement.  Neither the Borrower nor any of its agents acting or benefitting in any capacity in connection with this Agreement is a Specially Designated National under the sanctions administered by the Office of Foreign Assets Control (OFAC) and has not used and shall not use the Facility in any transaction with or for the purpose of financing the activities of any person currently subject to any U.S. sanctions administered by OFAC, including, without limitation, those implemented by regulations codified in Subtitle B, Chapter V of Title 31, U.S. Code of Federal Regulations.  The Borrower is not involved in the business of banking or financial services and/or real estate (as defined in Regulation 2(p) of Notification FEMA 120, dated July 7, 2004 issued by the Reserve Bank of India) nor does it have a place of business in India.  None of the proceeds of any of the Loans is being remitted into India.

ARTICLE IV

Conditions

SECTION 4.01    Effective Date.  The obligation of the Initial Lender or the Issuing Bank, as the case may be, to make up to the portion of the Initial Lender Tranche A Total Commitment available to the Borrower pursuant to Section 2.02(a)(i) as a Loan or Letter of Credit pursuant to Section 2.06, under this Agreement shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)    The Facility Agent (or its counsel) shall have received from each party thereto either (i) a counterpart of this Agreement, the Guarantee Agreements, the Collateral Account Agreement and the Security Agreement, signed on behalf of each party thereto, or (ii) written evidence satisfactory to the Facility Agent (which may include telecopy or electronic transmission of a signed signature page of this Agreement) that each party thereto has signed a counterpart of this Agreement or such other Loan Document.

(b)    The Facility Agent shall have received such documents and certificates required by the Loan Documents referred to in paragraph (a), or as the Facility Agent (or its counsel) may reasonably request, relating to the organization, existence and, to the extent applicable, good standing of the Borrower and the Guarantors, the authorization of the Transactions by all board of directors, governors, managers or other governing authority, a certificate of incumbency and specimen signatures, and any other reasonable legal matters relating to the Borrower, the Guarantors, the Loan Documents referred to in paragraph (a) or the Transactions, all in form and substance reasonably satisfactory to the Facility Agent.

(c)    All consents and approvals required to be obtained from any Governmental Authority or other Person in connection with the execution or performance of this Agreement and the other Loan Documents referred to in paragraph (a) have been obtained and copies thereof shall have been received by the Facility Agent (or its counsel).

(d)    the Facility Agent shall have received confirmation that the Escrow Account (as defined in the Collateral Accounts Agreement) has been established by the

Borrower and the Escrow Agent and Account Bank, and the Borrower shall have delivered to the Escrow Agent and Account Bank and shall have otherwise satisfied any and all conditions to the effectiveness of the Collateral Account Agreement.

(e)     The Facility Agent shall have received, or shall have received confirmation of payment of, all fees and other amounts due and payable on or prior to the Effective Date under this Agreement, including (i) all fees separately agreed in writing to be payable to the Mandated Lead Arranger, the Initial Lender, the Escrow Agent and Account Bank and the Security Agent, in respect of this Agreement and the other Loan Documents referred to in paragraph (a), and (ii) to the extent invoiced at least one (1) Business Day prior to the Effective Date, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of counsel) required to be reimbursed or paid by the Borrower under this Agreement or any other Loan Document.

(f)     The Facility Agent shall have received a certificate, dated the Effective Date and signed by the President, a Vice President or a Financial Officer of the Borrower, confirming compliance with the conditions set forth in Section 4.04, in form and substance reasonably satisfactory to the Facility Agent.

(g)     the Facility Agent shall have received a letter from Essar Americas, Inc. accepting its appointment as agent for service of process on behalf of the Borrower and the Guarantors under the Loan Documents referred to in paragraph (a).

(h)     Uniform Commercial Code financing statements shall have been filed in respect of the Security Agreement in the appropriate filing office in the State of Minnesota.

(i)     The Facility Agent shall have received favorable written opinions (addressed to the Facility Agent and the Initial Lender and dated the Effective Date) of (i) Shearman & Sterling, New York counsel for the Borrower and (ii) Briggs & Morgan, Minnesota counsel for the Borrower, substantially in the forms included in Exhibit I.

(j)     The Facility Agent shall have received favorable written opinions (addressed to the Facility Agent and the Initial Lender and dated the Effective Date) of (i) Baker & McKenzie LLP, New York counsel to the Facility Agent and the Initial Lender, (ii) Moorar Gujadhur, Mauritius counsel to the Facility Agent and the Initial Lender; in respect of the Parent, and (iii) Appleby Global, Grand Cayman counsel to the Facility Agent and the Initial Lender, in respect of EGL, substantially in the forms included in Exhibit H.

(k)     The Facility Agent shall have received a customary certificate from a Financial Officer, certifying as to the solvency of Borrower after giving effect to the Transactions.

(l)     The Initial Lender shall have satisfied, in its complete discretion, its Know Your Customer and related customer due diligence requirements.

The Facility Agent shall promptly notify the Borrower and the Initial Lender of the Effective Date, and such notice shall be conclusive and binding.

SECTION 4.02    Initial Lender Tranche A-2 Event.
The obligation of the Initial Lender or the Issuing Bank, as the case may be, to make up to the final portion of the Initial Lender Tranche A Total Commitment available to the Borrower pursuant to Section 2.02(a)(ii) as a Loan or Letter of Credit (or any amendment, renewal or extension of an outstanding Letter of Credit) pursuant to Section 2.06, under this Agreement shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)    The Facility Agent (or its counsel) shall have received from each party thereto either (i) a counterpart of the LLC Pledge Agreement, signed on behalf of each party thereto, or (ii) written evidence satisfactory to the Facility Agent (which may include telecopy or electronic transmission of a signed signature page of the LLC Pledge Agreement) that each party thereto has signed a counterpart of the LLC Pledge Agreement.

(b)    The Facility Agent (or its counsel) shall have received from each party thereto, either (i) a counterpart of the Members Control Agreement (as defined in the LLC Pledge Agreement), between the Borrower and the Parent, signed on behalf of each party thereto, or (ii) written evidence satisfactory to the Facility Agent (which may include telecopy or electronic transmission of a signed signature page of the LLC Pledge Agreement) that each party thereto has signed a counterpart of such Members Control Agreement.

(c)    The Facility Agent shall have received such documents and certificates required by the LLC Pledge Agreement, or as the Facility Agent (or its counsel) may reasonably request, relating to the organization, existence and, to the extent applicable, good standing of the Borrower, the authorization of the LLC Pledge Agreement and the Members Control Agreement by all board of directors, governors, managers or other governing authority, and any other reasonable legal matters relating to the Borrower, the Parent, the LLC Pledge Agreement and the Members Control Agreement, all in form and substance reasonably satisfactory to the Facility Agent.

(d)    All consents and approvals required to be obtained from any Governmental Authority or other Person, including Great Northern Iron Ore Properties, in connection with the execution or performance of the LLC Pledge Agreement or the Members Control Agreement have been obtained and copies thereof shall have been received by the Facility Agent (or its counsel).

(e)    the Facility Agent shall have received a letter from Essar Americas, Inc. accepting its appointment as agent for service of process on behalf of the Parent and the Borrower under the LLC Pledge Agreement.

(f)    Uniform Commercial Code financing statements shall have been filed in respect of the LLC Pledge Agreement in the appropriate filing office in the State of Minnesota.

(g)    The Facility Agent (or its counsel) shall have received from each party thereto either (i) a counterpart, signed on behalf of each party thereto, of a Consent and Agreement with respect to each Project Contract entered into on or prior to such Borrowing, each Mortgage with respect to the Mortgaged Property, as such Mortgage has been filed or recorded

in the relevant filing office or offices in the State of Minnesota U.S.A., and each other Consent and Agreement or Security Document creating a first perfected security interest with respect to the rights of Borrower in respect of any real property that is leased by Borrower, including with respect to all mining rights and leases of the Borrower, and with respect to rights in extracted minerals that may be required under Applicable Law, or (ii) written evidence satisfactory to the Facility Agent (which may include telecopy or electronic transmission of a signed signature page of this Agreement) that each party thereto has signed or such Loan Document.

(h)     The Facility Agent shall have received (i) the applicable mortgage title policy issued in respect of each Mortgaged Property and any mining rights thereunder by a title insurer or insurers in form and substance reasonably acceptable to the Facility Agent (or its counsel) or the Security Agent, and (ii) such other documents as may be reasonably required by the Facility Agent (or its counsel) or the Security Agent to confirm the security interest and priority of the Secured Parties in and to any such property and with respect to the mining rights and leases of the Borrower.

(i)     The Facility Agent shall have received confirmation that all other Accounts under the Collateral Accounts Agreement (other than the Escrow Account (as defined therein) which has been opened pursuant to Section 4.01(d)) have been established by the Borrower and the Escrow Agent and Account Bank.

(j)     The Facility Agent shall have received a business plan of the Borrower for the five (5) years following the Effective Date reasonably satisfactory to the Facility Agent.

(k)     The Facility Agent shall have received a satisfactory report from its Environmental Consultant with respect to environmental due diligence.

(l)     The Facility Agent shall have received any and all certificates from applicable insurers providing insurance policy supplements with respect to the outstanding insurance policies maintained by the Borrower naming the Secured Parties as additional insured and that the Security Agent is designated as loss payee thereunder. The Facility Agent shall also have received a report or certificate, in form and substance reasonably satisfactory to the Lenders, from its Insurance Consultant with respect to the adequacy and effectiveness of insurance policies for the Project and other matters as the Lenders and such Insurance Consultant may reasonably require.

(m)     All consents and approvals required to be obtained from any Governmental Authority or other Person, including each lessor of a leased property included as part of the Project, in connection with the execution or performance of the Security Documents referred to in paragraph (g) above, have been obtained and copies thereof shall have been received by the Security Agent (or its counsel).

(n)     The Facility Agent shall have received, or shall have received confirmation of payment, of all fees and other amounts due and payable on or prior to such Borrowing date under this Agreement, including (i) all fees separately agreed in writing to be payable to the Mandated Lead Arranger, the Initial Lender, the Escrow Agent and Account Bank and the Security Agent, in respect of this Agreement and the other Loan Documents, and (ii) to

the extent invoiced at least three (3) Business Day prior to the Effective Date, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of counsel) required to be reimbursed or paid by the Borrower under this Agreement or any other Loan Document.

(o)    The Facility Agent shall have received a certificate, dated the Effective Date and signed by the President, a Vice President or a Financial Officer of the Borrower, confirming compliance with the conditions set forth in Section 4.04, in form and substance reasonably satisfactory to the Facility Agent.

(p)    The Facility Agent shall have received favorable written opinions (addressed to the Facility Agent and the Lenders and dated such Borrowing) of Shearman & Sterling, New York counsel for the Borrower and Briggs & Morgan, Minnesota counsel for the Borrower, with respect to the LLC Pledge Agreement, the Mortgages, the Consents and Agreements and other Security Documents, in form and substance satisfactory to the Facility Agent.

