# EXHIBIT D

# FACILITY AGREEMENT

Dated June 01, 2012
Made at New Delhi

### Amongst

### ESSAR PROJECTS (INDIA) LIMITED
(*As Borrower*)

And

### CENTRAL BANK OF INDIA
(*As Lender*)

And

### EXPORT IMPORT BANK OF INDIA
(*As Lender*)

And

### CENTRAL BANK OF INDIA
(*As Lead Bank/Facility Agent*)

ALLIANCE CORPORATE LAWYERS
805, 8th Floor, Arcadia,
Nariman Point,
Mumbai- 400 021.

# TABLE OF CONTENTS

ARTICLE I .........................................................................................................................5

DEFININITIONS AND INTERPRETATION.........................................................................5

    SECTION 1.01    DEFINITIONS ...........................................................................5
    SECTION 1.02    INTERPRETATION ...................................................................5

ARTICLE II .......................................................................................................................12

THE FACILITIES ...............................................................................................................14

    SECTION 2.01    AMOUNT AND TERMS OF FACILITIES.................................14
    SECTION 2.02    BORROWING .........................................................................14
    SECTION 2.03    INTEREST .............................................................................15
    SECTION 2.04    APPLICATION PROCESSING AND DOCUMENTATION FEE ..........16
    SECTION 2.05    SERVICE FEES........................................................................18
    SECTION 2.06    APPOINTMENT OF LEAD BANK/FACILITY AGENT ...............18
    SECTION 2.07    SYNDICATION CHARGES.........................................................18
    SECTION 2.08    UPFRONT FEE ......................................................................19
    SECTION 2.09    AVAILABILITY PERIOD..........................................................19
    SECTION 2.10    DISBURSEMENTS PENDING CREATION OF SECURITY / INTERIM DISBURSEMENTS ...............19
    SECTION 2.11    REPAYMENT .........................................................................19
    SECTION 2.12    PAYMENTS ...........................................................................20
    SECTION 2.13    PREMATURE REPAYMENT......................................................21
    SECTION 2.14    SPECIAL PROVISIONS RELATING TO PRE-SHIPMENT FACILITIES...........................21
    SECTION 2.15    APPROPRIATION OF PAYMENTS .............................................22
    SECTION 2.16    IMPOSTS, COSTS AND CHARGES .............................................23
    SECTION 2.17    ILLEGALITY .........................................................................23
    SECTION 2.18    GENERAL CONDITIONS TO FORM AN INTEGRAL PART OF AGREEMENT....................24

ARTICLE III .....................................................................................................................25

SECURITY .........................................................................................................................25

    SECTION 3.01    SECURITY FOR THE PRE-SHIPMENT LOANS ..........................25
    SECTION 3.02    SECURITY FOR THE POST-SHIPMENT LOANS ........................25

ARTICLE IV .....................................................................................................................28

CONDITIONS PRECEDENT ..............................................................................................28

    SECTION 4.01    CONDITIONS TO EFFECTIVENESS ...........................................28
    SECTION 4.02    PRE-DISBURSEMENT CONDITIONS FOR PRE-SHIPMENT FACILITY ........................28
    SECTION 4.03    CONDITIONS PRECEDENT TO INITIAL BORROWING DATE UNDER POST-SHIPMENT FACILITY 30
    SECTION 4.04    CONDITIONS PRECEDENT TO EACH BORROWING DATE .................................
    SECTION 4.05    OTHER CONDITIONS .............................................................32
    SECTION 4.06    SPECIAL CONDITIONS............................................................32
    SECTION 4.07    MANDATORY PRE-PAYMENT BY ESML.................................36
    SECTION 4.08    INTER CREDITOR AGREEMENT ..............................................36
                                         37

ARTICLE V .......................................................................................................................38

REPRESENTATIONS AND WARRANTIES.........................................................................38

    SECTION 5.01    REPRESENTATIONS & WARRANTIES OF THE BORROWER .........38
    SECTION 5.02    RELIANCE ............................................................................38
    SECTION 5.03    ACKNOWLEDGEMENT AND WARRANTY ................................43
    SECTION 5.04    RIGHTS AND REMEDIES NOT LIMITED ..................................43
    SECTION 5.05    REPETITION OF REPRESENTATION AND WARRANTIES................43

ARTICLE VI .....................................................................................................................45

COVENANTS OF THE BORROWER ...................................................................................45

    SECTION 6.01    AFFIRMATIVE COVENANTS ...................................................45
    SECTION 6.02    NEGATIVE COVENANTS .........................................................48

ARTICLE VII ....................................................................................................................50

ACCOUNTS .......................................................................................................................50
                                        50

SECTION 7.01    ACCOUNT BANK AND ACCOUNTS ................................................................ 50

ARTICLE VIII ..................................................................................................... 51

EVENTS OF DEFAULT ........................................................................................... 51

SECTION 8.01    EVENTS OF DEFAULT .................................................................... 51
SECTION 8.02    CUMULATIVE RIGHTS ................................................................... 51
SECTION 8.03    NOTICE TO THE LENDERS ON THE HAPPENING OF AN EVENT OF DEFAULT ... 56
SECTION 8.04    RIGHT TO DISCLOSE/PUBLISH THE NAMES OF THE BORROWER AND ITS DIRECTORS AS ... 57
DEFAULTERS    57

ARTICLE IX ....................................................................................................... 58

SUSPENSION & TERMINATION ................................................................................ 58

SECTION 9.01    SUSPENSION ................................................................................ 58
SECTION 9.02    SUSPENSION TO CONTINUE TILL DEFAULT REMEDIED ........................ 58
SECTION 9.03    TERMINATION .............................................................................. 58
SECTION 9.04    CANCELLATION OF COMMITMENTS .................................................. 58

ARTICLE X ........................................................................................................ 59

EFFECTIVE DATE OF AGREEMENT & INDEMNIFICATION ................................................ 59

ARTICLE XI ....................................................................................................... 61

MISCELLANEOUS ................................................................................................. 61

SECTION 11.01    AMENDMENT ............................................................................. 61
SECTION 11.02    NOTICE .................................................................................... 61
SECTION 11.03    EVIDENCE AND CALCULATIONS ..................................................... 61
SECTION 11.04    COSTS AND EXPENSES .................................................................. 61
SECTION 11.05    NOVATIONS AND PARTICIPATIONS .................................................. 61
SECTION 11.06    GOVERNING LAW ........................................................................ 62
SECTION 11.07    JURISDICTION ............................................................................ 64
SECTION 11.08    INCORPORATION OF FINANCING DOCUMENTS .................................. 64
SECTION 11.09    EXECUTION IN COUNTERPARTS ...................................................... 65
SECTION 11.10    WAIVER NOT TO IMPAIR THE RIGHTS OF THE LENDERS ...................... 65
SECTION 11.11    PARTIAL INVALIDITY .................................................................... 65

SCHEDULE I ...................................................................................................... 67

REPAYMENT SCHEDULE ........................................................................................ 67

A.    PRE-SHIPMENT LOAN ..................................................................................... 67

B.    POST-SHIPMENT LOAN .................................................................................... 67

SCHEDULE II ..................................................................................................... 68

DRAWDOWN SCHEDULE ........................................................................................ 68

SCHEDULE III .................................................................................................... 69

ADDRESS OF PARTIES TO THIS AGREEMENT IN ACCORDANCE WITH SECTION 11.2 ............. 69

EXHIBIT A ........................................................................................................ 71

FORM OF NOTICE OF BORROWING ......................................................................... 71

FORM OF NOVATION AGREEMENT ........................................................................... 73

ANNEXURE ........................................................................................................ 77

GENERAL CONDITIONS ......................................................................................... 77



## FACILITY AGREEMENT

THIS FACILITY AGREEMENT (**"this Agreement"**) made at New Delhi on this 1ˢᵗ day of June, 2012

### AMONGST

**Essar Projects (India) Ltd.**, a public company within the meaning of Companies Act, 1956 and having its registered office at Essar House, 11 K.K.Marg, Mahalaxmi, Mumbai -400 034 and its offices, among others, at Prakash Deep, 10th Floor, 7 Tolstoy Marg, New Delhi–110001 (hereinafter referred to as **"the Company"** or **"Borrower"**, as the context may require, which expression shall, unless it be repugnant to the subject or context thereof, include its successors and permitted assigns) of the FIRST PART

Page 1 of 86

| CBI<br>(as Lead Bank/ Facility Agent) | CBI<br>(as Lender) | Exim Bank<br>(as Lender) | EPIL<br>(as Borrower) |
|---|---|---|---|
| | | | |



दिल्ली DELHI                                                                T 043824

**AND**

**Central Bank of India,** a body corporate constituted under the Banking Companies (Acquisition and Transfer of Undertaking) Act, 1970 and having its central office at Chandermukhi, Nariman Point, Mumbai – 400 021 and Corporate Finance branch at 1st Flr., MMO Building, Fort, Mumbai – 400 023 (hereinafter referred to as "**CBI**" or "**Lender**", as the context may require, which expression shall, unless it be repugnant to the subject or context thereof, include its successors and permitted assigns)

**AND**

**Export-Import Bank of India,** a corporation established under the Export Import Bank of India Act, 1981, and having its Head office at Centre 1 building, 21st flr., World Trade Centre Complex, Cuffe Parade, Mumbai – 400 005 (hereinafter referred to as "**Exim Bank**" or "**Lender**", as the context may require, which expression shall, unless it be repugnant to the subject or context thereof, include its successors and assigns).

Page **2** of 86

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

(Each of CBI and Exim Bank are hereinafter, collectively referred to as "Lenders" which expression shall unless it be repugnant to the subject, context or meaning thereof, be deemed to mean and include their successors and assigns) of the SECOND PART

AND

Central Bank of India, a body corporate constituted under the Banking Companies (Acquisition and Transfer of Undertaking) Act, 1970, and having its central office at Chandermukhi, Nariman Point, Mumbai – 400 021 and Corporate Finance branch at 1st flr., MMO Building, Fort, Mumbai – 400 023 acting as Lead Bank (hereinafter referred to as "Lead Bank" or "Facility Agent", which expression shall, unless it be repugnant to the subject or context thereof, include its successors and permitted assigns) of the THIRD PART

(Each of the parties mentioned above are hereinafter collectively referred to as "Parties" and individually as a "Party")

WHEREAS

A.   The Borrower in terms of the Contract (as defined in section 1.01 herein after) dated May 5, 2010 entered into with Essar Steel Minnesota LLC, Minnesota, USA, ("ESML" or "Buyer") has agreed to execute works and supply goods, equipment and products and / provide services for the proposed 4.10 million tons p.a. Integrated Iron Ore Pellet Plant being set up by the Buyer along with iron ore mining at Nashwauk, Minnesota, USA with a project cost of USD 1096.91 mn in accordance with the terms and conditions of the Contract.

B.   In consideration of the Borrower supplying the equipments and services to ESML, ESML has agreed to pay the Borrower contract price of USD 215 million on FOB basis ("Contract Price").

C.   To fulfil its obligations in terms of the Contract, the Borrower has approached the Lenders and the Lenders have agreed to provide fund based pre-shipment and post-shipment supplier's credit facility and also non-fund based facility for the purpose of opening / confirming letters of credit from time to time in favour of suppliers of raw materials and equipment ("Beneficiary") as also for issuance of letter(s) of comfort/ counter guarantees/ indemnity/ indemnities in favour of the Lenders or any bank through which the Lenders may cause the letters of credit to be opened/ confirmed if so necessary, (such letters of credit being hereinafter referred to as "the L/Cs"" which expression shall be deemed to include any modification(s), extension(s) or renewal(s) thereof, and where the context so requires, shall include also letter(s) of comfort / counter-guarantees / indemnity / indemnities that may be issued by the Lenders [individually or collectively] to the bank opening / confirming L/Cs on behalf of the Lenders for account of the Borrower), on the terms and conditions contained in their respective Letters of Sanction and this Agreement.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

D.  Pending execution of joint documents including creation of security in favour of Exim Bank and CBI, the Borrower and Exim Bank entered into a Facilities Agreement dated August 30, 2010 ("**Facilities Agreement**") pursuant to which Exim Bank lent and advanced fund based credit by way of pre-shipment credit and non fund based facility to enable the Borrower to have the letters of credit opened/confirmed for the purpose of execution of contract , upto the aggregate limit of Rs 600 crores available for drawal in Rupees and/or in Dollars ("**Exim Bank Facilities**").

E.  As security for the due repayment of the Exim Bank Facilities and payment of interest and all other monies payable by the Borrower to Exim Bank under the Facilities Agreement, the Borrower executed a Deed of Hypothecation dated August 30, 2010 in favour of Exim Bank thereby creating an exclusive charge in favour of Exim Bank over its entire moveable assets both present and future pertaining to the Contract acquired under the Exim Bank Facilities.

F.  At the further request of the Borrower, pending execution of joint documents including creation of security in favour of Exim Bank and CBI, who have granted the pre –cum Post shipment credit to the Borrower for the Contract Exim Bank made available the Facility by way of post shipment credit upto the amount of Rs 600 crores available for drawal in Rupees and/or in Dollars for the purpose meeting the Borrower's post shipment requirements in connection with the execution of the Contract upon the terms and subject to the conditions contained in Modifying Dual Currency Post-Shipment Loan Agreement dated 20.12.2011("**Modifying Agreement**"). As security, the Borrower executed a Modifying Deed of Hypothecation dated 20.12. 2011 ("**the Modifying Deed**") in favour of Exim Bank thereby extending the charge over its entire moveable assets pertaining to the Contract acquired under the Exim Bank Facilities both present and future and also created a pari passu charge over the receivables pertaining to the Contract, in favour of Exim Bank.

G.  In pursuance of the Facilities Agreement and Modifying Agreement, Exim Bank has disbursed an aggregate amount of Rs.213 crore to the Borrower as pre-shipment and an amount of Rs.187 crore as post shipment credit. As on Date of Signing, principal loan amount of Rs.400 crore has been disbursed to the Borrower.

H.  In order to enable the Borrower to continue execution and performance of its obligations in terms of the Contract, Exim Bank has agreed at the request of the Borrower to continue the Exim Bank Facilities and CBI has agreed to provide to the Borrower, fund-based facility and also non-fund based facility on the contained in their respective Letters of Sanction and this Agreement.

I.  To enable the Lenders to have joint documentation of their Facilities, the Parties have agreed to enter into this Agreement and upon execution of this Agreement, the aforesaid Exim Facilities Agreements shall stand modified to the extent they are inconsistent with the terms and conditions contained herein.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

**NOW, THEREFORE,** in consideration of terms and other good and valuable consideration the receipt and sufficiency of each are hereby acknowledged, the Parties hereto agree as follows:

**ARTICLE I**

**DEFIFINITIONS AND INTERPRETATION**

**Section 1.01    Definitions**
As used in this Agreement, the following terms shall have the meaning assigned to them as set out herein below

"**Account Bank**" shall have the meaning assigned to it under the Trust and Retention Account Agreement.

"**Additional Interest**" shall have the meaning ascribed to it in Section 2.10 or Section 4.02(i)(e) or Section 4.03 (xi) or Section 6.1.12~~6.1.9~~, as the case may be.

"**Applicable Interest Rate**" shall mean the Interest Rate or the Reset Interest Rate, as the case may be.

"**Authorised Officer**" means, with respect to any Person, the Chairperson, Managing Director, Chief Executive Officer ("CEO"), President, Chief Financial Officer, Secretary or Treasurer, any Vice President, Assistant Secretary or Assistant Treasurer thereof, and any other officer designated in writing by such Person as having been authorized to execute and deliver any of the Financing Documents to which it is or will be a party, or any other notice or instrument contemplated hereby or thereby.

"**Availability Period**" shall have the meaning ascribed to it under Section 2.09 hereunder.

"**Assignment Deed**" shall mean the Assignment Deed dated on or about the Date of Signing executed by the Borrower (as assignor) in favour of the Lenders;

"**Beneficiary**" shall have the meaning assigned to it in recital (C) hereinabove;

"**Borrowing**" shall mean a borrowing of Loan pursuant to this Agreement.

"**Borrowing Date**" shall mean a date on which a Borrowing occurs.

"**Business Day**" shall be construed as reference to a day on which banks remain open for business in Mumbai, London, New York, and such other cities or financial centres as may be relevant for the purpose contemplated by this Agreement.

"**Buyer**" or "**ESML**" shall mean Essar Steel Minnesota LLC, Minnesota, USA with whom the Company has entered into the Contract.

| CBI<br>(as Lead Bank/ Facility Agent) | CBI<br>(as Lender) | Exim Bank<br>(as Lender) | EPIL<br>(as Borrower) |
|---|---|---|---|
| | | | |

**"COD"** or **"Commercial Operation Date"** shall mean June 30, 2013 or such other date as may be mutually agreed between the Borrower and the Lenders.

**"Collateral"** means all or any of the assets, properties or revenues of the Borrower over which a Security Interest is created under or pursuant to and in accordance with the Collateral Documents and all or any of the other properties, assets or revenues that is or is intended to be charged as security or upon which Security Interest/Lien is required to be created for the benefit of the Lenders pursuant to the Financing Documents.

**"Collateral Documents"** means, collectively, the Mortgage Document(s), Unattested Deed(s) of Hypothecation, Corporate Guarantee, Pledge Agreement, Consent and Assignment Agreements, the PoAs, Declarations, Undertakings from the Borrower and/or the Promoter and any other instrument, document or deed that creates or purports to create a Security Interest in favour of the Lenders, and includes any other instrument, document or deed executed / to be executed in connection with or pursuant to any of the foregoing.

**"Contract"** shall mean the Supply and Engineering Contract dated May 5, 2010 entered into between the Borrower and ESML for supply of part Equipment and Engineering Services for the Project valued at USD 215 mn (approximately Rs.995.02 crore) governing the terms, conditions and specifications of the goods and shall include all amendment(s) thereto that may be made from time to time;

**"Date of Signing"** shall mean June 01, 2012

**"Debt Discharge Date"** means the date on which all Obligations of the Borrower to the Lenders under the Financing Documents have been fully paid and discharged to the satisfaction of the Lenders.

**"Equipment & Engineering Services"** shall have the meaning assigned to them in the Contract.

**"Event of Default"** shall mean any of the events specified in Article VIII of this Agreement;

**"Exim Bank Financing Documents"** shall mean collectively the Facilities Agreement dated 30.08.2010 and Modifying Dual Currency Post-Shipment Loan Agreement dated 20.12.2011 entered into between the Borrower and Exim Bank, Deed of Hypothecation of Moveable Assets dated 30.08.2010 and Modifying Deed of Hypothecation dated 20.12. 2011 executed by the Borrower in favour Exim Bank, Corporate Guarantee dated 30.08.2010 and Modifying Deed of Guarantee dated 20.12.2011 executed by the Promoter in favour Exim Bank and other undertakings, declarations, documents, etc. executed in relation to the pre-shipment facility, fund based and non-fund based (in INR or USD) and post shipment facility, for an amount not exceeding Rs.600 crores sanctioned by Exim Bank.

**"Facilities"** or **"Loans"**, as the case may be, shall mean collectively the Pre-Shipment Facilities and Post-Shipment Facilities and Non fund facility granted by the Lenders to the Borrower and the expression **"Facility"** or **"Loan"** shall be construed to mean either Pre-Shipment Facility or Post-Shipment Facility.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

**"Facility Agreement"** shall mean this Agreement read with the General Conditions.

**"Financial Closure Date"** shall mean the date on which the Financing Documents have been executed;

**"Financing Documents"** shall mean, collectively:

i.   Facility Agreement;

ii.  Facility Agent Agreement;

iii. Inter creditor Agreement;

iv.  Assignment Deed;

v.   Corporate Guarantee Deed for Pre-Shipment & Post-Shipment Facilities;

vi.  Trust & Retention Account Agreement;

vii. Deed of first charge on Trust & Retention Account;

viii. Deed of Hypothecation for Pre-Shipment Facility;

ix.  Transaction Documents;

x.   Any other document, declaration, undertaking, agreement or instrument designated as such by the Lenders.

**"Fund-based Facility"** shall mean each Loan facility and any other financial assistance sanctioned by the Lenders to the Company in connection with the Contract on terms and conditions contained in this Agreement;

**"General Conditions"** shall mean the general terms, conditions, covenants and other provisions and stipulations set out in the Annexure hereto which shall form an integral part of this Agreement and be deemed to be incorporated herein by reference;

**"Governmental Authority"** means any nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies ).

**"Initial Borrowing Date"** shall mean the date on which the first Borrowing occurs under Post-Shipment Facility.

**"Interest"** shall have the meaning ascribed to such term in Section 2.03 hereof.

**"Interest Payment Date"** shall mean either Pre-Shipment Interest Payment Date or Post-Shipment Interest Payment Date, as the context may require.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

"**Interest Period**" shall mean the period between an Interest Payment Date and the immediately following Interest Payment Date.

"**Interest Rate**" shall mean either the Pre-Shipment Interest Rate or Post-Shipment Interest Rate, as the context may require.

"**Interest Reset Date**" shall mean either the Pre-Shipment Interest Reset Date or Post-Shipment Interest Reset Date, as the context may require.

