## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1] | Case No. 16-11626 (BLS) |
| | (Jointly Administered) |
| Debtors. | |

| | |
|---|---|
| BRADLEY E. SCHER, solely in his capacity as Litigation Trustee for SC Mesabi Litigation Trust, | |
| Plaintiff | |
| v. | |
| ESSAR GLOBAL FUND LIMITED; ESSAR PROJECTS LIMITED; ESSAR PROJECTS USA, LLC; ESSAR PROJECTS (INDIA) LIMITED; ESSAR PROJECT MANAGEMENT COMPANY LIMITED; ESSAR CONSTRUCTIONS LIMITED; ESSAR PROJECTS MIDDLE EAST FZE; ESSAR ENGINEERING SERVICES LIMITED; GLOBAL SUPPLIES FZE; ESSAR LOGISTICS LIMITED; DOES 1-500 | Adv. Proc. No. 17-50001 (BLS) |
| Defendants. | |

## OPPOSITION TO ESSAR GLOBAL FUND LIMITED, ESSAR PROJECT MANAGEMENT COMPANY LIMITED, AND ESSAR CONSTRUCTIONS LIMITED'S PARTIAL MOTION TO DISMISS

---

[1] Essar Steel Minnesota LLC ("**ESML**") is doing business as Mesabi Metallics Company LLC. The last four digits of its federal taxpayer identification number are 8770. The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT ALLEGATIONS OF THE SECOND AMENDED COMPLAINT ........................ 3

    A.   Genesis of the Project ........................................................................................... 3

    B.   The Lump Sum Turn Key Agreement .................................................................. 4

    C.   Essar Global's Rampant Misconduct with Respect to the Project ....................... 6

    D.   Essar Global Repeatedly Fails to Make Required Equity Contributions ............ 7

    E.   The Bankruptcy Case ........................................................................................... 9

ARGUMENT ............................................................................................................................. 9

    A.   The Second Amended Complaint States a Claim for Breach of Fiduciary Duty Against Essar Global ..................................................................................... 10

    B.   The Second Amended Complaint States a Claim for Breach of Contract Against Essar Constructions and Essar Project Management ........................................... 14

    C.   Essar Global Is Properly Named As Defendant With Respect to the First Six Counts of the SAC as the Alter Ego of the Relevant Contract Counter Party .................. 16

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ....................................................................8, 12

*Dreamstone Entm't v. Maysalward Inc.,*
  No. 14-02063, 2014 U.S. Dist. LEXIS 81084 (C.D. Cal. June 11, 2014) ..............................18

*Edgar v. MITE Corp.,* 457 U.S. 624 (1982) .................................................................9

*Exp. Dev. Can. v. Dickman,*
  No. 17-07067, 2018 U.S. Dist. LEXIS 31156 (C.D. Cal. Jan. 22, 2018) ..............................17

*Five Points Hotel P'ship v. Pinsonneault,*
  2014 U.S. Dist. LEXIS 60627 (D. Ariz. May 1, 2014) ....................................17

*Green Atlas Shipping SA v. United States,* 306 F. Supp. 2d 974 (D. Or. 2003) ...........................17

*Household Reinsurance Co. v. Travelers Ins. Co.,*
  1992 U.S. Dist. LEXIS 1006 (N.D. Ill. Jan. 31, 1992) ....................................10

*In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410 (3d Cir. 1997) .......................................9

*In re Xcel Energy, Inc.,* 222 F.R.D. 603 (D. Minn. 2004) ...............................................9

*Jes Solar Co. v. Matinee Energy, Inc.,*
  No. 12-00626, 2015 U.S. Dist. LEXIS 178476 (D. Ariz. Oct. 30, 2015)...............................17

*Kost v. Kozakiewicz,* 1 F.3d 176 (3d Cir. 1993) .............................................................8

*Maio v. Aetna, Inc.,* 221 F.3d 472 (3d Cir. 2000) ...........................................................9

*N. D. Catholic Educ. Programming Fund, Inc. v. Gheewalla,* 930 A.2d 92
  (Del. 2007)  .......................................................................................12

*N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp.* (*In re Maxus Energy Corp.*),
  571 B.R. 650 (Bankr. D. Del. 2017) .....................................................9

*Niki Dev. Corp. v. HOB Hotel Chi. Partners, Ltd. P'ship,*
  2001 U.S. Dist. LEXIS 1544 (N.D. Ill. Feb. 15, 2001) .........................................12

*Official Comm. of Unsecured Creditors of TOUSA v. Tech. Olympic, S.A.* (*In re TOUSA*),
  437 B.R. 447 (Bankr. S.D. Fla 2010) ....................................................11

*Raimbeault v. Accurate Mach. & Tool,*
  2014 U.S. Dist. LEXIS 140313 (S.D. Fla. Sep. 30, 2014) .....................................17

*Rafool v. Goldfarb Corp.* (*In re Fleming Packaging Corp.*),
  370 B.R. 774 (Bankr. C.D. Ill. 2007) ....................................................11

*Schmitt-Norton Ford*, Inc. v. Ford Motor Co.,
  534 F. Supp. 1099 (D. Minn. 1981)......................................................14

*Spitzmueller v. Burlington N.R. Co.,* 740 F. Supp. 671 (D. Minn. 1990)...............................13, 14

*Tara Prods. v. Hollywood Gadgets, Inc.*,
   2010 U.S. Dist. LEXIS 37889 (S.D. Fla. Apr. 16, 2010) ........................................17