(q)    The Facility Agent shall have received favorable written opinions (addressed to the Facility Agent and the Initial Lender and dated the date of such Borrowing) of (i) Baker & McKenzie LLP, New York counsel to the Facility Agent and the Initial Lender, and (ii) Faegre & Benson LLP, Minnesota counsel to the Facility Agent and the Initial Lender, with respect to the LLC Pledge Agreement, the Mortgages, the Consents and Agreements and other Security Documents, and in respect of the Parent, in form and substance satisfactory to the Facility Agent.

The Facility Agent shall promptly notify the Borrower and the Lenders of the completion of the foregoing conditions, and such notice shall be conclusive and binding.

SECTION 4.03    Initial Lender Tranche B and Accession Project Financing Event.  The obligation of the Initial Lender or the Issuing Bank, as the case may be, to make the Initial Lender Tranche B Commitment available to the Borrower pursuant to Section 2.02(b) as a Loan or Letter of Credit, the obligation of any Subsequent Project Lender to make its Accession Project Financing available to the Borrower pursuant to an Accession Agreement, and the obligation of an Issuing Bank to issue any Letter of Credit pursuant to Section 2.06, and the obligations of the Initial Lender, any other Lender or any Issuing Bank, as the case may be, to make any other amount available to the Borrower as a Loan or Letter of Credit (or any amendment, renewal or extension of an outstanding Letter of Credit) under this Agreement thereafter shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)    The Lenders and the Facility Agent, shall have received evidence prior to or simultaneously with the Initial Lender Tranche B Borrowing that the Financial Closure shall have occurred.

(b)    All consents and approvals required to be obtained from any Governmental Authority or other Person in connection with the completion of Financial Closure

and any Accession Project Financing have been obtained and copies thereof shall have been received by the Facility Agent (or its counsel).

(c)    The Facility Agent shall have received, or shall have received confirmation of payment, of all fees and other amounts due and payable on or prior to the such Borrowing date under this Agreement, including (i) all fees separately agreed in writing to be payable to the Mandated Lead Arranger, the Initial Lender, the Escrow Agent and Account Bank and the Security Agent, in respect of this Agreement and the other Loan Documents, and (ii) to the extent invoiced at least three (3) Business Day prior to the Effective Date, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of counsel) required to be reimbursed or paid by the Borrower under this Agreement or any other Loan Document.

(d)    The Facility Agent shall have received a certificate, dated the Effective Date and signed by the President, a Vice President or a Financial Officer of the Borrower, confirming compliance with the conditions set forth in Section 4.04, in form and substance reasonably satisfactory to the Facility Agent.

The Facility Agent shall promptly notify the Borrower and the Lenders of the completion of the foregoing conditions, and such notice shall be conclusive and binding.

SECTION 4.04    Each Credit Event.  The obligation of any Lender to make a Loan pursuant to Section 2.01 (including the initial Loan hereunder and subsequent Initial Lender Tranche A or Initial Lender Tranche B Loan) or under any Accession Project Financing, and the obligation of an Issuing Bank to issue any Letter of Credit (or any amendment, renewal or extension of an outstanding Letter of Credit) pursuant to Section 2.06, as the case may be, available to the Borrower as a Loan or Letter of Credit (or any amendment, renewal or extension of an outstanding Letter of Credit) pursuant to Section 2.06, as the case may be, shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)    The representations and warranties of the Borrower and each Guarantor set forth in the Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date.

(b)    No Default shall have occurred and be continuing.

(c)    No Force Majeure Event shall have occurred and be continuing.

(d)    No development that results in, or would reasonably be expected to result in, a Material Adverse Effect shall have occurred and be continuing.

(e)    After giving effect to the requested Borrowing, (a) the ratio of (i) the sum of, without duplication, (A) the principal amount outstanding of the Term Loans and LC Exposure, including any Accession Project Financing, if any, and (B) the principal amount

outstanding under the Supplier Financing, to (ii) the aggregate amount of equity contributions and Unsecured Subordinated Promoter Loans to the Borrower from its Affiliates  made on or prior to the date of each Borrowing (but excluding the Supplier Financings and also excluding, in the event of the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting Borrower thereof that would reasonably be expected to result in a Material Adverse Effect that occurs prior to the Commercial Operations Date, any contribution to the Borrower's Equity Interests or other capital contribution, or an advance of an Unsecured Subordinated Promoter Loans, in respect of any liability or Indebtedness (or the creation of any reserve) arising as a result of such action, suit or proceeding), (b) equals, or is not greater than the maximum ratio of 65:35.

Each Borrowing of a Loan and each request by the Borrower for the issuance, amendment, renewal or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a) through (e) of this Section.

## ARTICLE V

### Affirmative Covenants

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, and all Letters of Credit shall have expired or terminated and no LC Disbursements shall remain outstanding, the Borrower covenants and agrees with the Lenders and the Facility Agent, that:

SECTION 5.01    Financial Statements and Other Information.  Borrower will furnish to the Facility Agent, and each Lender for the Borrower:

(a)    within thirty (30) days after the date of this Agreement with respect to the Borrower's fiscal year ended March 31, 2010, an audited balance sheet of the Borrower and related statements of income, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, reported on by Ernst & Young, and within one hundred twenty (120) days after the end of each fiscal year of the Borrower beginning with fiscal year 2011, an audited balance sheet of the Borrower and related statements of income, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by Deloitte LLP or other independent certified public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such financial statements present fairly in all material respects the financial condition and results of operations of the Borrower in accordance with GAAP consistently applied;

(b)    within sixty (60) days after the end of each of the four (4) fiscal quarters of each fiscal year of the Borrower, beginning with the fiscal quarter ending December 31, 2010, and at each half year period ending in September 30 of each year, an unaudited balance sheet of the Borrower and related statements of income as of the end of and for such fiscal quarter and

half year period and related statements of income and cash flows for the then-elapsed portion of the fiscal year, or trailing 12 month period in the case of the half year financial statements, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the financial condition and results of operations of the Borrower in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)     concurrently with any delivery of financial statements of the Borrower under clause (a) or (b) above, a certificate of a Financial Officer (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) at any time that the Financial Covenants must be satisfied pursuant to Section 6.12, setting forth reasonably detailed calculations demonstrating compliance with the Financial Covenants, setting forth reasonably detailed calculations of EBITDA, Net Finance Charges, Adjusted Tangible Net Worth, Net Debt and the Debt Service Coverage Ratio, as at the end of and for the applicable fiscal period, (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate, and (iv) identifying all Subsidiaries formed or acquired since the end of the previous fiscal quarter;

(d)     concurrently with any delivery of financial statements under clause (a) above, a certificate of the accountants that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Event of Default under Section 6.12 (which certificate may be limited to the extent required by accounting rules or guidelines);

(e)     at least forty-five (45) days prior to the Scheduled Commercial Operations Date and at least forty-five (45) days prior to the commencement of each fiscal year of Borrower after the Commercial Operations Date shall have occurred, a detailed budget for such fiscal year (including a projected balance sheet and related statements of projected income and cash flow, in each case as of the end of and for such fiscal year, and setting forth the material underlying assumptions applicable thereto) demonstrating its ability to service the Facilities (an "Operational Budget"), and in case the Operational Budget for any fiscal year is not provided within the stipulated time in this clause (e), the prior fiscal year's Operational Budget shall be deemed to be the Operational Budget for the upcoming fiscal year until such Operational Budget is provided;

(f)     promptly after the same become publicly available, copies of all material periodic and other financial reports and statements and at the request of any Lender or the Facility Agent other materials filed by Borrower with any Governmental Authority in the form it is filed;

(g)     at least on a quarterly basis and no later than the last day of each fiscal quarter, an end-use certificate for Borrowings during each such fiscal quarter in form and substance reasonably satisfactory to the Required Lenders and the Facility Agent, from an

Credit Agreement                    - 70 -

independent public accountant or other Person acceptable to the Required Lenders, and the Facility Agent;

(h)    within five (5) Business Days provide notice to the Lenders and the Facility Agent, of any change in its certified public accountants or fiscal year; and

(i)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower, or compliance with the terms of any Loan Document, as the Facility Agent, or any Lender may reasonably request.

SECTION 5.02    Notices of Material Events; Certain Litigation.  Promptly (and not later than five (5) Business Days) after any Responsible Officer of the Borrower obtains knowledge thereof, Borrower will furnish to the Lenders or the Facility Agent, on behalf of each Lender written notice of the following:

(a)    the occurrence of any Default, including any material breach of any representation hereunder or under any Loan Document;

(b)    the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting Borrower thereof that would reasonably be expected to result in a Material Adverse Effect, and any judgment, award or settlement entered into in connection therewith (including with respect to the Great Lakes Litigation);

(c)    the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect; and

(d)    any other development or event that has or results in, or would reasonably be expected to have or result in, a Material Adverse Effect on any of the Borrower.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

In addition, in the event of the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting Borrower thereof that would reasonably be expected to result in a Material Adverse Effect that occurs prior to the Commercial Operations Date, the actual liability, any liability for the creation of a reserve in accordance with GAAP in respect thereof, or any Indebtedness thereunder, in each case to the extent not covered by insurance, shall be met out of a contribution to the Borrower's Equity Interests or other capital contribution, or an advance of an Unsecured Subordinated Promoter Loans, and any such contribution or Loans shall not be considered in determining Adjusted Tangible Net Worth or Total Assets or compliance with the ratio set forth in Section 4.04(e).

SECTION 5.03   <u>Information Regarding Collateral</u>.
(a)  Borrower will furnish to the Facility Agent, and the Security Agent prompt written notice of any change (i) in the Borrower's legal name, (ii) in the Borrower's Federal Taxpayer Identification Number or identification number, if any, issued to it by the jurisdiction under the laws of which it is organized or (iii) in the jurisdiction of the Borrower's organization.  Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Facility Agent, or Security Agent, as applicable, to continue, to the extent existing prior to such change, at all times following such change to have a valid, legal and perfected security interest in all the Collateral.

(b)      On or before the first to occur of (i) six (6) months after the initial Borrowing hereunder pursuant to Tranche A-1, and (ii) the date on which the Borrower makes a Borrowing Request with respect to Tranche B, the Borrower shall certify and present evidence to the Lenders and the Facility Agent in such form as shall be reasonably satisfactory to the Lenders that the Borrower has entered into land lease or purchase agreements with the appropriate Persons to acquire ownership or usage rights of the land required for the construction of the pellet plant portion of the Project and other ancillary uses related to the Project, including any land not owned by the Borrower on the date of the Agreement.

SECTION 5.04   <u>Existence; Conduct of Business</u>.
(a)  The Borrower will do or cause to be done all things necessary to preserve, renew and keep in full force and effect (i) its legal existence, and (ii) the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except to the extent the failure to do so would not reasonably be expected to have a Material Adverse Effect.  The Borrower shall employ appropriate management and technical personnel to manage the day to day affairs of its business.

(b)  As contemplated in the definition of the term "Commercial Operations Date" and as agreed by the parties hereto, the Required Lenders shall have the right, at Borrower's expense, to and until one (1) year following the Commercial Operations Date, and at any time a Default or Event of Default shall have occurred and be continuing, to appoint an Engineering Consultant reasonably acceptable to the Borrower (except upon the occurrence of a Default or Event of Default, whereupon the consent of the Borrower shall not be required) to report with respect to the determination or the occurrence of the Commercial Operations Date, and such other matters with respect to the operations and business of the Borrower as the Required Lenders or the Facility Agent may reasonably require.