"**L/Cs**" shall mean the letters of credit to be opened or, as the case may be, confirmed by the Lender/s on behalf of the Borrower or caused to be opened or confirmed by any bank on its behalf under the Non-Fund based Facility;

"**Letter of Sanction**" shall mean the letter No. PF-TF/DIR-912/10/397 dated August 11, 2010 and subsequent amendments vide letter No. TF/DIR-912/11/583 dated October 07, 2011 of Exim Bank and letter No. CBI:CFB:CR:ESA:F.37:2010-11::2064 dated August 20, 2010 and subsequent amendments vide letter No. CBI:CFB:CR:ESA:F.37:2011-12::360 dated May 3, 2011 and letter No. CBI:CFB:CR:ESA:F.37:2011-12::5099 dated March 07, 2012 of CBI advising sanction of the Fund-based Facility and / or the Non-Fund based Facility to the Company up to the amounts therein specified within the aggregate amount of the Facilities mentioned hereinabove.

"**LIBOR**" with respect to the floating rate of interest that may be specified in the relevant Letter of Sanction as applicable to the Fund-based Facility thereby sanctioned, shall mean the per annum rate, or the arithmetical mean of the rates if there be more than one rate (rounded upwards, if necessary, to the nearest 1/16th of 1%) as advised to Exim Bank/CBI by its concerned lender(s) as appearing on the Reuters Screen LIBO Page or such other service as may be approved by Exim Bank/CBI or its lender(s) as the information vendor for the purpose of displaying LIBOR or rates comparable to LIBOR at or about 11AM (London time) on the relevant Quotation Date for deposits in euro dollars or other relevant foreign currency in which the Loan may have been approved by Exim Bank/CBI, for the duration of six months or as mentioned in the relevant Letter of Sanction, or, as the case may be, the rate determined in accordance with the provisions relating to alternative basis of interest rate(s); and in relation to any Interest Period whose duration may be less than the aforesaid Interest Period, LIBOR shall mean the per annum rate as may be advised by Exim Bank/CBI which shall reflect the cost to Exim Bank/CBI of funding and maintaining the relevant disbursement during such Interest Period from source(s) it may select.

"**Lien**" means any charge, claim or encumbrance of any kind, or any other type of preferential arrangement having the commercial effect of conferring security, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

"**Margin**" shall mean, with reference to Interest Rate for Dollar disbursements, a spread of 350 basis points or such other amount as mutually agreed between the Borrower and the individual Lender inclusive of withholding tax, as applicable.

Page 8 of 86

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

"**Material Adverse Effect**" means an effect which, in the opinion of the Lenders, has a material adverse effect on (a) the business, financial condition, all or a substantial part of the properties of the Borrower (b) the rights and remedies of any Lenders under any Financing Document including the ability to enforce the same, (c) the ability of any Obligor to perform its obligations under any Financing Document to which it is or will be a party, or (d) the validity and/or the enforceability of the Financing Documents.

"**Obligation**" means, with respect to the Borrower, any payment, performance or other obligation of the Borrower of any kind, including without limitation, any liability of the Borrower on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceedings. Without limiting the generality of the foregoing, the obligations of the Borrower, under the Financing Documents include (a) the obligation to pay principal, interest, additional interest, premium, guarantee fees, liquidated damages, commissions, charges, expenses, fees, attorneys' fees and disbursements indemnities and other amounts payable by the Borrower under any Financing Document, (b) the obligation of the Borrower to reimburse any amount in respect of any of the foregoing that, any Lender, in its sole discretion, may elect to pay or advance on behalf of the Borrower and (c) the obligation to perform the other terms, conditions and covenants of the Financing Documents.

"**Obligors**" means, collectively, the Borrower and the Promoter who are a party to any Financing Document.

"**Person**" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"**Post-Shipment Facility**" or ""**Post-Shipment Loan**", as the case may be, shall mean collectively the Fund-based Facility agreed to be provided by the Lenders to the Company in connection with the Contract in Rupees and /or USD or in any other foreign currency or currencies approved by the Lenders on the terms and conditions contained in this Agreement and subject to specific terms and conditions that may be stipulated by the Lenders in their respective Letters of Sanction on case by case basis and the expression "**Post-Shipment Facilities**" or "**Post-Shipment Loans**" shall be construed accordingly. Provided however that the amount of the Post-Shipment Facilities under this Agreement in Rupees and/or USD or in any other foreign currency or currencies together at any time shall not exceed the aggregate sum of Rs.600 crores (Rupees Six Hundred Crores) in case of Exim Bank and Rs.300 crores (Rupees Three Hundred Crores) in case of CBI and shall include the principal amount thereof outstanding from time to time, and with respect to foreign currency disbursement(s), also the converted Rupee amount(s) consequent upon default.

"**Post-Shipment Interest Payment Date**" shall mean:
    (i) with respect to Rupees disbursements, the tenth (10th) day of each calendar month in case of Exim Bank and first day of every calendar month in case of CBI;
    (ii) with respect to foreign currency disbursements, 01.07.2012 and first day of each quarter thereafter; or
    (iii) such other date as may be mutually decided between the Parties.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

"**Post-Shipment Interest Rate**" shall have the meaning ascribed to such term in section 2.03 (b) hereof.

"**Pre-Shipment Facility**" or "**Pre-Shipment Loan**", as the case may be, shall mean the Pre-Shipment fund-based Facility and the Pre-Shipment non-fund based Facility agreed to be provided by the Lenders to the Borrower in connection with the Contract in pursuance of Section 2.01 (a) hereof in Rupees and / USD or in any other foreign currency or currencies approved by the Lenders on the broad terms and conditions contained in this Agreement and subject to specific terms and conditions that may be stipulated by the Lenders in their respective Letters of Sanction on case by case basis. Provided however that the amount of the Pre-Shipment Facilities under this Agreement in Rupees and/or USD or in any other foreign currency or currencies together at any time shall not exceed the aggregate sum of Rs.600 crores (Rupees Six Hundred Crores) in case of Exim Bank and Rs.300 crores (Rupees Three Hundred Crores) in case of CBI and shall include the principal amount thereof outstanding from time to time, and with respect to foreign currency disbursement(s), also the converted Rupee amount(s) consequent upon default. The expression "**Pre-Shipment Facilities**" or "**Pre-Shipment Loans**" shall be construed accordingly.

"**Pre-Shipment Interest Payment Date**" with respect to Pre-Shipment Loan sanctioned
    i.   for foreign currency disbursements under Pre-Shipment Loan, shall mean the date falling on the last day of each Pre-Shipment Interest Period relating to the relevant disbursement, and
    ii.   for Rupee disbursements of Pre-Shipment Loan, shall mean the 10th day of March, June, September and December in each year in the case of quarterly payment of interest, and the 10th day of each month in the case of monthly payment of interest.

"**Pre-Shipment Interest Period**" in relation to foreign currency disbursement(s) of the Pre-Shipment Loan, shall mean each successive period having a duration of three months or otherwise, and for Rupee disbursements shall mean a period of one month or otherwise, as provided in Section III of the General Conditions, for which each such disbursement shall be outstanding and with respect to which interest shall be payable;

"**Pre-Shipment Interest Rate**" shall mean:
   (A) with respect to Exim Bank
    i.   for Dollar disbursements of the Pre-Shipment Loan, the rate equal to the sum of LIBOR plus Margin;
    ii.   for Rupee disbursements of the Pre-Shipment Loan, the 9.75% per annum; or
    iii.   such other rate as may be agreed to between the Parties

   (B) with respect to CBI
    i.   for PCFC disbursements of Pre-Shipment Loan in Dollar, the rate equal to the sum of 3 month LIBOR plus 2% p.a.;
    ii.   for EPC disbursements of the Pre-Shipment Loan in Rupee, CBI's Base Rate + 1.5%

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

per annum

which interest shall be payable by the Borrower on outstanding disbursements of the Pre-Shipment Loan on each relevant Interest Payment Date.

"**Project**" shall mean 4.1 million tons p.a. Integrated Iron Ore Pellet Plant along with iron ore mining near Nashwauk at Minnesota, United States of America, being set up by ESML.

"**Project Finance**" shall mean the USD denominated term loan and letter of credit facility tied up by ESML with the Project Lenders.

"**Project Lenders**" shall mean banks, financial institutions and the Borrower who have extended financial assistance of approximately USD 713 million to ESML towards meeting costs of the Project for setting up the Project.

"**Promoter**" shall mean Essar Projects Ltd., a company incorporated in UAE, and the holding Company of the Borrower.

"**Quotation Date**" shall mean, in relation to any period for which LIBOR is required to be determined, the date that shall be the second Business Day before the beginning of the relevant Interest Period;

"**Repayment Date**" shall mean the date on which a Loan or each disbursement thereof shall fall due for payment in accordance with Section 2.11 hereunder.

"**Repayment Moratorium**" shall mean the nine month period from COD which shall be ending no later than March 31, 2014.

"**Requirement of Law**" means, with respect to any Person, all laws, statutes, treaties, rules, regulations, determinations, orders, writs, processes, decrees, injunctions, judgements, or awards of an arbitrator, a court or any other Governmental Authority, and all Governmental Authorisations binding upon or applicable to such Person or to any of its properties or assets.

"**Reuters Screen LIBO Page**" shall mean the display of London inter bank offered rates of major banks for euro dollar deposits designated as page "LIBO" on the Reuters Monitory Money Rates Service (or such other page as may replace the LIBO page on such service);

"**Security Interest**" shall mean any mortgage, pledge, lien, hypothecation, assignment, charge, security interest or interest in the nature of a security, deed of trust or other encumbrance of any kind or any other type of preferential arrangement (including, without limitation, any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature of a conditional sale or title retention agreement or any financial lease).

"**Tax**" shall be construed so as to include any tax, surcharge, levy, impost, duty or any other charge of whatever nature now or at any time hereafter imposed in connection with payment of any monies in respect of the Facilities under the Facilities Agreement and/or

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

under the relevant Letter of Sanction, together with interest on tax and penalty in respect thereof;

"**Transaction Documents**" shall mean the Contract, Advance Payment Corporate Guarantee, Performance Corporate Guarantee and any other document contemplated under the Contract.

"**TRA Agent**" means Central Bank of India acting as the Trust and Retention Account Agent.

"**Trust and Retention Account**" or "**TRA Account**" shall have the meaning assigned to it under the Trust and Retention Account Agreement.

"**Trust and Retention Account Agreement**" means the Trust and Retention Account Agreement, dated on or about the Date of Signing and made amongst the Lead Bank/ TRA Agent, the Lenders, the Account Bank and the Borrower.

Section 1.02    Interpretation

(a)    Unless otherwise stated in this Agreement, any reference (i) to this Agreement and each other Financing Document shall mean any of such documents as amended, supplemented or modified and in effect from time to time as permitted hereby, (ii) to any Person shall include such Persons' successors and assigns as permitted hereby, and (iii) to any Government Authority shall include any Government Authority succeeding to such Government Authority's functions and capacities.

(b)    Unless the context of this Agreement otherwise requires (i) words of any gender include each other gender, and (ii) words using the singular or plural number also include the plural or singular number, respectively, (iii) the terms " hereof", "hereby", "hereto" and similar words refer to this Agreement and not any particular Section, clause, or Schedule or any other subdivision of this Agreement, (iv) references to "Section", "clause", "Attachment" or "Schedule" are to this Agreement, (v) the words "include" or "including" shall be deemed to be followed by "without limitation" or "but not limited to" whether or not they are followed by such phrases or words of like import, (vi) references to any statute or statutory provision shall be construed as a reference to the same as it may have been, or may from time to time be amended, modified or re-enacted and (vii) references to any agreement or document shall be construed as a reference to such agreement or document as amended, modified or supplemented in accordance with the terms hereof and in effect from time to time and shall include a reference to any document which amends, modifies or supplements it or is entered into, made or given, pursuant to or in accordance with its terms.

(c)    All conditions stipulated by the Lenders in each Letter of Sanction or subsequently imposed by it in accordance with the terms hereof or applicable letter of sanction shall be applicable to the Facilities as if each of them were mentioned herein, and accordingly, the Borrower shall be liable to observe and perform all such conditions without any further deed, instrument or writing. In the event of any inconsistencies between this Agreement and the Letter(s) of Sanction issued by the Lenders, the

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

provisions contained in the respective Letter of Sanction shall prevail.

(d)     Upon execution of this Agreement, the Exim Bank Facilities, to the extent disbursed already, shall stand merged with and form part of the Pre-Shipment Facilities sanctioned by Exim Bank under this Agreement. All amounts so disbursed under Exim Bank Facilities shall, upon execution of this Agreement, be deemed to have been disbursed under and governed by the terms and conditions of this Agreement and in the event of any inconsistency between the terms of this Agreement and Exim Bank Facilities Agreement, the provisions contained in this Agreement shall prevail.

(e)     In the event of any inconsistency between any provision of this Agreement and the General Conditions annexed hereto, the relevant provision of this Agreement shall prevail.

---

END OF PAGE

---

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

ARTICLE II

THE FACILITIES

Section 2.01    Amount and terms of Facilities

(a)    Subject to and upon the terms and conditions contained in this Agreement:

i)    Exim Bank agrees to make available to the Borrower Post-Shipment Facility of Rs.600 crore. Provided that the limit of Rs.600 crore shall include Pre-Shipment Facility and non-fund based Facility of Rs.400 crore (to be liquidated out of Pre-Shipment Facility) and the aggregate outstanding at any point of time during the tenure of the Facility shall not exceed Rs.600 crore.

ii)   CBI agrees to make available to the Borrower Post-Shipment Facility in the form of term loan not exceeding Rs.300 crore with sub-limit of Rs.300 crore in the form of Pre-Shipment Facility / Pre-Shipment Credit upto 360 days / Pre-Shipment Credit in Foreign Currency / cum Letter of Credit (import / inland – usance upto 27 months.

(b)    Subject to and upon the terms and conditions contained in this Agreement, the Borrower agrees to avail the Facilities aggregating to a maximum of Rs.900 crores.

(c)    Subject to and upon the terms and conditions contained in this Agreement, the Borrower agrees to borrow from each of the Lenders and each of the Lenders severally agree to provide a Facility to the Borrower, to the maximum extent as set out in Section 2.01 (a) (i) & (ii).

(d)    The obligations of each of the Lenders are several. No Lender is responsible for the obligations of the other Lender under this Agreement. Failure of a Lender to carry out its obligations does not relieve the Borrower or any other party of its obligations under the Financing Documents to which it is a party.

(e)    Subject to availability of foreign currency, the Facility by each Lender may be converted into foreign currency, either in part or in full, at LIBOR + Margin, as may be mutually agreed between the Borrower and the Lender/s at the relevant time.

(f)    Door to door tenure of all the Facilities shall be no longer than 9 years 6 months from the Financial Closure Date.

*2.1.1   Application of proceeds*

The Borrower shall apply the proceeds of each Facility to the extent of amount not exceeding Rs.900 crore, in aggregate, subject to the terms and conditions contained in this Agreement.

| CBI (as Lead Bank/Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

**2.1.2   Condition precedent & conditions to effectiveness**

The obligations of each Lender to provide Facility under this Agreement are subject to its satisfaction of the conditions to effectiveness as also its satisfaction of the conditions precedent set out in Article IV of this Agreement.

**Section 2.02   Borrowing**

(a)     The Facilities shall be disbursed/ provided in one or more installment(s) or in such other manner as may be decided by the Lenders, subject to the Borrower complying with the provisions of this Agreement and the disbursement procedure agreed to between the Lenders and the Borrower (including production/execution of evidences/documents required for disbursement/borrowings).

(b)

   i.   Pre-Shipment Loan and the Post-Shipment Loan (subject to compliance of sections 4.02, 4.03 and 4.04 hereof) shall be disbursed in a phased manner taking into account specific purpose and needs of the Borrower including shipment schedules and production and procurement cycles.

   ii.  Any disbursement(s) in foreign currency shall be subject to availability of funds to Lenders in such foreign currency at a cost at which it would be in a position to make such disbursement(s) provided a notice of drawdown received by Lenders in writing from the Borrower not less than five Business Days before the proposed date for disbursement, receipt whereof shall oblige the Borrower to borrow the amount requested on the date therein stated;

   iii. The proposed date for any disbursement hereunder shall be a Business Day;

   iv.  Nothing contained in this Agreement shall be construed to cast any obligation on the Lenders to consider sanction of further financial assistance to the Borrower at any time in future or be deemed to confer any right on the Borrower or automatically make it eligible to seek further financial assistance from the Lenders, whether for expansion of its business or for any other purpose.

(c)     The Borrower may make a request to borrow the Facility, on any Business Day on or before the last day of withdrawal (provided in Section 2.09 hereinafter), by giving a notice of borrowing to the Lead Bank/Facility Agent (the "**Notice of Borrowing**") in the format provided (in **Exhibit A**).

        Each Notice of Borrowing shall be irrevocable and shall commit the Borrower to borrow accordingly.

(d)     Each **Notice of Borrowing** must:

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

      a.  specify the proposed Borrowing Date, being a date, before the last day of withdrawal (provided in Section 2.09 herein after);

      b.  specify the amount of borrowing; and

      c.  be signed by an Authorized Officer of the Borrower;

(e)  Subject to and upon the terms and conditions of this Agreement, and subject to the disbursement procedure of each Lender for the proposed Facility, as agreed between each such Lender and the Borrower from time to time, each Lender, on the proposed Borrowing Date, shall in its sole discretion make available, such Lender's portion of such borrowing to the Borrower, with intimation to the Lead Bank/Facility Agent.

(f)  The Borrower shall not seek disbursement of the Facility or any part thereof after its account has been classified as non-performing in the account books of any of the Lenders as per the guidelines of the Reserve Bank or on the Borrower's failure to comply with the terms and conditions of this Agreement.

### Section 2.03   Interest

(a)  On each Interest Payment Date relating to a disbursement under the Pre-Shipment Facility, the Borrower shall pay to the Lenders, interest accrued on such disbursement during the Interest Period relating thereto at the Pre-Shipment Interest Rate. Provided that any interest accrued on any disbursement and remaining outstanding on the final Repayment Date relating to the relevant Pre-Shipment Loan shall be paid on that date.

(b)  The Borrower shall pay interest to the Lenders, on the principal amount(s) of the Post-Shipment Facility outstanding from time to time, and on other monies which shall accrue under the provisions of this Agreement, at the rate of 10.50% p.a. to Exim Bank and at the rate of CBI's Base Rate + 2.75% to CBI or such other rate as may be mutually agreed between the Borrower and the Lenders ("**Post-Shipment Interest Rate**"). The interest as above, shall be payable by the Borrower in arrears on each Interest Payment Date. Such interest shall become payable from the first Interest Payment Date falling immediately after the Initial Borrowing Date.

(c)  The Borrower shall pay Interest Rate surcharge or any other charge, levy or fee at such rate as may be levied or demanded from the Borrower or required to be levied, demanded or collected by the Lenders from the Borrower, from time to time, if stipulated by Reserve Bank of India or under any other applicable law pertaining to or in respect of the Loans. The Borrower shall also pay over and above the Interest / Further Interest / Additional Interest, the interest tax, if applicable, from time to time.

(d)  In case of default in payment of any installment of principal amount, interest thereon or other monies (except Further Interest) becoming due on their respective due dates, the Borrower shall pay on such defaulted amounts, further interest at the rate of [2%] p.a. over and above the Applicable Rate of Interest for the period of

Page **16** of 86

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

default ("**Further Interest**"). Such Further Interest shall be payable on the next Interest Payment Date falling after the date of default. Arrears of Further Interest shall carry interest at the Applicable Rate of Interest till the date of payment of the defaulted amount.

(e)    Interest on each Loan shall be payable by the Borrower on each Interest Payment Date and on any prepayment (whether by acceleration or otherwise) on the amount prepaid on the date of the prepayment of that Loan.

(f)    All interest on other monies which shall accrue to the Lenders under the provisions of this Agreement and other Financing Documents shall also be payable in the manner mentioned herein for the payment of Interest on the Interest Payment Dates.

(g)    Interest and all other costs, charges, expenses shall accrue from day to day and shall be computed on the basis of the actual number of days elapsed and a year of 365 days.

(h)    **Currency of Payment & Interest Rate upon Default (*in the case of foreign currency disbursements*)**

If the Borrower commits a default in repayment of any foreign currency disbursement (whether at stated maturity or upon acceleration or otherwise) or payment of interest thereon when due under this Agreement, then and in such event, the defaulted amount and, if so deemed expedient by the Lenders, also the entire outstanding foreign currency disbursement(s) of the Loans under the fund-based Facility then outstanding or any part thereof and/or accrued interest thereon, shall be converted into Rupees at any time before the expiry of a period of thirty (30) days after the relevant due date, at the spot rate of exchange of the relevant foreign currency or currencies prevailing on the date of conversion as quoted by an authorised dealer approved by the Lenders, and the Borrower's liability in respect of such converted amount(s) shall thenceforth be denominated in Rupee currency without prejudice to Lender's rights and remedies under this Agreement, and upon being notified by Lenders of such Rupee liability, the Borrower shall be liable to pay to Lenders such converted Rupee amount forthwith on demand, unless otherwise agreed by Lenders, together with interest thereon from the date of conversion until payment, at a rate per annum as may be notified by Lenders to the Borrower, which shall be the aggregate of (a) the applicable interest rate applicable to Rupee term loans under the Fund Based Facility on the date of conversion as may be determined by Lenders, and (b) two (2%) per cent per annum being additional interest by way of liquidated damages owing to default.