*Teleglobe Commc'ns Corp. v. BCE, Inc.* (*In re Teleglobe Commc'ns Corp.*),
   493 F.3d 345 (3d Cir. 2007)...................................................................................10

*Tow v. Amegy Bank N.A.*, 505 B.R. 455 (Bankr. S.D. Tex. 2014)................................12

*Triple Five of Minn., Inc. v. Simon*, 404 F.3d 1088 (8th Cir. 2005) .............................11

*Tronox v. Anadarko Petroleum Corp.* (*In re Tronox Inc.*),
   450 B.R. 432 (Bankr. S.D.N.Y. 2011)...................................................................10

*United States ex rel. Humane Soc'y of the U.S. v. Westland/Hallmark Meat Co.*,
   2010 U.S. Dist. LEXIS 147772 (C.D. Cal. Dec. 21, 2010) ....................................17

*VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007)..........................9, 10, 11

*Western Contracting Corp v. Dow Chem. Co.*, 664 F.2d 1097 (8th Cir. 1981) ............14

## STATE CASES

*Cinotto v. Levine*,
   2014 Cal. App. Unpub. LEXIS 6511 (Cal. 2d. App. Sept. 16, 2014).......................9

*In re USA Cafes, L.P. Litig.*, 600 A.2d 43 (Del. Ch. 1991) ...........................................11

*Norris v. Cohen*, 27 N.W.2d 277 (Minn. 1947)............................................................16

*Sinclair Oil Corp. v. Levien*, 280 A.2d 717 (Del. 1971)..........................................10, 11

*Snyder Elec. Co. v. Fleming*, 305 N.W.2d 863 (Minn. 1981)...................................10, 11

*Sorensen v. Coast-to-Coast Stores, Inc.*, 353 N.W. 2d 666 (Minn. Ct. App. 1984)....................14

*U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363 (Minn. 2011)................10

*Van Hee v. Haala*,
   No. 09-1456, 2010 Minn. App. Unpub. LEXIS 272 (Mar. 30, 2010) ....................16

*Wallace v. Wood*, 752 A.2d 1175 (Del. Ch. 1999) .....................................................11

*Wallner v. Schmitz*, 239 Minn. 93 (1953) ...................................................................13

## FEDERAL RULES

Fed. R. Bankr. P. 7012(b) ..............................................................................................8

Fed. R. Civ. P. 12(b)(6)..................................................................................................8

Bradley E. Scher, in his capacity as the Litigation Trustee for the SC Mesabi Litigation Trust (the "**SC Litigation Trustee**" or "**Plaintiff**") established pursuant to the *Third Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 990] (the "**Plan**") confirmed in the above-captioned jointly administered chapter 11 case, hereby submits this opposition (the "**Opposition**") in response to *Essar Global Fund Limited, Essar Project Management Company Limited and Essar Constructions Limited's Partial Motion to Dismiss* [Adv. D.I. 73] (the "**Motion to Dismiss**").  For the reasons set forth below, the Court should deny the Motion to Dismiss.

## PRELIMINARY STATEMENT

The Second Amended Complaint[1] sets forth in detail how Essar Global Fund Limited ("**Essar Global**"), through its complete control and dominion over its subsidiaries entered into self-serving contracts, misappropriated loan proceeds, and systematically looted the Debtors for its own gain.  When the contracts it imposed on its subsidiaries did not work to its benefit, it breached those contracts, refused to follow the processes dictated therein, or unilaterally imposed new contracts on the Debtors to suit its ultimate purpose.  When Essar Global itself began to struggle financially, it strong-armed its subsidiaries, including through the Debtors' officers and directors to divert project funds directly to its own bank accounts.

What should have been an over $1.8 billion state-of-the-art iron ore mine and pellet plant was left by Essar Global as a jumble of unfinished steel structures and fields strewn with steel beams and other unassembled parts of the facility.  Although the Debtors successfully

---

[1] The "**Second Amended Complaint**" or "**SAC**" is the *Second Amended Complaint and Substantive and Non-Substantive Objections to Claim Nos. 179-186* [Adv. D.I. 60].  Where context requires, each capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term in the Second Amended Complaint.

1

reorganized, Essar Global's illegal shell game left nearly $2 billion in unpaid claims.

By the Motion to Dismiss, Defendants argue that Essar Global's egregious conduct does not constitute a breach of fiduciary duty and that the self-serving agreements it foisted on ESML through a series of misrepresentations should insulate certain of its subsidiaries from liability on account of their failure to honor their commitments to ESML.  Those arguments fail.

First, Defendants claim that Essar Global does not owe fiduciary duties to its wholly owned subsidiary, ESML.  Defendants' simplistic recitation of the general rule for solvent entities ignores that upon insolvency a parent entity owes fiduciary duties of care and loyalty to its wholly owned subsidiary.  Those duties are an essential protection afforded to the insolvent subsidiary's beneficiaries (its creditors) to prevent the parent from using its position of control to raid its subsidiary's coffers.  That is exactly what happened here.  As alleged in the Second Amended Complaint, ESML was insolvent at all times relevant to the Complaint.  While ESML was insolvent, Essar Global used its control to engage in a series of self-dealing transactions that enriched it to the detriment of ESML and its creditors.  Those actions violated Essar Global's fiduciary duties to ESML.