SECTION 5.05   <u>Payment of Obligations</u>.  The Borrower will pay all Tax liabilities and all other liabilities and obligations of the Borrower, before the same shall become delinquent or in default, except where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings and (ii) the Borrower has set aside on its books adequate reserves with respect thereto in accordance with GAAP, or (b) the failure to make any such payments, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.06    <u>Maintenance of Properties</u>.
Except where a failure individually or in the aggregate to do so would not reasonably be
expected to result in a Material Adverse Effect, the Borrower will keep and maintain all property
material to the conduct of its business in good working order and condition, ordinary wear and
tear excepted, and the Borrower shall own, lease or have other appropriate rights of use with
respect to the real property necessary to develop the Project as contemplated on the Effective
Date.  The Borrower at all times will own or lease, and will not transfer to any Person, including
any Subsidiary, any property, assets or rights pertaining to the Project.

SECTION 5.07    <u>Insurance</u>.  (a)  The Borrower will
maintain, with financially sound and reputable insurance companies insurance in such amounts
and against such risks as are customarily maintained by companies of established repute engaged
in the same or similar businesses operating in the same or similar locations (after giving effect to
any self-insurance reasonable and customary for similarly situated companies), including with
respect to applicable fire, earthquakes, floods and similar casualty events, to the satisfaction of
the Required Lenders.  The Borrower will furnish to the Lenders and the Facility Agent, on
behalf of the Lenders, upon request of the Required Lenders and the Facility Agent, information
in reasonable detail as to the insurance so maintained and will, upon the request of the Secured
Parties, provide that the Secured Parties shall be additional insured parties under such insurance
and that the Security Agent is designated as loss payee.

(b)    The Required Lenders shall have the right, at Borrower's expense, to and
until one (1) year following the Commercial Operations Date and at any time a Default or Event
of Default shall have occurred and be continuing to appoint an Insurance Consultant reasonably
acceptable to the Borrower (except upon the occurrence of a Default or Event of Default
whereupon the Borrower's consent shall not be required) to report (not more frequently than
once per calendar year, as may be required by the Required Lenders, *provided,* that upon the
occurrence of any Default or Event of Default the Required Lenders may require a report more
frequently than once per calendar year) upon the Project and any material insurance matters and
policies.

SECTION 5.08    <u>Casualty and Condemnation</u>.  On
and after the Commercial Operations Date, Borrower will furnish to the Lenders or the Facility
Agent, prompt written notice of any material casualty or other insured damage to any material
portion of any Collateral or the commencement of any action or proceeding for the taking of any
material portion of the Collateral under power of eminent domain or by condemnation or similar
proceeding.

SECTION 5.09    <u>Books and Records; Inspection
and Audit Rights</u>.  The Borrower will keep proper books of record
and account sufficient to permit the preparation of financial statements in accordance with
GAAP.  The Borrower will permit any representatives designated by the Facility Agent, or any
Lender, upon reasonable prior notice and during normal business hours and not more than twice
per calendar year, to visit and inspect its properties, to examine and make extracts from its books
and records, and to discuss its affairs, finances and condition with its officers and independent
accountants and the reasonable expenses of the Facility Agent and such Lender in connection
with such visit or inspection shall be for the Borrower's account; *provided, further,* that when an

Event of Default exists, the Facility Agent or any Lender (or any of their respective representatives) may do any of the foregoing at the reasonable expense of the Borrower at any time during normal business hours and with reasonable advance notice. The Facility Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent accountants.

SECTION 5.10    Compliance with Laws;
Environmental Reports. (a) The Borrower will (i) comply in all material respects with all Environmental Laws applicable to its operations and properties, (ii) obtain and renew all permits required by Environmental Laws necessary for its operations and properties, and (iii) conduct any remedial actions in compliance with applicable Environmental Laws if such remedial action cures in all material respects the violation or breach or remediates or abates the effect of any such violation or breach; *provided*, *however*, that the Borrower shall not be required to undertake any remedial action or obtain or renew any environmental permit, or comply with any Environmental Law to the extent that its obligation to do so is being contested in good faith and by appropriate proceedings and with appropriate reserves, in accordance with GAAP, are maintained in connection therewith. If the Borrower is in default of its obligations under this paragraph, the Borrower will, at the request of the Lenders through the Facility Agent, provide to the Required Lenders within thirty (30) days after such request, at the expense of the Borrower, an environmental site assessment report for the properties to which such default relates, prepared by an environmental consulting firm reasonably acceptable to the Required Lenders and Facility Agent and evaluating whether or not Hazardous Materials are likely to have been released at or to have adversely affected the property, or otherwise resulted in Environmental Liability and the estimated cost of any compliance or remedial action in connection with such matters.

(b)    The Borrower will in good faith and with commercially reasonable efforts, in all material respects, operate its mining Project and related activities in accordance with applicable rules and regulations be applicable United States and State Governmental Authorities in existence on the date of this Agreement, and as appropriate to the nature of such Project.

(c)    The Borrower will comply in all material respects with all other laws, rules, regulations and orders of any Governmental Authority applicable to it or its property.

(d)    The Required Lenders shall have the right, at Borrower's expense, to and until one (1) year following the Commercial Operations Date and at any time a Default or Event of Default shall have occurred and be continuing to appoint an Environmental Consultant reasonably acceptable to the Borrower (except upon the occurrence of a Default or Event of Default whereupon the Borrower's consent shall not be required) to report (not more frequently than once per calendar year, as may be required by the Required Lenders, *provided,* that upon the occurrence of any Default or Event of Default the Required Lenders may require a report more frequently than once per calendar year), upon the Project and any material environmental, social, health or safety matters. Borrower will promptly and in good faith report to the Facility Agent, and the Lenders any material adverse environmental, social, health or safety developments.

SECTION 5.11    Use of Proceeds and Letters of
Credit. The proceeds of Term Loans and any Letter of Credit may

be used only in connection with the Project and the Facilities or as otherwise specified in this Agreement. No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation (including on the part of any Lender) of Regulation U or X of the Board. Borrower shall ensure that at all times not more than 25% of the value of its assets will consist of Margin Stock (as defined in Regulation U of the Board).

           SECTION 5.12    Subsidiaries. If a Subsidiary of the Borrower is to be formed or acquired following the Effective Date or if any Investment is to be made in any Subsidiary of the Borrower or any Person which as a result of the Investment will become a Subsidiary of the Borrower, the Borrower will not form or acquire such Subsidiary or make such Investment unless, (a) not less than thirty (30) days (or such other period as the Facility Agent may agree in writing) prior to such formation, acquisition or Investment, the Borrower notifies the Facility Agent and the Security Agent thereof, (b) there shall be no Default with respect to any Financial Covenant existing and continuing at such time or arising and continuing as a result of such formation, acquisition or Investment, and (c) there shall be no Event of Default existing and continuing at such time or arising and continuing as a result of such formation, acquisition or Investment. In addition, no such Subsidiary shall own or hold any assets or property pertaining to the Project.

           SECTION 5.13    Further Assurances. On and after the Effective Date, the Borrower will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), which may be required under any applicable law, or which the Facility Agent, the Security Agent or the Required Lenders may reasonably request, all at the expense of the Borrower to perfect the Liens on the Collateral as contemplated by the Loan Documents. The Borrower also agrees to provide to the Facility Agent or the Security Agent, from time to time upon reasonable request, evidence reasonably satisfactory to the Facility Agent or Security Agent, as applicable, as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

           SECTION 5.14    Security Documents. (a) The Borrower shall enter into the Security Agreement and the LLC Pledge Agreement upon the times in accordance with Article IV with respect to all Collateral (as defined therein) owned by the Borrower. As required in connection with the conditions set forth in Section 4.02, the Borrower shall enter into the Mortgages on all Mortgaged Property, and the Borrower shall enter into and deliver fully executed Consents and Agreements in respect of the Project Contracts and Offtake Contracts and Agreements then in effect. Thereafter, including upon Financial Closure, the Borrower shall enter into and provide any Additional Security Document, if necessary, to include any Collateral not included in the Security Agreement with respect to all assets and property acquired or owned by Borrower on any Additional Collateral Date, including with respect to all Mortgaged Property and all other movable and immovable, tangible and intangible assets and property of the Borrower, and including all Mortgaged Property not owned on the Effective Date and acquired in respect of the provisions of Section 5.03(b), all Project Contracts, all Offtake Contracts and Agreements, and the Pledged Borrower LLC Interests that may arise following the Effective Date.

Credit Agreement

(b)     At all times on and after the Effective Date, the Security Documents, when executed by Borrower and delivered as required by Article IV and Section 5.14(a), shall be effective to create in favor of the Security Agent or the Escrow Agent and Account Bank, as the case may be, for the ratable benefit of the Secured Parties a valid and enforceable security interest in the Collateral (as defined therein) owned by the Borrower on the Effective Date or on any Additional Collateral Date as set forth in the Security Documents, and the proceeds thereof, and (i) when the Collateral (as defined therein) constituting certificated securities (as defined in the Uniform Commercial Code (as defined in the Security Agreement)) is delivered to the Security Agent or the Escrow Agent and Account Bank, as the case may be, under the applicable Security Document together with instruments of transfer duly endorsed in blank, on or prior to the Effective Date and on any Additional Collateral Date, the security interest of the Security Agent or Escrow Agent and Account Bank, as the case may be, therein will constitute a perfected Lien on, and security interest in, all right, title and interest of the Borrower in such Collateral, prior and superior in right to any other Person (subject only to Liens permitted under Section 6.02), and (ii) when financing statements in appropriate form are filed in the appropriate offices specified in the Uniform Commercial Code on or prior to the Effective Date and on any Additional Collateral Date, the security interest of the Security Agent or Escrow Agent and Account Bank, as the case may be, will constitute a perfected Lien on and security interest in all right, title and interest of the Borrower in the Collateral (as defined therein) and the proceeds thereof to the extent perfection can be obtained by filing Uniform Commercial Code financing statements, prior and superior to the rights of any other Person (subject only to Liens permitted under Section 6.02).

(c)     In the event any Additional Security Document or a summary thereof is properly filed in the United States Patent and Trademark Office and the United States Copyright Office, and, with respect to Collateral in which a security interest cannot be perfected by such filings, upon the proper filing of the financing statements referred to in paragraph (a) above, the Security Agreement and such financing statements shall constitute a perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in the Material US Patents, Material US Copyrights and Material US Trademarks (as defined in the Security Agreement), in each case prior and superior in right to any other Person (subject only to Liens permitted under Section 6.02) (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on Material US Patents, Material US Copyrights and Material US Trademarks acquired by the Borrower after the date hereof).