(i)    **Interest Reset**

    i. Each Lender shall be entitled to revise the Pre-Shipment Interest Rate in respect of its respective Loan ("**Pre-Shipment Reset Interest Rate**") payable to such Lender:
        -    After expiry of 360 days from the date of first disbursement under Pre-Shipment Facility in case of disbursements in Rupee;

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  | ฿~ | Ohick |

- After expiry of 180 days from the date of first disbursement under Pre-Shipment Facility in case of disbursements in USD.

ii. Each Lender shall be entitled to revise the Interest Rate in respect of its respective Loan ("**Post-Shipment Reset Interest Rate**") payable to such Lender at the end of thirty six (36) months from the Financial Closure Date and every year thereafter.

iii. The Borrower shall pay interest on the outstanding principal amount of the Loan at the Reset Interest Rate from such date as may be advised in writing by each Lender ("**Interest Reset Date**").

iv. The Interest Rate or the Reset Interest Rate, as the case may be, shall hereinafter be referred to as the '**Applicable Interest Rate**'. In case the Reset Interest Rate is not acceptable to the Borrower, it shall advise the same within fifteen (15) days from the receipt of intimation of Reset Interest Rate. No further disbursements shall be made to the Borrower under the Facility and the amounts already disbursed shall be repaid by the Borrower on respective due dates subject to section 2.13 (Pre-payment) below. Any further disbursement shall be subject to :-

(a)   Availability Period.
(b)   Mutually agreeable revised rate of interest.

(j)   All rates of interest mentioned herein are exclusive of interest tax and/or any such other levies/ duties. Any interest tax/ other levies/ duties, if applicable, shall be payable by the Borrower to the Lenders over and above the rates mentioned hereinabove.

(k)   The Borrower acknowledges that the Loans provided under the Agreement are for a commercial transaction and waives any defences available under usury or other laws relating to the charging of interest.

**Section 2.04   Application Processing and Documentation Fee**
Borrower shall pay a sum of Rs.1,00,000/- (Rupees One Lakh only) plus applicable service tax thereon to Exim Bank upfront and on a non-refundable basis for each Facility sanctioned i.e. Post-Shipment Facility and Pre-Shipment Facility.

**Section 2.05   Service fees**
Service fees @ 0.25% for each Facility sanctioned by Exim Bank i.e. Post-Shipment Facility and Pre-Shipment Facility, shall be payable by the Borrower to Exim Bank together with applicable service tax thereon. Service fee shall be payable upfront and shall be non-refundable.

**Section 2.06   Appointment of Lead Bank/Facility Agent**
Borrower has agreed to appoint CBI as the Lead Bank/Facility Agent at the fees of Rs.15,00,000/- (Rupees Fifteen Lakh only) per annum together with applicable service tax thereon.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
| --- | --- | --- | --- |
| | | | |

**Section 2.07    Syndication charges**

    Borrower shall pay syndication charges to CBI @ 0.20% of the aggregate amount of Facilities sanctioned by the Lenders less the amount of Facility sanctioned by CBI, together with applicable service tax thereon.

**Section 2.08    Upfront Fee**

    Borrower shall pay to CBI an upfront fee @ 0.25% of the amount of Facilities sanctioned by CBI, together with applicable service tax.

**Section 2.09    Availability Period**
**(a) Pre-Shipment Availability Period**

    Pre-Shipment Availability Period for availing the Pre-Shipment Facility from each Lender shall be the earlier of (a) period of twenty seven (27) months commencing from the date of Financial Closure, i.e. upto June 30, 2013 or such other extended date which the Lenders may in their absolute discretion agree at the request of the Borrower on terms and conditions that the Lenders may stipulate; or (b) the Business Day on which the entire Pre-Shipment Loan has been disbursed.

**(b) Post-Shipment Availability Period**

    Post-Shipment Availability Period for availing the Post-Shipment Facility from each Lender shall be the period commencing from the Financial Closure Date till six (6) months after COD or such extended period as may be determined by the Lenders.

    Unless the Lenders agree otherwise, Borrower's right to make withdrawals from the Post-Shipment Facility shall cease at the end of six (6) months from COD.

**Section 2.10    Disbursements pending creation of Security / Interim Disbursements**

    (a) If the Borrower fails to create the security as contemplated in Section 3.02 hereof within six (6) months from the date of first disbursement/Initial Borrowing Date under the Post-Shipment Facility or such additional period as the Lenders may agree, the Borrower shall be liable to pay Additional Interest @ 0.50% p.a., in addition to the interest at the Applicable Interest Rate, on all principal amounts of Loans disbursed and outstanding from the date immediately falling the date of expiry of six months or additional period as aforesaid till the creation and perfecting of all the security, as contemplated in this Agreement. This Additional Interest shall be payable on the Interest Payment Dates. Without prejudice to the Borrower's liability to pay the Additional Interest on non perfection of security as above, the Lenders reserve the right to recall the Facilities sanctioned to the Borrower.

    (b) In the event, the Lenders agree to disburse any amount of the Loans after six months from the Initial Borrowing Date or the opening of L/Cs, pending creation

| CBI<br>(as Lead Bank/ Facility Agent) | CBI<br>(as Lender) | Exim Bank<br>(as Lender) | EPIL<br>(as Borrower) |
|---|---|---|---|
|  |  |  |  |

of all of the security as stipulated in Section 3.02 hereof, the same may be disbursed on such terms as may be decided by the Lenders.

(c) Provided that the obligation of the Lenders to make disbursements of the Post-Shipment Loans shall be subject to the Borrower performing all its Obligations and undertakings under the Financing Documents apart from compliance by the Borrower with the disbursement procedure stipulated by the Lenders, including submission of necessary information, documents, etc. to the satisfaction of the Lenders.

(d) Each Lender reserves the right to make interim disbursements, at its sole discretion, to the Borrower prior to Financial Closure Date on such terms and conditions as may be stipulated by such Lender under its respective Letter of Sanction. Such interim disbursements when made shall, subsequent to Financial Closure Date, be deemed to have always formed part of the Facilities granted by the respective Lender under this Agreement and will be governed by the terms and conditions contained herein.

## Section 2.11    Repayment

(i)    The Pre-Shipment Loan or each disbursement thereof, as the case may be, shall be repaid by the Borrower to the Lenders on the Repayment Date relating thereto, i.e. within 360 days from the date of such disbursement or out of relative export proceeds or corresponding disbursement of Post-Shipment Facility, whichever is earlier.
Provided that in the case of any foreign currency disbursement(s) under Pre-Shipment Facility, the Borrower shall be required to confirm to Lenders in writing at least four Business Days prior to each Interest Payment Date and Repayment Date that the relative interest and instalment of principal shall be paid by it on such date, failing which it shall be in order for the Lenders to assume that the Borrower may not make the necessary payment on the relevant due date.

(ii)    The Borrower agrees that after Repayment Moratorium of nine (9) months from COD, it shall repay the principal amounts of the Post-Shipment Loans to the Lenders in twenty four (24) quarterly installments (comprising 23 quarterly installments of 4.17% of the Post-Shipment Facility amount and final quarter containing 4.09% of the Post-Shipment Facility amount), payable after the end of Repayment Moratorium, on each Repayment Date commencing from April 1, 2014 in accordance with the Repayment Schedule provided in Schedule I hereto.

(iii)    The final repayment installment shall in any event be no less than the aggregate unpaid principal amounts of the Post-Shipment Loans together with all accrued and unpaid interest on the Post-Shipment Loans and all other amounts payable by the Borrower to the Lenders under the Financing Documents.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  | $\Omega$= | |

(iv)    The Lenders may, in suitable circumstances revise, vary or postpone the repayment of the principal amounts of the Loans or the balance outstanding for the time being or any installment(s) of the said principal amounts of the Loans or any part thereof upon such terms and conditions as may be decided by them.

(v)    In the event of any default in the payment of installments of principal, any interest, liquidated damages and/or any other charges payable to the Lenders, postponement, if any, allowed by the Lenders shall be at the rate of interest as may be stipulated by the Lenders at the time of postponement.

(vi)    If for any reason the amount finally disbursed by the Lenders is less than the total sanctioned amount, the repayment installments shall stand reduced proportionately but shall be paid on the repayment dates as set out in Schedule I (*Repayment*).

(vii)    Any amount paid towards repayment of the principal amount of the Loans shall be applied in payment to each Lender towards their respective repayment installments, pro rata to their respective total disbursements.

**Section 2.12    Payments**

(a)    All payments including Interest payments to be made by the Borrower to any Lenders under this Agreement shall be made, without set off, cross claim or counterclaim.

(b)    All monies payable by the Borrower to the Lenders shall be paid on or before 1 p.m. on the due date in immediately available funds either (i) through Real Time Gross Settlement mechanism or (ii) by local cheque/bank draft. Credit for all payments made by the Borrower will be given on the later of (i) the realization of the proceeds of such instrument, and (ii) the due date, provided that payments shall be deemed to have been made on the relevant due date if a high value cheque is delivered to the Lenders by the Borrower on or before 10 a.m. on the relevant due date. All monies payable to the Lenders shall be paid to Lenders at such office(s) as may be specified by them by telegraphic, electronic or mail transfer to the account of such office(s) or by cheque or by bank draft drawn in favour of the Lenders on a scheduled bank at Mumbai or such other place or to such other account as the Lenders may notify to the Borrower / Lead Bank.

(c)    If a payment under this Agreement is due on a day which is not a Business Day, the due date for such payment shall instead be the immediately preceding Business Day. Notwithstanding the receipt of any payment prior to its due date pursuant to this Section 2.12 (c), the calculation of Interest and any other amounts shall be made as if such payment was made on such due date.

**Section 2.13    Premature repayment**

Borrower shall have option to prepay the Lenders, in part or in full, the Post-Shipment Loan together with all interest accrued thereon, prepayment premium and other charges and monies due and payable to the Lenders up to the date of such prepayment. Such prepayment shall attract prepayment premium@ 1% on the amount prepaid.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

Provided, however, that no prepayment premium shall be payable under the following circumstances, i.e. where:

a)      prepayment is made at the instance of Lender(s); or

b)      prepayment is effected on account of illegality or change in law/mandatory prepayment; or

c)      prepayment is made through internal accrual (applicable in case of CBI only); or

d)      prepayment is effected within sixty (60) days of the Interest Reset Date(s) after giving a prior notice (in writing) of minimum period of ten (10) days.


**Section 2.14    Special Provisions relating to Pre-Shipment Facilities**

(i)     The Borrower shall pay commission at the rate of 0.50% (all inclusive) p.a. to CBI on L/C and commission at the rate of 0.75% p.a. (upfront) to Exim Bank in respect of L/C tenure/ usuance upto 360 days togetherwith applicable taxes, and including commitment charge, usuance charge and retirement charges payable upfront.

(ii)    In case Letter of Comfort / Letter of Guarantee or Standby Letter of guarantee is issued in favour of the provider of the buyers credit, the Borrower shall pay commission at the rate as fixed at the time of issuance thereof, for the period of such buyers credit.

(iii)

  a.  The Borrower shall also pay to the Lenders Fee by way of L/C commission at the rate, in the manner and within the period as may be specified in the relevant Letter of Sanction, on the amount of the L/C(s) for the period commencing from the date of issuance of each L/C upto its usance period / retirement of bill(s) thereunder. The commission shall not be refunded by the Lenders even if the relevant L/C may not be opened.

  b.  If pursuant to any action that may be initiated by the Borrower, Lenders shall be prevented by an order of a court from making any payment to the Beneficiary under any of the L/C(s) then the Borrower shall also be liable to pay to Lenders apart from any other moneys payable to it hereunder, commission for the period for which the Borrower may have thereby delayed payment under the L/C(s).

  c.  The Borrower shall also pay to Lenders the amount of commission and other charges that may be payable by Lenders to or for account of its correspondent bank for confirmation of any L/C at the request of Lenders.

Page 22 of 86

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

**Section 2.15    Appropriation of payments**

(1)  Unless otherwise agreed to by the Lenders, any payment due and payable under this Agreement and made by the Borrower shall be appropriated towards such dues in the following order, viz.,

    (i)       Interest on costs, charges, expenses and other monies;

    (ii)      Costs, charges, expenses and other monies;

    (iii)     Further Interest on defaulted amounts;

    (iv)     Interest including additional interest, payable in terms of this Agreement.

    (v)      Premium on prepayment ;

    (vi)     Repayment of principal/installments of principal due and payable under this Agreement.

(2)  Notwithstanding anything contained in sub-section (1) hereinabove, the Lenders may at their discretion, appropriate such payment towards satisfaction of dues, if any, payable by the Borrower in respect of any other loan/facility availed of from the Lenders to the extent such loan/facility is due and unpaid.

**Section 2.16    Imposts, Costs and Charges**

Unless otherwise agreed to by the Lenders, the Borrower shall:

(i)      during the currency of the Loans bear all such imposts, duties and taxes (including interest and other taxes, if any) as may be levied from time to time by the Government or other authority with the sanction of law pertaining to or in respect of the Loans;

(ii)     pay all other costs, charges and expenses in any way incurred by the Lenders and such stamp duty, other duties, legal fees, travel expenses, documentation expenses, taxes, charges and other penalties incurred in connection with the appraisal, monitoring and supervision of the account, if and when the Borrower is required to pay according to the laws for the time being in force in the State in which its properties are situated or otherwise.

In the event of the Borrower failing to pay the monies referred to in sub-clauses (i) and (ii), the Lenders shall be at liberty (but shall not be obliged) to pay the same. The Borrower shall reimburse all sums paid by the Lenders in accordance with the provisions contained in this Agreement.

**Section 2.17    Illegality**

Notwithstanding any other provision of this Agreement, if any Lender notifies the Lead Bank/Facility Agent that the introduction of or any change in or in the interpretation of any law or regulation makes it unlawful, or any Governmental Authority asserts that it is unlawful, for any Lender to perform its obligations hereunder to make any Loan or to fund or maintain its participation in any Facility hereunder,

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

(i)    the obligation of that Lender to provide Facility hereunder and the amount of the unused Facility shall be reduced to zero, and

(ii)    if the Lead Bank/Facility Agent on behalf of such Lender so requires, the Borrower shall, within sixty (60) days of receipt of notice from the Lead Bank/Facility Agent or within the period allowed by Requirement of Law, whichever is shorter, repay (without premium or penalty), such Lender's portion of any outstanding Loan, together with interest accrued thereon till the date of repayment.

### Section 2.18    General Conditions to form an integral part of Agreement

This Agreement shall be read with the General Conditions contained in the **Annexure** hereto which shall form an integral part of this Agreement and be deemed incorporated herein by reference to the extent the same is applicable and the parties hereto agree to accept and be bound by the provisions thereof.

---

END OF PAGE

---

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

**ARTICLE III**

**SECURITY**

**Section 3.01    Security for the Pre-Shipment Loans**

*3.1.1*    The Pre-Shipment Loans together with all interest, premia on prepayment (if any) or on redemption, costs, expenses and other monies whatsoever stipulated in this Agreement and the other Financing Documents shall, in a manner and form satisfactory to the Lenders, be secured by:

(A)    a first pari passu charge by way of hypothecation in favour of the Lenders over all the assets, both present and future, acquired / to be acquired by the Borrower from the Pre-Shipment Loans.

(B)    an irrevocable and unconditional guarantee in favour of the Lenders from Essar Projects Ltd., UAE guaranteeing the due performance of the Borrower's obligations under the Facility Agreement until such time as the Pre-Shipment Loans are liquidated from the Post-Shipment Facility or export realizations from ESML under the Contract

**Section 3.02    Security for the Post-Shipment Loans**

*3.2.1*    The Post-Shipment Loans together with all interest, premia on prepayment (if any) or on redemption, costs, expenses and other monies whatsoever stipulated in this Agreement and the other Financing Documents shall, in a manner and form satisfactory to the Lenders, be secured by:

(A)

(i)    First pari-passu charge on Trust and Retention Account opened by the Borrower for the receivables from ESML in compliance with the terms and conditions of the Contract.

(ii)    Assignment of all contracts, rights, securities and insurances of the Borrower with respect to ESML, in favour of the Lenders on pari passu basis.

(iii)    Bills drawn by the Borrower on ESML duly accepted by ESML and undertaking by ESML to pay, directly from the escrow account maintained by ESML with the Project Lenders in USA in accordance with the waterfall mechanism stipulated under section 3.2.4(A) of this Agreement, to the Trust and Retention Account opened for the Facility in India.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

**(B)**

(i)    Assignment of security created by way of first charge of equitable mortgage on immovable properties and first charge by way of hypothecation on movable fixed assets of ESML in favour of Project Lenders (including the Borrower), on pari passu basis.

(ii)    Assignment of pledge of 51% of shares of ESML created in favour of Project Lenders including the Borrower, on pari passu basis.

(iii)    Assignment of the Borrower's rights under the ESML trust and retention account agreement or any other such agreement providing for waterfall mechanism for ESML's cash flows in favour of Project Lenders (including the Borrower) on pari passu basis.

**(C)**

(i)    Corporate Guarantee by Essar Projects Ltd., UAE (holding company of the Borrower) till the Project securities created under Clause (B) above are perfected.

Provided that on perfection of the Project securities under clause (B) above and confirmation on enforceability thereof in USA by the lenders' legal counsel for the Project Finance, the abovementioned Corporate Guarantee by Essar Projects Ltd., UAE shall be released by the Lenders after confirmation from lenders' legal counsel for the Project Finance.

**3.2.2**    The Borrower shall create the security mentioned above in Section 3.2.1 (A) within six (6) months from the Initial Borrowing Date or such additional period as the Lenders may agree.

**3.2.3**    The Borrower shall create and perfect the security mentioned above in Section 3.2.1 (B) within six (6) months from the Initial Borrowing Date or such additional period as the Lenders may agree. Further, all such security created under Section 3.2.1 (B) above would be governed as per the terms of the Project Finance documents, which shall not be in any case inferior to the existing security stipulations.

**3.2.4**

A.    The Borrower shall ensure that a trust and retention account is opened by ESML for the purpose of depositing therein all receivables arising out of contracts with its customers and such account is governed by the following cash waterfall each month:

    a.  First, towards statutory dues;

    b.  Second, towards operating expenses;

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

    c. Third, towards capital expenditure not exceeding USD 12.5 million per quarter;

    d. Fourth, towards payment of interest obligations due to Project Lenders;

    e. Fifth, towards payment of principal amount due to Project Lenders;

    f. Sixth, towards top-up debt service reserve account, if required;

    g. As otherwise determined in the Project Finance facility documents: provided that there is no material change / variation from the aforesaid waterfall mechanism under items (a) to (f) above.

**B.** The Borrower shall further ensure that all the remaining cash in the trust and retention account opened by ESML shall be applied as per the Cash Sweep Mechanism (to be operational within 9 months from Commercial Operations Date) as provided below:

    (i) For the period prior to April 1, 2014, at the end of each financial quarter, if the DSCR exceeds 1.25 times, then the Project Lenders shall have the right to sweep the cash to the extent of 50% of the surplus cash above DSCR of 1.25 times.

    (ii) For the period from April 1, 2014, till Final Maturity, at the end of each financial quarter, if the DSCR exceeds 1.15 times, then the Project Lenders shall have the right to sweep the cash to the extent of 50% of the surplus cash above DSCR of 1.15 times.

**C.** The payment to Project Lenders shall be proportionate to their outstanding amounts while the remaining cash may be utilized by ESML. For the purpose of computation of DSCR, the USD 12.5 million shall be assumed to be the capital expenditure in a given quarter.

**3.2.5** CBI agrees that in its capacity as a working capital lender, it shall issue NOC to the Borrower for creation of exclusive charge over the current assets of the Borrower pertaining to the Contract in favour of the Lenders.

---

**END OF PAGE**

---

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

ARTICLE IV

CONDITIONS PRECEDENT

**Section 4.01   Conditions to effectiveness**
This Agreement shall come into effect and be binding on the Borrower and the Lenders with effect from the Date of Signing and it shall remain in force till all the moneys due and payable and disbursed from time to time under this Agreement are fully repaid.