Second, Defendants claim that certain novation agreements released two of Essar Global's subsidiaries from any liability with respect to hundreds of millions of dollars of work that was paid for, but never completed.  However, Essar Global's rampant misconduct and misrepresentations is evident even on the face of the novation agreements.  Under the circumstances, more fact finding is necessary to determine the validity and effect of the purported releases.  Indeed, courts generally do not find that affirmative defenses, such as release, constitute grounds to dismiss a claim pursuant to a motion under Federal Rule 12(b)(6).

Finally, Defendants' attempt to argue that the Court should dismiss breach of contract claims brought against Essar Global as the alter ego of certain obligors with respect to the LSTK

2

Contract and other associated agreements is similarly misguided.  Pleading conventions require

that a party liable with respect to a particular claim under an alter ego theory be named as a

defendant with respect to the specific claim.  At best, Defendants' motion to dismiss these claims

with respect to Essar Global is a weak attempt to bolster its motion to compel arbitration.  Like

that motion, it is not persuasive and must be denied.

## <u>RELEVANT ALLEGATIONS OF THE SECOND AMENDED COMPLAINT</u>

### A.     Genesis of the Project

1.      In late 2008, ESML entered into several contracts (the "**2008 Project Contracts**")

with its affiliates, including Essar Constructions Limited ("**Essar Constructions**") and Essar

Project Management Company Limited ("**Essar Project Management**") that were to govern the

construction of ESML's iron ore pellet plant in Nashwauk, Minnesota (the "**Project**").  SAC

¶¶ 28-29.  The 2008 Project Contracts were not a result of arm's-length negotiation and no one at

ESML ever reviewed the agreements.  SAC ¶ 28.  Rather, ESML's CEO and longtime confidant

and employee of Essar Global, Madhu Vuppuluri, simply instructed an employee to execute

them as presented by its affiliates.  SAC ¶ 135.

2.      In early 2010, senior management at several Essar affiliates, including the CFO of

the Essar Projects Group,[2] decided, without any meaningful input from ESML, that the 2008

Project Contracts should be replaced.  SAC ¶ 33.  The purpose of the new contracts (collectively,

the "**2010 Project Contracts**") was to minimize US tax liability for the benefit of Essar Global

and its project subsidiaries.  SAC ¶ 38.  Again, the 2010 Project Contacts were imposed on

ESML, which had no role in drafting, and did not negotiate the terms of, the agreements.  SAC ¶

───────────────

[2] Essar Projects is the corporate parent of the Essar Projects Group, which consists of 23 companies (including Essar Projects-US and Essar Projects-Middle East).  Essar Projects Group is a wholly owned subsidiary of Essar Global. With one exception, each of the 23 companies comprising the Essar projects group is indirectly wholly owned by Essar Global.

34.[3]

3.      Among other agreements, as part of the 2010 transaction, ESML entered into an agreement with Essar Constructions, dated March 22, 2010, to perform all construction work on the Project for $291.5 million (the "**2010 Essar Constructions Contract**").  SAC ¶ 36.  ESML also entered into a contract with Essar Project Management, dated March 22, 2010, to provide all project management services for $14.23 million (the "**2010 Essar Project Management Contract**.").  *Id.*

## B.      The Lump Sum Turn Key Contract

4.      On July 2, 2012, the Project contracts were again replaced to suit Essar Global's interests of capturing as much value from the Project in Essar Projects (Essar Global's direct wholly owned subsidiary) as possible and further minimizing the U.S. taxes incurred by the Essar affiliates.  SAC ¶ 40.  The resulting Lump Sum Turn Key Contract (as amended and with all annexures thereto, the "**LSTK Contract**")[4] is a turnkey construction contract requiring that ESML pay a sum-certain in return for Essar Projects constructing and delivering a fully functional iron ore pellet plant.  SAC ¶ 39.

5.       Again, the LSTK Contract and its annexes were not a result of arm's-length negotiations.  Instead, they were prepared, almost exclusively, by Essar affiliates, including Essar Projects.  SAC ¶ 40.

6.      Among the contracts annexed to the LSTK Contract were two agreements that purported to novate certain obligations under the 2010 Essar Constructions Contract and 2010

---

[3] In fact, at the time the 2010 Project Contracts were executed, ESML did not have a general counsel and did not employ outside counsel to negotiate the transaction.

[4] The LSTK Contract is attached as Exhibit B to the *Opening Brief in Support of Essar Global Fund Limited, Essar Project Management Company Limited and Essar Constructions Limited's Partial Motion to Dismiss* [D.I. 74] (the "**Defendants' Brief**").

Essar Project Management Contract (the "**2012 Novation Agreements**").  Specifically, the 2012

Novation Agreements represent that Essar Constructions novated $111.5 million of the

$291.5 million of construction services it was obligated to provide under the 2010 Essar

Construction Contract to Essar Projects.  SAC ¶ 47.  Additionally, Essar Project Management

purportedly novated $9.31 million of the $14.23 million of project management services it was

obligated to provide under the 2010 Essar Project Management Contract to Essar Projects.  SAC

¶ 48.

  7. Each of the 2012 Novation Agreements expressly provided that the obligations

that were retained by Essar Constructions and Essar Project Management had been either

disbursed to those entities or committed by those entities to third party subcontractors.  *See*

LSTK Contract, Annex 11 § 7 [D.I. 74-4 at 42] ("As on the Novation Date, the payment

disbursed by ESML to [Essar Constructions] and value of purchase orders already committed by

[Essar Constructions] is USD 180 Million . . . ."); LSTK Contract, Annex 13 § 7 [D.I. 74-4 at 52]

("As on the Novation Date, the payment disbursed by ESML to [Essar Project Management] and

value of the purchase orders already committed by [Essar Project Management] is USD 4.92

million . . . .").  Those statements were not true.