(d)     Mortgages shall be entered into by the Borrower in favor of the Security Agent with respect to all real property, fixtures and leasehold interests of the Borrower and with respect to all mining rights and leases of the Borrower. Any permits of the Borrower shall be assigned or a security interest therein shall be created in favor of the Security Agent, for the ratable benefit of the Secured Parties. Each Mortgage, upon execution and delivery by the parties thereto, and each assignment or security interest in any permit of the Borrower will create in favor of the Security Agent, for the ratable benefit of the Secured Parties, legal, valid and enforceable Lien on all the applicable mortgagor's right, title and interest in and to the Mortgaged Properties (other than immaterial portions thereof) subject thereto and the proceeds thereof, and when Mortgages constituting any Security Document or Additional Security Document have been recorded in the jurisdictions specified by the Security Agent on or prior to

the Effective Date or on an Additional Collateral Date, the Mortgages will constitute a perfected Lien on all right, title and interest of the mortgagors in the Mortgaged Properties (other than immaterial portions thereof) and the proceeds thereof, prior and superior in right to any other Person (but subject to Liens permitted under Section 6.02) (it being understood that for purposes of this paragraph (d) all the Mortgaged Properties covered by a single Mortgage shall be deemed to be a single real property).

SECTION 5.15    DSRA.  (a)  The Borrower will establish and maintain under the Collateral Account Agreement a Debt Service Reserve Account ("DSRA") with the Escrow Agent and Account Bank.  The security interest of the Escrow Agent and Account Bank will constitute a perfected Lien on and security interest in all right, title and interest of the Borrower in the Collateral (as defined therein) and the proceeds thereof to the extent perfection can be obtained by filing Uniform Commercial Code financing statements or a "control agreement", prior and superior to the rights of any other Person.

(b)    The Borrower will deposit (or cause to be deposited) in the DSRA (i) not later than three (3) months after the Scheduled Commercial Operations Date, an amount equal to the aggregate interest on the Loans under this Agreement required for the then current Interest Period to be paid on the Loans on the immediately succeeding Interest Payment Date, and, following such Interest Payment Date and the determination of interest for the next succeeding Interest Period, shall assure that the amount deposited in the DSRA at all times thereafter is in an amount equal to the aggregate interest on the Loans under this Agreement due for each such succeeding Interest Period thereafter, and (ii) not later than nine (9) months after the Scheduled Commercial Operations Date, an additional amount equal to the aggregate principal on the Loans under this Agreement due on the immediately succeeding scheduled principal payment date under Section 2.09 (as such amount may have been reduced upon application of any prepayment in accordance with Section 2.11) , and, following such scheduled principal payment, shall assure that the amount deposited in the DSRA at all times thereafter is in an amount equal to the aggregate principal on the Loans under this Agreement (as such amount may be reduced upon application of any prepayment in accordance with Section 2.11) due on each succeeding scheduled principal payment date thereafter (the "Required Amount").

(c)    To the extent that funds are not available under the Escrow Account in order to made a mandatory prepayment as a result of the Cash Sweep Mechanism under Section 2.02 of the Collateral Account Agreement, in accordance with Section 2.11(c)(vii) of this Agreement, the Escrow Agent and Account Bank shall apply funds in the DSRA to the extent necessary to make the required mandatory prepayment, and the Borrower shall assure that, following such application of DSRA funds that additional funds are deposited in the DSRA in order to maintain the Required Amount therein.  The Borrower shall fulfill its obligation to deposit the Required Amount by the deposit of Cash or a standby letter of credit, a bank guaranty or other alternative funding in form and substance reasonably satisfactory to the Required Lenders or the Facility Agent.  To the extent the amount in the DSRA is in excess of the Required Amount, the excess amount shall be transferred to the Unrestricted Account under the Collateral Account Agreement.

ARTICLE VI

Negative Covenants

Until the Term Loan Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full, and all Letters of Credit shall have expired or terminated and no LC Exposure shall remain outstanding, the Borrower covenants and agrees with the Lenders and the Agents:

SECTION 6.01    Indebtedness.  The Borrower will not create, incur, assume or permit to exist any Indebtedness or Attributable Debt, except:

(i)    Indebtedness created under the Loan Documents, including any Accession Project Financing included hereunder pursuant to Section 2.20 after the date of this Agreement;

(ii)    Indebtedness created under the Existing Credit Agreement; *provided, however,* the aggregate principal amount outstanding at any time under the Indebtedness of clauses (i) and (ii) of this Section 6.01 shall not exceed in the aggregate five hundred thirty million Dollars (US$530,000,000);

(iii)    secured or unsecured Indebtedness of Borrower and Attributable Debt in respect of sale and leaseback transactions permitted by Section 6.05(a), in each case incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof; *provided* that (A) any such Indebtedness or Attributable Debt is incurred within one hundred eighty (180) days prior to or within one hundred eighty (180) days after such acquisition or the completion of such construction or improvement and (B) any such Attributable Debt is incurred in accordance with Section 6.05; and *provided* <u>further</u> that no Event of Default shall have occurred and be continuing or would result therefrom;

(iv)    Indebtedness created under the Supplier Financing;

(v)    Indebtedness incurred by the Borrower as Unsecured Subordinated Promoter Loans from any Guarantor or Affiliate thereof; *provided, however*, the Borrower shall not incur any Unsecured Subordinated Promoter Loans in connection with a Permitted Project Change prior to the Commercial Operations Date, unless the Borrower has obtained the prior written approval as set forth in the definition of the term "Permitted Project Change" for both the Permitted Project Change and such Indebtedness;

(vi)    Indebtedness in connection with Working Capital Bank Financing for the purpose of financing the ordinary business operations of the Borrower; *provided, however*, such Working Capital Bank Financing shall be permitted only if and to the extent it is incurred by the Borrower on or after a date that is six (6) months prior to the Scheduled Commercial Operations Date;

(vii)    Indebtedness under any Permitted Hedging Agreement;

(viii)    Indebtedness incurred in connection with a refinancing of any of the Indebtedness listed in Section 6.01 other than, except in the case of Supplier Financing, with Affiliates of the Borrower; *provided* that with the exception of clause (x), the principal amount thereof is not increased, *provided, further* any interest or other terms thereof in respect of Indebtedness referred to in clauses (i), (ii) (iv), (vi) (vii) and (xi) shall not be increased at the time of such refinancing, and in all other cases interest and other terms shall not be increased at the time of such refinancing at other than market terms at such time for similar financings, and *provided, further*, other than in respect of Indebtedness referred to in clause (vi), (a) no refinancing shall require scheduled or mandatory repayments earlier than those than are provided in Section 2.09 of this Agreement, and (b) the priority of any Lien thereunder shall never rank above the priority of the Liens in favor of the Secured Parties or except in the case of Additional Indebtedness which, if permitted under clause (xi) may be unsecured, junior or pari passu, no refinancing shall include any property or assets of the Borrower other than the property or asset originally included in the Lien in respect of the Indebtedness that is to be refinanced;

(ix)    Indebtedness in connection with any Insurance Premium Financing and any Indebtedness incurred in connection with issuers of surety, performance or other bonds, guaranties, letters of credit or bank guaranties in the ordinary course of business which does not singly or in the aggregate exceed twenty-five million Dollars (US$25,000,000) at any time outstanding;

(x)    Indebtedness in connection with the Minnesota State Loan, but not any increase in any amount owing thereunder pursuant to any amendment or modification of such loan following the date hereof, other than an increase of principal due owing to the capitalization of interest thereunder; and

(xi)    additional Indebtedness ("Additional Indebtedness"), either subordinate to, or on a senior *pari passu* basis with, the Facilities, not otherwise permitted above, at any time after the first testing of the Financial Covenants under this Agreement, *provided,* that at the time such Additional Indebtedness is incurred, there is no Default with respect to the Financial Covenants and no Event of Default shall have occurred and be continuing, and *provided, further* that, prior to incurring such Additional Indebtedness and prior to each drawdown of any advance or loan thereunder, the Borrower has provided a certificate of a Responsible Officer of the Borrower with a certified pro forma projection to the Lenders and the Facility Agent, indicating that, including the full amount of such prospective Additional Indebtedness whether or not immediately drawn, the Borrower projects FACR, determined as set forth in the definition of that term, will be at least 1.50; *provided, however*, except for Working Capital Bank Financing and the Supplier Financing that in either case may be then outstanding and the Unsecured Subordinated Promoter Loans, notwithstanding the foregoing, the Borrower may not incur any Indebtedness (other than additional Unsecured Subordinated Promoter Loans) at any time it is in Default with respect to the Financial Covenants or such Indebtedness would result in a Default with respect to the Financial Covenants; or if an Event of Default is existing and continuing at such time or would arise and continue as a result of such Indebtedness.

SECTION 6.02    Liens.  The Borrower will not create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter

acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

        (a)     Liens in favor of the Secured Parties created under or specifically required by the Loan Documents and the Supplier Financing securing some or all of the Obligations and the Additional Obligations;

        (b)     Permitted Encumbrances;

        (c)     Liens in respect of the refinancing of any Indebtedness as permitted under Section 6.01(viii) that is secured by a Permitted Encumbrance;

        (d)     Liens in favor of customers, vendors and service providers in the ordinary course of business;

        (e)     Existing Liens on cash deposits in respect of letters of credit issued for the account of the Borrower prior to the date of this Agreement in favor of creditors under the Existing Credit Agreement;

        (f)     Liens in favor of providers on Insurance Premium Financing permitted under Section 6.01, *provided* such Liens are limited to any financed insurance premiums that may be repayable or repaid to the Borrower upon a termination of an insurance policy by the provider of Insurance Premium Financing upon any default in payment by the Borrower of Indebtedness under such Insurance Premium Financing;

        (g)     Liens on a first priority basis, or on a *pari passu* or subordinated basis, as may be provided thereunder, limited to Current Assets of the Borrower (and not including other assets or property of the Borrower) in respect of Indebtedness in connection with the Working Capital Bank Financing if and as such Indebtedness is permitted under Section 6.01;

        (h)     Liens in favor of providers of Additional Indebtedness permitted under Section 6.01 on a *pari passu* or subordinated basis with the Secured Parties over any of the Collateral, *provided,* no such Additional Indebtedness will share in distributions from the Escrow Account in respect of the Cash Sweep Mechanism unless approved by the Required Lenders.

        SECTION 6.03    Fundamental Changes. (a) The Borrower will not effect any merger, consolidation, liquidation or dissolution with or into any other Person (other than of any Subsidiary with and into the Borrower) or the sale, transfer, lease or other disposition of all or substantially all the assets to another Person (other than of any Subsidiary to the Borrower), including any merger or consolidation involving the Borrower in which Borrower is not the surviving Person (the "Successor Company") unless (i) the Successor Company will be a corporation organized and existing under the laws of the United States of America, any State thereof or the District of Columbia and the Successor Company will expressly assume, by an agreement executed and delivered to the Lenders or the Facility Agent, in form reasonably satisfactory to the Required Lenders and the Facility Agent, all the obligations of Borrower under the Loan Documents; and (ii) immediately after giving effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Company or any Subsidiary as a result of such transaction as having been incurred by the

Successor Company or such Subsidiary at the time of such transaction), no Event of Default shall have occurred and be continuing or would result therefrom.