**Section 4.02   Pre-disbursement conditions for Pre-Shipment Facility**
(i)   The obligation on the part of the Lenders to provide the Pre-Shipment Facility to the Borrower hereunder and maintain the same shall be subject to compliance by the Borrower with the following conditions, to the satisfaction of Lenders:

   a.   the Borrower shall have produced a certified true copy of the duly executed Contract, alongwith its application to the Lenders for availing of any specific fund-based facility and / or non-fund based facility for the purpose of the Contract, with complete details as may be required by Lenders including any arrangement made with bank(s) / financial institution(s) for co-financing the Contract and its working capital requirements, based on which Lenders shall have sanctioned the Pre-Shipment Facility relevant to the Contract on the specific terms and conditions set out in the relative Letter of Sanction of Lenders;

   b.   the Borrower shall submit an undertaking that advance procured under the Pre-Shipment Loan will be utilised for the specific purpose of executing the Contract and not for any other purpose;

   c.   the Borrower shall submit an undertaking that the Borrower will not raise any credit from any other bank / financial institution for financing working capital requirement of the Contract, which is financed under the Facilities;

   d.   the Borrower shall obtain suitable insurance policy to cover major risks as stipulated by the Lenders. The insurance policy(ies) shall be assigned in favour of the Lenders.

   e.   the Borrower shall execute an undertaking for obtaining No Objection Certificates ("**NOCs**") from existing charge holders ceding exclusive charge over contract specific assets, in favour of the Lenders, within 6 months from the date of first disbursement, failing which additional interest at the rate of 0.50% p.a. will be payable from the date of first disbursement under this Facility Agreement till satisfactory compliance of the terms and conditions provided in the Letters of Sanction. The Lenders shall also have the right to recall the Facilities, in the event that the Borrower fails to create the Security within the stipulated time.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

f. the Borrower shall tie-up the Post-Shipment Credit Facility for an amount equivalent to the Pre-Shipment Facility limit

g. the Borrower shall have satisfactory reviews conducted by technical, accounting, tax and legal advisors/ consultants, if advised by the Lenders.

h. the Borrower shall have obtained or shall have made arrangements satisfactory to Lenders for obtaining all necessary approvals, licences, consents and clearances from the Government, Reserve Bank of India ("RBI") and other concerned regulatory and corporate authorities for availing of the Pre-Shipment Facility, the carrying on of the business of the Borrower as being carried on, as also for the due execution, delivery and performance of its obligations under the Contract and under the Facility Agreement and documents hereby contemplated and for creation of the Security as herein provided;

i. the Borrower shall have produced to Lenders, wherever applicable, prior to availing of the initial Pre-Shipment Loan facility hereunder, a certificate of an independent chartered accountant or the Borrower's internal auditor, alongwith an undertaking to submit, within 30 days, a certificate from the Borrower's statutory auditors substantially in the form prescribed by Lenders certifying to the effect that the amount of the Pre-Shipment Loan to be borrowed together with the aggregate of all its other borrowings would not exceed the limit on borrowings fixed by its shareholders in terms of the relevant provisions of the Companies Act, 1956;

j. subject to the timelines for security creation and perfection stipulated in this Agreement and the Letter of Sanction, the Borrower shall have created valid Collateral Documents as stipulated under clause 3.1.1 in favour of Lenders for the Pre-Shipment Facility, and, wherever applicable, shall have produced evidence satisfactory to Lenders of the filing of particulars of creation of charge(s) constituting the Security, with the concerned registering authorities;

k. the Borrower shall have furnished/procured all necessary documents in form and substance acceptable to Lenders and shall have also fulfilled all condition(s) precedent including payment of fees, charges and other dues, if any, as may have been stipulated by Lenders in their respective Letters of Sanction relevant to the Contract;

l. all representations and warranties made by the Borrower in the Facility Agreement and in each of its applications for availing of specific Pre-Shipment Facility shall have remained true and correct on the date of availment of the relevant Pre-Shipment Facility as if each of the representations and warranties shall have been repeated herein with respect to the facts and circumstances existing on the date thereof;

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

    m. no Event of Default and no event which, with the giving of notice or lapse of time or both would become an Event of Default, shall have happened and be continuing on the date hereof and on the date of availment of the relevant Pre-Shipment Facility.

(ii)    The Lenders may agree to defer performance or fulfilment of any one or more of the above conditions precedent as it may in their sole discretion deem fit, provided that each of such conditions precedent whose compliance may be so deferred by Lenders shall, unless expressly waived by Lenders/ Lead Bank in writing, be fully satisfied by the Borrower within such period as may be permitted by Lenders.

**Section 4.03   Conditions Precedent to Initial Borrowing Date under Post-Shipment Facility**

Prior to the Initial Borrowing Date, the Borrower shall, to the satisfaction of the Lenders, have complied with the following:

(i)    Completed financial tie up for the entire Facility to the extent of Rs.900 crore.

(ii)    Ensure that the Lenders shall have received the final copies of the executed Contract with all related annexures / appendices / amendments.

(iii)    Appointment of the Lenders' Legal Counsel ("**LLC**") for the Facilities and any other consultants as may be required by the Lenders shall have been completed.

(iv)    Obtain a confirmation from the LLC for the Facility that all statutory and non-statutory clearances required for fulfilling the terms of the Contract have been obtained by the Borrower.

(v)    Obtain clearance/ approvals required from RBI / Working group constituted by RBI for undertaking the Contract on deferred payment basis.

(vi)    Ensure that the Lenders shall have received an opinion from the LLC on documentation for the Facility. In the event of any issues/concerns raised by the LLC, the same shall be addressed by the Borrower to the satisfaction of the Lenders.

(vii)    The insurance coverage over the assets forming part of Security created under Section 3.2.1 above shall have been obtained to the satisfaction of the Lenders and endorsed in favour of the Lenders.

(viii)    Create security as envisaged under Section 3.2.1 (C) hereto above.

(ix)    Undertake to create securities as envisaged in Section 3.2.1 (A) and (B) and perfect the same within six (6) months from the Initial Borrowing Date.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

(x)    Submit an undertaking to ensure first pari passu charge on the securities created for Project Finance as stipulated in section 3.2.1 (B) of this Agreement and subsequent assignment of the same to the Lenders.

(xi)    Submit an undertaking to procure and furnish a "No Objection Certificate" within six months from the Initial Borrowing Date from the existing charge holders for assignment of security as per Section 3.02 of this Agreement, failing which additional interest of 0.50% shall be payable from the date of default under the Post-Shipment Facility.

(xii)   Establish that the 15% of the Contract Price as advance payment has been received by the Borrower and utilized towards financing the Contract.

(xiii)  Open a Trust & Retention Account through which all payments to be received by the Borrower from ESML / Lenders shall be routed.

(xiv)   Execute an agreement with ESML/Lenders to the satisfaction of the Lenders which shall include that all payments to be received by the Borrower from ESML/Lenders would be routed through TRA Account.

(xv)    Undertake to furnish to the Lenders such information and data as may be required by them or any agency appointed by the Lenders to ensure that the physical progress as well as expenditure incurred on the execution of the Contract is in compliance with terms of Contract.

(xvi)   Submit a confirmation from ESML together with opinion of 'LLC for the Project Finance' that all necessary approvals/clearances including import licenses, if required, have been obtained by ESML to ensure effectiveness of ESML's performance under the Contract.

(xvii)  Submit an undertaking from ESML that ESML shall ensure that all reports prepared by the LIE/LLC/Other Consultants of the Project will be shared with the Lenders/other agencies as suggested by the Lenders, as available with ESML.

(xviii) Agree that in the case of any default in the payment of dues to Lenders, Lenders and/or Reserve Bank of India (RBI) shall have an unqualified right to disclose or publish the details of the default and the name of the Borrower, and its directors as defaulters in such manner and through such medium as Lenders or RBI in their absolute discretion may think fit.

(xix)   Remove the directors, whose names appear in RBI's wilful defaulters' list from its board, or get their names deleted from the list or any other similar requirements from time to time.

(xx)    Execute an undertaking to the effect that it will utilize the Facility only for the purpose of execution of the Contract, and in case of failure to supply the goods/services, the Loan availed from the Lenders shall be paid out of the Borrower's own resources.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

(xxi)   Execute an undertaking to the effect that-
- None of the Directors or the Borrower is connected in the past with any NPA/OTS/Compromise/unscrupulous defaulters.
- None of the Directors of the Borrower is related to Directors / Senior Officers of the Lenders.
- There is no litigation initiated against the Borrower by any Bank/Financial Institution having Material Adverse Effect.

## Section 4.04   Conditions precedent to each Borrowing Date

(i)   The Borrower has not committed breach of any representation or warranty. All the representations and warranties contained in **Article V** of this Agreement are true and correct on and as of the relevant Borrowing Date.

(ii)   No event has occurred and is continuing, or would result from the proposed Borrowing or from the application of the proceeds therefrom, that constitutes a Default or an Event of Default.

     a.   The conditions precedent set forth in section 4.02 and section 4.03 have been fulfilled to the satisfaction of the Lenders or otherwise waived in writing by the Lenders.

Notwithstanding anything contained in Section 2.01 (a) of this Agreement, the Lenders shall not be liable to provide Pre-Shipment Facility to the Borrower hereunder if (a) the amount of the Pre-Shipment Facility specified in Section 1.01 (a) is exceeded; or (b) any other account of the Borrower with the Lenders or, of its group company, if any, may have been classified by the Lenders as a non-performing asset in accordance with directives of the RBI in force at the relevant time; or (c) any group company of the Borrower or any director of a group company shall be a defaulter to the Lenders, whether as a borrower or guarantor, or (d) any group company or any of the directors of the Borrower or of the group company shall have been declared a wilful defaulter by the Lenders or any other bank/financial institution in accordance with RBI guidelines then in force.

## Section 4.05   Other conditions
Availability of Facilities under this Agreement shall also be subject to the following conditions:

(i)   The Borrower shall:
    a.   submit stock statements / any other reports in the format and frequency as desired by the Lenders;

    b.   facilitate the Lenders and its agents and representatives at Borrower's own expense, to have access to books and records of the Borrower, arrange for visit to properties of the Borrower forming part of the security created hereunder, meetings with management and auditors of the Borrower, in carrying out the surveys and inspection and/or such specific assignment. The

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

costs, charges and expenses including professional fees and travelling and other expenses of and incidental to such inspection/specific assignment shall be payable by the Borrower and shall be reimbursed to the Lenders forthwith on receipt of a notice of demand in this behalf;

   c.  maintain separately, the stocks meant for export under the Contract.

(ii)   Post-Shipment Loan disbursements will be made only on submission of export bills to the equivalent amount after adjusting advance amount.

(iii)   In case of a default in repayment of Loans or payment of interest thereon on due dates, Lenders or appropriate authorities will have an unqualified right to disclose the name of the Borrower and its directors as defaulters in such manner and through such medium as Lenders and the appropriate authorities, in their absolute discretion may think fit, after providing appropriate notice and cure period.

(iv)   Borrower shall obtain adequate Foreign Exchange Risk Cover for interest and principal repayments, as accepted mutually between the Borrower and Lenders.

(v)   Lenders shall have the right to stipulate any additional condition, as considered necessary and as acceptable to the Borrower, upon occurrence of any event, which has a Material Adverse Effect on fulfillment of the terms of this Agreement.

(vi)   Borrower shall pay on demand to the Lenders the reasonable cost incurred by the Solicitors/Advocates/Company Secretaries used by the Lenders in connection with the creation and registration of security, certification of charge thereof with the appropriate authorities, compilation of search/status reports or other similar matters, provided that the Lenders were authorized by the Borrower to use such services.

(vii)   Borrower shall furnish to the Lenders unaudited quarterly results within ninety (90) days from end of each quarter, duly certified by an officer of the Borrower not below the designation of company secretary, and every year a copy of audited annual accounts of the Borrower immediately on finalization of the same but in any case not later than one hundred & eighty (180) days from the end of each relevant accounting period, audited and certified by an independent auditor acceptable to the Lenders.

(viii)   Borrower shall permit Authorised Officers of the Lenders to examine the books of accounts of the Borrower and carry out technical, financial and legal inspections of the assets created out of the Contract and to visit the site of manufacturing and examine the plants, installations, site works, buildings, properties, equipments, record and documents relevant to the performance of the Obligations of Borrower under this Agreement.

(ix)   Borrower shall ensure that :

   a.  Regular progress reports on the Project as agreed by the Project Lenders during construction of the Project are provided to the Lenders.

Page 33 of 86

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

    b.   Lenders are kept informed of the happening of any event likely to have substantial effect on ESML's profit and business with explanations and the remedial steps proposed to be taken.

(x)    Lenders shall have the right but not an obligation to down sell their Post-Shipment Loans to any other bank/financial institution, without cost/obligation to the Borrower.

(xi)    Borrower shall provide all documents and other evidence requested by the Lenders to carry out and be satisfied with all necessary "Know Your Customer" or other checks.

(xii)    Copies of all Transaction Documents to the satisfaction of the Lenders shall be submitted to Lenders.

(xiii)    Lenders reserve the right to review the terms and conditions of this Agreement as may be deemed necessary in the opinion of the Lenders in the Event of Default or in the event of any material adverse change in the market conditions and in the financial position, constitution or ownership of the Borrower.

(xiv)    The Promoter shall not, during currency of the Facility, without prior written approval of the Lenders:

    a.   Reduce, directly or indirectly, its shareholding in the Borrower below 51%; or
    b.   relinquish control of the Borrower

(xv)    Unsecured loans from promoters, if any, shall be subordinate to the Loans, and shall not be repaid without prior approval of the Lenders so long as any Obligations are due and outstanding to the Lenders.

(xvi)    The Borrower shall submit to the Lenders due diligence report based on the Borrower's audited financials from time to time including for FY 2010-11. The Facility shall at all times be in compliance with RBI guidelines, regulations, rules, notifications, circulars, directions, etc; issued from time to time.

(xvii)    The Lenders shall be entitled to appoint any person, firm, company or association of persons engaged in technical, management or consultancy business or any chartered accountant/cost accountant for carrying out any specific assignment to supervise and monitor performance under the Contract, examine the systems and procedures adopted by the Borrower for its working or to act as its concurrent or internal auditors or for conducting a special audit of the Borrower. Such consultants/accountants shall give their report to the Lenders.

(xviii)    In the Event Of Default, the Lenders shall have the right to review the management set-up of the Borrower and if found necessary, to require restructuring thereof including the formation of committees or sub-committees of the management of the Borrower with such powers, authorities and functions as may be considered desirable by the Lenders.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

(xix)   The Borrower shall not avail of any double finance from any source in respect of the same credit requirement financed by the Lenders hereunder nor shall the Borrower avail of any additional finance in respect of its Pre-Shipment Facility and/or Post-Shipment Facility and / or working capital requirement from any other source without the prior written consent of the Lenders.

(xx)    The Borrower shall not induct any person on its board of directors, who is a director on the board of directors of a company which may have been identified as a wilful defaulter as defined under the guidelines issued by RBI/any governmental authority from time to time, and, if at any time a director on the board of directors of the Borrower may be found to be a director also of such company, the Borrower shall forthwith advise the Lenders and take expeditious and effective steps for removal of such person from its board.

(xxi)   The Borrower shall cause its statutory auditors to provide a certificate to the Lenders whenever required by the Lenders certifying to the effect that based on their examination of the records of the Borrower and audit of its accounts, (a) the Borrower has applied the proceeds of each Loan to the purpose for which the Loan shall have been sanctioned by the Lenders, (b) the Borrower has not siphoned off any Loan by using the proceeds thereof for purposes unrelated to its operations, and (c) the Borrower has not diverted funds out of any Loan by making investment in other companies by way of equity/debt instruments without the prior written approval of the Lenders, or by utilising the proceeds of the Loan for any purpose which may be inconsistent with sanction terms, failing which , the Lenders shall be at liberty to seek such certification directly from the Borrower's statutory auditors, for which the Borrower hereby irrevocably authorizes the Lenders to do so on its behalf without further reference to it

(xxii)  The Borrower hereby further expressly agrees and confirms that its obligations to make payment to the Lenders of all amounts payable by it in respect of the Facilities are absolute, unconditional and irrevocable under any and all circumstances and the performance, observance and discharge of such obligations shall not be delayed, excused, avoided or in any manner affected by reason of:

   (i)     any probability or existence of any dispute of whatever nature relating to or arising out of the Contract or any other agreement pertaining to the Project;

   (ii)    any invalidity or unenforceability of any of the obligations contained in the Contract or the absence of any action to enforce the same; or

   (iii)   any waiver or consent or variation with respect to any of the provisions of the L/Cs.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

**Section 4.06    Special conditions**

(i)     Disbursement under Pre-Shipment Facility would be available to the extent of 100% of the order / contract value after creation of security stipulated under clause 3.1.1, filing of form with ROC and compliance of pre-disbursement conditions stipulated under Article IV of this Agreement and against submission of Chartered Accountant certifying:

(i) receipt of advance payment from ESML and utilization thereof towards financing pre-shipment requirements; and

(ii) details of pre-shipment expenditure incurred by EPIL (net of advance payments) and particulars of expenditure to be incurred by EPIL.

(ii)    Disbursement under Post-Shipment Facility would be available to the extent of 85% of invoice value (provided the invoice amount is not adjusted for advance/retention amount to the extent of 100% of invoice value) after completion of pre-disbursement conditions stipulated under Article IV and creation of security as stipulated under clause 3.2.1 and against submission of:

a.    Copies of invoice and other shipping documents/Transaction Documents.

b.    Confirmation from CBI stating that on realization of export proceeds, the same will be remitted to Trust and Retention Account towards repayment of the Post-Shipment Loans. The export documents shall be handled by CBI or any other bank acceptable to Exim Bank.

(iii)   The Borrower shall ensure that the Project Lenders provide finance of approximately USD 530 million to ESML towards meeting the Project Cost and the aggregate finance towards the project cost and suppliers' credit to the Project does not exceed USD 713 million.

**Section 4.07    Mandatory Pre-payment by ESML**

The Borrower shall ensure that ESML mandatorily prepays to the Project Lenders, without payment of any prepayment premium or break costs out of proceeds as provided herein below:

(i)     75% proceeds from any dilution of stake by the Promoter of ESML. However, any fresh issuance of equity by ESML shall not be subject to such mandatory prepayment subject to maintenance of ownership covenants;

(ii)    the receipt of insurance proceeds pertaining to the Project (other than those in respect of loss of revenue or third party liability) under insurance policies in excess of USD 10.0 million per claim, provided such claim proceeds are first used to reinstate the damaged assets;

(iii)   100% of any proceeds received from any expropriation;

(iv)    100% of liquidated damages received under project contracts. Provided that, such liquidated damages would be initially used for meeting any overrun, if any,

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

in the Project cost arising out of non performance by various contractors under the project contracts and to cover any other expenses resulting from the cause for such liquidated damages;

(v) 100% of the receipt of proceeds resulting from an arbitral or judicial award in connection with any of the project contracts other than liquidated damages mentioned above, provided such proceeds would initially be used for meeting any overruns in the Project Cost arising out of non-performance by various contractors under the project contracts and to cover any other expenses resulting from the events that gave rise to such award; and

(vi) 100% net proceeds from any asset sale of Borrower outside of the ordinary course of business exceeding USD 10.0 million (subject to reinvestment and payment to any prior charge holder of the assets sold).

No amounts prepaid may be re-borrowed under the current facility of USD 530 million for the Project. Such prepayments will be applied pro-rata to the then remaining principal outstanding of the Project Lenders.

**Section 4.08   Inter Creditor Agreement**
The Borrower shall ensure that an Inter Creditor Agreement is entered into amongst ESML, Security Agent of the Facility given by the Project Lenders, Facility Agent of Project Finance, Project Finance Lenders and Borrower as the provider of supplier financing to ESML, Lenders of Supplier Credit (termed as the Upstream Supplier Financing Creditors in the Project Finance Facility) and the Inter Creditor Agent within 6 months of obtaining initial Post-Shipment disbursements.

---
END OF PAGE
---

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

ARTICLE V

REPRESENTATIONS AND WARRANTIES

**Section 5.01    Representations & Warranties of the Borrower**
In order to induce each of the Lenders to enter into this Agreement, the Borrower represents and warrants, to and for the benefit of each Lender, as follows, which representations and warranties will survive the execution and delivery of this Agreement and making and repayment of the Loans:

*5.1.1    Existence*

The Borrower:

(a)    is a company duly organised and validly existing under the laws of India;

(b)    is duly authorised to do business in each jurisdiction in which it owns or leases property or assets or in which the conduct of its business requires it to be so authorised;

(c)    is conducting its business and operations in compliance with all applicable laws and directives of governmental authorities having the force of law as also with all applicable published guidelines and policy statements ; and

(d)    has all requisite power and authority (i) to own or hold under lease and to operate all of its property and assets, (ii) to carry on its business as now being conducted and as now proposed to be conducted and (iii) to execute, deliver and perform all of its obligations under the Contract and each of the Financing Documents to which it is a party.

*5.1.2    Independent Decision*

That the Borrower:

(a)    has made its own independent decision to avail of the Facilities on the terms and conditions contained in this Agreement, based upon its own judgment and upon advice from such advisers as it has deemed necessary;

(b)    is not relying on any communication (written or oral) of the Lender(s) as an investment advice or as a recommendation to enter into the loan transaction;

(c)    has not received any assurance or guarantee or representation from the Lenders as to the appropriateness or merits of the currency in which any of the Facilities may be sought to be availed of by the Borrower, or the rate of interest applicable thereto; and

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

(d)    it is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the risks of the loan transaction, and is also capable of assuming and assumes the financial and other risks in respect thereof.

### 5.1.3    Due Authorisation: No Conflict

The Borrower has duly authorized the execution, delivery and performance of, and has duly executed and delivered, each of the Financing Documents to which it is a party. Neither the execution, delivery nor performance by the Borrower of any of the Financing Documents to which it is a party nor the consummation by the Borrower, of the Contract or any of the other transactions contemplated hereby or thereby:

(a)    contravenes the Memorandum and Articles of Association or similar organisational documents of the Borrower;

(b)    contravenes any Requirement of Law binding upon or applicable to them or any of their properties/assets/revenues;

(c)    contravenes, or results in any breach of or constitutes any default under, any agreement, mortgage, lease, contract or other instrument to which it is a party or by which it or any of its properties and assets may be bound; or

(d)    The Borrower is not in violation of any Requirement of Law or in breach of any agreement, mortgage, lease, contract or other instrument, the violation or breach of which could reasonably be expected to result in a Material Adverse Effect

### 5.1.4    No Filings Required

No authorisation, approval or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required for:

(a)    the due execution, delivery, recording, filing or performance by the Borrower of the Contract or any Financing Document to which they are a party; or

(b)    the exercise by any of the Lenders of their rights under the Financing Documents or their remedies in respect of the Collateral pursuant to the Collateral Documents.

### 5.1.5    Stamp Duty

Each Financing Document has been duly stamped in accordance with the applicable stamp duty laws and executed in accordance with Indian law.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

### 5.1.6   *Legal, valid and binding obligations*

(a)   This Agreement and each of the Financing Documents to which the Borrower is a party when executed and delivered shall be legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

(b)   The obligations by the Borrower in this Agreement are, and in respect of the Facilities upon their sanction by the Lenders and those expressed to be assumed by it in each of the documents hereby contemplated when executed by the Borrower shall be, legally valid obligations binding on the Borrower in accordance with the terms hereof.