  8. The 2012 Novation Agreements also purported to release Essar Constructions and

Essar Project Management for their respective obligations under the 2010 Essar Constructions

Contract and the 2010 Essar Project Management Contract.  The false representations in each

2012 Novation Agreement were indentified as consideration for those purported releases.  *See,*

*e.g.,* LSTK Contract, Annex 11 § 2 [D.I. 74-4 at 40] ("With effect from and including the

Novation Date and in consideration of the mutual representations, warranties and covenants

contained in this Novation Agreement. . . .").

  9. Notwithstanding the 2012 Novation Agreements, Essar Constructions and Essar

Project Management, or their successor, continued to perform work and receive payments with respect to the Project after July 2012.  SAC ¶ 54.

10.      Despite ESML paying Defendants and their various affiliates over $1.1 billion – the entire amount it was obligated to pay under the LSTK Contract and other related contracts – in 2016, the Defendants and their affiliates refused to continue work on the Project and left ESML with an incomplete plant, over a billion dollars of secured debt, and hundreds of millions of dollars of claims and liens from subcontractors and various other claimants.  *See* SAC ¶ 2.

**C.      Essar Global's Rampant Misconduct with Respect to the Project**

11.      At all times relevant to the Second Amended Complaint, Essar Global and its affiliates orchestrated and directed every material aspect of ESML's business.[5]  SAC ¶¶ 1, 124-144.  Standing on both sides of each transaction and dictating the budgets for the Project, Essar Global and its subsidiaries unilaterally charged enormous markups for materials and services.  SAC ¶¶ 126, 128.  For instance, counterparties to the LSTK Contract charged margins that were more than 400% in excess of on-market margins for similar goods and services.  The "profits" were spread through the Essar enterprise at the direction of Essar Global, including directly to itself.  SAC ¶ 130.

12.      Throughout the life of the LSTK Contract, Essar Global also caused ESML and its other subsidiaries to transfer to itself for non-Project purposes hundreds of millions of dollars of loan proceeds that were explicitly required to be spent on the Project.  SAC ¶ 101.   An independent audit report commissioned by the Official Committee of Unsecured Creditors (the "**Committee**") and the Debtors' internal reports show that Essar Global caused ESML, Essar Projects-Middle East, Essar Projects-US, and Essar Constructions to transfer over $300 million

---

[5] ESML never had the expertise, ability, or information—much less the independence—to meaningfully review or verify the decisions made by Essar Global's affiliates.  SAC ¶¶ 28, 32, 34

earmarked for Project purposes to Essar Global.  SAC ¶¶ 109-115.  Those transfers were made at the explicit direction of Essar Global, often approved by the same individual on each side of the transaction (SAC ¶ 129), and rarely documented (SAC ¶ 118).

13.     Based on available information, this course of conduct was Essar Global's standard practice.  In total, Essar Global caused Essar Projects and its subsidiaries to transfer more than $780 million to Essar Global.  SAC ¶ 114.  As part of its scheme, Essar Global attempted to cover its trail by moving certain obligations to newly created subsidiaries while stranding known and potential liabilities at the original contract counterparties.  It then would convince the project company to release the original contract counterparties by misrepresenting the amount of work that had been signed up and delivered.  This practice is exemplified by the 2012 Novation Agreements that purported to release Essar Constructions from approximately $175 million in liabilities incurred between 2010 and 2012.  Importantly, contrary to affirmative representations made in the 2012 Novation Agreements themselves, the majority of that work had neither been paid nor contracted at the time those agreements were executed.

14.     Essar Global was not always so sly.  After the LSTK Contract was executed it caused ESML to transfer more than $90 million directly to itself through a series of intercompany loans that were never fully repaid.  SAC ¶¶ 117- 119.  At least $79 million of that amount was drawn directly from a project loan with ICICI Bank Limited that was contractually required to be used for Project purposes.  SAC ¶ 117.  Additionally, on several occasions Essar Global caused ESML to make payments with respect to LC facilities and other miscellaneous charges that were entirely unrelated to the Project.  SAC ¶¶ 105-108.

**D.      Essar Global Repeatedly Fails to Make Required Equity Contributions**

15.     Unsurprisingly, throughout the life of the Project, Essar Global repeatedly proved unwilling to make required equity contributions necessary to fill the holes caused by its cash

grabs.

16.     As part of the initial debt financing to fund the Project in 2010, Essar Global guaranteed $530 million of debt incurred by ESML, agreed to make an approximately $285 million equity contribution to ESML, and agreed to provide ESML with any additional funds required to complete the Project.  SAC ¶ 82.  Essar Global failed to honor those promises. SAC ¶¶ 84-85.  As a direct result of that failure, ESML incurred costly delays amounting to tens of millions of dollars in damages.  SAC ¶ 86.

17.     Similarly, in 2014, ESML pursued a bond issuance to supplement its bank financing.  That financing was contingent on Essar Global making an agreed equity contribution to ESML of over $400 million.  SAC ¶ 88.  Essar Global failed to make the required equity contribution.  *Id*.  That failure doomed the bond issuance and cost ESML over $41 million in unnecessary administrative fees.  SAC ¶ 90.