(b)     Borrower will not, without the prior written approval of the Required Lenders, engage in any business or activity other than the Project.

(c)     Other than a Permitted Project Change, the Borrower will not change in any material manner the scope of the Project without the prior written approval of the Required Lenders.

SECTION 6.04    Asset Sales. (a)  The Borrower will not sell, transfer, lease or otherwise dispose of all or substantially all the assets of Borrower (except for merger of a Subsidiary with and into the Borrower or another Subsidiary as permitted in Section 6.03).

(b)     The Borrower will not sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by the Borrower in any Subsidiary, except:

(i)     sales, transfers and other disposals of inventory, used or surplus materials or equipment and Permitted Investments in the ordinary course of business;

(ii)     sales, transfers and other dispositions of any asset between the Borrower and a Subsidiary, *provided* that the Borrower shall not sell, transfer or otherwise dispose of any assets pertaining to the Project to any Subsidiary;

(iii)     sales, transfers or leases of assets as part of a sale and leaseback transaction permitted by Section 6.05;

(iv)     sales, transfers or other disposals of Current Assets in connection with any Working Capital Bank Financing as permitted under Section 6.01; and

(v)     sales, transfers, leases or other disposals of assets (other than in the ordinary course of business) that do not exceed ten million Dollars (US$10,000,000) during any fiscal year.

SECTION 6.05    Sale and Leaseback Transactions. The Borrower will not enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except for any such sale and leaseback of any fixed or capital assets that is made for cash consideration in an amount not less than the cost of such fixed or capital asset and is consummated within one hundred eighty (180) days after the Borrower acquires or completes the construction of such fixed or capital asset; *provided* that the aggregate amount of the Attributable Debt in respect of such sale and leaseback transactions under this Section 6.05 at any time outstanding, taken together with all outstanding secured Indebtedness of Borrower is permitted under Section 6.01.

SECTION 6.06    Permitted Hedging Agreements.
The Borrower will not enter into any Hedging Agreement, other than Hedging Agreements entered into in the ordinary course of business to hedge or protect against actual or reasonably anticipated risks to which Borrower is exposed in the conduct and financing of its business, and not in any event for speculation (any such Hedging Agreement, a "Permitted Hedging Agreement").

SECTION 6.07    Restricted Payments; Certain Payments of Indebtedness. (a) Excepting any Restricted Payments the payments of which are to be used solely for the payments due on the Supplier Financings, the Borrower will not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except, so long as no Default or Event of Default shall have occurred and is continuing, to the extent that funds are available under the Cash Sweep Mechanism and remitted to the Unrestricted Account under the Collateral Account Agreement, such funds may be applied to make Restricted Payments or make payments in respect of any Unsecured Subordinated Promoter Loan.

(b)    In addition, notwithstanding the foregoing provisions of this Section 6.07, in the event, (i) due to the filing of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting Borrower that would reasonably be expected to result in a Material Adverse Effect that occurs prior to the Commercial Operations Date, there has been a contribution to the Borrower's Equity Interests or other capital contribution, or an advance as an Unsecured Subordinated Promoter Loan, in respect of any liability or Indebtedness (or the creation of any reserve) arising as a result of such action, suit or proceeding, which contribution or advance has been required in accordance with GAAP to establish such reserve or is intended to pay or settle any such liability or Indebtedness, and (ii) such liability or Indebtedness has been fully and finally resolved or paid for an amount or aggregate amounts less than the aggregate amount of contribution to the Borrower's Equity Interests or other capital contribution, or advances as Unsecured Subordinated Promoter Loans, then, (iii) *provided*, at such time no Default or Event of Default shall have occurred and shall be continuing, following the effectiveness of such resolution or payment, an amount up to, but not exceeding, the then excess amount contributed as Equity Interests or other capital contribution, or advanced as an Unsecured Subordinated Promoter Loan, may be distributed or paid, as the case may be, to the Parent or Affiliate which has provided such contribution or Unsecured Subordinated Promoter Loan without the consent of the Required Lender being required.

SECTION 6.08    Transactions with Affiliates. The Borrower will not sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, including under any Supplier Financing, except for transactions or services in the ordinary course of business and in each case at prices and on terms and conditions not less favorable to the Borrower than could be obtained on an arm's-length basis from unrelated third parties. Each of the Supplier Financing with EPIL, and Affiliate of the Borrower, has been or shall be on back-to-back terms with the financing entered into by EPIL with the Upstream Supplier Financing Creditors, and the terms thereof shall not require a repayment schedule earlier than that set out in Section 2.09 of this Agreement and shall be substantially on the same terms and provisions as are set forth in Schedule 6.01, the rights under which, including

rights in respect of security, shall be assigned by EPIL to the Upstream Supplier Financing Creditors, and which shall be subject to an Intercreditor Agreement.

SECTION 6.09    Restrictive Agreements.  Other than in connection with the Loan Documents and any other documents entered into in connection with the Permitted Indebtedness, the Borrower will not, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement, including any Project Contract, any Offtake Contract or Agreement and any other contract entered into with respect to the Project that may fall in any exclusion in the definition of the term "Project Contract", that prohibits, restricts or imposes any condition upon the ability of the Borrower to create, incur or permit to exist any Lien to secure the Obligations (or any refinancing, restructuring or replacement thereof (other than with Unsecured Subordinated Promoter Loans)) upon any of its property or assets.

SECTION 6.10    Amendment of Material Documents.  (a)  The Borrower will not amend, modify or waive any of its rights under, or terminate, suspend or enter into any agreement relating to, (i) its certificate of incorporation, by laws or other organizational documents, including the Members Control Agreement, or (ii) the Existing Credit Agreement, and Supplier Financing (in each case other than a permitted refinancing thereof) or (iii) any of the Project Contracts or Offtake Contracts or Agreements; which, in case of the agreements and contracts referred to in clauses (ii) and (iii), would reasonably be expected to have an adverse effect upon the interests or rights of the Security Agent or the Secured Parties; *provided*, *however*, the Borrower may amend, waive, release or consent to any such amendment, waiver or release under any Project Contract or Offtake Contract or Agreement, after giving written notification to the Facility Agent, on behalf of the Lenders, to the extent required by applicable law.  Notwithstanding anything to the contrary in this Agreement, in connection with the possible settlement of the Great Lakes Litigation and restructuring or termination of the Great Lakes Contract, the Borrower, at its sole discretion and without any consent from the Lenders, may settle at its sole discretion the Great Lakes Litigation and may terminate, modify, amend and/or restate the Great Lakes Contract.  The Borrower will use its commercially reasonable efforts to obtain a Consent and Agreement in connection with the Great Lakes Contract, as modified or replaced.

(b)    Notwithstanding the foregoing, upon receiving a request in writing by the Borrower or the Parent to the Security Agent after the first testing of the Financial Covenants hereunder, the Security Agent shall release the Pledged Borrower LLC Interests, if at the time of such request by the Borrower or the Parent, no Event of Default shall have occurred and is continuing on such date and *provided, further* that, prior to any such release, the Borrower has provided a certified pro forma projection to the Lenders and the Facility Agent, indicating that on the date of such release, Borrower has calculated FACR, determined as set forth the definition of that term, will be at least 1.50. For the avoidance of doubt, except as stated in Section 6.01(x), nothing contained herein shall prevent the Borrower from amending, terminating, restating or otherwise modifying the Minnesota State Loan.

SECTION 6.11    Fiscal Year.  Borrower will not change its fiscal year to end on any date other than March 31 unless it provides written notice thereof within five (5) Business Days of any such change.

SECTION 6.12    <u>Financial Covenants</u>.  Beginning as at September 30, 2013, the Borrower will not, without the approval of the Required Lenders, permit:

(a)    the ratio of Net Debt to Adjusted Tangible Net Worth for each Relevant Period ending on the date set out below to exceed or be equal to:

(i)    1.85 for the Relevant Period ending September 30, 2013;

(ii)    1.70 for the Relevant Periods ending March 31, 2014 to and including March 31, 2016;

(iii)    1.50 for Relevant Periods ending September 30, 2016 to and including September 30, 2017; and

(iv)    1.25 for Relevant Periods ending March 31, 2018 and thereafter;

(b)    the ratio of Net Debt to EBITDA for each Relevant Period  ending on the date set out below to exceed or be equal to:

(i)    4.00 for the Relevant Period ending September 30, 2013;

(ii)    3.75 for the Relevant Periods ending March 31, 2014 to and including March 31, 2016;

(iii)    3.50 for the Relevant Periods ending September 30, 2016 to and including September 30, 2017; and

(iv)    3.00 for the Relevant Periods ending March 31, 2018 and thereafter;

(c)    the ratio of EBITDA to Net Finance Charges for each Relevant Period ending on the date set out below to be less than or equal to:

(i)    1.75 for the Relevant Period ending September 30, 2013;

(ii)    2.25 for each Relevant Period ending March 31, 2014 to and including March 31, 2016;

(iii)    2.50 for the Relevant Periods ending September 30, 2016 to and including September 30, 2017; and

(iv)    3.00 for the Relevant Periods ending March 31, 2018 and thereafter; and

(d)    the Debt Service Coverage Ratio for each Relevant Period ending on the date set out below to be less than or equal to:

(i)    1.25 for the Relevant Periods ending September 30, 2013 to and including March 31, 2016;

(ii)    1.40 for the Relevant Periods ending September 30, 2016 to and including September 30, 2017; and

(iii)    1.50 for the Relevant Periods ending March 31, 2018 and thereafter.

The foregoing financial ratios shall be complied with for each Relevant Period based on the audited and unaudited financial statements, respectively, prepared as at March 31 and based on the half year unaudited financial statements prepared as at September 30 of each fiscal year.  These financial covenants shall be complied with on a trailing twelve (12) months basis except for September 30, 2013 where two (2) times the half-year financials for the six (6) months ending September 30, 2013 shall be utilized.

SECTION 6.13    Ownership and Control of Borrower.  The Borrower will not consent to or take any action that would permit any transfer of Equity Interests in the Borrower or issue, or cause or permit the issuance of, any additional Equity Interests in the Borrower to any Person if as a result less than fifty-one percent (51%) of the Borrower's Equity Interests will or would following such issuance or transfer be owned of record and beneficially by Parent or other Affiliates of EGL.