### 5.1.7   *No proceedings*

(a)   There are no pending or threatened actions, suits, claims, proceedings or investigations of any kind whatsoever binding upon or affecting the Borrower or any of its properties, assets or revenues that, either individually or in the aggregate, is likely to have a Material Adverse Effect.

(b)   The Borrower has not taken any corporate action nor have any other steps been taken or legal proceedings been commenced or (to the best of the Borrower's knowledge and belief) threatened against the Borrower for its winding-up or dissolution or merger or re-organisation or any scheme of arrangement or compromise for the benefit of its creditors, or for the appointment of a receiver, trustee or similar officer of itself or of any of its assets or revenues.

### 5.1.8   *Accounts*

The balance sheet of the Borrower as on March 31, 2011, and the consolidated balance sheet duly certified by the Authorised Officer of the Borrower, and the related statement of income and cash flows of the Borrower for the Fiscal Year then ended, accompanied by the Statutory Auditor's report, of the Borrower, copies of which have been furnished to each Lender, fairly present the financial condition of the Borrower as on such date and the results of the operations of the Borrower for the period ended on such date, all in accordance with Indian GAAP applied on a consistent basis. Further, the Borrower warrants that since the date of its most recent financial statements, there has been no change in the Borrower's financial condition or results of operations to an extent as may impair the Borrower's ability to perform its obligations under this Agreement or in respect of the Facilities in accordance with respective Letters of Sanction. The Company has no contingent obligations, liabilities for taxes or other outstanding financial obligations which are material in the aggregate, except as disclosed in such statements, information and data.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

### 5.1.9 *Valid Security*

(a) The Collateral Documents create a valid Lien / Security Interest in all of the Collateral in favour of the Lenders, securing the payment of all the Facilities and all filings and other actions necessary to perfect and protect such Liens and Security Interests (including the first priority nature thereof) have been duly made or taken and are in full force and effect or shall be duly made or taken within 6 months of the Initial Borrowing Date under this Agreement.

(b) The Borrower has a good, clear and marketable title to all the properties and assets ownership of which is reflected in its most recent audited financial statements and the notes thereto, and that all such properties and assets are free and clear of mortgages, liens, charges and other encumbrances, save as reflected in the notes to the audited financial statements or disclosed to the Lenders;

### 5.1.10 *Act of God, etc.*

(a) Neither the business nor the properties/assets of the Borrower are affected by any fire, explosion, accident, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that is likely to have a Material Adverse Effect.

(b) There are no strikes, lockouts or other labour disputes against the Borrower, and no material unfair labour practice complaint is pending or, to the best knowledge of the Borrower threatened against the Borrower before any Governmental Authority, which would have a Material Adverse Effect.

### 5.1.11 *Taxes*

The Borrower has filed, has caused to be filed or has been included in all tax returns (national, state, provincial, local and foreign, if any) required to be filed and has paid all taxes shown thereon to be due and payable, together with applicable interest and penalties and there are no outstanding liabilities in that regard under Indian law, except for any taxes the amount, applicability or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which the Borrower, have established appropriate and adequate reserves in accordance with Indian GAAP for the Borrower and which have been disclosed to the Lenders either by way of disclosure by way of financial statements or directly, unless and until any Lien resulting therefrom attaches to their property/assets/revenues and becomes enforceable against their creditors.

| CBI<br>(as Lead Bank/ Facility Agent) | CBI<br>(as Lender) | Exim Bank<br>(as Lender) | EPIL<br>(as Borrower) |
|---|---|---|---|
|  |  |  |  |

### 5.1.12 Solvency

The Borrower is solvent, both individually and together with its Promoter as on the Date of Signing.

### 5.1.13 No Immunity

The execution and performance of the Financing Documents to which the Borrower is a party constitutes, and the exercise of its rights and performance of its obligations there under shall constitute, private and commercial acts done and performed for private and commercial purposes. In any proceedings taken in any of the Borrower's jurisdiction of incorporation in relation to any of the Financing Documents to which it is or will be a party, the Borrower, shall not be entitled to claim for itself or any of its assets, immunity from suit, execution, attachment or other legal process.

### 5.1.14 No Event of Default

No Event of Default has occurred and is continuing. To the best of the Borrower's knowledge, no other event or circumstance is outstanding which constitutes a default, or with the giving of notice, lapse of time, determination of materiality or the fulfilment of any other applicable condition or any combination of the foregoing, might constitute a default, under any document which is binding on the Borrower or any asset of the Borrower.

### 5.1.15 Information

All information which has been made available to, the Lenders and/or their representatives by the Borrower in connection with the transactions contemplated hereby, or has been subsequently supplemented (including by the Schedules attached hereto) so as to be, complete and correct in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were made.

### 5.1.16 Statutory Auditors

The Statutory Auditors have been duly appointed by the Borrower on the Date of Signing.

### 5.1.17 Capitalisation

On the Date of Signing, the authorised share capital of the Borrower consists of Rs.130,00,00,000/-divided into 130,000,000/- equity shares of Rs.10/- each.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

*Audit Committee*

The Borrower has constituted a sub committee of their Directors in accordance with the provisions of section 292A of the Companies Act, 1956.

### 5.1.18 Conditions Precedent

The Borrower has satisfied all the conditions precedent set forth in Article IV (CONDITIONS PRECEDENT) hereof, unless waived/relaxed in writing by the Lenders and there has been no change in the status thereof.

### 5.1.19 Director as a wilful defaulter

No director on the Board of Directors of the Borrower is / has been declared as a willful defaulter.

### Section 5.02    Reliance

The Borrower warrants that each of the representations in Section 5.1 (*Representation & Warranties of the Borrower*) is true and correct in all material respects as of the Date of Signing and that none of them omits to state any matter which makes any of such representations misleading in any material respect.

### Section 5.03    Acknowledgement and Warranty

The Borrower acknowledges that it has made the representations contained in Section 5.1 (*Representation & Warranties of the Borrower*) with the intention of persuading the Lenders to enter into the Financing Documents and that the Lenders have entered into the Financing Documents on the basis of, and in full reliance on, each of such representations.

### Section 5.04    Rights and Remedies Not Limited

The Lenders' rights and remedies in relation to any misrepresentation or breach of warranty on the part of the Borrower shall not be prejudiced by any investigation by or on behalf of the Lenders into the affairs of the Borrower by any other act or thing which may be done by or on behalf of the Lenders in connection with the Financing Documents and which might, apart from this section, prejudice such rights or remedies.

### Section 5.05    Repetition of Representation and Warranties

The representations and warranties contained in Section 5.1 (*Representation & Warranties of the Borrower*) are given and made on and as of the date hereof, shall survive the execution and delivery of this Agreement and the making and repayments of the Loans and

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

shall be deemed to have been repeated on the date of each Notice of Borrowing, each Borrowing Date, before and after giving effect to the proposed Borrowing and to the application of the proceeds there from, as though made on and as of such date and shall be true and accurate so long as any obligations of the Borrower under the Financing Documents remain unsatisfied (other than any such representations or warranties that, by their terms, refer to a specific date other than the date of the proposed Borrowing, in which case as of such specific date).

---

END OF PAGE

---

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

ARTICLE VI

COVENANTS OF THE BORROWER

**Section 6.01   Affirmative Covenants**

So long as any Obligation of the Borrower towards the Lenders under the Financing Documents shall remain unsatisfied, the Borrower shall, at all times:

6.1.1   *Payment of Taxes*

Pay (including by way of making good faith estimated payments on a timely basis in accordance with appropriate procedures established for such purpose) and file before the same shall become delinquent, (a) all taxes, assessments, reassessments and governmental charges or levies imposed upon it or upon its property, assets or revenues and (b) all lawful claims and obligations that, if unpaid, might by law become a lien upon or any of the property, assets or revenues of the Borrower, provided, however, that the Borrower shall not be required to pay or to file any such tax, assessment, reassessment, charge, levy or claim, the amount, applicability or validity of which is being contested in good faith and by proper proceedings with respect to which the Borrower has established appropriate and adequate reserves in accordance with Indian GAAP and which have been disclosed to the Lenders.

6.1.2   Keep the Lenders informed about breach of any condition of Contract by either of the Parties to the Contract.

6.1.3   Conduct its business in the ordinary course and use its reasonable efforts, in the ordinary course, to preserve its business and the goodwill of its customers, advertisers, suppliers and others having business relations with it.

6.1.4   Maintain and preserve its corporate existence and all rights and privileges enjoyed by it, conduct its business in an orderly, efficient and customary manner, maintain and keep all its properties in good working order and condition and fully and effectively insured; comply with all laws, rules, regulations and directions of any governmental authority non-compliance of which may adversely affect its business or assets, and discharge all its indebtedness and perform all contractual obligations promptly pursuant to agreements to which it is a party or by which it is bound.

6.1.5   Keep proper books of record and account, in which full and correct entries shall  be made in conformity with Indian GAAP.

6.1.6   Apply the proceeds of all advances under this Agreement, for the purpose of the pre-shipment and post shipment supplier's credit, in accordance with the terms of this Agreement / Contract.

6.1.7   Maintain personnel for implementation of the Contract/Project to the satisfaction of the Lenders;

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

6.1.8 Promptly inform the Lenders regarding any litigations against the Borrower, any of its properties or business or undertaking or if a Receivers/Official Liquidator is appointed of any of its properties or business or undertaking.

6.1.9 Submit a statement of related party transactions covering loans and advances, sale/purchases on credit terms, investment by way of equity, quasi equity, guarantee, etc. on a quarterly basis or oftener, should the Lenders so require.

6.1.10 Submit a statement of end-utilization of funds disbursed to the Borrower at pre-shipment stage, duly certified by Statutory Auditor/independent Chartered Accountant as may be acceptable to Lenders, within thirty (30) days from the date of each disbursement. Provided that no such certification is required for letters of credit retired out of the Facility.

6.1.11 Submit within 45 days after the end of each quarter of its financial year, a status report on the Project/supplies made under the Contract/Project, in such form and containing such information as the Lenders may request, signed by a responsible officer of the Borrower referred to in section 4.05 (vii).

6.1.12 Furnish to the Lenders:

    a.    Confirmation of outstanding balances at the end of each financial year, or oftener if so desired by the Lenders, within fifteen (15) days of the end of the period for which balance confirmation is sought.

    b.    Assets of the Borrower financed with the Facilities and all other assets of the Borrower shall be insured against "all risks". A certified copy of the policy in respect of assets charged to Lenders, duly noting Exim Bank / CBI as the Lender (with Bank Clause and Reinstatement Value Clause). Borrower shall keep the policy valid during the tenor of the Facilities.

    c.    Such other statements, lists of property, accounts, budgets, projections, opinions, certificates, information and/or other documents as the Lenders may reasonably require.

        In the event of Borrower not furnishing any one or more of the above information within the respective time periods, Lenders shall reserve the right to charge an additional interest of 1% over and above the Applicable Interest Rate on the outstanding Loan amount till the desired information is furnished to the satisfaction of the Lenders.

6.1.13 Ensure that ESML maintains in full force all the required statutory/non-statutory clearances for the Project.

6.1.14 Promptly give to the Lenders, written notice of:

    a.    any litigation, arbitration or other proceedings commenced or threatened against the Borrower including any application for its winding-up, which if

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | |  |

determined against the Borrower may impair its ability to discharge its obligations under this Agreement or in respect of the Facilities; and

b.    any dispute between the Borrower and any governmental authority or employer, prime contractor or Contract/Project authority or between the Borrower and its sub-contractor or supplier concerned with the Contract/Project, which if not resolved may lead to a material adverse change in the Borrower's financial condition or operations, or adversely affect the observance and performance of its obligations hereunder or in respect of the Facilities.

6.1.15    Obtain, maintain and promptly renew from time to time all authorizations, approvals, consents, licences, clearances and exemptions as may be required to enable it to perform its obligations in respect of the Facilities or under the Financing Documents or as may be required for the validity or enforceability thereof, or otherwise necessary for performance of the Contract;

6.1.16    So long as any of the liabilities of the Borrower in respect of the Facilities sanctioned for any Project shall remain outstanding, the Borrower shall:

(a)    maintain separate records showing expenditure incurred in respect of the Project and the machinery, if any, acquired by means of the Loan and the operations and financial condition of the Borrower, and permit the authorised agents and representatives of the Lenders to carry out all technical survey and inspections of works during the stage of setting-up and operations of the Project as also inspection of the records, registers and accounts of the Borrower. Such agents and representatives of the Lenders shall have free access at all reasonable times to such records, registers and accounts and to all schedules, cost estimates, plans and specifications relating to such works, and they shall receive full co-operation and assistance from the Borrower. The cost of such inspection shall be payable by the Borrower forthwith on receipt of a notice of demand from the Lenders;

(b)    forward to the Lenders on demand a chart showing the actual progress of the Project as compared to original schedule together with percentage of completion of all major phases of acquisition and/ or construction/erection of equipment, plant and machinery, and on completion of the Project, furnish to the Lenders a statement with various heads of expenditure showing the final cost of the Project as compared to the original estimate together with reasons for variation(s), if any.

6.1.17    Pay premia in respect of all its insurance policies and keep the same in full force and effect and reimburse the Lenders for premium paid by them, if any.

6.1.18    Furnish to the satisfaction of the Lenders such financial information / statements relating to ESML at such intervals and in such form and manner,

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

duly certified by an officer of ESML not below the designation of company secretary or an auditor acceptable to the Lenders.

**Section 6.02    Negative Covenants**

So long as any Obligation of the Borrower under the Financing Documents shall remain unsatisfied, the Borrower shall not at any time without prior written approval of the Lenders:

6.2.1    Effect any changes to the Contract , except changes in the normal course of business of the Borrower, and manifest errors;

6.2.2    Assign any security created/assigned to the Lenders in favour of other persons during the currency of the Facility;

6.2.3    Utilize the Facilities for:
  a.    Extending loans to subsidiaries or associate companies or for making any inter-corporate deposits, except in the normal course of business or for temporary periods for projects under implementation;
  b.    Investment in real estate or any speculative activities;
  c.    Subscription to or purchase of shares/debentures or for repayment of dues of promoters/associate concerns/ inter-corporate deposits etc.

6.2.4    Declare dividend for any year except out of profits relating to that year after making all due and necessary provisions and provided further that no Event of Default had occurred in any repayment obligation to the Lenders. Any deviation shall require prior written approval of the Lenders.

6.2.5    Make any material change in the composition of Board of Directors, management structure and equity pattern of the Borrower.

6.2.6    Create any lien or charge or encumbrance of whatsoever nature over the receivables from ESML under the Contract.

6.2.7    Create any mortgage, charge, lien or other encumbrance in any form whatsoever over any of its properties and assets that are secured to the Lenders in accordance with this Agreement except a pari passu mortgage/charge in favour of any banker(s)/ term lender(s) who may have co-financed or agreed to co-finance the execution of the Contract/Project or as otherwise permitted in this Facility Agreement;

6.2.8    Create, incur or assume, in the Event of Default, any further indebtedness of any nature whether for borrowed money or otherwise, except any indebtedness for its working capital requirement in the ordinary course of business

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

6.2.9   Enter into any merger/amalgamation or consolidation or any scheme of arrangement or compromise for the benefit of its creditors, (unless the Borrower is the surviving entity and such merger or amalgamation is with an Affiliate), or sell, lease or transfer all or a substantial portion of its current assets that are secured to the Lenders in accordance with this Facility Agreement or revalue any of them;

6.2.10  Assume guarantee, endorse or in any manner become directly or contingently liable for or in connection with the obligation of any person, firm, company or corporation except for transactions in the ordinary course of business or in respect of wholly-owned subsidiaries of the Borrower (applicable in case of Exim Bank only in compliance with section 372A of the Companies Act, 1956);

6.2.11  Amend its Memorandum and Articles of Association or alter its capital structure or its shareholding pattern if such amendments are prejudicial to the interests of the Lenders;

6.2.12  Agree to alter or rescind any contract or any agreement or sub-contract with any supplier of raw materials or spares relating to production for supplies under the Contract/Project or agree to reschedule the deferred credit installments under the Contract;

6.2.13  Recognise, allow or register any transfer or disposal of shareholding of the Promoter in its equity/quasi equity capital that will have the effect of reducing, directly or indirectly, the shareholdings of the Promoter in the Borrower's paid up equity share capital, below 51% or permit withdrawal of any subordinated loans or deposits obtained at any time by the Borrower from its directors and their friends and associates to finance a part of the cost of execution of the Contract/Project or the working capital requirements of the Borrower, or make prepayment of any long-term debt in the Event of Default.

6.2.14  Enter into any transaction with person or entity otherwise than in the ordinary course of business on usual commercial terms or in which the Borrower would be obligated to pay more than the normal commercial price for any purchase or to receive less than the full commercial price (subject to normal trade discounts for its services);

6.2.15  Extend any loan or advance to or place deposit with any company free of interest or at a rate lower than the prime lending rate applicable to the Facilities advanced by the Lenders, without prior approval of the board of directors of the Borrower, except normal trade credit or advances/loans to its employees or security deposit in the normal course of business or otherwise in compliance with any statute.

6.2.16  The Borrower shall not (in its capacity as a Project Lender), without prior written consent of the Lenders, give its consent / NOC to ESML for incurring, assuming or raising any further secured debt for the Project and creating any Security Interest therefor ranking pari passu with the Project Lenders on the Assigned Contracts (as defined under Assignment Deed) or any assets covered thereunder, during the currency of the Facilities, provided that such consent / NOC shall not be unreasonably withheld by the Lenders.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

## ARTICLE VII

## ACCOUNTS

**Section 7.01    Account Bank and Accounts**

7.1.1  The Borrower shall open the Proceeds Account, Debt Service Account and the Insurance Proceeds Account with an Account Bank no later than fifteen (15) Business Days prior to the delivery of the first Borrowing to be made after Date of Signing. The identity of Account Bank and its location shall be agreed between the Borrower and the Lenders.

7.1.2  The Borrower shall procure an acceptance and acknowledgment of the Account Bank that it shall abide by the terms and conditions of the Trust and Retention Account Agreement.

7.1.3  For so long as the obligations of the Lenders exist, the Borrower shall maintain the following accounts denominated in rupees:

(i)     The proceeds accounts in the name the Borrower denominated in rupees to be maintained in an Account Bank ("**the Proceeds Accounts**").

(ii)    The insurance proceeds accounts denominated in rupees (**Insurance and Compensation Proceeds Accounts**).

7.1.4  **Proceeds Account**
Except as otherwise provided in this Agreement or any other Financing Document, all amounts received by the Borrower from ESML in compliance with the terms of the Contract shall be paid into the Proceeds Accounts forthwith on receipt of the same.

7.1.5  **Insurance Proceeds Account**
The Borrower shall procure that all amounts received by it or payable to its order with respect to insurance proceeds and/or compensation proceeds are paid forthwith by the relevant insurer directly into the Insurance Proceeds Accounts.

---

END OF PAGE

---

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

## ARTICLE VIII

## EVENTS OF DEFAULT

**Section 8.01   Events of Default**

The occurrence of any of the following events or circumstances shall constitute an **"Event of Default"**:

**8.1.1**

    (a)  the Borrower has defaulted in the payment of principal instalments of the Loans on the due dates; or

    (b)  the Borrower has defaulted in the payment of any instalment of Interest on the Loans

and such default has continued for a period of forty-five (45) Business Days from their respective due dates.

**8.1.2**  Any representation or warranty made by the Borrower (or any of its officers) under or in connection with any Financing Document or any other information furnished by the Borrower in the application for Loan or in the reports or otherwise provided by the Borrower from time to time, shall prove to have been incorrect in any material respect or misleading, when made or deemed to have been given and no steps to remedy the circumstance resulting in such incorrect or misleading representation or statement shall have been taken to the satisfaction of the Lead Bank/ Lenders within 15 days of the earlier of the Lead Bank/Lender giving notice to the Borrower or the Borrower becoming aware of such circumstance.

**8.1.3**  The Borrower shall have failed to perform or observe any term, covenant or agreement contained in any Financing Document to which it is a party and such failure shall not have been remedied within sixty (60) days of the breach.

**8.1.4**  The Borrower/ESML shall have committed any breach of the Contract or Transaction Documents unless (a) such breach or the consequences thereof are immaterial and could not reasonably be expected to have a Material Adverse Effect, and (b) such breach shall not have been remedied to the reasonable satisfaction of the Lenders within a period of sixty (60) days.

**8.1.5**  Execution or distress or any attachment being enforced or levied against the whole or any part of the Borrower's property or assets or any part thereof or certificate proceedings shall be taken or commenced for recovery of any dues or any decree or judgment for money, damages or for a fine or penalty in excess of Rs.5,00,000/- shall be entered against the Borrower, or any order relating thereto is not discharged or stayed within a period of ninety (90) days from the date of enforcement or levy.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

8.1.6    The Borrower ceasing to carry on its business for a period exceeding ninety (90) days.

8.1.7    Any acceleration under the Project Finance facility due to an event of default as defined in the Project Finance facility.

8.1.8    The occurrence of any event or circumstance which is prejudicial to or imperils or depreciates the security given to/ created in favour the Lenders materially and such event or circumstance continues to a detrimental effect, for a period in excess of ninety (90) days.

8.1.9    Failure of Borrower to take reasonable steps to comply with observations of Lenders' consultants to the satisfaction of Lenders within a period of ninety (90) days.