18.     After the failed bond issuance, ESML entered into a credit agreement with certain lenders whereby the funds loaned thereunder would be released when ESML hit certain completion milestones with respect to the Project and Essar Global made scheduled equity contributions totaling $410 million.  SAC ¶¶ 92-94.  Essar Global's equity contributions were governed by that certain Equity Contribution Agreement, which also obligated Essar Global to fund any amounts required to finish the Project in excess of $1.8 billion.  SAC ¶ 96.

19.     Essar Global "made" two of its three scheduled equity contributions.  SAC ¶ 97. However, at least $84 million of those equity contributions was made with ESML's ***own money*** that had been round-tripped to Essar Global *via* Essar Projects and Essar Projects-India.  SAC ¶¶ 120-22.  When push came to shove, Essar Global refused to make the required equity contribution, failed to honor its agreement to cover the costs to complete the Project in excess of $1.8 billion, and stranded ESML with well over a billion dollars of secured debt and no means to

8

repay its creditors.  SAC ¶ 97.

### E.    The Bankruptcy Case

20.    On July 8, 2016 (the "**Petition Date**"), each of ESML and ESML Holdings Inc. (together, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the Chapter 11 Cases before this Court.

21.    At the outset of the Chapter 11 Cases, the independent members of ESML's Board of Governors engaged outside counsel to investigate the company's related-party transactions and potential claims relating thereto.  As part of that investigation, counsel worked in conjunction with the ESML's remaining employees and the Committee's financial advisor to uncover the facts underpinning the Second Amended Complaint.  Despite multiple promises to the contrary, neither Essar Global nor any of its affiliates cooperated or provided any substantial information with respect to the investigation.

22.    By the Second Amended Complaint, Plaintiff brings thirty-one claims against the various defendants.  On September 12, 2018, Defendants Essar Global, Essar Projects Management, and Essar Constructions sought to dismiss certain causes of action for breach of contract and breach of fiduciary duty.  For the reasons set forth below, the Court should deny the Motion to Dismiss.

### ARGUMENT

23.    To survive a motion to dismiss under Rule 12(b)(6), made applicable to this adversary proceeding by Bankruptcy Rule 7012(b), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve disputed facts or decide the merits of the case.  *Kost v. Kozakiewicz,* 1 F.3d 176, 183

(3d Cir. 1993). "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997). A motion to dismiss may be granted only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000).

## A.     The Second Amended Complaint States a Claim for Breach of Fiduciary Duty Against Essar Global

24.     Federal courts sitting in Delaware must apply the law of the state of incorporation when a corporation's internal affairs are implicated. *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982). As such, Plaintiff agrees that Minnesota substantive law should govern the claims for breach of fiduciary duty. Minnesota courts routinely follow Delaware law when deciding issues relating to corporate governance and fiduciary duties. *See In re Xcel Energy, Inc.*, 222 F.R.D. 603, 606 (D. Minn. 2004); *see also Cinotto v. Levine*, 2014 Cal. App. Unpub. LEXIS 6511, at *27 (Cal. 2d. App. Sept. 16, 2014).

25.     Fiduciary duties should be as broad as their purpose requires. *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 635 (3d Cir. 2007). Defendants argue that Plaintiff's claim for breach of fiduciary duty against Essar Global must fail because a parent corporation does not owe fiduciary duties to a wholly owned subsidiary. Defs' Br. at 6. Defendants' position oversimplifies the law and disregards that the general rule is subject to an important exception applicable here. Upon insolvency, a parent of a wholly owned subsidiary does owe a fiduciary duty to that subsidiary.[6] *See N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp. (In re Maxus*

---

[6] Indeed, the only case analyzing Minnesota law cited by Defendants for the proposition that a corporate parent does not owe a fiduciary duty to its wholly owned subsidiary is an unpublished decision by the United States District Court for the Northern District of Illinois that examined the parent's fiduciary duties in the context of a solvent

*Energy Corp.*), 571 B.R. 650, 659 (Bankr. D. Del. 2017) (Sontchi, J.) (internal citations omitted); *see also Tronox v. Anadarko Petroleum Corp.* (*In re Tronox Inc.*), 450 B.R. 432, 438 (Bankr. S.D.N.Y. 2011) ("The Delaware Supreme Court has also recognized that a parent owes fiduciary duties to a subsidiary when that subsidiary is insolvent. . . ."). That duty is necessary to ensure a parent corporation does not loot its subsidiary to the detriment of its beneficiaries, which upon insolvency, are the subsidiary's creditors. *Snyder Elec. Co. v. Fleming*, 305 N.W.2d 863, 869 (Minn. 1981).

26.    Fiduciary duties serve to protect those whose economic interests are affected by the decisions of an entity's control persons. Thus, as explained by the Third Circuit, a corporate parent is bound by a duty of loyalty whenever its subsidiary has a minority interest that bears economic risk. *VFB*, 482 F.3d at 635 . Most often, this duty arises when a subsidiary is not wholly owned. There, a majority shareholder owes a duty of loyalty and care to subsidiary to prevent the majority shareholder from taking advantage of its controlling position to the detriment of the minority holder. *See U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 381 (Minn. 2011); *see also Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971). It also applies when a wholly owned subsidiary becomes insolvent. *VFB*, 482 F.3d at 635; *see also Teleglobe Commc'ns Corp. v. BCE, Inc.* (*In re Teleglobe Commc'ns Corp.*), 493 F.3d 345, 367 (3d Cir. 2007) ("If the subsidiary is not wholly owned, however, in the interest of protecting its minority shareholders we revert to requiring that whoever controls the subsidiary seek to maximize its economic value with requisite care and loyalty. Similarly, if the subsidiary is insolvent, we require the same in the interest of protecting the subsidiary's creditors.").