ARTICLE VII

Events of Default

If any of the following events (each an "Event of Default") shall occur and be continuing:

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, unless such failure is caused by administrative or technical error and payment is made within three (3) Business Days after its due date;

(b)    the Borrower shall fail to pay (i) any interest on any Loan or (ii) any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, unless such failure is caused by administrative or technical error and payment is made within three (3) Business Days after its due date;

(c)    any representation or warranty made or deemed made (i) by or on behalf of the Borrower in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or (ii) by or on behalf of any Guarantor in the Guarantee Agreement, or by or on behalf of the Parent in the LLC Pledge Agreement, to which it is a party or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made, and, if such incorrect material representation or warranty is remediable, the underlying fact or circumstance making such representation or warranty incorrect is not cured within fifteen (15) Business Days of

knowledge thereof by a Responsible Officer of such incorrect representation or warranty, or notice thereof;

(d)    the Borrower shall fail to observe or perform any Financial Covenant; or the Borrower or any Guarantor shall fail to observe or perform any other covenant, condition or agreement contained in this Agreement or in any other Loan Document, including the creation of Additional Security Documents on any Additional Collateral Date, within fifteen (15) Business Days of the occurrence of such failure to observe or perform any such other covenant, condition or agreement, or notice thereof;

(e)    (i) a default shall occur (whether a default in payment or otherwise) under or with respect to any Indebtedness of the Borrower, if the effect of any such default has resulted in a demand for immediate payment of Indebtedness of the Borrower, or the acceleration of the stated maturity of Indebtedness of the Borrower, or shall permit the holder or holders or obligee or obligees of Indebtedness of the Borrower to demand payment of Indebtedness of the Borrower or accelerate the stated maturity of Indebtedness of the Borrower, and the aggregate amount of Indebtedness of the Borrower affected thereby, individually or in the aggregate, together with the aggregate amount of all Hedging Agreements of the Borrower affected by an event referred to in clause (f) below, at such time, equals or is in excess of twenty-five million Dollars (US$25,000,000);

(ii) a default in payment, equal or in excess of twenty-five million Dollars (US$25,000,000), together with the aggregate amount of all Hedging Agreements of the Parent or EGL (prior to the EGL Guarantee Release Date), as the case may be, affected by an event referred to in clause (f) below, shall occur, or any other default shall occur, under or with respect to any Indebtedness of the Parent or EGL (prior to the EGL Guarantee Release Date), if the effect of any such default has resulted in a demand for immediate payment of Indebtedness of such Guarantor, or the acceleration of the stated maturity of Indebtedness of such Guarantor;

(f)    the Borrower, the Parent or EGL (prior to the EGL Guarantee Release Date) defaults in the observance or performance of any material agreement or condition relating to any Hedging Agreement, or any other event shall occur or condition exist (other than any event or condition that does not result from any action or inaction by, and does not relate specifically to, the Borrower, the Parent or EGL (prior to the EGL Guarantee Release Date), the effect of which default or other event or condition is to cause any party to such Hedging Agreement (other than the Borrower, the Parent or EGL (prior to the EGL Guarantee Release Date)) to terminate such Hedging Agreement prior to its stated termination date, and the net termination payment obligations under Hedging Agreements not paid when due or when accelerated or early terminated, individually or in the aggregate, for the Borrower, the Parent or EGL (prior to the EGL Guarantee Release Date) each taken separately, equals or is in excess of twenty-five million Dollars (US$25,000,000);

(g)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower, the Parent or EGL (prior to the EGL Guarantee Release Date), or its or their debts, or of a substantial part of its or their assets, under any Federal or state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver,

trustee, custodian, sequestrator, conservator or similar official for the Borrower, the Parent or EGL (prior to the EGL Guarantee Release Date) for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

       (h)    the Borrower, the Parent or EGL (prior to the EGL Guarantee Release Date) shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (g) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower, the Parent or EGL (prior to the EGL Guarantee Release Date) or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, or (v) make a general assignment for the benefit of creditors;

       (i)    the Borrower, the Parent or EGL (prior to the EGL Guarantee Release Date) shall become unable, admit in writing its inability or fail generally, to pay its debts as they become due;

       (j)    one or more final and nonappealable judgments for the payment of money other than in respect of existing litigation described in Schedule 3.06 shall be rendered against the Borrower, the Parent or EGL (prior to the EGL Guarantee Release Date) and (i) the same shall remain undischarged for a period of forty-five (45) consecutive days during which execution shall not be effectively stayed, or (ii) any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower, the Parent or EGL (prior to the EGL Guarantee Release Date) to enforce any such judgment; *provided*, in each case, such judgment or judgments for the payment of money rendered against the Parent or EGL is equal to or exceeds fifteen million Dollars (US$15,000,000);

       (k)    an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect;

       (l)    any Lien purported to be created under any Security Document or Additional Security Document over any material Collateral or any material portion thereof shall cease to be, or shall be asserted by the Borrower not to be, valid and, to the extent contemplated by the applicable Security Document or Additional Security Document, with the priority required by the applicable Security Document, except as a result of the sale or other disposition of the applicable asset in a transaction permitted under the Loan Documents;

       (m)    either of the Guarantee Agreements shall cease to be, or shall be asserted by the Borrower or the Parent or EGL (prior to the EGL Guarantee Release Date) in writing not to be, valid and enforceable;

       (n)    any Governmental Authority (i) shall condemn, seize, nationalize or assume the management of or appropriate any material portion of the property, assets or

revenues of the Borrower without payment of compensation, or (ii) render unlawful, or enact a moratorium against, any payment of any Obligation required hereunder or under any other Loan Document;

(o)     a Change in Control of Borrower shall occur;

(p)     the Required Amount under the DSRA as specified in Section 5.15 shall not be deposited under the Collateral Account Agreement within seven (7) Business Days following the date the amount deposited in the DSRA under the Collateral Account Agreement is less than the Required Amount, including by reason of the application of funds out of the DSRA for the purpose of making a mandatory prepayment under Section 2.11(c)(vii) hereof;

(q)     on or prior to the sixth (6th) month anniversary of the date of this Agreement, (i) the Financial Closure shall not have occurred, or (ii) a Common Project Financing Facility shall not be executed by all parties thereto providing financing for the Project, together with the Supplier Financing, in an aggregate amount of not less than seven hundred thirteen million Dollars (US$713,000,000).

(r)     any Governmental Authority shall revoke any material operating license or other authorization of the Borrower for the Project or with respect to the Transactions contemplated thereby or hereunder which has a Material Adverse Effect; except if such revocation is cured within thirty (30) days of notice thereof;

(s)     the Commercial Operations Date shall fail to occur on or prior to the first to occur of (i) the date that is three (3) months after the Scheduled Commercial Operations Date (as such date is determined by the Required Lenders and the Borrower at the time of Financial Closure), and (ii) June 30, 2013;

(t)     there shall occur and be continuing any development or event that has or results in a Material Adverse Effect on any Obligor; or

(u)     on or prior to the sixth (6th) month anniversary of the date of this Agreement, the conditions in respect of the Security Documents as set forth in Sections 4.01(a) and (h) and Sections 4.02(a), (b), (c), (f) (g), (h) and (m) shall not have been satisfied (or waived in accordance with Section 9.02);

then, and in every such event (other than an event described in clause (g) or (h) of this Article), and at any time thereafter during the continuance of such event, the Facility Agent, may, and at the request of the Required Lenders shall, by prior written notice to the Borrower, specifying the occurrence and continuance of an Event of Default, take any or all of the following actions, at the same or different times:  (i) terminate the Total Commitment, and thereupon the Total Commitment and each Lender's Unused Commitment shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and (iii) exercise any or

all the remedies then available under the Security Documents and Additional Security Documents; and in case of any event with respect to the Borrower described in clause (g) or (h) of this Article, the Total Commitment shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

## ARTICLE VIII

### The Agents

Each of the Lenders, the Agents and the Issuing Bank hereby irrevocably appoints (a) Wells Fargo Bank Northwest, N.A., as Security Agent for the Secured Parties under this Agreement and the other Loan Documents, (b) ICICI Bank Limited, New York Branch, as Escrow Agent and Account Bank for the Secured Parties under this Agreement and the other Loan Documents, (c) ICICI Bank Limited, Singapore Branch, as Facility Agent under this Agreement, and (d) ICICI Bank Limited, as the Mandated Lead Arranger for the Lenders, the Agents and the Issuing Bank under this Agreement and the other Loan Documents. Each Lender and each Issuing Bank authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to the applicable Agent by the terms of the applicable Loan Documents, together with such actions and powers as are reasonably incidental thereto. The Mandated Lead Arranger, in its capacity as such, shall have no responsibilities or authority under this Agreement or the other Loan Documents.

Each of the Lenders serving as Issuing Bank, the Facility Agent, the Escrow Agent and Account Bank or the Mandated Lead Arranger shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the applicable Issuing Bank, Agent or Mandated Lead Arranger, and each of such Lender and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or other Affiliate thereof as if it were not an Issuing Bank, Agent or the Mandated Lead Arranger.

In acting under this Agreement, including but not limited to any actions taken following an Event of Default, no Agent shall have any implied duties or obligations except those expressly set forth in the applicable Loan Documents. Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that the Facility Agent is required to exercise in writing as directed by the Lenders whose approval is required under a Loan Document (or such other number or percentage of the Lenders or Secured Parties as shall be necessary under the circumstances as provided in Section 9.02 or the applicable Loan Document), and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose, or shall be liable for the failure to disclose, any information relating to the Borrower that is communicated to or obtained by the bank serving as such Agent or any of its Affiliates in any capacity under the

Loan Documents, the Parent Credit Agreement or the Loan Documents thereunder. No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Lenders whose approval is required under a Loan Document (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence, fraud or willful misconduct. No Agent shall be deemed to have knowledge of any Default unless and until (i) it already has actual knowledge thereof or (ii) written notice thereof is given to the Facility Agent by the Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (A) any statement, warranty or representation made in or in connection with any Loan Document, (B) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (D) the legality, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (E) the adequacy, accuracy and/or completeness of any information supplied to the Agent in connection with any Loan Document or the transactions contemplated therein, (F) any losses to any person or liability arising as a result of taking or refraining from taking any action in relation to any Loan Document, (G) any shortfall which may arise on the enforcement of any relevant Loan Document, or (H) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral under the Security Documents and to carry out the rights of the secured parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents, including, specifically with respect to the Pledged Borrower LLC Interests, upon the occurrence of an Event of Default, and otherwise applicable law. In addition, each Lender, each Agent and each Issuing Bank hereby irrevocably authorizes and directs the Agents to enter, on behalf of each of them, into the Security Documents and agrees to be bound by the terms of the Security Documents. Each Lender, each Agent and each Issuing Bank hereby irrevocably authorizes and directs the Agents, as applicable, to enter into amendments from time to time to the Security Documents or take any other action for the purpose of naming as Secured Parties thereunder additional Secured Project Lenders that become parties to this Agreement after the Effective Date.

In acting under this Agreement, including but not limited to any actions taken following an Event of Default, each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Security Agent shall act in accordance with instructions given to it by the Facility Agent and may refrain from acting unless and until such instructions are received by it, and it

and shall incur no liability for acting in accordance with such instructions or for refraining from acting until it receives such instructions.

Each Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents or representative appointed by the applicable Agent at the cost of the Borrower. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

No Agent shall commence any litigation in the name of, or on behalf of, any Lender without the prior consent of such Lender; *provided, however*, that notwithstanding the foregoing, in the event that any Agent commences any litigation at the direction of the Lenders, any Lender that shall not have consented thereto shall remain liable for its pro rata share of the costs and expenses of such Agent pursuant to the provisions of this Agreement.

The Security Agent shall not be responsible or liable for: (A) determining the manner in which a security interest over any Collateral is obtained, perfected, maintained or discharged, (B) obtaining any license, consent or other authority for the execution, delivery, legality or enforceability of any Loan Document or Security Document, or (C) registering, filing, recording, perfecting, maintaining, discharging or otherwise protecting any security interest or other rights under any Loan Document or Security Document.