8.1.10    A receiver being appointed in respect of the whole or any part of the property of the Borrower and such appointment is not stayed, quashed or dismissed within a period of ninety (90) days.

8.1.11    Any force majeure event that has a Material Adverse Effect on fulfillment of Obligations under the Facility and such a situation is not corrected to the satisfaction of Lenders within a period of sixty (60) days.

8.1.12    Any change in law either in the country of the Borrower or the Project which has a Material Adverse Effect on repayment and such a situation is not corrected to the satisfaction of the Lenders within a period of sixty (60) days.

8.1.13    The Borrower shall have failed to retire or make any arrangement satisfactory to the Lenders to retire any bill under any L/C. for a period of forty-five (45) Business Days from due date.

8.1.14    Any breach or default shall have occurred under any other agreement involving the borrowing of money or the extension of credit under which the Borrower may be obligated as a company or guarantor, if such default shall permit or cause termination of any commitment to lend or acceleration of any indebtedness by any Lender or if such default shall consist of the failure on the part of the Borrower to pay any indebtedness or any installment thereof when due.

8.1.15    Any breach or default shall have occurred in the observance or performance of any obligation by a guarantor or surety or any other person liable for the Borrower, under any agreement or document furnished to or executed in favour of the Lenders in respect of the Facilities or any other financial assistance.

8.1.16    Any licence, consent, approval or exemption of any competent authority as may be necessary for the Contract or otherwise required for the validity, enforceability or legality of this Agreement, Security, or any of the Collateral Documents or for the performance hereof or thereof, shall be revoked, withheld or materially modified or shall otherwise not be renewed or fail to remain in full force and effect and such

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

circumstances shall remain unremedied for a period of thirty (30) days from the date of commencement thereof.

**8.1.17** The Borrower shall admit in writing its inability to pay its debts as they mature or shall declare a general moratorium on payment of its debts or shall enter into a composition or arrangement with or make a general assignment for the benefit of its creditors.

**8.1.18** A petition shall have been presented in a court of competent jurisdiction for the winding-up, liquidation or dissolution of the Borrower or any similar or analogous proceedings shall have been taken, and it shall not have been dismissed or stayed within 45 days from the date of the first hearing thereof.

**8.1.19** All or a substantial part of the undertaking or assets of the Borrower shall be seized, nationalised, confiscated, expropriated, requisitioned or acquired by or under the authority of any government or its agency.

**8.1.20** A strike, lock-out or lay-off shall occur with respect to the Contract/Project or the Company's business or its contractors/suppliers which results into an extra-ordinary situation which in the opinion of the Lenders shall make it improbable for the Borrower to perform or observe its obligations towards the Lenders in the normal course in respect of the Facilities or under this Agreement or any other document delivered in connection therewith.

**8.1.21 Consequences of default**

a)   If any Event of Default shall occur or be continuing, then, in every such event and at any time thereafter during the continuance of such event, the Lenders shall have the right to cancel their undrawn/unavailed commitments or the unused commitments and accelerate the Obligations of the Borrower and in the exercise of such rights each Lender may, after giving a notice of thirty (30) days, take one or more of the following actions:

i.   declare that the Lender's obligations to make available Loan, has been terminated forthwith;

ii.   declare the unpaid principal amount of and interest in respect of the Loan(s) and all other amounts payable by the Borrower hereunder and the other Financing Documents to be forthwith due and payable, whereupon such amounts shall become forthwith due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein to the contrary notwithstanding;

iii.   exercise any and all rights specified in the Collateral Documents and the other Financing Documents including, without limitation, to enforce, the Security Interest / Liens created under or pursuant to the Collateral Documents;

iv.   with respect to non-fund based facility, require the Borrower to deposit cash collateral in Indian rupees in a special deposit account with the Lenders within

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

such period as may have been specified in the notice, and in such sum as shall not be less than the Rupee equivalent of the aggregate value of then outstanding L/Cs calculated, if in foreign currency, at the rate of exchange quoted by the Lenders to be prevailing on the date of the notice, and such other additional amount(s) as the Lenders may deem necessary to keep it indemnified against any loss that may result from adverse fluctuation in the rate of exchange of the relevant foreign currency involved, and upon failure of the Borrower to deposit any such amount in the special deposit account within such specified period, the Borrower shall be liable to pay interest to the Lenders without prejudice to its other rights and remedies, on the amount not deposited by it as aforesaid to the date of payment in full at a rate per annum as may be notified by the Lenders to the Borrower, which shall be the aggregate of (a) the maximum interest rate applicable to the Lenders' Rupee term loans on the date of conversion as may be determined by the Lenders, and (b) one per cent (2%) per annum being additional interest by way of liquidated damages owing to default, in accordance with the provisions of this Agreement, and thereupon the Collateral, if any, created by the Borrower shall become enforceable at the discretion of the Lenders;

v.   terminate the obligation of the Lenders to continue to keep in force all or any of the L/Cs as may have been issued / confirmed and shall then still be in force, in which event, it shall also be lawful for (but not obligatory upon) the Lenders, without prejudice to any of its rights, powers and remedies under this Agreement, to negotiate with each Beneficiary for termination of the Lenders' liabilities under the L/Cs and to pay the amount(s) as may be then equal to the value of outstanding L/Cs / in order to get the L/Cs duly discharged and cancelled and procure release of the Lenders from all its liabilities and obligations in respect thereof notwithstanding that there may not be any claim or demand made by the Beneficiary thereunder, and any payment so made the Lenders shall be deemed to have been rightfully made under the L/Cs and shall forthwith become due and payable by the Borrower (to the extent of the amount not deposited by it in the special deposit account) together with interest thereon as aforesaid within four working days from receipt by the Borrower of a notice of demand from the Lenders, alongwith all other monies that may have remained unpaid hereunder, and the Security, if any, created by the Borrower shall thereupon become enforceable at the discretion of the Lenders;

vi.  declare the outstanding principal amounts of and all accrued interest in respect of the Facilities (together with other monies payable under this Agreement) to become immediately due and payable, whereupon the whole of such unpaid principal amounts and accrued interest thereon as also all overdues and other monies accrued or payable thereunder as mentioned in such notice shall, notwithstanding anything to the contrary contained in this Agreement or the relevant Letters of Sanction, become immediately due and payable without further demand or protest or notice of any kind whatsoever, all of which are hereby expressly waived by the Borrower, and the Security created in favour of the Lenders shall become enforceable at the discretion of the Lenders, and the Lenders shall also be entitled to enter upon and take possession of the assets of

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

the Borrower and / or transfer the assets by way of lease, leave and licence or sale, as may be deemed expedient to them.

vii. If the Borrower shall commit a default in the payment of any installment of any Loan or of any disbursement thereof or interest thereon on their respective dues dates or any other monies in respect of the Facilities when due as aforesaid or in accordance with this Agreement or the relevant Letters of Sanction, then, without prejudice to the provisions contained hereinabove the Lenders shall be entitled to apply, set-off and appropriate, at their discretion and without reference to the Borrower, any moneys belonging to the Borrower or lying at credit in any account of the Borrower with the Lenders (whether matured or not) or to which the Borrower may otherwise be entitled, (so far as the same may extend) in or towards reimbursement/payment of any amount payable by the Borrower to the Lenders in respect of the Facilities under this Agreement and / or the relevant Letters of Sanction, and to the extent that such monies may be denominated in a foreign currency, to apply monies in such foreign currency to the extent as shall on the date of such application, set-off or appropriation, be equivalent of the amounts then due under the Facilities, and for the purpose, also to obtain approvals, consents and permissions from all competent authorities as may be necessary in that behalf;

viii. All expenses incurred by the Lenders after an Event of Default shall have occurred in connection with preservation of the Borrower's assets and collection of amounts due under this Agreement and the relevant Letters of Sanction shall be forthwith payable by the Borrower, and until payment, shall carry interest at the rate provided in sub-clause (iv) above.

ix. Notwithstanding any cancellation, suspension or termination pursuant to the aforesaid provisions, this Agreement shall continue to enure to the benefit of the Lenders and their assigns until the Borrower shall have duly discharged all its liabilities and obligations towards the Lenders in respect of the Facilities in accordance with this Agreement and relevant Letter(s) of Sanction.

x. **Nominee Director**
   (i)    The Lenders shall be entitled to appoint from time to time, upon the occurrence and continuance of an Event of Default, a director ("the Nominee Director") on the Board of Directors of the Borrower for which purpose, the Borrower shall promptly take necessary corporate and regulatory actions and authorizations to implement such appointment by the Lenders. The Nominee Director shall not be required to hold any qualification shares and shall not be liable to retire by rotation. If required by the Lenders, the Nominee Director shall be also included as a member of any management committee or other committee(s) that may be constituted by the Board of Directors of the Borrower. The Nominee Director shall be entitled to all the rights and privileges of other directors of the Borrower and shall also have the right to receive notices of and attend all general meetings and Board meetings of the Borrower and meetings of any committee of the Borrower of which the Nominee Director may be a member.

Page 55 of 86

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

(ii)    The Nominee Director shall be paid the same sitting fees, commission, remuneration and expenses as shall be payable to other non-whole-time directors. The Borrower shall pay the sitting fees and other expenses to the Nominee Director directly, but the commission, remuneration or other monies and fees to which the Nominee Director shall become entitled, shall accrue due to the Lenders and accordingly be paid by the Borrower directly to the Lenders. Provided that if any such Nominee Director shall be an officer of the Lenders, the sitting fees, commission, remuneration and other monies payable to such Nominee Director shall also accrue to the Lenders and the same shall accordingly be paid by the Borrower directly to the Lenders. Any expenses that may be incurred by the Lenders or such Nominee Director in connection with the appointment of directorship shall also be paid or reimbursed by the Borrower to the Lenders, or as the case may be, to such Nominee Director.

(iii)   No Nominee Director appointed as aforesaid shall incur any obligation or liability by reason only of his being a director or for anything done or omitted to be done in good faith in the discharge of his duties as a director or anything in relation thereto. The Company shall indemnify every Nominee Director and the Lenders against all actions and proceedings, and losses and expenses suffered or incurred by the Nominee Director or the Lenders in, or in relation to, the discharge of his duties as such director.

(iv)    If the Nominee Director at any time may not be able to attend a meeting of the Board of Directors or any of its committee(s) of which the Nominee Director may be a member, then the Lenders shall be entitled to depute an observer to attend such meeting, in which event, expenses that may be incurred by Lenders for deputing such observer shall be borne by the Borrower.

(v)     Until the Lenders shall have appointed the Nominee Director, the Borrower shall furnish agenda notes of the meetings of its Board of Directors to the Lenders whenever required by it provided that agenda notes of Board Meetings at which the Borrower's annual accounts shall be taken up for consideration shall be forwarded by the Borrower well in advance even if not specifically called for by the Lenders.

xi.  impose any other terms and conditions as may be deemed fit by the Lender;

**Section 8.02   Cumulative Rights**

For greater certainty, it is expressly understood and agreed that the respective rights and remedies of the Lenders under this Agreement, the other Financing Documents or under any document or instrument executed pursuant hereto or thereto, are cumulative and are in addition to and not in substitution of any of the Lenders' rights or remedies provided by law or by equity and any single or partial exercise by the Lenders of any right or remedy for

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

a default or breach of any term, covenant, condition or agreement contained in this Agreement, the other Financing Documents or any other document or instrument executed pursuant hereto or thereto, shall not be deemed to be a waiver of or to alter, affect or prejudice the right or remedy or other rights or remedies to which the Lenders may be lawfully entitled for such default or breach. Any waiver by the Lenders of the strict observance, performance or compliance with any term, covenant, condition or agreement herein contained and any indulgence granted either expressly or by course of conduct of the Lenders shall be effective only in the specific instance and for the purpose for which it was given and shall be deemed not to be a waiver of any rights and remedies of the Lenders under this Agreement, the other Financing Documents or any document or instrument executed pursuant hereto or thereto, as a result of any other default or breach hereunder or thereunder.

**Section 8.03    Notice to the Lenders on the happening of an Event of Default**
If any Event of Default has happened, the Borrower shall forthwith give notice thereof to the Lead Bank/Facility Agent in writing specifying the nature of such Event of Default.

**Section 8.04    Right to disclose/publish the names of the Borrower and its directors**

(a)    The Lenders shall at all times have full authority and consent of the Borrower, without any further reference to the Borrower, to disclose to the Reserve Bank of India ("RBI"), any other governmental/regulatory authority, bank/financial institution, credit information bureaux or any other agency authorised in this behalf by RBI, any information pertaining to the Borrower, the Facilities and in respect of any default of the Borrower in the discharge of its obligations thereunder or under the Facility Agreement, to enable such authorised agency to use and process the said information and data so disclosed by the Lenders, in the manner deemed fit by such agency, and to provide the processed information and data or products thereof prepared by any such agency, to banks/financial institutions and other credit grantors or registered users, as may be specified by RBI in this behalf.

(b)    The Borrower hereby declares that the information and data furnished by the Borrower to the Lenders are true and correct and further undertakes that:

(i)    the Credit Information Bureau and any other agency so authorized may use, process the said information and data disclosed by the Lenders in the manner as deemed fit by them; and

(ii)    the Credit Information Bureau, and any other agency so authorized may furnish, the processed information and data or products thereof prepared by them, to banks/financial institutions and other credit grantors or registered users, as may be specified by the Reserve Bank in this behalf.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

## ARTICLE IX

### SUSPENSION & TERMINATION

**Section 9.01    Suspension**

Notwithstanding anything to the contrary contained in this Agreement, further access by the Borrower to the Loans may be suspended or terminated by the Lenders upon the occurrence of any one or more of the following events:

(i)     Non Compliance of terms and conditions:
Upon failure by the Borrower to carry out all or any of the terms of any Financing Document on the happening of an Event of Default;

(ii)    Change in the Borrower's set-up:
If any change in the Borrower's set-up or any guarantor for the Facilities has taken place which, in the opinion of the Lenders (which shall be final and binding on the Borrower), would adversely affect the conduct of the Borrower's business or the financial position or the efficiency of the Borrower's management or personnel or the performance of the Contract or the effectiveness of the Collateral.

**Section 9.02    Suspension to continue till default remedied**

The right of the Borrower to make withdrawals from the Loans shall continue to be suspended until the event which gave rise to such suspension shall have ceased to exist to the satisfaction of the Lenders and the Lenders have notified the Borrower that the right to make withdrawals has been restored.

**Section 9.03    Termination**

Without prejudice to the provisions of Article VIII (*Events of Default*) of this Agreement, upon the occurrence and continuance of any Event of Default or if the Borrower has not drawn the Loans by the Availability Period or such later date, as may have been agreed to by the Lenders, then in such event, the undrawn portion shall automatically stand cancelled. Notwithstanding any suspension, cancellation or termination pursuant to the provisions of this Article IX, all the provisions of this Agreement shall continue to be in full force and effect as herein specifically provided.

**Section 9.04    Cancellation of commitments**

The Borrower may, by notice in writing to the Lenders, cancel the unused Facility or any part thereof provided that the Borrower shall not be entitled to claim refund of any fees that may have been paid by it to any of the Lenders in respect of the Facility so cancelled.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

## ARTICLE X

### EFFECTIVE DATE OF AGREEMENT & INDEMNIFICATION

10.1    This Agreement shall become binding on the Borrower on and from the date of signing and against the Lenders on and from the later of (a) the Date Of Signing and (b) the date on which the conditions to effectiveness and the conditions precedent set forth in Article IV (*Conditions Precedent*) of this Agreement are complied with by the Borrower to the satisfaction of the Lenders. It shall remain in force until the Debt Discharge Date.

10.2    The termination or expiry of this Agreement shall be without prejudice to any obligations of the Borrower which are intended to or customarily survive such termination or expiry.

10.3    Indemnification

(a)    The Borrower agrees to do, perform and execute or cause to be done, performed and executed at its cost and expense, all such act, deed, assurance, matter or thing as may be required by the Lenders to indemnify and keep the Lenders safe, harmless and indemnified of, from and against all suits, actions, proceedings, claims and demands which may be taken or brought or made against the Lenders under or by virtue of the L/Cs or as a consequence, direct or indirect, of granting the Non-Fund Based Facility, as also against all dues, penalties, taxes, losses, damages, liabilities, costs, charges and expenses of any nature whatsoever which may be suffered, sustained or incurred by the Lenders by reason of the L/Cs or granting the Non-Fund Based Facility or in consequence of any breach or default that may be committed by the Borrower in the due performance, observance and discharge of its obligations and liabilities under the Contract or any other agreement relating thereto or in connection with the Project, or otherwise howsoever in the premises.

(b)    Without prejudice to and independent of the provisions of sub-clause (a) above, the Borrower hereby further agrees and undertakes that in the event of the Lenders being at any time required to retire bill(s) under any L/Cs, the Borrower shall without demur or protest pay to the Lenders at Mumbai within four (4) Business Days from the date of receipt of a notice of demand served on the Borrower by Lenders, the amount or amounts specified therein, which in the case of foreign currency payment(s) shall be the equivalent of the amount(s) in relevant foreign currency of the claim paid/payable under the L/Cs or Guarantee(s), as the case may be, calculated at the spot rate of exchange prevailing on the date of payment thereunder, together with interest on the amount that may be paid by Lenders to the Beneficiary under the L/Cs from the date of payment till reimbursement, at a rate that shall be determined by Lenders to be the highest rate then applicable to term loans sanctioned by Lenders to their constituents with such rests as may then be decided by Lenders at their sole discretion, and all costs (legal costs on a full indemnity basis), charges and expenses which the Lenders may have paid, incurred

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

or suffered in anywise concerning the L/Cs or otherwise in respect of the Non-Fund based Facility.

(c)     The indemnification provision contained in this Agreement is in addition to any securities which the Lenders may now or hereafter have from the Borrower or from any other person on its behalf in respect of the liabilities and obligations undertaken by it hereunder or in connection with the Facilities and nothing contained herein shall prejudice the rights and remedies of the Lenders against the Borrower (irrespective and independent of these presents) in respect of any other loan, advance or credit facility granted or agreed to be made available by the Lenders to the Borrower.

---

END OF PAGE

---

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

ARTICLE XI

MISCELLANEOUS

**Section 11.01  Amendment**

No amendment or waiver of any provision of this Agreement nor consent to any departure by the Borrower there from, shall in any event be effective unless the same shall be in writing and signed by the Lenders and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**Section 11.02  Notice**

Any notice, demand, communication or other request (**"Notice"**) to be given or made to the Lenders or to the Borrower or to any other Party shall be in writing. Such Notice shall be deemed to have been given or made when it is delivered by hand or dispatched by mail, facsimile, cable or telex or sent by overnight courier to the Party to which it is addressed at such Party's address specified in SCHEDULE III hereof or at such other address as such Party shall from time to time have designated by fifteen (15) days written Notice to the Party giving such Notice.

**Section 11.03  Evidence and Calculations**

(a)  Accounts maintained by a Lender in connection with this Agreement are conclusive evidence against the Borrower of the matters to which they relate.

(b)  In any legal actions or proceedings arising out of or in connection with this Agreement or the other Financing Documents, the entries made in the accounts maintained pursuant to Section 11.03 (a) above and any certificate or determination by a Lender of a rate or amount under this Agreement or the other Financing Documents shall be conclusive evidence of the matters to which it relates.

**Section 11.04  Costs and Expenses**

(a)  The Borrower agrees to pay all sums paid by the Lenders under the provisions of this Agreement or the other Financing Documents within thirty (30) days from the date of notice of demand from the Lead Bank/Facility Agent. Such sums will include but not be limited to the costs and expenses (including legal expenses) of each Lender and the Lead Bank /Facility Agent in connection with the preparation, execution, delivery, modification and amendment of this Agreement, the other Financing Documents and any other document delivered hereunder or there under, including, without limitation, (i) due diligence, syndication (including printing, distribution and bank meetings), transportation, computer, duplication, appraisal, consultant, insurance, search, filing and recording fees, audit expenses and all other reasonable out-of-pocket expenses; and (ii) the fees and expenses of the Lenders' Counsel with respect thereto. The Borrower further agrees to pay within thirty (30) days from the date of notice of demand the costs and expenses, if any, of Lender and the Lead

| CBI<br>(as Lead Bank/ Facility Agent) | CBI<br>(as Lender) | Exim Bank<br>(as Lender) | EPIL<br>(as Borrower) |
|---|---|---|---|
|  |  |  |  |

Bank/Facility Agent (including, without limitation, counsel fees and expenses), in connection with the preservation and/or enforcement of any of the rights of the Lenders or any of them, in connection with the enforcement of rights under this Agreement.

(b)     The Borrower undertakes to indemnify, keep indemnified and hold harmless each Lender and the Lead Bank/Facility Agent (each, an **"Indemnified Party"**) from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case, arising out of, or by reason of, or in connection with this Agreement, other Financing Documents, any of the transactions contemplated herein or therein except to the extent the claims, losses or expenses are found in a final, non-appealable judgment by a court of competent jurisdiction resulted from such Indemnified Party's fraud or gross negligence or wilful misconduct.

(c)     All such sums as payable under Sections 11.04 (a) and Section 11.04 (b) as aforesaid may be debited to the Borrower's account maintained with the Lenders and shall carry Interest at the then prevailing Interest Rate of the relevant Lender from the date of payment till such reimbursement.

(d)     Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 11.04 and accrued during the currency of this Agreement shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Financing Documents and the termination or expiry of this Agreement.