27.    When a subsidiary becomes insolvent its creditors become beneficiaries of its

---

subsidiary. *See Household Reinsurance Co. v. Travelers Ins. Co.*, 1992 U.S. Dist. LEXIS 1006, at *9 (N.D. Ill. Jan. 31, 1992).

obligation to maximize value of the corporation.  *Snyder*, 305 N.W.2d at 869; *accord N. D.*

*Catholic Educ. Programming Fund, Inc. v. Gheewalla*, 930 A.2d 92, 101, 103 (Del. 2007).  In

such a situation, the parent has a fiduciary duty of loyalty and care to its wholly owned

subsidiary that prevents it from using its control to enter into negligent or self-dealing

transactions to the detriment of the subsidiaries creditors.  *See VFB*, 482 F.3d at 636; *Official*

*Comm. of Unsecured Creditors of TOUSA, Inc. v. Tech. Olympic, S.A.* (*In re TOUSA, Inc.*), 437

B.R. 447, 460 (Bankr. S.D. Fla 2010); *see also Rafool v. Goldfarb Corp.* (*In re Fleming*

*Packaging Corp.*), 370 B.R. 774, 792 (Bankr. C.D. Ill. 2007) (finding a controlling shareholder

may owe a duty of care to an insolvent corporation).

28.    Indeed, the Delaware Chancery Court has explicitly held that "[o]ne who controls

property of another may not, without implied or express agreement, intentionally use that

property in a way that benefits the holder of the control to the detriment of the property or its

beneficial owner." *In re USA Cafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991).  The *USA*

*Cafes* court rhetorically posited that where an individual uses a parent entity to cause a

partnership or LLC to enter into a transaction which injures the partnership or LLC but rewards

the parent entity: "[c]an it be imagined that such persons have not breached a duty to the

partnership [or LLC] itself?  And does it not make perfect sense to say that the gist of the offense

is a breach of the equitable duty of loyalty that is placed on the fiduciary?" *Id.* at 49.

29.    That logic applies equally in the case of a corporate parent that dominates and

controls the affairs of its subsidiary.  *See Triple Five of Minn., Inc. v. Simon*, 404 F.3d 1088,

1096 (8th Cir. 2005) (finding a parent entity liable for its subsidiary's breach of fiduciary duty

under Minnesota law when it controlled that subsidiary and engaged in self-dealing conduct); *see*

*also Wallace v. Wood*, 752 A.2d 1175, 1182 (Del. Ch. 1999) (holding that Delaware recognizes

extending fiduciary duties to corporate parents that control the affairs of a subsidiary and cause

that subsidiary to distribute its assets for the parent's benefit); *Sinclair Oil Corp.*, 280 A.2d at

720 ("A parent does indeed owe a fiduciary duty to its subsidiary when there are parent-

subsidiary dealings."); *Tow v. Amegy Bank N.A.*, 505 B.R. 455, 468 (Bankr. S.D. Tex. 2014)

(holding that *TOUSA* and *USA Cafes* "stand for the established proposition that a parent

corporation may owe a fiduciary duty to a subsidiary corporation that it controls, and may be

liable for breach for engaging in self-dealing transactions.").

30.     Here, the Second Amended Complaint clearly alleges that "ESML was insolvent

or operating in the zone of insolvency at all relevant times."   SAC ¶ 332.   That allegation has

not been contested and must be accepted as true at the motion to dismiss phase.  *Iqbal,* 556 U.S.

at 678.

31.     Moreover, Plaintiff has adequately pleaded that Essar Global controlled and

dominated ESML at all times relevant to the Second Amended Complaint.  SAC ¶¶ 124-44; 347-

57.  Defendants do not contest the sufficiency of those allegations.  Nor could they at the motion

to dismiss stage, because "[o]bviously whether a corporate parent can be held liable depends on

the specific facts of the case—the development of which has not yet taken place."  *Niki Dev.*

*Corp. v. HOB Hotel Chi. Partners, Ltd. P'ship*, 2001 U.S. Dist. LEXIS 1544, at *11 (N.D. Ill.

Feb. 15, 2001) (applying Delaware law to reject a corporate parent's argument that it did not owe

fiduciary duties to its wholly owned subsidiary).

32.     In sum, the allegations of the Second Amended Complaint establish that the

exception to the general rule applied and Essar Global owed fiduciary duties of loyalty and care

to ESML and its creditors.  Essar Global breached those duties by, among other things,

negligently engaging in a series of self-dealing transactions that included: causing ESML to enter

into agreements with its affiliates containing unconscionable markups; diverting hundreds of

millions of dollars purportedly paid by ESML for the Project to itself and its subsidiaries;

directing ESML to directly transfer tens of millions of dollars to Essar Global for no resulting

benefit; and directing ESML to make numerous payments either to or on account of other Essar

affiliates for no resulting value.  SAC ¶ 334.  Defendants' Motion to Dismiss with respect to

Plaintiff's twentieth count for breach of fiduciary duty against Essar Global should be denied.