In acting under this Agreement, including but not limited to any actions taken following an Event of Default, the Security Agent may refrain from acting in accordance with the instructions of the Facility Agent until it has received any indemnification and/or security that it may in its absolute discretion require (whether by way of payment in advance or otherwise) for all costs, losses and liabilities which it may incur.

The Mandated Lead Arranger and, subject to the appointment and acceptance of a successor as provided in this paragraph, any Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Lenders shall have the right, with the consent of the Borrower (so long as not Event of Default has occurred and is continuing), to appoint a successor Agent. If no successor shall have been so appointed by the Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders and the Borrower, appoint its successor, which shall be a bank or financial institution with an office in the same jurisdiction in which the retiring Agent performs its duties under the relevant Loan Document. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After any Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in

respect of any actions taken or omitted to be taken by any of them while it was acting as an Agent.  Any retiring Agent shall not be responsible for payment of any costs incurred by any other party occurring as a result of such Agent's resignation.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lenders and based on such documents and information, as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lenders and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

The obligations of the Agents and the Mandated Lead Arranger shall be separate and several and none of them shall be responsible or liable for the acts or omissions of any other, except, to the extent that any such Agent serves in more than one agency capacity, such Agent shall be responsible for the acts and omissions relating to each such agency function.

Without the prior written consent of the Lenders but subject to Section 9.02(b), the Agents will not, except as contemplated by this paragraph, consent to any modification, supplement or waiver of any Security Document.  Notwithstanding any other provision of this Article VIII, the Security Agent will, at the request of Borrower, release (or subordinate such interest) from the Security Documents (and enter into an amendment to any applicable Security Document and execute such other instruments as may be necessary in connection therewith), any interest of the Security Agent upon receipt by the Facility Agent of a certificate from a Responsible Officer of Borrower specifying the asset to be released and the related transaction and certifying that after giving effect thereto, no Event of Default shall occur or be continuing, specific assets (which may either be released from the Lien of the Security Documents or excluded from the after-acquired property clauses of the Security Documents) as required to be released to allow sales, transfers or other dispositions, secured financings, capital leases and sale leaseback transactions and pledges of assets expressly permitted hereby.

The parties hereto acknowledge and agree that: (A) this Agreement is executed, delivered and performed by Wells Fargo Bank Northwest, N.A., not in its individual capacity but solely as Security Agent; (B) each of the representations, undertakings and agreements made herein on the party of the Security Agent are made and intended not as individual representations, undertaking and agreements of Wells Fargo Bank Northwest, N.A. but are made and intended for the purpose of binding only the Security Agent in such capacity; and (C) under no circumstances shall Wells Fargo Bank Northwest, N.A., be individually liable for the payment of any indebtedness or expenses or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Security Agent herein except for in the case of the Security Agent's own gross negligence or willful misconduct.

## ARTICLE IX

### Miscellaneous

SECTION 9.01    <u>Notices</u>.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)    if to the Borrower, to it at Essar Steel Minnesota LLC, 555 W 27th Street, Hibbing, Minnesota, U.S.A. 55746, Attention: Narasimhan Ramakrishnan, Director of Finance (Telecopy No. 1-218-312-1434) (narasimhan.ramakrishnan@essar.com);

(ii)    if to ICICI Bank Limited, as Mandated Lead Arranger, to it at ICICI Bank Limited, New York Branch, 500 5th Avenue, Suite No. 2830, New York, New York U.S.A. 10110, Attention: Mr. Ashish Bafna (Telecopy No. +1 646 827 8435);

(iii)    if to ICICI Bank Limited as the Escrow Agent and Account Bank, to it at ICICI Bank Limited, New York Branch, 500 5th Avenue, Suite No. 2830, New York, New York U.S.A. 10110, Attention: Mr. Ashish Bafna (Telecopy No. +1 646 827 8435);

(iv)    if to ICICI Bank Limited as the Initial Lender and the Issuing Bank, to it at ICICI Bank Limited, New York Branch, 500 5th Avenue, Suite No. 2830, New York, New York U.S.A. 10110, Attention: Mr. Ashish Bafna (Telecopy No. +1 646 827 8435);

(v)    if to ICICI Bank Limited, Singapore Branch as the Facility Agent, to it at ICICI Bank Limited, Singapore Branch, 9 Raffles Place, #50-01 Republic Plaza, Singapore 048619, Attention: Mr. Virendra Dhir (Telecopy No. +65 6435 7474); and

(vi)    if to the Security Agent, to it at Wells Fargo Bank Northwest, N.A., 299 S. Main Street, 12th Floor, MAC U1228-120, Salt Lake City, UT, 84111, Attention Corporate Trust Lease Group (Telecopy No. +1 (801) 246-5053, (ctsleasegroup@wellsfargo.com).

(b)    Notices and other communications to the Facility Agent or the Lenders hereunder may be delivered pursuant to procedures approved by the Facility Agent; *provided* that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Facility Agent, and the applicable Lender.  The Agents, the Lenders, and the Borrower shall accept notices and other communications to it hereunder by electronic communication pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 9.02    <u>Waivers; Amendments</u>. (a) No failure or delay by any Agent, any Lender or any Issuing Bank in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agents, the Lenders and the Issuing Banks hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or the issuance, amendment, extension or renewal of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether any Agent, any Lender or any Issuing Bank may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the relevant Agent, the Borrower and the other Persons that are parties thereto, in each case with the consent of the Required Lenders; *provided* that no such agreement shall (i) increase the Term Loan Commitment of any Lender without the written consent of such Lender, (ii) reduce or forgive the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby, (iii) postpone the maturity of any Loan, or the required date of reimbursement of any LC Disbursement under Section 2.06, or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Term Loan Commitment, without the written consent of each Lender affected thereby, (iv) change Section 2.18(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (v) change any of the provisions of this Section or the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (vi) release any of the Guarantors from its Guarantee Agreement or limit the liability of any of the Guarantors in respect of its Guarantee Agreement, without the written consent of each Lender, (vii) release all or substantially all the Collateral from the Liens of the Security Documents (other than in connection with the Pledged Borrower LLC Interests), without the written consent of each Lender; or (viii) except as contemplated in Section 6.02(h), release or change any priority in respect of any Collateral or change the granting clause of any Security Document in respect of any Collateral thereunder or payments due to any Lender under any Security Document without the written consent of each Lender, *provided* further that no such agreement shall amend, modify or otherwise affect the rights or duties of any Agent or any Issuing Bank without the prior written consent of such Agent or such Issuing Bank, as the case may be. Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by the Borrower, the

Credit Agreement                                              - 94 -

Required Lenders and the Facility Agent if (i) by the terms of such agreement any remaining Unused Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment, and (ii) at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan, and each related Issuing Bank receives payment in full of the LC Exposure in respect of any outstanding Letter of Credit, made or issued by it and all other amounts owing to it or accrued for its account under this Agreement.  In addition, a Common Project Financing Facility may become effective as set forth in Section 2.21 hereof in accordance with the provisions thereof.

SECTION 9.03    Expenses; Indemnity; Damage Waiver. (a)  The Borrower agrees to pay (i) all reasonable out-of-pocket expenses incurred by each Agent and the Mandated Lead Arranger, including the reasonable fees, charges and disbursements of the Consultants and counsel for each Agent and the Mandated Lead Arranger and its Affiliates, in connection with the syndication of the credit facilities provided for herein, the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable out-of-pocket expenses incurred by each Issuing Bank in connection with the issuance, amendment, extension or renewal of any Letter of Credit or any demand for payment thereunder and (iii) all out-of-pocket expenses incurred by any Agent, any Issuing Bank or any Lender, including the fees, charges and disbursements of any counsel for any Agent, any Issuing Bank or any Lender, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b)     The Borrower agrees to indemnify each Agent, each Lender and each Issuing Bank and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all stamp duties, registration charges, statutory duties, losses, claims, damages, liabilities and related reasonable expenses, including the fees, charges, and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by any Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower, or any Environmental Liability related in any way to the Borrower, other than losses, claims, damages, liabilities and related costs and expenses arising from a release of Hazardous Materials or Environmental Liability (except releases of Hazardous Materials or Environmental Liabilities actually caused by the Borrower or any of its tenants, contractors or agents) to the extent (and only to the extent) first occurring and first existing after title to the relevant real property or facility is vested in any Agent or Lenders or other party after the completion of

foreclosure proceedings or the granting of a deed-in-lieu of foreclosure or similar transfer of title, or (iv) any actual claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, fraud or willful misconduct of such Indemnitee.

(c)      To the extent that the Borrower fails to pay any amount required to be paid by it to any Agent or any Issuing Bank under paragraph (a) or (b) of this Section (but without affecting the Borrower's obligations thereunder), each Lender severally agrees to pay to the applicable Agent or the applicable Issuing Bank, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent or such Issuing Bank, as the case may be, in its capacity as such.  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total Term Loan Exposures and Unused Commitments at the time.  If any action, suit or proceeding arising from any of the foregoing is brought against any Lender, any Agent, any Issuing Bank or other Person indemnified or intended to be indemnified pursuant to this Section 9.03, the Borrower, to the extent and in the manner directed by such indemnified party, will resist and defend such action, suit or proceeding or cause the same to be resisted and defended by counsel designated by Borrower (which counsel shall be satisfactory to such Lender, such Agent, such Issuing Bank or other Person indemnified or intended to be indemnified).  If Borrower shall fail to do any act or thing which it has covenanted to do hereunder or any representation or warranty on the part of Borrower contained in this Agreement shall be breached, any Lender, any Issuing Bank or any Agent may (but shall not be obligated to) do the same or cause it to be done or remedy any such breach, and may expend its funds for such purpose.  Any and all amounts so expended by any Lender, any Issuing Bank or any Agent shall be repayable to it by Borrower immediately upon such Person's demand therefor, provided that if the Borrower fails to pay such amount, each Lender severally agrees to repay the Agent or Issuing Bank as set forth above.

(d)      To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof.

(e)      All amounts due under this Section shall be payable not later than thirty (30) days after written demand therefor (which shall include reasonable detail in connection with the requested amount).

(f)      The provisions of this Section 9.03 shall not apply with respect to Taxes, which shall be governed solely by Section 2.17.

SECTION 9.04    Successors and Assigns. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents, the Issuing Banks and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Loan Commitment or LC Exposure and the Loans at the time owing to it) without the prior consent of the Borrower; *provided, however,* following an Accession Project Financing, the following procedures shall apply (and no such procedures shall apply prior to the appointment of a Facility Agent):

(i)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender or an Affiliate of a Lender, or an assignment of the entire remaining amount of the assigning Lender's Term Loan Commitment or Loans, the amount of the Term Loan Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Facility Agent) shall not be less than five million Dollars (US$5,000,000) unless the Facility Agent otherwise consents;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Facility Agent an Assignment and Assumption, together with a processing and recordation fee established by the Facility Agent, if required by it, payable by either the assignee or the assignor (*provided* that only one such fee shall be payable in respect of simultaneous assignments by a Lender and its Approved Funds); and

(D)    the assignee, if it shall not be a Lender, shall deliver to the Facility Agent any tax forms required by Section 2.17(f).