**Section 11.05  Novations and participations**

(a)     Each Lender (each, an **"Old Bank"**) may enter into a novation (at its own cost and after giving prior notice of 30 Business Days to the Borrower) with one or more scheduled commercial banks or Indian financial institutions or institutional lenders including existing Lenders (the **"New Banks"**) in respect of all or a portion of its rights and obligations under this Agreement; provided, however, that **(i)** each such novation shall be of a constant, and not a varying percentage of all rights and obligations hereunder and thereunder (including, without limitation, all or a portion of its Facility; **(ii)** the parties to each such novation shall execute and deliver to the Lead Bank/Facility Agent, for its recording in the Register, a Novation Agreement; **(iii)** such Old Bank shall concurrently novate an equivalent portion of its rights and obligations under all the Financing Documents to which it is a party; and **(iv)** such New Bank agrees to be bound by the terms of this Agreement, the Intercreditor Agreement and the Trust & Retention Account Agreement. Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Novation Agreement and to the extent therein specified, (1) the Old Bank and the other Parties to this Agreement (collectively, the **"Remaining Parties"**) shall be released from their obligations to each other, (2) the New Bank and the Remaining Parties shall assume obligations towards each other which are identical to those released in accordance

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

with sub-clause (1) above, except insofar as they are owed to or assumed by the Old Bank instead of the New Bank, (3) the rights of the Old Bank against the Remaining Parties shall be cancelled and the rights of the Remaining Parties against the Old Bank shall be cancelled, and (4) the New Bank and the Remaining Parties shall acquire rights against each other which are identical to those cancelled in accordance with sub-clause (3) above, except insofar as they are exercisable by or against the Old Bank instead of the New Bank.

(b)  By executing and delivering a Novation Agreement, the Old Bank thereunder and the New Bank confirm to and agree with each other and the other Parties hereto as follows: (i) other than as provided in such Novation Agreement, such Old Bank makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any Security Interest or Lien created or purported to be created under or in connection with this Agreement, the other Financing Documents or any other instrument or document furnished pursuant hereto or thereto; (ii) such Old Bank makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance or observance by any Borrower of any of its obligations under this Agreement, the other Financing Documents or any other instrument or document furnished pursuant hereto or thereto to which it is a party; (iii) such New Bank confirms that it has received a copy of this Agreement and the other Financing Documents and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Novation Agreement; (iv) such New Bank confirms that it is a "New Bank" (as defined hereinabove); (vi) such New Bank appoints and authorizes the Lead Bank/Facility Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Financing Documents as are delegated to the Lead Bank/Facility Agent by the terms hereof or thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such New Bank agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement and the other Financing Documents are required to be performed by it as a Lender.

(c)  The Lead Bank/Facility Agent shall maintain, a copy of each Novation Agreement delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and principal amount of the Loan owing to, each Lender from time to time (the "**Register**").

(d)  The Borrower further agrees, assures and undertakes to do, execute, acknowledge, deliver, record, file, re-file and register, any and all further acts, conveyances, instruments/documents, as may be reasonably required in connection with the novation or participation by any Lender.

(e)  Notwithstanding any other provision of this Agreement or the other Financing Documents, the Borrower shall not transfer, assign, sell or otherwise release all or any portion of its rights, interests or obligations under this Agreement or the other Financing Documents without prior written consent of the Lenders.

Page **63** of 86

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

**Section 11.06  Governing Law**

The Borrower agrees that this Agreement shall be governed and construed in accordance with the laws of India.

**Section 11.07  Jurisdiction**

(a)  The Borrower agrees that the courts and tribunals at New Delhi , India, shall have exclusive jurisdiction to settle any disputes, which may arise out of or in connection with this Agreement and that, accordingly, any legal action, suit or proceedings (collectively referred to as "**Proceedings**") arising out of or in connection with this Agreement may be brought in those courts and tribunals and the Borrower irrevocably submits to and accept for itself and in respect of its property, generally and unconditionally, the jurisdiction of those courts and tribunals.

(b)  The Borrower irrevocably waives any objection now or in future, to the laying of the venue of any Proceedings in the courts and tribunals in New Delhi, any claim that any such Proceedings have been brought in an inconvenient forum and further irrevocably agrees that a judgment in any Proceedings brought in the courts and tribunals in New Delhi shall be conclusive and binding upon it and may be enforced in the courts and tribunals of any other jurisdiction, (subject to the laws of such jurisdiction) by a suit upon such judgment, a certified copy of which shall be conclusive evidence of such judgment, or in any other manner provided by law.

(c)  Nothing contained in this Section 11.7, shall limit any right of the Lenders / Lead Bank to take Proceedings in any other court or tribunal of competent jurisdiction, nor shall the taking of proceedings in one or more jurisdictions preclude the taking of proceedings in any other jurisdiction whether concurrently or not and the Borrower irrevocably submits to and accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of such court and tribunal, and the Borrower irrevocably waives any objection it may have now or in the future to the laying of the venue of any Proceedings and any claim that any such Proceedings have been brought in an inconvenient forum.

(d)  The Borrower hereby consents generally in respect of any Proceedings arising out of or in connection with any Financing Document to the giving of any relief or the issue of any process in connection with such Proceedings including, without limitation, the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be made or given in such proceedings.

(e)  To the extent that the Borrower may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed), the Borrower hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

**Section 11.08  Incorporation of Financing Documents**
The Parties acknowledge that this Agreement and the other Financing Documents are an integral part of the same transaction.

**Section 11.09  Execution in counterparts**
This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**Section 11.10  Waiver not to impair the rights of the Lenders**
No delay in exercising or omission to exercise any right, power or remedy accruing to the Lenders upon any default under this Agreement, the other Financing Documents or any other agreement or document shall impair any such right, power or remedy or shall be construed to be a waiver thereof or any acquiescence in such default, nor shall the action or inaction of the Lenders in respect of any default or any acquiescence by it in any default, affect or impair any right, power or remedy of the Lenders in respect of any other default.

**Section 11.11  Partial Invalidity**
The illegality, invalidity or unenforceability of any provision of this Agreement under any Requirement of Law of any jurisdiction shall not affect its legality, validity or enforceability under any Requirement of Law of any other jurisdiction nor the legality, validity or enforceability of any other provision and the illegality, invalidity or unenforceability of any provision in any particular circumstance shall not affect its legality, validity or enforceability in other circumstances.

**Section 11.12  Evidence of Debt**

(a)      (i)      The Lenders may maintain, in accordance with their usual practice, separate Loan accounts in the name of the Borrower in respect of each Loan evidencing the amount(s) from time to time lent by and owing to the Lenders as also amount(s) received or recovered by them, and separate interest receivable account(s) for each Loan, showing therein the amount(s) of interest accrued and payable by the Borrower in accordance with this Agreement and the relative Letters of Sanction as also amount(s) received or recovered by them.

(ii)      In respect of foreign currency disbursements under any Loan, the Lenders may also maintain, if necessary, a Rupee loan account showing the converted Rupee amount(s), if any, owing to the Lenders consequent upon default, and amount(s) received or recovered by the Lenders in respect thereof. The Lenders may similarly maintain a Rupee interest receivable account corresponding to the foreign currency interest receivable account, showing therein the converted amount of interest in Rupees and other moneys payable by the Borrower, the amount of interest on the converted Rupee amount(s), if any, as also amount(s) received or recovered by the Lenders in respect thereof.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

(b)     With respect to Non-fund Based Facilities, the Lenders will maintain, in accordance with its usual practice, accounts in the name of the Borrower evidencing, inter alia, the amount(s) of L/Cs established by them and amounts, if any, paid thereunder, the amounts of commission, interest and other monies due from time to time and remaining owing and outstanding to the Lenders in respect thereof as also amount(s) received or recovered by them.

(c)     In any legal proceedings arising out of or in connection with the Facilities and/ or this Agreement or documents executed pursuant thereto or in respect thereof, entries made in the accounts maintained by the Lenders as aforesaid shall be prima-facie evidence of the existence of the liabilities of the Borrower as therein recorded.

**Section 11.13  Certification by the Lenders**

Where pursuant to any provision of this Agreement or the relevant Letter of Sanction, the Lenders may certify or determine a rate, whether of interest or foreign exchange, or an amount to be payable by the Borrower or express an opinion on any matter, such certification, determination or opinion shall be conclusive and binding on the Borrower in the absence of manifest error.

**Section 11.14  Language**

The Facility Agreement shall be executed also in Hindi language. In the event of any inconsistency in the provisions of the English and the Hindi versions of the Facility Agreement, the document in the English language shall prevail.

---
END OF PAGE
---

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

SCHEDULE I

REPAYMENT SCHEDULE

A.      Pre-Shipment Loan

Repayment out of export realization or disbursement(s) under Post-Shipment Facility or within 360 days from the date of respective disbursement under Pre-Shipment Facility, whichever being earliest.

B.      Post-Shipment Loan

| Sr. no | Repayment Date | % of Facility Repaid |
|--------|----------------|----------------------|
| 1 | 1-Apr-14 | 4.17% |
| 2 | 1-Jul-14 | 4.17% |
| 3 | 1-Oct-14 | 4.17% |
| 4 | 1-Jan-15 | 4.17% |
| 5 | 1-Apr-15 | 4.17% |
| 6 | 1-Jul-15 | 4.17% |
| 7 | 1-Oct-15 | 4.17% |
| 8 | 1-Jan-16 | 4.17% |
| 9 | 1-Apr-16 | 4.17% |
| 10 | 1-Jul-16 | 4.17% |
| 11 | 1-Oct-16 | 4.17% |
| 12 | 1-Jan-17 | 4.17% |
| 13 | 1-Apr-17 | 4.17% |
| 14 | 1-Jul-17 | 4.17% |
| 15 | 1-Oct-17 | 4.17% |
| 16 | 1-Jan-18 | 4.17% |
| 17 | 1-Apr-18 | 4.17% |
| 18 | 1-Jul-18 | 4.17% |
| 19 | 1-Oct-18 | 4.17% |
| 20 | 1-Jan-19 | 4.17% |
| 21 | 1-Apr-19 | 4.17% |
| 22 | 1-Jul-19 | 4.17% |
| 23 | 1-Oct-19 | 4.17% |
| 24 | 1-Jan-20 | 4.09% |

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

**SCHEDULE II**

**DRAWDOWN SCHEDULE**

*As may be agreed between the Borrower and the Lenders*

END OF PAGE

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

SCHEDULE III

ADDRESS OF PARTIES TO THIS AGREEMENT IN ACCORDANCE WITH SECTION 11.2

| Party Name | Address |
|---|---|
| Essar Projects (India) Ltd. | Essar House,<br>11, K.K. Marg, Mahalaxmi,<br>Mumbai – 4000 034. |
| Lead Bank/Facility Agent | Central Bank of India,<br>Chandermukhi,<br>Nariman Point,<br>Mumbai – 400 021 |

Lenders

| SR. No. | Name of Lender | Dealing Office |
|---|---|---|
| 1. | Central Bank of India | Corporate Finance Branch,<br>1st Flr., MMO Building,<br>Fort, Mumbai – 400 023 |
| 2. | Export-Import Bank of India | Centre 1 building,<br>21st flr., World Trade Centre Complex,<br>Cuffe Parade, Mumbai – 400 005 |

END OF PAGE

| CBI<br>(as Lead Bank/ Facility Agent) | CBI<br>(as Lender) | Exim Bank<br>(as Lender) | EPIL<br>(as Borrower) |
|---|---|---|---|
|  |  |  |  |

**IN WITNESS WHEREOF** the Borrower has caused its Common Seal to be affixed hereto and to a duplicate hereof and the Lenders and the Lead Bank/Facility Agent have caused this Agreement to be executed by their duly constituted attorney/authorized official on the day, month and year first hereinabove written.

THE COMMON SEAL OF **ESSAR PROJECTS (INDIA) LIMITED** has pursuant to the Resolution of its Board of Directors passed in that behalf on the 42ᵗʰ day of Mauch , 2012, hereunto been affixed in the presence of Mr. Dhwani Mehta ~~Director~~/ ~~Secretary~~/Authorised person of the Borrower, who has signed these presents in token thereof.

**SIGNED AND DELIVERED** BY the within named Lenders

Signed for and on behalf of **Central Bank of India** as a Lender, by the hand of

Name:    /. SREEKUMAR
Title:    Chief Manager

For Central Bank of India

मुख्य प्रबंधक/Chief Manager
कॉरपोरेट वित्त शाखा/
Corporate Finance Branch

Signed for and on behalf of **Export Import Bank of India** as a Lender, by the hand of

MR. SRIRAM SUBRAMANIAM

Name:
Title:
उप महाप्रबंधक एवं क्षेत्रीय प्रमुख
Deputy General Manager and Regional Head
भारतीय निर्यात-आयात बैंक
Export-Import Bank of India
Ground Floor, Statesman House,
तल मंजिल, स्टेट्समैन हाउस,
148, बाराखम्भा रोड, नई दिल्ली-110 001
148, Barakhamba Road, New Delhi- 110 001

Signed for and on behalf of **Central Bank of India** in its capacity as Lead Bank/Facility Agent, by the hand of

Name:    / SREEKUMAR
Title:    Chief Manager

For Central Bank of India

मुख्य प्रबंधक/Chief Manager
कॉरपोरेट वित्त शाखा/
Corporate Finance Branch

**EXHIBIT A**

**FORM OF NOTICE OF BORROWING**

[Date]

**The Deputy General Manager,**
Central Bank of India,
Corporate Finance Branch,
1st floor,
MMO Building, Fort,
Mumbai – 400 023
**(as Lead Bank/**Facility Agent**)**

Dear Sir

**Sub: Notice of Borrowing**

The undersigned, Essar Projects (India) Ltd. refers to the Facility Agreement, dated as of [_____], 2012 (as amended or modified from time to time, the "**Facility Agreement**"), among the undersigned, certain Lenders parties thereto, Central Bank of India, as the Lead Bank (the "**Lead Bank**" / "**Facility Agent**") for said Lenders parties thereto and hereby gives you notice, irrevocably, pursuant to Section ___ of the Facility Agreement that the undersigned hereby requests a Borrowing under the Facility Agreement, and in that connection sets forth below the information relating to such Borrowing (the "**Proposed Borrowing**") as required by Section ___ of the Facility Agreement (Defined terms used herein, unless otherwise defined herein, shall have the meaning set forth in the Facility Agreement)

(i)    The Business Day of the Proposed Borrowing is _____, ____.

(ii)    The aggregate amount of the Proposed Borrowing is Rs._____.

The undersigned hereby certifies that the following statements are true on the date hereof:

1.    There are no legal proceedings in India or any other jurisdiction affecting the obligations of the Borrower, and that there are no legal proceedings regarding the effectiveness or validity of any of the clearances/ statutory approvals that have been obtained for the Contract or any of the Financing Documents.

2.    The representations and warranties of the Borrower contained in the Financing Documents are correct on and as of the date hereof.

3.    That there are no decisions, ruling, orders or other actions of any kind by any Court / Governmental Authority that could reasonably be expected to result in a Material Adverse Effect.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

4.    No event has occurred and is continuing, or would result from the proposed Borrowing or from the application of the proceeds therefrom, that constitutes an Event of Default.

5.    Bills have been duly authorised by ESML for the payment.

Yours truly,

**ESSAR PROJECTS (INDIA) LTD.**

By: _____

(Authorized Signatory)

| CBI<br>(as Lead Bank/ Facility Agent) | CBI<br>(as Lender) | Exim Bank<br>(as Lender) | EPIL<br>(as Borrower) |
|---|---|---|---|
|  |  |  |  |

**EXHIBIT B**

**FORM OF NOVATION AGREEMENT**

Dated as of _____, 20____.

Reference is made to the **Facility Agreement**, dated as of [_____] (as amended or otherwise modified from to time, the "**Facility Agreement**"), among the Borrower, the Lenders, the Central Bank of India as the Lead Bank/Facility Agent for the Lenders parties thereto.

At the request of the Old Bank (as defined in Schedule I hereto)/Borrower, the New Bank (also as defined in Schedule I hereto) has agreed to discharge the obligations of the Old Bank and discharge the liability of the Borrower to the Old Bank under the Facility Agreement to the extent specified herein, and subject to certain terms and conditions set forth below.

The Old Bank, the New Bank, the Borrower and the Lead Bank/Facility Agent on behalf of the other Remaining Parties (as defined below) hereto agree as follows:

1.    As of the Effective Date (defined below) the New Bank, at the request of the [Old Bank/the Borrower], agrees to discharge the obligations of the Old Bank in and under the Facility Agreement as expressed to be the subject of this Novation Agreement as set out in Schedule I hereto, and to such extent (a) the Old Bank and the other parties to the Facility Agreement specified in Schedule I hereto (collectively, the "**Remaining Parties**") shall be released from their obligations to each other, (b) the New Bank and the Remaining Parties shall assume obligations toward each other which are identical to those released in accordance with sub-clause (a) above, except in so far as they are assumed by the Old Bank instead of the New Bank, (c) the rights of the Old Bank against the Remaining Parties shall be cancelled and the rights of the Remaining Parties against the Old Bank shall be cancelled, and (d) the New Bank and the Remaining Parties shall acquire rights against each other which are identical to those cancelled in accordance with sub-clause (c) above, except insofar as they are exercisable by or against the Old Bank instead of the New Bank.

2.    The Old Bank hereby (a) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Facility Agreement or any other Financing Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or Security Interest created or purported to be created under or in connection with, any Financing Document or any other instrument or document furnished pursuant thereto, and (b) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance or observance by the Borrower, of any of their obligations under any Financing Document to which they are or will be a party or any other instrument or document furnished pursuant thereto.

Page 73 of 86

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

3.   As of the Effective Date, (i) the New Bank agrees to become, and to be deemed for all purposes to be, a signatory to (a) Facility Agreement, (b) the Intercreditor Agreement, and (c) the Trust & Retention Account Agreement with the same force and effect as if the New Bank had been an original signatory thereto, and the New Bank agrees to be bound by all terms and conditions thereof as a Lender thereunder, and (ii) the Old Bank shall, to the extent provided in this Novation Agreement, relinquish its rights and be released from its obligations under the Facility Agreement.

4.   The Old Bank hereby gives notice that nothing herein or in the Facility Agreement (or any document relating thereto) shall oblige the Old Bank to (a) accept any claim or demand from the New Bank of the whole or any part of its rights, benefits and/or obligations under the Facility Agreement forming the subject matter of this Novation Agreement, (b) support any losses directly or indirectly sustained or incurred by the New Bank for any reason whatsoever including, without limitation, the non-performance by the Borrower or any other party to the Financing Documents (or any document relating thereto) of its obligations under any such document. The New Bank hereby acknowledges the absence of any such obligation as is referred to in sub-clause (a) or (b) above.

6.   This Novation Agreement shall be governed by, and construed in accordance with, the laws of India.

7.   This Novation Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Novation Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Novation Agreement.

---

END OF PAGE

---

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

**IN WITNESS WHEREOF,** the Borrower has caused its Common Seal to be affixed hereto and to a duplicate hereof on the day, month and year first hereinabove written and the Old Bank, the New Bank, and the Lead Bank/Facility Agent on behalf of the Remaining Parties have caused this Novation Agreement to be executed by their officials duly authorised in this regard

*THE COMMON SEAL OF **ESSAR PROJECTS (INDIA) LIMITED** has pursuant to the Resolutions of its Board of Directors passed in that behalf on the _____ day of _____, 20, hereunto been affixed in the presence of Mr. _____, Director of the Borrower, who has signed these presents in token thereof AND _____,
[_____], as Old Bank

By _____
Name:
Title:


[_____], as New Bank
By _____
Name :
Title :

The Lead Bank/Facility Agent on
Behalf of the remaining parties

 By _____
Name :
Title :

---

* Modify common seal provision in accordance with the Borrower's Articles of Association.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

**Schedule I to Exhibit B**

Percentage interest transferred:                                         _____%

(Old Bank's) Facility :                                          Rs._____

Aggregate outstanding principal amount of
Loans transferred:                                         Rs._____

Effective Date:_____, _____

Applicable Margin:

Old Bank:

New Bank:

Administrative details of New Bank:

Lending Office:

Account for Payments:

Telephone:
Facsimile Number:
Attention:
_____

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
| --- | --- | --- | --- |
| | | | |

ANNEXURE

GENERAL CONDITIONS

I.    **Definitions & Interpretations**

Except as expressly specified herein, all expressions used in the General Conditions and defined in the Facility Agreement of which the General Conditions form a part, shall have the same meanings as given to them in the Facility Agreement. Words importing singular number only shall include plural and vice versa. In the event of any inconsistency between any provision of the Facility Agreement and the General Conditions, the relevant provision of the Facility Agreement shall prevail.

II.   **Terms of Disbursement**

(1)   The Loan facility shall be made available to the Borrower in one or more disbursement(s) as may be mutually agreed between the Parties subject to the Borrower complying with the provisions of the Facility Agreement and the disbursement procedure stipulated by Exim Bank and provided the financing of the expenditure shall be in consonance with the details furnished to Exim Bank.

(2)   In the case of disbursement in respect of pre-shipment credit requirement of the Borrower under the Fund-based Facility, the Borrower shall give a notice of drawdown to the Lenders for a disbursement against a specific Contract/letter of credit, whereupon the Lenders shall make the disbursement by payment for account of the Borrower to the credit of its account with such bank as may be specified by the Borrower in its notice of drawdown. The Lenders shall have the right to review the costs incurred and progress made by the Borrower in connection with the Contract since the date of the first/previous disbursement before making further disbursement(s).

(3)   In the case of disbursement in respect of post-shipment credit requirement of the Borrower under the Fund-based Facility, the Borrower shall give a notice of drawdown to the Lenders for a disbursement against a shipment after the shipment is effected under the Contract. Such notice shall be accompanied by a copy each of the invoice and the relative shipping documents. The disbursement(s) shall be claimed through a commercial bank which shall satisfy itself that shipments have been made in accordance with the provisions of the Contract and documents submitted to it by the Borrower are in accordance with the letter(s) of credit, if any, and also confirm to the Lenders to that effect. The Lenders shall thereafter make disbursement up to a sum apportionable to the value of the relative shipment by payment for account of the Borrower to the credit of its account with such bank as may be specified by the Borrower in its notice of drawdown.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

(4)    All collection/remittance charges, if any, in respect of a disbursement shall be borne by the Borrower. Interest on each disbursement shall begin to accrue from the date of transfer by the Lenders.

(5)    The Lenders may, at their discretion, deduct from sums to be lent and advanced by them to the Borrower, any monies then remaining due and payable and outstanding by the Borrower to the Lenders under any other account(s) of the Borrower.

III.    **Provisions specific to Foreign Currency Disbursements:**

(A)    **Interest Period**

(1)    Each Interest Period shall be of such duration as specified in Schedule I of the Facility Agreement unless otherwise provided herein.

(2)    The first Interest Period relating to each disbursement of a Loan shall commence on the date on which the disbursement is made by the Lenders, and except as mentioned below, shall end on the last day of the then current Interest Period relating to the first disbursement of the same Loan so that all disbursements made during an Interest Period relating to the same Loan shall be consolidated on expiry of such Interest Period.

(3)    The first Interest Period in relation to the first disbursement of each Loan shall end on the date of expiry of the Interest Period specified in Schedule I of the Facility Agreement or on such other date as may be advised by the Lenders to the Borrower at the time of making of the first disbursement relating to the relevant Loan. Provided that if a disbursement itself is repayable in installments or in one lumpsum on a specific Repayment Date, then the first Interest Period in relation to each disbursement shall end on the date of expiry of the Interest Period specified in Schedule I.

(4)    Each subsequent Interest Period relating to each disbursement of any Loan shall commence on the first day of the next following Interest Period.

(5)    If any Interest Period commences on the last Business Day of a calendar month or on a day for which there is no numerically corresponding day in the month of its expiry, that Interest Period shall, subject to sub-Sections (3), (6) and (7), end on the last Business Day of such calendar month.

(6)    Any Interest Period that would otherwise end during the month preceding or extend beyond the (final) Repayment Date of any disbursement shall be of such duration that it shall end on that date subject to adjustment of interest and Fee, if any, in accordance with Section IX (D).

(7)    The Lenders shall be at liberty to reduce the duration of any Interest Period at

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

any time during the currency of a Loan, having regard to its source of funds or the cost of maintaining such Loan, in which event, each Interest Period shall thereafter end on such date and, if necessary, the Repayment Date relating to such Loan also may correspondingly stand so altered, as may be advised by the Lenders, and thereupon such revised date(s) shall be binding on the Borrower.

**(B)     Alternative Basis of Interest Rate(s)**

(1) If the Lenders may at any time be advised by their lender(s) from whom they may have borrowed funds to on-lend or maintain any foreign currency disbursement hereunder that by reason of circumstances affecting the relevant inter-bank financial market, such funds were not available in requisite amount or that adequate and reasonable means do not or would not exist for ascertaining the relevant LIBOR applicable to any Interest Period or that such LIBOR does not adequately reflect the cost to the Lenders' lender(s) of obtaining or maintaining funds for that Interest Period, then the Lenders shall notify the Borrower of such rate in lieu of LIBOR and any resultant change in the duration of the relevant Interest Period as may be agreed between the Lenders and their lender(s), which shall be final, conclusive and binding on the Borrower.

(2) If the rate of interest notified by the Lenders to the Borrower as provided in sub-Section (1) shall not be found acceptable to the Borrower, then (i) if no disbursement shall have been made, the Borrower shall not be entitled thereafter to avail of the Loan facility in such foreign currency or (ii) if any foreign currency disbursement may have been made, the Borrower shall after giving 30 days' prior written notice to the Lenders prepay the relevant disbursement or disbursements in such foreign currency together without prepayment premium on the next Interest Payment Date together with interest thereon up to the date of prepayment at the rate notified to the Borrower by the Lenders in accordance with sub-Section (1) above.

**(C)     Change of Law or Circumstances**

(1) If it becomes unlawful for the concerned lender of the Lenders from whom the Lenders may have borrowed funds to on-lend and/or maintain any foreign currency disbursement(s), to give effect to its obligations under its agreement with the Lenders, then the Lenders shall so notify the Borrower in writing whereupon any unavailed foreign currency disbursement out of the Loan facility shall be cancelled and their obligation to make, fund or maintain any further disbursement in such foreign currency shall cease. The Borrower shall forthwith after notification or such longer period as the Lenders may permit prepay such foreign currency disbursement in full (without any prepayment premium) together with interest accrued thereon to the date of prepayment and any other monies owing to the Lenders hereunder.

(2)

      (i)     If the Lenders determine that by reason of (a) any change in law or regulation or in its interpretation and/or (b) compliance with any request from or requirements of any central bank or other fiscal,

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

monetary or similar authority applicable to the Lenders or their lender(s), (i) the Lenders shall incur a cost as a result of their having agreed to make disbursement(s) hereunder in any foreign currency; or (ii) there shall be any increase in the cost to the Lenders of making, funding or maintaining all or any of the disbursement(s) of any Loan or under the Fund-based Facility; or (iii) the Lenders shall become liable to pay any tax or to make any other payment on or calculated by reference to the amount of disbursement(s) made or to be made by them in foreign currency or interest accrued thereon, or (iv) there shall be any other condition imposed on the Lenders the effect of which may be to reduce the amount of any payment receivable by, or the effective return to them in respect of the foreign currency disbursement(s), then the Borrower shall from time to time on demand pay to the Lenders such amounts as the Lenders may certify to be necessary to compensate the Lenders against (i) such cost; (ii) such increased cost (or such portion of increased cost as shall in the opinion of the Lenders be attributable to their making, funding or maintaining disbursement(s) in the relevant foreign currency or currencies hereunder); (iii) such liability or (iv) reduction (each an "increased cost"), as the case may be. For removal of doubt, it is hereby clarified that costs referred to in this Section shall not include administrative overhead expense of the Lenders.

(ii)   So long as circumstances giving rise to such increased cost shall continue, the Borrower may, after giving the Lenders not less than thirty (30) days' prior written notice (which shall be irrevocable), prepay on the next Interest Payment Date or the Repayment Date, the relevant foreign currency disbursement(s) then outstanding without any prepayment premium, and upon the giving of such notice, the unavailed portion, if any, of the relevant Loan facility shall be cancelled.

IV.    **Computation of Interest**

(1)   Interest on the outstanding amount of the Loan and/or on the converted Rupee amount(s) consequent upon default (in case of foreign currency disbursements) and/or on other monies accruing due in respect of the Facilities pursuant to the Facility Agreement and/or the relevant Letter of Sanction shall, in case the same be not paid when due, carry further interest at the same rate(s) contemplated in the Facility Agreement from the respective due dates and shall become payable upon the footing of compound interest with such rests as may be applicable to the relevant disbursement or as may be otherwise required by the Lenders. Provided however that payment of compound interest by the Borrower shall not entitle it to withhold or defer payment of any moneys then due and payable nor shall it in any manner prejudice the right of the Lenders to proceed against the Borrower for any default under the Facility Agreement.

(2)   Computation of interest shall be made on the basis of actual number of days elapsed (including the first day of the period during which it accrues) using 360

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

days a year factor in the case of disbursement(s) in foreign currency and for interest on outstanding Rupee amount(s), such computation shall be made using 365 days a year factor.

V.     <u>Interim Disbursement</u>

    (1) In the event of the Lenders agreeing to make any disbursement at the request of the Borrower pending compliance by it with any of the pre-disbursement conditions and formalities, such disbursement may be made by the Lenders against such interim securities/arrangements as may be mutually decided by the Lenders, and the Borrower shall be liable to pay interest on such interim disbursement(s) at a higher rate if so stipulated by the Lenders until the Borrower shall have fully complied with all the pre-disbursement conditions and formalities to the satisfaction of the Lenders. The Borrower shall also execute in favour of the Lenders such documents as may be required by them in this behalf.

    (2) The Borrower shall be liable to repay interim disbursement(s) on demand if so required by the Lenders upon the occurrence and continuance of an Event of Default, and save as otherwise stipulated, all interim disbursement(s) shall be deemed to have been made pursuant to the relevant Letter of Sanction and shall be governed by the Facility Agreement, and accordingly all the provisions of the Facility Agreement shall be applicable thereto. Any security including guarantees that may be furnished by the Borrower to the Lenders for securing interim disbursement(s) shall remain in full force and effect until creation of the final security in terms of the Facility Agreement and also in terms of the relevant Letter of Sanction, in case any additional security shall be thereby stipulated.

VI.     <u>Deferment of Repayment Date</u>

    The Lenders may, at the request of the Borrower, in suitable circumstances and at its absolute discretion agree to revise, vary or postpone the Repayment Date of any disbursement of the Loan or any part thereof upon such terms and conditions including the charging of a higher rate of interest as may be decided by the Lenders.

VII.     <u>Prepayment</u>

    (1) The Borrower may prepay the whole or a part of any disbursement (being an amount or multiple of $100,000 or its equivalent in other foreign currencies in the case of foreign currency disbursement) together with accrued interest thereon subject to payment of prepayment premium at such rate as stipulated in the Facility Agreement, having regard to the then remaining maturity period of the disbursement, and provided the Borrower shall have given to the Lenders not less than thirty days' notice in writing of its intention to prepay, and the proposed date of prepayment (in the case of foreign currency disbursement) shall be any Interest Payment Date.

    (2) If Interest Rate shall be subject to re-set at specific interval(s) as per any Letter of

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

Sanction and such re-set Interest Rate shall not be found acceptable to the Borrower, then the Borrower shall be liable to prepay the whole of the Loan then outstanding without prepayment premium on the date from which such re-set Interest Rate shall become effective unless otherwise required in terms of the relevant Letter of Sanction, together with accrued interest and all other moneys payable under the Facility Agreement after giving 15 days' prior written notice to the Lenders.

(3) A notice given pursuant to sub-Section (1) or sub-Section (2) shall be irrevocable; it shall specify the amount and the date on which prepayment is proposed to be made and shall oblige the Borrower to make such prepayment.

(4) In the case of foreign currency disbursements, if prepayment shall be made by the Borrower pursuant to any other provision of the Facility Agreement on a date other than an Interest Payment Date or the Repayment Date, then unless otherwise mentioned, the Borrower shall pay to the Lenders on demand, the amount (if any) by which interest otherwise payable on the foreign currency disbursement or part thereof so prepaid until the Repayment Date for the relevant installment of such disbursement of the Loan, shall exceed the interest which would be received by the Lenders were it to place the amount so prepaid on deposit with a bank acceptable to it in the relevant inter-bank financial market for a period commencing on the date of prepayment and ending on the Repayment Date for such disbursement.

(5) If profitability of the Borrower, its cash flow and other circumstances shall in the opinion of the Lenders so warrant, then the Lenders shall be entitled to require the Borrower to repay the disbursement(s) of the Loan on dates earlier than the Repayment Date(s) specified in the relevant Letter of Sanction without prejudice to the provisions of sub-Section (3) and without the payment of any premium or penalty: Provided that while exercising such right, due consideration will be given to the fact that the same does not jeopardize the business of the Borrower.

(6) Any prepayment made in accordance with the provisions of the Facility Agreement shall satisfy pro-tanto the Borrower's obligations for repayment of the relevant Loan and accordingly, the repayment instalments, if any, falling due after prepayment shall be reduced pro-rata by the amount of such prepayment. Amounts prepaid may not be re-borrowed by the Borrower.

VIII.    **Currency of Account, Place and Mode of Payment**

(A)    Foreign Currency Disbursements

(1) Save as otherwise provided in the Facility Agreement or in the relevant Letter of Sanction, or subsequently agreed by the Lenders in writing, the foreign currency

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

in which the Loan shall have been borrowed by the Borrower shall be the currency of account and payment for each and every sum at any time due from the Borrower in respect of such Loan.

a) On the date on which an amount is due from the Borrower in any foreign currency, the Borrower shall make the same available to the Lenders by payment in such foreign currency on the due date therefor in same day funds (or such other funds as may for the time being be customary for settlement of international banking transactions in such foreign currency) by transfer credit to the Lenders' account with such bank in such place in or outside India as may be specified by the Lenders. Provided that if the Lenders may in their discretion so require, the Borrower shall make the payment available to the Lenders in Mumbai in Rupees at least two (2) Business Days prior to the relevant due date in such amount as shall be sufficient to enable the Lenders to purchase the relevant foreign currency of the requisite value at the spot rate of exchange prevailing on the due date of payment, to the intent that the payment obligations of the Borrower with respect to an amount due in respect of the Facilities in the relevant foreign currency shall be deemed fulfilled only when and to the extent that payment of such amount shall have been credited in such foreign currency without deduction to the specified account of the Lenders and shall be at its free disposal.

### (B) Rupee Disbursements

Any payment to be made by the Borrower to the Lenders in Rupees in respect of the Facilities shall be made by means of telegraphic, telex or mail transfer or by cheque or bank draft drawn in favour of the Lenders on a bank at Mumbai or at such other place and for the credit of such account as may be notified by the Lenders, so as to enable it to realise the amount at par on or before the relative due date. Credit for all payments by cheque/bank draft when realised, shall be given on the date of realisation or on the relative due date, whichever is later.

### (C) Taxes

All payments by the Borrower in respect of the Facilities shall be made free and clear of and without deduction for or on account of (i) any set-off or counter-claim or (ii) any present or future tax, provided that if any deduction for tax may be required to be made by the Borrower from any sum payable by it hereunder or any tax may need to be paid by the Lenders (otherwise than tax on their overall net income) on or in relation to any sum received or receivable by the Lenders hereunder, or payable by the Lenders to their lender(s) from whom the Lenders may have sourced funds to lend foreign currency disbursement(s) of any Loan to the Borrower, then the sum payable by the Borrower shall be increased to the extent necessary to ensure that after the making of such deduction or payment of tax, the Lenders shall receive (free from any liability in respect of such tax) a net sum equal to the sum which they would have received had no such deduction or payment of tax been made.

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

(D)     Whenever a payment hereunder in any foreign currency may become due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day unless such next succeeding Business Day falls in another calendar month in which event such due date shall be the preceding Business Day, and in the case of payment due in Rupees, it shall be made on the preceding Business Day if the due date thereof is not a Business Day, and in both the cases, the amount of interest and Fee shall be adjusted accordingly.

IX.     <u>Provisions Specific to L/Cs</u>

(1)     The Lenders shall be at liberty to admit, compromise or pay any claim or demand made on them under the L/Cs without reference to the Borrower and without being required to ascertain whether or not any amount so claimed or demanded from the Lenders under the L/Cs is in fact due, and notwithstanding that any direction to the contrary may be given by the Borrower on the ground of any dispute between the Borrower and any Beneficiary of the L/Cs or that any default or breach on the part of the Borrower in the due and faithful performance and discharge of its obligations under the Contracts may have been caused by or occurred due to circumstances beyond its control and which would generally be comprehended by the term "Force Majeure", or that the Contracts may have become impossible of performance due to government restrictions or statutory prohibitions or for any other reason whatsoever.

(2)     The Borrower shall not be entitled to require that the Lenders shall first retire the bill(s) under the L/Cs shall prove or establish their claim against the Borrower and/or the Lenders in a court of law or otherwise, before the Borrower can be called upon to make any payment to the Lenders hereunder.

(3)     The Borrower agrees that any claim or demand made on the Lenders under the L/Cs shall be sufficient authority to it to discharge its obligations thereunder and any payment which the Lenders may have to make in accordance with or purporting to be in accordance with the terms of the L/Cs shall be binding on the Borrower and shall be accepted by the Borrower as conclusive evidence of the liability of the Lenders to comply with such claim or demand in the absence of manifest error,and to make payment therefor and the Borrower shall not be entitled to question the validity or propriety of any such payment and such payment shall be deemed to be payment rightfully made by the Lenders.

(4)     If an order shall be issued by any court / tribunal restraining or preventing the Lenders as a guarantor, from making any payment under any L/C, then the obligation of the Borrower under this Agreement in respect of such L/C shall be immediately and automatically deemed a direct repayment obligation of the Borrower towards the Lenders as if the Borrower had been, for all intents and purposes, a primary obligor to the Lenders as a debtor for cash indebtedness in the sum equal to the Lenders' claim against the Borrower in respect of such L/C

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |

/ under this Agreement, and accordingly, the Borrower shall be liable to pay such sum to the Lenders independent of the L/C in dispute or the restraint order.

X.    **Security**

(1)    The Borrower shall, wherever applicable, furnish to the Lenders permission under Section 281(1) of the Income-Tax Act, 1961, and any other permission/consent of competent authorities as may be required for the creation of valid Security in favour of the Lenders. The Borrower shall also ensure that original of the relevant Collateral Document, as applicable, and documentary evidence of registration of creation/ modification of charge in favour of the Lenders, shall be forwarded to the Lenders upon registration.

(2)    The Borrower shall also furnish to the Lenders, within six months from first disbursement, or such extended period as may be agreed by the Lenders, prior written consent of other charge-holder(s), if any, permitting creation of the Security in favour of the Lenders. If the assets constituting the Security shall be required to be charged exclusively in favour of the Lenders, then the Borrower shall also furnish, within six months of the first disbursement or such extended period as may be agreed by the Lenders, written consent of other charge-holder(s), if any, in form and substance acceptable to the Lenders, for excluding such assets from the scope of security in its/their favour.

(3)    The rights of the Lenders under the Security and the Collateral Documents shall, save if exclusively created in its favour, rank pari passu with the rights thereover of any co-financer to the Contract/Project without any preference or priority of one over the other or others of them for all purposes and to all intents but with respect to charge over movable assets of the Borrower pertaining to this Facility, the Lenders' rights shall at all times during the currency of the Security rank prior to the rights of other charge-holder(s) under charge(s),if any, created or that may hereafter be created by the Borrower thereover for securing borrowings for its working capital requirements unless otherwise agreed by the Lenders.

(4)    The Borrower shall keep the Lenders advised in writing from time to time of all its acquisitions of immoveable properties and fixed assets, if fixed assets may have been stipulated by the Lenders to form part of the Security, and whenever called upon by the Lenders, make out a clear and marketable title thereto to the satisfaction of the Lenders and charge the properties and assets in its favour in such form and manner and within such time as may be required by the Lenders.

XI.    **Authorisation**

(1)    Without in any way affecting or derogating from its obligations hereunder, the

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | Page 85 of 86 EPIL (as Borrower) |
|---|---|---|---|
|  |  |  |  |

Borrower doth hereby irrevocably authorise the Lenders, upon the occurrence and continuance of an event of default, to collect, receive and recover from time to time at the cost and expense of the Borrower and without further notice, action or assignment on the part of the Borrower, all of its overseas payments, remittances, and receivables accrued under or generated from the Contract or to which the Borrower may now be or at any time hereafter become entitled under or in respect of the Contract as also all moneys payable under any insurance policy, indemnity or guarantee of ECGC or any other entity, and to appropriate the net proceeds of realisations thereof at the option of the Lenders in or towards satisfaction of the dues owing by the Borrower to the Lenders in respect of the Facilities or under any other agreement between the Borrower and the Lenders even prior to the stated maturity or date(s) fixed for payment thereof. Provided however that the Lenders shall not thereby be responsible for any shortfall in realisation resulting from fluctuation in the rate of exchange of any foreign currency involved, the intention being that any such shortfall or deficit shall be made good by the Borrower.

(2)    The Borrower shall on demand sign, execute and deliver to the Lenders, suitable mandate/authority if required by the Lenders for the aforesaid purposes.

(3)    For the removal of all doubts, it is hereby expressly agreed that notwithstanding anything contained in this Section, the due performance and discharge by the Borrower of its liabilities and obligations to the Lenders to repay the principal amount of each Loan and pay interest thereon and all other monies when respectively due to the Lenders in terms of the relevant Letter of Sanction shall not in any way be conditional upon receipt by or on behalf of the Borrower of the export proceeds from the Buyer or its bank or any moneys under the policy of ECGC, if any, or upon the exercise of the authorities hereby conferred on the Lenders, which it shall be under no obligation to exercise, and shall also not be delayed, deferred or suspended by the Borrower on the ground that the export proceeds may have been rescheduled or that the Borrower may not have received or may not be able to receive, realise or recover any payment, remittance or receivables from the Buyer or its bank or monies payable under any insurance policy or agreement or upon settlement of any dispute or counter-claim which the Borrower may have against the Buyer or any other party in connection with the Contract, whether due to economic factors, exchange control restrictions or war/hostility conditions prevailing at any time in the country of the Buyer or otherwise howsoever for any other reason, it being understood that the liabilities of the Borrower in respect of the Facilities shall at all times remain absolute and independent, and the Borrower admits, acknowledges and confirms that it is inter alia on the faith of what is stated hereinabove that the Lenders has agreed to lend and advance the Loan to the Borrower.

---

**END OF PAGE**

---

| CBI (as Lead Bank/ Facility Agent) | CBI (as Lender) | Exim Bank (as Lender) | EPIL (as Borrower) |
|---|---|---|---|
| | | | |