**B.    The Second Amended Complaint States a Claim for Breach of Contract Against Essar Constructions and Essar Project Management**

33.    Defendants argue that Plaintiff's fifth and sixth claims for (1) Essar

Constructions' breach of the 2010 Essar Constructions Contract and (2) Essar Project

Management's breach of the 2010 Essar Project Management Contract, respectively, are barred

by releases in the 2012 Novation Agreements.  However, each 2012 Novation Agreement

contains false representations that are identified as consideration for the relevant releases.  Those

misrepresentations raise significant questions as to the validity of the releases precluding

dismissal on this basis.

34.    The Third Circuit has held that "'generally speaking' an affirmative defense, such

as a release, should not be relied upon 'to trigger dismissal of a complaint under Rule 12(b)(6),'

unless the defense is evident from the face of the complaint."  *Rivard v. Bello*, 2013 U.S. Dist.

LEXIS 43928, at *8 (E.D. Pa. March 27, 2013) (quoting *Vitaulic v. Tieman*, 499 F.3d 227, 235

(3d Cir. 2007)).  It is not Plaintiff's duty to plead the absence of defenses.  Where, as here, the

defense raises factual questions, it cannot be determined at the motion to dismiss phase.  *See*

*Sorenson v. Coast-to-Coast Stores* (*Cent. Organization*)*, Inc.*, 353 N.W.2d 666, 670 (Minn. App.

1984) (citing *King v. Int'l Lumber Co.,* 156 Minn. 494 (1923)) (finding that whether a release

was induced by misrepresentation or fraud presents a question of fact).

35.    Under Minnesota law, a release procured by misrepresentation and fraud is

invalid.  *See Wallner v. Schmitz*, 239 Minn. 93, 97 (1953) ("A release may be set aside if

obtained by duress or fraud.").  Actionable misrepresentation requires either that the defendant

acted dishonestly or in bad faith (with fraudulent intent) or, alternatively, that the defendant was

negligent.  *Spitzmueller v. Burlington N.R. Co.*, 740 F. Supp. 671, 676 (D. Minn. 1990) (citing

*Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986)).  The elements of fraudulent

misrepresentation under Minnesota law are: (1) a representation; (2) the representation must be

false; (3) it must have to do with a past or present fact; (4) the fact must be material; (5) the fact

must be susceptible to knowledge; (6) the representor must know the fact is false or assert it as

his own knowledge; (7) the representor must intend to have the other person induced to act, or

justified in acting on it; (8) the person must be so induced to act or justified in acting; (9) the

person's actions must have been in reliance on the representation; (10) the person must suffer

damage; and (11) the damage must have been attributable to the misrepresentation.  *Western*

*Contracting Corp v. Dow Chem. Co.*, 664 F.2d 1097, 1100-01 (8th Cir. 1981).  Concealment of a

material fact may also constitute fraud.  *Spizmueller*, 740 F. Supp. at 677.

36.     Additionally, ESML's unilateral mistake render a release invalid if "accompanied

by inequitable conduct on the part of [the releasee], as where the latter knowingly has sought

advantage from it for [its] own unconscionable enrichment."  *Norris v. Cohen*, 27 N.W.2d 277,

281 (Minn. 1947); *see also Van Hee v. Haala*, No. 09-1456, 2010 Minn. App. Unpub. LEXIS

272, at *10-11 (Mar. 30, 2010) (citing *Sorensen v. Coast-to-Coast Stores (Cent. Org.), Inc.*, 353

N.W.2d 666, 670 (Minn. Ct. App. 1984)) ("Inequitable conduct that leads to a claimant

mistakenly releasing claims can invalidate a release.").

37.     As part of the 2012 Novation Agreements, Essar Constructions and Essar Project

Management each represented to ESML that the payments disbursed to and value of the purchase

orders already committed by the relevant entity equaled the amount of obligations that remained

with Essar Constructions ($180 million) and Essar Project Management ($4.92 million).  Those

representations were memorialized in Section 7 of each 2012 Novation Agreement. *See* LSTK Contract, Annex 11 § 7 [D.I. 74-4 at 42] ("As on the Novation Date, the payment disbursed by ESML to [Essar Constructions] and value of purchase orders already committed by [Essar Constructions] is USD 180 Million . . . ."); LSTK Contract, Annex 13 § 7 [D.I. 74-4 at 52] ("As on the Novation Date, the payment disbursed by ESML to [Essar Project Management] and value of the purchase orders already committed by [Essar Project Management] is USD 4.92 million . . . ."). They are expressly identified as consideration for the releases provided in Section 2 of the 2012 Novation Agreements (i.e. the releases Defendants claim warrant dismissal of the fifth and sixth claims brought by the Second Amended Complaint). *See, e.g.*, LSTK Contract, Annex 11 § 2 [D.I. 74-4 at 40] ("With effect from and including the Novation Date and in consideration of the mutual representations, warranties and covenants contained in this [2012] Novation Agreement. . . .").

38.     Each of those statements was false when made. Further factual development is necessary to determine (1) whether Essar Constructions and Essar Project Management knew those representations were false; (2) made those representations to induce ESML to execute the 2012 Novation Agreements; and (3) whether ESML relied on those representations when executing the 2012 Novation Agreements. These factual issues preclude resolution of the affirmative defense asserted by the Defendants at the motion to dismiss phase. In following, Defendants' Motion to Dismiss the fifth and sixth counts for breach of contract against Essar Constructions and Essar Project Management should be denied.

**C.     Essar Global Is Properly Named as Defendant With Respect to the First Six Counts of the SAC as the Alter Ego of the Relevant Contract Counterparty**

39.     Defendants argue that the Court should dismiss Plaintiff's first through six claims for breach of contract as to Essar Global because—although an alter ego of a party to the

relevant contracts—Essar Global is not itself party to the contracts.  *See* Defs' Br. at 10-11.

Defendants' own authority contradicts their position—it is "settled law" that a non-party parent

corporation can be liable for a breach of contract by its subsidiary when alter ego is found.  *Id.* at

10 (citing *N. Cent. EMS Corp. v. Bound Tree Med.*, LLC, 2016 WL 544472, at *4 (D. Minn. Feb

10, 2016)).

40.     Courts have found that a party sought to be held liable for a breach of contract on

an alter ego theory is properly named as a defendant with respect to a breach of contract claim.

*See, e.g., Exp. Dev. Can. v. Dickman*, No. 17-07067, 2018 U.S. Dist. LEXIS 31156, at *9 (C.D.

Cal. Jan. 22, 2018) (denying defendants' motion to dismiss breach of contract counts because

where plaintiff "adequately pleads that defendants are the alter egos of [a party to the contract],

defendants may eventually be held liable for breaching [the] contract").  Indeed, many courts

require a plaintiff to identify defendants purportedly liable as an alter ego under each specific

count.  *See Tara Prods. v. Hollywood Gadgets, Inc.*, 2010 U.S. Dist. LEXIS 37889, at *25 (S.D.

Fla. Apr. 16, 2010) (finding that "[p]laintiff must instead plead allegations regarding alter ego in

the body of its Complaint ***and then identify, under each relevant count, which specific***

***Defendant is being charged*** on the theory of piercing the corporate veil") (emphasis added);

*Green Atlas Shipping SA v. United States*, 306 F. Supp. 2d 974, 977 (D. Or. 2003) (requiring

plaintiff "to make its alter ego allegations in the context of the remaining underlying substantive

claims for liability in this action."); *United States ex rel. Humane Soc'y of the United States v.*

*Westland/Hallmark Meat Co.*, 2010 U.S. Dist. LEXIS 147772, at *13 (C.D. Cal. Dec. 21, 2010)

(noting plaintiff "must include alter ego allegations within th[e underlying] claim").

41.     Although courts tend to agree that alter ego is a theory of liability and not a

standalone cause of action,[7] they acknowledge that pleading alter ego as a declaratory count is not duplicative of the individual causes of action under which plaintiff seeks to hold the alter ego liable, but simply a mechanism to highlight a plaintiff's intention to recover on that theory.  *See Jes Solar Co. v. Matinee Energy, Inc.*, No. 12-00626, 2015 U.S. Dist. LEXIS 178476, at *19-21 (D. Ariz. Oct. 30, 2015) (recognizing that although "the count for declaratory relief to pierce the corporate veil on grounds of alter ego [is] not [a] stand alone claim[ ], . . . stating [it] as such in the SAC is merely a pleading mechanism to highlight Plaintiffs' intention to proceed on th[is] theor[y] of liability in respect to the substantive claims"); *Dreamstone Entm't v. Maysalward Inc.*, No. 14-02063, 2014 U.S. Dist. LEXIS 81084, at *13-14 (C.D. Cal. June 11, 2014) (recognizing "that 'piercing the corporate veil' is not an independent claim for relief" but denying defendant's motion to dismiss the alter ego count because "it does not appear that defendants will be prejudiced if this action proceeds with the complaint's allegations of alter ego liability styled as a separate claim").

42.      In following, Defendants' Motion to Dismiss Plaintiff's first through sixth counts as to Essar Global should be denied.

## CONCLUSION

43.      For all of the foregoing reasons, Plaintiff requests that the Court (i) deny Defendants' Motion to Dismiss; and (ii) grant such other and further relief as the Court deems just and proper.

---

[7] *Raimbeault v. Accurate Mach. & Tool*, 2014 U.S. Dist. LEXIS 140313, at *23-24 (S.D. Fla. Sep. 30, 2014) (collecting cases) ("[F]ederal courts generally find that "[a]lter ego is not a separate cause of action for which relief can be granted; rather, . . . alter ego serves as a theory to impose liability on an individual for the acts of a corporate entity.'"); *Five Points Hotel P'ship v. Pinsonneault*, 2014 U.S. Dist. LEXIS 60627, at *8-9 (D. Ariz. May 1, 2014) ("Overwhelmingly, cases addressing this issue have concluded an alter ego claim is not an independent right of action.").

Dated: October 12, 2018

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (No. 2436)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:  ljones@pszjlaw.com

-and-

**WHITE & CASE LLP**
Thomas E Lauria (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131-2352
Telephone:  (305) 371-2700
Facsimile:  (305) 385-5744
Email:  tlauria@whitecase.com

Glenn M. Kurtz (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone:  (212) 819-8200
Facsimile: (212) 354-8113
Email:  gkurtz@whitecase.com

Craig H. Averch (admitted *pro hac vice*)
Ronald K. Gorsich (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071-2433
Telephone:  (213) 620-7700
Facsimile:     (213) 452-2329
Email:  caverch@whitecase.com
Email:  rgorsich@whitecase.com

*Counsel to Bradley E. Scher, SC Mesabi Litigation Trustee*