(ii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iii)    The Facility Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Loan Commitment of, and principal amount of the Loans owing to, each Lender and its LC Exposure pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrower, the Agents, the Issuing Banks and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent, any Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(iv)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Facility Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(v)    At the request of the Borrower, the Facility Agent or the assignee under an Assignment and Assumption, each of the Borrower, each applicable Agent and such assignee shall enter into any amendments to the Security Documents or Additional Security Documents or take any other actions for the purpose of naming such assignee as a Secured Party thereunder.

(c)    Any Lender may, without the consent of, or notice to, the Borrower, the Facility Agent or the Issuing Banks, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Term Loan Commitment or LC Exposure and the Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) the Borrower, the Agents, the Issuing Banks and the other Lender shall

continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (D) such Lender will continue to give prompt attention to and process (including, if required, through discussions with Participants) requests for waivers or amendments hereunder.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant. Subject to paragraph (c)(ii) of this Section, the Borrower agree that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, *provided* such Participant agrees to be subject to Section 2.17(c) as though it were a Lender.

(d)     A Participant shall not be entitled to receive any greater payment under Section 2.15 (other than paragraph (b) thereof) or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant shall not be entitled to the benefits of Section 2.17 unless the Borrower is notified of the participation sold to such Participant and, if applicable, such Participant agrees, for the benefit of the Borrower, to comply with Section 2.17(f) as though it were a Lender.

(e)     Any Lender may, without the consent of the Borrower or the Facility Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 9.05    Survival.  All covenants, agreements, representations and warranties made by the Borrower in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Agent, any Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated.  The provisions of Sections 2.15, 2.17, 9.03, 9.12 and Article VIII shall survive the repayment of the Loans and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the expiration or

termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to any Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Facility Agent and when the Facility Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.07    Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08    Right of Set off. If an Event of Default shall have occurred and be continuing, each Lender and each Issuing Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations at any time owing (although such obligations may be unmatured) by such Lender or Issuing Bank or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations then due of the Borrower now or hereafter existing under this Agreement.  The applicable Lender or Issuing Bank shall notify the Borrower and the Facility Agent of such set off and application, *provided* that any failure to give or any delay in giving such notice shall not affect the validity of any such set off and application under this Section.  The rights of each Lender and each Issuing Bank under this Section are in addition to other rights and remedies (including other rights of set off) that such Lender and such Issuing Bank may have.

SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process; Sovereign Immunity. (a)  This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)    The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of

New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that any Agent, any Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any jurisdiction.

(c)    The Borrower shall irrevocably designate Essar Americas, Inc., with its office at 277 Park Avenue, 35th Floor, New York, New York 10017, U.S.A., and its successors as the Borrower's designee, appointee and agent to receive, accept and acknowledge, for and on behalf of the Borrower, service of any and all legal process, summons, notices and documents which may be served in such action, suit or proceeding relating to the Credit Agreement or any other Transaction Documents in the case of the courts of the located in the Borough of Manhattan, City and State of New York, which service may be made on any such designee, appointee and agent in accordance with legal procedures prescribed for such courts.  So long as the Borrower has any obligations under this Agreement, the Borrower agrees to take any and all action necessary to continue such designation in full force and effect and should such designee, appointee and agent become unavailable for this purpose for any reason not attributable to the Borrower, the Borrower will immediately grant a similar special irrevocable power of attorney to a new designee, appointee and agent with offices in New York, New York, U.S.A., which shall irrevocably agree to act as such, with the powers and for purposes specified in this Section 9.09.  The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(e)    The Borrower is not entitled in any jurisdiction in which judicial proceedings may at any time be commenced with respect to any Loan Document, to claim for itself or its property, assets or revenues any immunity (whether by reason of sovereignty or otherwise) from suit, jurisdiction of any court, attachment prior to judgment, setoff, execution of a judgment or from any other legal process or remedy, and to the extent that there may be attributed to the Borrower such an immunity (whether or not claimed), and to the extent that the Borrower may hereafter be entitled to claim such an immunity, the Borrower hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity.

SECTION 9.10    WAIVER OF JURY TRIAL.
EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED
BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY
LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING
TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS
CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT
OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO
REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS
REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD
NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER
AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE
BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS,
THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11    Headings. Article and Section
headings and the Table of Contents used herein are for convenience of reference only, are not
part of this Agreement and shall not affect the construction of, or be taken into consideration in
interpreting, this Agreement.

SECTION 9.12    Confidentiality. Each of the
Agents, the Issuing Banks and the Lenders agrees to maintain the confidentiality of the
Information (as defined below), except that Information may be disclosed (a) to its and its
Affiliates' governors, officers, employees and agents, including accountants, legal counsel and
other advisors (it being understood that the Persons to whom such disclosure is made will be
informed of the confidential nature of such Information and instructed to keep such Information
confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by
applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party
to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit,
action or proceeding relating to this Agreement or any other Loan Document or the enforcement
of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially
the same as those of this Section, to (i) any actual or prospective assignee of or Participant in any
of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or
its advisors) to any swap or derivative transaction relating to the Borrower or any other Loan
Party and its obligations, (g) with the consent of the Borrower or (h) to the extent such
Information (i) becomes publicly available other than as a result of a breach of this Section or (ii)
becomes available to any Agent, any Issuing Bank or any Lender on a nonconfidential basis from
a source other than the Borrower or other Obligor that, to its knowledge, was not obtained in
breach or contravention of a confidentiality agreement or non disclosure restriction. In the event
of a breach hereof, such breaching party shall promptly inform the Person whose confidential
Information has been disclosed. For the purposes of this Section, "Information" means all
information received from or on behalf of the Borrower relating to the Borrower or its business,
other than any such information that is available to any Agent, any Issuing Bank or any Lender
on a nonconfidential basis prior to disclosure by the Borrower. Any Person required to maintain
the confidentiality of Information as provided in this Section shall be considered to have
complied with its obligation to do so if such Person has exercised the same degree of care to
maintain the confidentiality of such Information as such Person would accord to its own
confidential information.

SECTION 9.13    Interest Rate Limitation.
Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any
Loan or participation in any LC Disbursement, together with all fees, charges and other amounts
which are treated as interest on such Loan or LC Disbursement or participation therein under
applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the
"Maximum Rate") which may be contracted for, charged, taken, received or reserved by the
Lenders holding such Loan or LC Disbursement or participation therein in accordance with
applicable law, the rate of interest payable in respect of such Loan or LC Disbursement or
participation therein hereunder, together with all Charges payable in respect thereof, shall be
limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have
been payable in respect of such Loan or LC Disbursement or participation therein but were not
payable as a result of the operation of this Section shall be cumulated and the interest and
Charges payable to such Lender in respect of other Loans or LC Disbursements or participations
therein or periods shall be increased (but not above the Maximum Rate therefor) until such
cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date
of repayment, shall have been received by such Lender.

SECTION 9.14    Judgment Currency.  The
specification of payment in Dollars and in New York City, with respect to amounts payable to
any Lender (or permitted assignee or Participant), any Agent or any Issuing Bank hereunder and
under the other Loan Documents is of the essence, and Dollars shall be the currency of account
in all events.  The payment obligations of a Borrower under this Agreement or any other Loan
Document shall not be discharged by an amount paid by the Borrower in another currency or in
another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid
on conversion to Dollars and transfer to New York City under normal banking procedures does
not yield the amount of Dollars in New York City due hereunder.  If for the purpose of obtaining
judgment in any court it is necessary to convert a sum due hereunder in Dollars into another
currency (the "Second Currency"), the rate of exchange which shall be applied shall be that at
which in accordance with normal banking procedures the Facility Agent could purchase Dollars
with the Second Currency on the Business Day next preceding that on which such judgment is
rendered.  The obligation of a Borrower in respect of any such sum due from the Borrower to
any Agent, any Issuing Bank or any Lender (or permitted assignee or Participant) hereunder or
under any other Loan Document (an "Entitled Person") shall, notwithstanding the rate of
exchange actually applied in rendering such judgment, be discharged only to the extent that on
the Business Day following receipt by such Entitled Person of any sum adjudged to be due
hereunder or under any other Loan Document in the Second Currency such Entitled Person may
in accordance with normal banking procedures purchase in the free market and transfer to New
York City Dollars with the amount of the Second Currency so adjudged to be due; and the
Borrower hereby agrees, as a separate obligation and notwithstanding any such judgment, to
indemnify such Entitled Person against, and to pay such Entitled Person on demand, in Dollars in
New York City, the difference between the sum originally due to such Entitled Person from the
Borrower in Dollars and the amount of Dollars so purchased and transferred.

SECTION 9.15    Patriot Act.  Each Lender and the
Facility Agent (for itself and not on behalf of any Lender), hereby notifies the Borrower that
pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record
information that identifies the Borrower, which information includes the name and address of the

Borrower and other information that will allow such Lender or the Facility Agent, as applicable, to identify the Borrower in accordance with the Patriot Act.  The Borrower agrees to provide the Lenders, upon request, with all documentation and other information required from time to time to be obtained by the Lenders pursuant to applicable "know your customer" and anti-money-laundering rules and regulations, including the Patriot Act.  Neither the Borrower nor any of its Affiliates is in violation of any requirement of applicable law or regulation relating to terrorism or money laundering.

SECTION 9.16    <u>No Fiduciary Relationship</u>.  The Borrower agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Borrower and the Agents, the Lenders, the Issuing Banks and their Affiliates will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Agents, the Lenders, the Issuing Banks or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.

SECTION 9.17    <u>Nonpublic Information</u>. (a)  Each Lender acknowledges that all information furnished to it pursuant to this Agreement from the Borrower or on its behalf and relating to the Borrower or its business may include material nonpublic information concerning the Borrower or its securities, and confirms that it has developed compliance procedures regarding the use of material non public information and that it will handle such material nonpublic information in accordance with the procedures and applicable law, including federal and state securities laws.

(b)    All such information, including requests for waivers and amendments, furnished by the Borrower or the Facility Agent, pursuant to it, or in the course of administering, this Agreement will be syndicate-level information, which may contain material nonpublic information about the Borrower and its securities.  Accordingly, each Lender represents to the Borrower and the Facility Agent, that it has identified a credit contact who may receive information that may contain material nonpublic information in accordance with its compliance procedures and applicable law, including federal and state securities laws.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

ESSAR STEEL MINNESOTA LLC, as the Borrower

by _____
      Name:
      Title:

ICICI BANK LIMITED, Singapore Branch, as Facility Agent

by _____
      Name:
      Title:

WELLS FARGO BANK NORTHWEST, N.A., as Security Agent

by _____
      Name:
      Title:

ICICI BANK LIMITED, New York Branch, as Issuing Bank and Escrow Agent and Account Bank

by _____
      Name:
      Title:

ICICI BANK LIMITED, as Mandated Lead Arranger

by _____
      Name:
      Title:

INITIAL LENDER

ICICI BANK LIMITED, New York Branch,
    as a Lender

by    _____
      Name:
      Title: