## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1] | Case No. 16-11626 (BLS) |
| Debtors. | (Jointly Administered) |
| KEVIN NYSTROM, solely in his capacity as Litigation Trustee for the UC LITIGATION TRUST, | **ORAL ARGUMENT REQUESTED** |
| Plaintiff, | |
| v. | |
| MADHU VUPPULURI; SANJAY BHARTIA; PRASHANT RUIA; ANSHUMAN RUIA; and DOES 1-500 | Adv. Proc. No. 17-50001 (BLS) |
| Defendants. | |

## PLAINTIFF'S OMNIBUS BRIEF IN OPPOSITION
## TO VUPPULURI'S AND BHARTIA'S MOTIONS TO
## DISMISS THE THIRD AMENDED COMPLAINT

---

[1] Essar Steel Minnesota LLC ("ESML") is doing business as Mesabi Metallics Company LLC. The last four digits of its federal taxpayer identification number are 8770. The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 2

RELEVANT PROCEDURAL HISTORY .................................................................. 9

ARGUMENT ............................................................................................................ 10

I.      LEGAL STANDARD ...................................................................................... 10

II.     PLAINTIFF STATES A COGNIZABLE CLAIM FOR BREACH OF A DUTY OF LOYALTY AGAINST THE D&O DEFENDANTS ................................................. 11

       A.     The D&O Defendants Cannot Invoke the Business Judgment Rule ................... 11

       B.     The D&O Defendants Lacked Independence ....................................................... 14

       C.     The D&O Defendants Were Self-Interested ........................................................ 16

III.    PLAINTIFF STATES A CLAIM FOR BREACH OF A DUTY OF CARE ................. 18

       A.     The D&O Defendants Are Not Shielded From Liability ..................................... 18

       B.     The D&O Defendants Failed To Act On An Informed Basis .............................. 21

       C.     The D&O Defendants Acted In Bad Faith ........................................................... 24

IV.    PLAINTIFF'S DISALLOWANCE CLAIMS SURVIVE THE MOTIONS ................... 26

V.     MINNESOTA'S STATUTE OF LIMITATIONS APPLIES. .......................................... 26

CONCLUSION ......................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford,*
    554 F. Supp. 2d 538 (D. Del. 2008)................................................................15

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................................................11

*In re Autobacs Strauss, Inc.,*
    473 B.R. 525 (Bankr. D. Del 2012) ...............................................................24

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...........................................................................................11

*In re BGC Partners, Inc.,*
    No. CV 2018-0722-AGB, 2019 WL 4745121 (Del. Ch. Sept. 30, 2019)..........................13, 15

*Black v. NuAire, Inc.,*
    426 N.W.2d 203 (Minn. Ct. App. 1988) ..........................................................12

*Buckley v. O'Hanlon,*
    No. 1:04-00955-GMS, 2007 WL 956947 (D. Del. Mar. 28, 2007) .........................................26

*Calesa Assocs., L.P. v. Am. Capital, Ltd.,*
    No. CV 10557-VCG, 2016 WL 770251 (Del. Ch. Feb. 29, 2016) .........................................16

*Carr v. New Enter. Assocs., Inc.,*
    No. CV 2017-0381-AGB, 2018 WL 1472336 (Del. Ch. Mar. 26, 2018) ...............................13

*In re Century Elecs. Mfg., Inc.,*
    345 B.R. 33 (Bankr. D. Mass. 2006) ..............................................................20

*Chen v. Howard-Anderson,*
    87 A.3d 648 (Del. Ch. 2014).............................................................................12

*Delaware Cty. Emps. Ret. Fund v. Sanchez,*
    124 A.3d 1017 (Del. 2015) ...............................................................................15

*Diedrick v. Helm,*
    14 N.W.2d 913 (Minn. 1944).............................................................................12

*In re Direct Response Media, Inc.,*
    466 B.R. 626 (Bankr. D. Del. 2012) ....................................................17, 24, 25

*In re DSI Renal Holdings, LLC,*
   574 B.R. 446 (Bankr. D. Del. 2017) ..................................................................18

*Dulhanty v. Conner,*
   No. 27-CV-15-14487, 2016 WL 8578366 (Minn. Dist. Ct. Dec. 2, 2016)............12

*Dunning v. Bush,*
   536 F.3d 879 (8th Cir. 2008) ............................................................................11

*EBS Litig. LLC v. Barclays Glob. Invs., N.A.,*
   304 F.3d 302 (3d Cir. 2002)..............................................................................28

*In re Evergreen Energy, Inc.,*
   546 B.R. 549 (Bankr. D. Del. 2016) ..................................................................25

*F.D.I.C. v. Florescue,*
   No. 8:12-cv-02547-JSM, 2013 WL 2477246 (M.D. Fla. June 10, 2013)............13

*F.D.I.C. v. Milbauer,*
   119 F. Supp. 3d 939 (D. Minn. 2015) ..........................................................17, 18

*F.D.I.C. v. Perry,*
   No. 2:11-cv-05561-ODW, 2012 WL 589569 (C.D. Cal. Feb. 21, 2012) .............13

*In re Fleming Packaging Corp.,*
   351 B.R. 626 (Bankr. C.D. Ill. 2006)................................................................20

*Frederick Hsu Living Tr. v. ODN Holding Corp.,*
   No. CV 12108-VCL, 2017 WL 1437308 (Del. Ch. Apr. 14, 2017) ......................18

*In re Fruehauf Trailer Corp.,*
   250 B.R. 168 (D. Del. 2000)..............................................................................28

*Furnari v. Wallpang, Inc.,*
   No. 13C-04-287-JRJ, 2014 WL 1678419 (Del. Super. Ct. Apr. 16, 2014) ..........28

*Gantler v. Stephens,*
   965 A.2d 695 (Del. 2009) ..................................................................................13

*Goldie v. Cox,*
   130 F.2d 695 (8th Cir. 1942) ............................................................................26

*In re Inv'rs Bancorp, Inc. Stockholder Litig.,*
   177 A.3d 1208 (Del. 2017), *as revised* (Dec. 19, 2017).......................................18

*Janssen v. Best & Flanagan,*
   662 N.W.2d 876 (Minn. 2003)...........................................................................12

*Jones Lang LaSalle Americas, Inc. v. Int'l Bhd. of Elec. Workers Local Union*,
    338 F. Supp. 3d 381 (D. Del. 2018)........................................................................27

*Juran v. Bron*,
    No. CIV. A. 16464, 2000 WL 1521478 (Del. Ch. Oct. 6, 2000).............................28

*In re Ltd., Inc.*,
    No. CIV.A. 17148-NC, 2002 WL 537692 (Del. Ch. Mar. 27, 2002) ............................ *passim*

*Marchand v. Barnhill*,
    212 A.3d 805 (Del. 2019) ........................................................................................15

*McTernan v. City of York, PA*,
    564 F.3d 636 (3d Cir. 2009)....................................................................................11

*In re Medtronic, Inc. Derivative Litig.*,
    68 F. Supp. 3d 1054 (D. Minn. 2014) .....................................................................11

*In re Mervyn's Holding LLC*,
    426 B.R. 488 (Bankr. D. Del. 2010) .................................................................27, 28

*N. Sunrooms & Additions, LLC v. Dorstad*,
    No. A10-1217, 2011 WL 292160 (Minn. Ct. App. Feb. 1, 2011) ..........................20

*Cumming on behalf of New Senior Inv. Grp., Inc. v. Edens*,
    No. CV 13007-VCS, 2018 WL 992877 (Del. Ch. Feb. 20, 2018)..........................17

*In re Opus E., LLC*,
    528 B.R. 30 (Bankr. D. Del. 2015), *aff'd sub nom. In re Opus E. LLC*, 698 F.
    App'x 711 (3d Cir. 2017)........................................................................................26

*Palmer v. Reali*,
    211 F. Supp. 3d 655 (D. Del. 2016)..................................................................12, 24

*Phillips v. County of Allegheny*,
    515 F.3d 224 (3rd Cir. 2008) ..................................................................................11

*Platt v. Richardson*,
    No. 1:88-cv-00144-EMK, 1989 WL 159584 (M.D. Pa. June 6, 1989) ..................13

*In re Primedia Inc. Derivative Litig.*,
    910 A.2d 248 (Del. Ch. 2006)................................................................................16

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ........................................................................................15

*RCS Creditor Tr. v. Schorsch*,
No. CV 2017-0178-SG, 2017 WL 5904716 (Del. Ch. Nov. 30, 2017),
*reargument denied*, No. CV 2017-0178-SG, 2018 WL 1640169 (Del. Ch. Apr.
5, 2018) .................................................................................................................17

*In re Robotic Vision Sys., Inc.*,
374 B.R. 36 (Bankr. D.N.H. 2007) ......................................................................20

*Saudi Basic Indus. v. Mobil Yanbu Petrochemical Co.*,
866 A.2d 1 (Del. 2005) .........................................................................................27

*Scott v. Vantage Corp.*,
No. 1:17-cv-0048-MPT, 2017 WL 3485818 (D. Del. Aug. 15, 2017) ............10, 11

*Smith v. Van Gorkom*,
488 A.2d 858 (Del. 1985) ......................................................................................20

*In re Sols. Liquidation LLC*,
No. 1:16-bk-10627-CSS, 2019 WL 5305517 (Bankr. D. Del. Oct. 21, 2019) .......25

*Stiff v. Associated Sewing Supply Co.*,
436 N.W.2d 777 (Minn. 1989).............................................................................26

*Swanson v. Tomlinson Lumber Mills, Inc.*,
239 N.W.2d 216 (Minn. 1976)........................................................................16, 17

*Telxon Corp. v. Meyerson*,
802 A.2d 257 (Del. 2002) .....................................................................................14

*In re The Brown Sch.*,
368 B.R. 394 (Bankr. D. Del. 2007) .....................................................................12

*In re Tower Air*,
416 F.3d 229 (3d Cir. 2005).....................................................................21, 23, 24

*In re Trados Inc. S'holder Litig.*,
73 A.3d 17 (Del. Ch. 2013)....................................................................................13

*In re USA Detergents, Inc.*,
418 B.R. 533 (Bankr. D. Del. 2009) .....................................................................12

*In re W.J. Bradley Mortg. Capital, LLC*,
598 B.R. 150 (Bankr. D. Del. 2019) ....................................................12, 22, 24

*In re Walt Disney Co. Derivative Litig.*,
825 A.2d 275 (Del. Ch. 2003)...........................................................................23, 24

*In re Walt Disney Co. Derivative Litig.*,
  906 A.2d 27 (Del. 2006) ........................................................................... 25

*Williams v. Runyon*,
  130 F.3d 568 (3d Cir. 1997) ...................................................................... 27

*Yang v. Voyagaire Houseboats, Inc.*,
  701 N.W.2d 783 (Minn. 2005) .................................................................. 20

## Statutes

11 U.S.C. § 502(b)(1) .................................................................................. 26

F.R.C.P. 8 ..................................................................................................... 11

F.R.C.P. 54(b) .............................................................................................. 27

Kevin Nystrom, as Litigation Trustee for the UC Litigation Trust ("Plaintiff"), hereby submits this memorandum of law in opposition to Defendant Madhu Vuppuluri's ("Vuppuluri") and Defendant Sanjay Bhartia's ("Bhartia," jointly with Vuppuluri, the "D&O Defendants") Motions to Dismiss the Third Amended Complaint (the "Motions").[2]  For the reasons set forth herein, the Motions should be denied.

## **INTRODUCTION**

This action arises from the D&O Defendants' complete disregard of their fiduciary duties to ESML in favor of their own interests and those of the Ruia family.  The Third Amended Complaint (the "AC") goes well beyond boilerplate allegations of a breach of fiduciary duty.  Rather, the AC alleges egregious breaches of these duties.

Indeed, in recognition of the Court's clear rulings on the prior motions to dismiss, the AC alleges specific facts regarding each of the challenged transactions.  With respect to the duty of loyalty claims, the AC specifically identifies the D&O Defendants' self-interest and lack of independence in the transactions.  For instance, the AC alleges that Vuppuluri lacked independence *due to his 27-year history working for Essar Affiliates controlled by the Ruia family* and that each of the D&O Defendants received a "bonus" for facilitating a fraudulent invoicing scheme in 2015.  In the limited circumstances where ESML's Board of Governors (the "Board") even considered any of the challenged transactions, Vuppuluri's conflict with Essar Global precludes application of the business judgment rule.  However, because virtually all of the transactions were approved or facilitated by the D&O Defendants as employees, the business judgment rule should not apply as a matter of law and, even if it otherwise would, Vuppuluri's conflicts similarly preclude it.

---

[2] Defendants Prashant Ruia and Anshuman Ruia are referred to as the "Ruia Defendants."  The D&O Defendants and the Ruia Defendants are collectively referred to as "Defendants."

With respect to the duty of care claims, the AC includes detailed allegations concerning the D&O Defendants' intentional and grossly negligent conduct that precludes dismissal. Specifically, the AC provides concrete examples that the D&O Defendants ignored clear warnings about ESML's dire financial condition; yet they repeatedly approved the challenged transactions to benefit Essar Global affiliates while intentionally misleading creditors concerning the completion schedule for the Project.  The culmination of their misconduct was a fraudulent invoicing scheme in 2015, where the D&O Defendants abandoned any veneer of legitimacy and falsified invoices to facilitate two payments to Essar Global affiliates totaling $38 million for no consideration at all.  Together, the new allegations in the AC readily meet *Twombly's* pleading requirement of "facial plausibility" – necessitating that Plaintiff's claims survive the Motions. While the D&O Defendants desperately attempt to shoehorn into the exculpation clause in ESML's charter, they simply chose to ignore the plain language limiting its application to "Governors" when the well-pleaded allegations in the AC make clear that they were acting solely as "Officers" because they consistently failed to have the challenged transactions considered by the Board.  Thus, the exculpation clause simply does not apply.

The D&O Defendants' recitation of the arguments from its prior motions is nothing more than a shameless attempt to induce the Court to ignore the well-pleaded allegations of the AC which plainly states valid claims.  Accordingly, the Motions should be denied.

## STATEMENT OF FACTS[3]

### A.   Background

ESML was a wholly-owned subsidiary of Essar Global Fund Limited ("Essar Global"), a large, multinational enterprise controlled by the Ruia family.  (AC ¶ 1.)  Essar Global acquired

---

[3]  Plaintiff respectfully refers the Court to the AC filed on July 25, 2019 for a full recitation of the facts.  All terms not defined herein shall have the meaning ascribed to them in the AC.

ESML to build what was supposed to be a state-of-the-art iron ore mine and pellet plant in Minnesota (the "Project").  (*Id.* at ¶ 2.)  Essar Global's various affiliates (the "Essar Affiliates") were supposed to provide various services to ESML to complete the Project.  (*Id.* at ¶¶ 2-3.)

Ultimately, however, after borrowing billions of dollars, the Project was never completed, and ESML never produced any revenues or cash flow.  (*Id.* at ¶ 3.)  Instead, it was forced to file Chapter 11 in this Court, due to, at least in part, the breaches of the D&O Defendants' fiduciary obligations and other misconduct.  (*Id.* at ¶ 4.)

**B.    The D&O Defendants' Relationship With ESML**

**a.    Madhu Vuppuluri**

Madhu Vuppuluri has been an employee of affiliates of the Ruia family for the past twenty-seven years.  (*Id.* at ¶¶ 20-23.)  Over this time, he held various director and executive officer roles within the Ruia family's Essar Global enterprise:

- From July 1994 to September 1999, Vuppuluri was the Senior Vice President of Essar Global;

- From October 1999 to October 2007, Vuppuluri was the President and CEO of Essar Americas, Inc.;

- From December 2003 to August 2014, Vuppuluri was a director of Aegis, Inc. ("Aegis"), a subsidiary of Essar Steel Holdings, Ltd., a wholly owned subsidiary of Essar Global;

- From June 2007 to October 2014, Vuppuluri was a board member of Essar Steel Algoma, Inc. ("Essar Steel Algoma"), a wholly owned subsidiary of Essar Global;

- From May 2011 to June 2015, Vuppuluri was a board member of Essar Resources, Inc.;

- At all relevant times, Vuppuluri was a director of Trinity Coal Corporation ("Trinity"), a wholly owned subsidiary of Essar Steel, Ltd.;

- Vuppuluri was President and CEO of Essar Resources Inc. ("Essar Resources"); and

- Vuppuluri was the *de facto* CEO of Essar Projects, USA, LLC ("Essar Projects-US"), a subsidiary of Essar Projects Ltd. ("Essar Projects").

He was also President and Chief Executive Officer of ESML between October 2007 and November 2016.  (*Id.* at ¶ 20.)

During his tenure at ESML, Vuppuluri simultaneously served on the board and/or as an officer at several other Essar Affiliates under the control of the Ruia family, including: Trinity, Essar Steel Algoma, Essar Resources, Aegis, and Essar Projects-US.  (*Id.* at ¶ 22.)  By virtue of his various (and dual) positions within the Essar Global enterprise, Vuppuluri derived millions of dollars in income in addition to the compensation he received from ESML.  (*Id.* at ¶¶ 21-22.)  As a result of Vuppuluri's life-long employment by Essar Global, he has been dependent upon Essar Global and the Ruia family for his livelihood and thus, he lacked independence.  (*Id.* at ¶ 21.)  He remains employed by one or more of the Essar Affiliates to this day.  (*Id.* at ¶ 22.)

### b.    Sanjay Bhartia

Sanjay Bhartia was the Chief Financial Officer of ESML beginning in 2013.  (*Id.* at ¶ 24.)  He also served as a governor of ESML from 2014-2015.  (*Id.*)  As a condition of his employment with ESML, Bhartia was prohibited from engaging in any conduct that would constitute an actual or perceived conflict of interest.  (*Id.* at ¶ 25.)  Bhartia's temporary worker visa, which permitted him and his family to relocate to the United States, was sponsored by ESML and required him to be employed by ESML.  (*Id.*)

### C.    The D&O Defendants Facilitated Improper Transfers

Between 2008 and 2016, the D&O Defendants approved the payment of hundreds of millions of dollars to Essar Global and Essar Affiliates purportedly to complete the Project for little or no consideration.  (*Id.* at ¶¶ 3, 36, 61-104.)  But, instead, nearly half of those funds were never used on the Project.  (*See id.*)  Instead, the D&O Defendants improperly authorized and/or facilitated the transfer of hundreds of millions of dollars from ESML to Essar Global and Essar

Affiliates over ESML's financial interests.  (*See id.* at ¶¶ 61-104.)  These transfers include, without limitation, the following:

- March 2012: $5 million transfer to Trinity;

- June 2012: $79 million "loan" to Essar Global;

- January 2013: $325,000 "loan" to Essar Global;

- January 2013: $21 million "loan" to Essar Global;

- Late 2013: Release of $5 million claim in the Trinity bankruptcy case for no consideration;

- November 2014: $3.3 million "payment" to an Essar Affiliate;

- March 2015: $68 million payment to Essar Projects, which was recirculated as Essar Global's equity contribution to ESML under the Equity Contribution Agreement;

- 2015: Participating in a fraudulent invoicing scheme with Essar Projects-US;

- 2015: $17 million payment to Essar Projects-India to facilitate Essar Global's $16 million equity contribution to ESML;

- Mid-2015: Millions of dollars in transfers for letters of credit ("LCs" for the Paradeep Project;

- 2014 and 2015: Millions of dollars paid in connection with Essar Projects' attempts to open LCs – both for the Project and in connection with other business Essar Projects was involved with.  (*Id.*)[4]

The AC references internal correspondence to provide specific examples of the D&O Defendants' misconduct.  (*See, e.g.*, ¶¶ 4, 7-9, 42-45, 48-56, 61, 64, 66, 69, 75, 80, 87-90, 97.)  Each of these examples demonstrate that the D&O Defendants knew that ESML was not properly capitalized to complete the Project at the time they approved of these transfers.  (*Id.*)  For instance, the AC alleges:

---

[4]  Bhartia incorrectly contends that he was not involved in these transactions.  The AC, however, clearly implicates Bhartia in several transactions including, without limitation, (i) the November 2014 $3.3 million transfer to Aegis, AC ¶¶ at 75-81; (ii) the 2015 fraudulent invoicing scheme, *id.* at ¶¶ 88-97; and (ii) the $19.8 million of transfer to settle LC for Essar Affiliates, *id.* at ¶¶ 82-87.

- In November 2014, the D&O Defendants authorized a $3.3 million transfer to Aegis solely in response to the demands of defendant Anshuman Ruia. (*Id.* at ¶¶ 75-81.) Significantly, the AC cites emails between the D&O Defendants demonstrating that they approved the transfer knowing that ESML did not owe the funds and that Aegis would not be able to repay them. (*Id.*) Despite this, they did not require Aegis to enter into an agreement to return the funds to ESML. (*Id.*)

- In 2015, the D&O Defendants discussed Essar Projects' failure to pass on ESML's payments to Essar Projects-US. Instead of considering whether to compel Essar Projects to make these payments, Vuppuluri and Bhartia agreed to pay Essar Projects-US directly for work that was never performed. (*Id.* at ¶¶ 88-97.)

Critically, the D&O Defendants knowingly disregarded warnings from ESML employees regarding the transfers. For instance, the AC alleges that the D&O Defendants settled LCs in 2015 on behalf of an Essar Affiliate solely in response to the demands of defendant Prashant Ruia. (*Id.* at ¶¶ 82-83.) Although an ESML employee warned against the transfer given ESML's insolvency, the D&O Defendants ignored this warning and transferred the funds the very next day. (*Id.* ¶¶ 85-87.) Remarkably, the D&O Defendants continued to facilitate the Ruia Defendants' and Essar Global's siphoning of assets from ESML thereafter. (*See id.*)

The D&O Defendants elevated their own personal interests over ESML's interests in making these transfers because they would reap substantial personal and financial benefits. (*Id.* at ¶¶ 20-21, 23, 25, 136.) Indeed, the AC contains detailed examples of the D&O Defendants' self-interest. For example, the D&O Defendants were paid hundreds of thousands of dollars in December 2015 *directly by Essar Global or its designees* after facilitating and approving the improper transfer of millions of dollars to Essar Affiliates, including Essar Projects-US and Essar Constructions Limited ("Essar Constructions"). (*Id.* at ¶¶ 88-97.) Indeed, internal records confirm that the D&O Defendants received these payments the same month they approved of a $27 million transfer to Essar Constructions for no consideration. (*Id.* at ¶¶ 11, 96.) Critically, there was no legitimate reason for the D&O Defendants to authorize this payment as Essar

Constructions had not performed any meaningful work for ESML in years as its duties had been transferred to other Essar Affiliates. (*Id.* at ¶¶ 88-97.) Nonetheless, the D&O Defendants authorized the payment of these fraudulent invoices with full knowledge of the fraud. (*Id.*)

Moreover, Vuppuluri held dual directorship and officer roles at Essar Affiliates when he authorized several of the challenged transactions. (*Id.* at ¶¶ 22, 104.) Indeed, the AC includes new allegations concerning Vuppuluri's dual officer roles at ESML and Essar Projects-US when the D&O Defendants executed an invoicing scheme for the benefit of Essar Projects-US. (*See id.* at ¶¶ 88-97.) Although Essar Projects-US is a wholly-owned subsidiary of Essar Global, internal organization charts and records establish that Vuppuluri supervised and managed Essar Projects-US's highest ranking officer, Steve Rutherford. (*Id.* at ¶ 92.) Vuppuluri also held a dual directorship role at Trinity when he authorized the transfer of over $5 million from ESML to Trinity for little or no consideration. (*Id.* at ¶¶ 21-22, 64, 104.)

As a result of the D&O Defendants' dependence on the Ruia family, the D&O Defendants permitted Essar Global, through the Ruia Defendants, to control and dictate the D&O Defendants' decisions with respect to the siphoning of ESML's assets to Essar Global and Essar Affiliates. (*See, e.g.*, ¶¶ 5, 6-11, 56, 61-104.) Although the D&O Defendants served as both governors and officers of ESML, the AC includes new allegations to establish that the D&O Defendants approved these transfers in their capacity as officers of ESML. (*Id.*) Indeed, at all relevant times during the D&O Defendants' employment with ESML, the D&O Defendants failed to conduct board meetings and permitted the Ruia family to exercise dominion and control over ESML. (*Id.*) For example:

- In June 2012, Vuppuluri authorized ESML to draw $79 million from ICICI Bank Limited, New York Bank ("ICICI Bank"). (*Id.* at ¶ 68.) Instead of using the funds for Project purposes as required under the related credit agreement, Vuppuluri transferred the funds to Essar Global as a "loan." (*Id.*) Vuppuluri knew that Essar Global was not likely to repay the "loan;" he

7

knowingly authorized it to enable Essar Global to pay its own debts. (*Id.* at ¶ 69.) Notably, this occurred without Board approval when he knew that ESML's liquidity "reached an extremely critical stage." (*Id.* at ¶ 70.) And as he told Prashant Ruia, "you may recall for the last three years, we have not raised this subject[.]" *Id.*

- On January 25, 2013, Vuppuluri authorized ESML to borrow $21 million for the benefit of Essar Global. (*Id.* at ¶ 73.) Although Vuppuluri informed the bank that ESML needed the $21 million for "immediate project needs," he authorized the loan of $21 million to Essar Global instead. (*Id.*) Vuppuluri did not require Essar Global to sign any agreement documenting this loan and there are ***no Board meeting minutes or resolutions*** relating thereto (*Id.* (emphasis added).)

- On January 4, 2013, under instruction from Essar Global, ESML "loaned" $325,000 to Essar Global without documentation or board consideration or approval. (*Id.* at ¶ 74.)

- In November 2014, the D&O Defendants authorized a $3.3 million payment to Aegis to buy a machine. (*Id.* at ¶¶ 75-81.) The D&O Defendants knew that ESML did not owe Aegis for this machine as it was not part of the Project. (*Id.*) Nonetheless, the D&O Defendants authorized the transaction because, as Bhartia noted, Anshuman Ruia "called again today and was getting very angry that we are not paying." (*Id.*)

The D&O Defendants' bad faith in executing these transfers is evident from their repeated misrepresentations to ESML's lenders in 2015. For example, the AC alleges new facts demonstrating that the D&O Defendants made the following misrepresentations to lenders:

- In July 2015, Bhartia represented to a lender that the Project was over 80% complete. (*Id.* at ¶ 55.) Bhartia continued to make these misrepresentations to lenders throughout 2015. (*Id.*)

- On December 16, 2015, Bhartia informed a U.S. lender in an email that the project "will be completed by Q3 2016." (*Id.*)

- On January 14, 2016, Bhartia sent another lender, on the instruction of Vuppuluri, a presentation which stated that the project "as of October 2015 [was] 88.4% completed." (*Id.*)

The D&O Defendants knew that these statements were completely false. (*Id.* at ¶ 56.) To remedy these harms on behalf of ESML, Plaintiff filed this adversary proceeding for, *inter alia*, breach of the D&O Defendants' fiduciary duties.

## RELEVANT PROCEDURAL HISTORY

Plaintiff filed the AC on July 25, 2019, D.I. 121, following this Court's dismissal, with leave to re-plead, of the Plaintiff's Second Amended Complaint ("SAC").[5]  *See* Decision Granting Defendants' Motions to Dismiss the SAC (Bankr. D. Del. May 23, 2019), D.I. 112, (hereinafter "the Decision").  Although the Court held that the SAC was timely and adequately pled insolvency, *id.* at 11, 13, the Court determined that the SAC failed to sufficiently allege facts to support its duty of loyalty and duty of care claims against the D&O Defendants.  *Id.* at 15, 20.  With respect to the duty of loyalty claim, the Court determined that the SAC failed to allege specific facts (i) linking any payments to the D&O Defendants for any of the challenged transactions, or (ii) regarding the D&O Defendants' self-interest.  *Id.* at 16-17.  With respect to the duty of care claim, the Court determined that (i) the exculpation clause in ESML's Articles of Organization shielded the D&O Defendants from liability, *id.* at 19, and (ii) the SAC failed to allege facts concerning the D&O Defendants' decision-making process.  *Id.* at 19-20.  As further set forth herein, the AC rectifies each of the pleading deficiencies identified by the Court.

First, the AC includes separate claims against the D&O Defendants for their conduct as *governors* and *officers* of ESML.  As set forth herein, the D&O Defendants cannot invoke the business judgment rule, *see* Section II(A) *infra*, or ESML's exculpation clause, *see* Section III(A) *infra*, to shield them from liability for actions taken as *officers* of ESML.

Second, the AC includes additional allegations demonstrating that the D&O Defendants lacked independence from the Ruia family and Essar Global because they depended on them for their livelihoods.  (*See* AC ¶¶ 20-23) (describing Vuppuluri's 27-year history with the Ruia family).)

---

[5]  A redlined copy of the AC evidencing Plaintiff's new allegations is attached hereto as Exhibit A.

Third, the AC alleges that the D&O Defendants engaged in the "classic examples" of self-interest previously identified by the Court.  *See* Decision at 16.  For example, the AC identifies at least three instances of where Vuppuluri stood on both sides of a challenged transaction.  (*Id.* at ¶ 64 (describing Vuppuluri's dual directorship roles in connection with the Trinity transactions); ¶ 92 (describing Vuppuluri's dual officer role in connection with the 2015 fraudulent invoicing scheme facilitated by the D&O Defendants); ¶¶ 62, 104 (describing Vuppuluri's dual directorship role in connection with the $2.68 million payment to Essar Steel Algoma for the benefit of Essar Global or its affiliates).)  Moreover, the AC alleges that the D&O Defendants received "bonus" payments in the same month that they facilitated a fraudulent invoicing scheme for the benefit of Essar Constructions. (*Id.* at ¶¶ 11, 95.)

Further, the AC contains detailed allegations demonstrating that the D&O Defendants failed to act on an informed basis or with customary corporate governance on each of the challenged transactions.  As alleged in the AC, the D&O Defendants facilitated the challenged transactions without Board meetings.  (*Id.* at ¶¶ 9-10, 65-71, 73-74, 77, 86, 121-122.)  Moreover, the AC cites to internal records to provide the Court with specific examples of the D&O Defendants' failure to consider material information, including explicit warnings from ESML employees.  (*Id.* at ¶¶ 50-51, 55-56, 65-66, 69-73, 78-79, 85-87.)

## ARGUMENT

### I.   LEGAL STANDARD

The purpose of a motion to dismiss is "not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims."  *Scott v. Vantage Corp.*, No. 1:17-cv-0048-MPT, 2017 WL 3485818, at *3 (D. Del. Aug. 15, 2017).  Indeed, "a motion to dismiss may be granted ***only if***, after, accepting all well-pleaded allegations in the

complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to relief." *Id.* (citation omitted) (emphasis added).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility exists if the allegations merely "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "*Twombly's* formulation of the pleading standard can be summed up [as] thus: [the standard] does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3rd Cir. 2008) (citation omitted); *McTernan v. City of York, PA*, 564 F.3d 636, 646 (3d Cir. 2009).

Finally, *Twombly* expressly affirmed the existing liberal pleading standard of Rule 8, noting that it "requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" 550 U.S. at 555 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Viewing the AC in light of these standards, the Motions should therefore be denied.

## II. PLAINTIFF STATES A COGNIZABLE CLAIM FOR BREACH OF A DUTY OF LOYALTY AGAINST THE D&O DEFENDANTS[6]

### A. The D&O Defendants Cannot Invoke the Business Judgment Rule

The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling

---

[6] Fiduciary duties are governed by the law of the state of formation under the "internal affairs" doctrine. *Dunning v. Bush*, 536 F.3d 879, 886 (8th Cir. 2008). Here, ESML is a Minnesota corporation. Courts interpreting Minnesota corporate governance disputes "often look to Delaware law for assistance in developing rules of corporate law" where Minnesota law is lacking. *See In re Medtronic, Inc. Derivative Litig.*, 68 F. Supp. 3d 1054, 1062 (D. Minn. 2014).

shareholder[.]"  Decision at 14; *In re USA Detergents, Inc.*, 418 B.R. 533, 545 (Bankr. D. Del. 2009); *see Diedrick v. Helm*, 14 N.W.2d 913, 919 (Minn. 1944).  Under Minnesota law, the business judgment rule protects ***directors*** from liability "as long as the disinterested directors made an informed business decisions, in good faith[.]" *Janssen v. Best & Flanagan*, 662 N.W.2d 876, 882 (Minn. 2003) (emphasis added) (citations omitted).[7]  Here, the D&O Defendants cannot invoke the business judgment rule to dismiss the AC because the AC asserts a separate duty of loyalty claim against the D&O Defendants solely in their capacity as ***officers*** of ESML.  (*See, e.g.*, AC ¶¶ 9-10, 65, 71, 73, 74, 86, 102, 122, 140 (specifically alleging that the D&O Defendants approved the challenged transactions in their capacity as officers).)

No Minnesota court has held that the business judgment rule applies to officers.[8]  In discussing the rule, the Minnesota Supreme Court has expressly noted that the business judgment rule was "developed by state and federal courts to protect boards of ***directors*** against shareholder claims that the board made unprofitable business decisions." *Janssen*, 662 N.W.2d at 882 (emphasis added) (citations omitted).  Indeed, the Minnesota Supreme Court has yet to apply or even discuss the doctrine under Minnesota law in connection with corporate officers.

Like Minnesota, Delaware courts have never specifically addressed whether the business judgment rule applies to officer conduct.  *See Palmer v. Reali*, 211 F. Supp. 3d 655, 666 n.8 (D. Del. 2016) ("Defendants have cited to no cases where a Delaware court has held that the Business Judgment Rule applies to corporate *officers*[.]"); *Chen v. Howard-Anderson*, 87 A.3d

---

[7] As an initial matter, the business judgment rule is an affirmative defense and should not be considered on a motion to dismiss. *In re W.J. Bradley Mortg. Capital, LLC*, 598 B.R. 150, 163 (Bankr. D. Del. 2019); *In re The Brown Sch.*, 368 B.R. 394, 401 (Bankr. D. Del. 2007).  In any event, Plaintiff has alleged sufficient facts to rebut the business judgment rule presumption.

[8] Although some courts, *in dicta*, state that the rule protects officers, the case law they cite does not support that proposition.  For example, in *Dulhanty v. Conner*, No. 27-CV-15-14487, 2016 WL 8578366 (Minn. Dist. Ct. Dec. 2, 2016), the court stated that the rule applied to directors and officers citing *Janssen*, 662 N.W.2d at 876 and *Black v. NuAire, Inc.*, 426 N.W.2d 203 (Minn. Ct. App. 1988).  Yet, both *Janssen* and *NuAire* only state that the rule applies to directors – it does not discuss the application of the rule to officers at all.

648, 666 n.2 (Del. Ch. 2014) ("A lively debate exists regarding the degree to which decisions by

officers should be examined using the same standards of review developed for directors."); *Platt*

*v. Richardson*, No. 1:88-cv-00144-EMK, 1989 WL 159584, at *2 (M.D. Pa. June 6, 1989)

(stating that the court has not found "a single authority" under Delaware law which extends the

presumption afforded by the business judgment rule to officers).  Moreover, several other

jurisdictions have also declined to extend the business judgment rule to officers.  *See, e.g.*,

*F.D.I.C. v. Perry*, No. 2:11-cv-05561-ODW, 2012 WL 589569, at *3 (C.D. Cal. Feb. 21, 2012)

(finding CEO's request to extend business judgment rule to officers "unprecedented"); *F.D.I.C.*

*v. Florescue*, No. 8:12-cv-02547-JSM, 2013 WL 2477246, at *4-6 (M.D. Fla. June 10, 2013)

(declining to extend business judgment rule to officers).  As the Minnesota Supreme Court has

yet to expressly hold that the business judgment rule applies to corporate officer conduct, the

entire fairness standard applies to the D&O Defendants.  *Gantler v. Stephens*, 965 A.2d 695,

708–09 (Del. 2009) (applying the entire fairness standard to officer conduct).

Even if this Court determines that the D&O Defendants may invoke the business

judgment rule, the entire fairness standard must still apply as Plaintiff specifically alleges that the

D&O Defendants:[9] (1) lacked requisite independence to consider whether the transactions were

in the best interest of ESML; or (2) were self-interested in the challenged transactions.  *See In re*

*BGC Partners, Inc.*, No. CV 2018-0722-AGB, 2019 WL 4745121, at *14 (Del. Ch. Sept. 30,

2019) (allegations of self-interest *or* lack of independence rebut the business judgment rule); *see*

*also Carr v. New Enter. Assocs., Inc.*, No. CV 2017-0381-AGB, 2018 WL 1472336, at *21 (Del.

---

[9] As set forth above, the AC alleges that the D&O Defendants approved virtually all of the transactions in their capacity as officers.  To the extent that the D&O Defendants acted in their capacity as *directors* of ESML, the AC alleges that at least half of ESML's Board lacked independence or were interested in the transactions.  (*See, e.g.*, AC ¶¶ 108-115.)  Accordingly, the entire fairness standard should apply.  *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44–45 (Del. Ch. 2013) (stating entire fairness standard applies to the entire board where the majority of the board was not independent or disinterested.).

Ch. Mar. 26, 2018) ("With respect to the duty of loyalty, [plaintiff] [] rebutted the business judgment rule because he [] pled facts showing that at least half of the [] board that approved the [] [t]ransaction was not disinterested or independent"); *In re Ltd., Inc.*, No. CIV.A. 17148-NC, 2002 WL 537692, at *7 (Del. Ch. Mar. 27, 2002) (plaintiff stated a duty of loyalty claim where plaintiff demonstrated that half of the board was either interested or not independent).

### B.    The D&O Defendants Lacked Independence

To establish that the D&O Defendants lacked independence, Plaintiff need only allege that the D&O Defendants were unable to objectively consider the merits of the challenged transactions because they were "controlled by another." *See Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002). Although "self-interest" and "independence" are often used interchangeably, independence does not require that the challenged director derives a benefit *from the transaction* that is not generally shared with the other shareholders. *Id.* Rather, it involves an inquiry into whether the director's decision resulted from that director being *controlled* by another. *Id.* A director or officer can be beholden to (and thus controlled by) another "when the [] controlling entity . . . has the unilateral power to decide whether the [challenged] director continues to receive a benefit . . . and that its threatened loss might create a reason to question [the director's objectivity]." *Id.* Here, the Plaintiff alleges that the D&O Defendants lacked independence because they were both beholden to Essar Global and the Ruia family for their livelihood. (*See* AC ¶¶ 21, 23, 114, 137.)

Significantly, Vuppuluri has been an employee of affiliates of the Ruia family, and their Essar Global enterprise, *for the past twenty-seven years* – essentially his entire adult life and long before he joined ESML – *and he transitioned to another Essar Global affiliate after leaving ESML*. (*Id.* at ¶ 20-23.) During his tenure as CEO of ESML, Vuppuluri simultaneously held board and/or officer positions at no less than four Essar Global affiliates, including Essar Steel

Algoma, Essar Resources, Inc., Trinity, and Essar Projects-US.  (*Id.* at ¶¶ 20-21.)  As a result of his various roles within the Essar Global enterprise, Vuppuluri was paid millions of dollars, over and above the compensation he received at ESML, directly by Essar Global or its designees for decades.  (*Id.* at ¶¶ 23, 137.)

Courts have repeatedly found that, where, as here, a director is a life-long employee of a controlling entity, the director cannot be deemed to be disinterested in transactions involving the controlling entity and affiliates.  *See BGC Partners, Inc.*, 2019 WL 4745121, at *12 (allegations concerning the 20-year professional relationship between board member and controlling shareholder created a "reasonable doubt about [the board member's] independence"); *Marchand v. Barnhill*, 212 A.3d 805, 819-20 (Del. 2019) (officer and board member was not independent where he had a 28-year career an affiliate); *Delaware Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015) (reversing dismissal where evidence of a life-long business relationship between a director and the interested party supported "an inference that the director could not act independently"); *In re Ltd.*, 2002 WL 537692, at *5 (employee's "long-time" position with the controlling entity generated reasonable doubt as to his independence).[10]

The AC's specific allegations regarding the D&O Defendants' dependence on the Ruia family, drawing all reasonable inferences in Plaintiff's favor, support a finding that the D&O

---

[10]  Plaintiff recognizes that this Court previously held Bhartia's interest in maintaining his employment – and thus status in the US – does not support a breach of a duty of loyalty claim.  Decision at 17.  For purposes of preserving this issue on appeal, Plaintiff states that Bhartia also allowed himself to be controlled by the Ruia family, because he derived a substantial portion (if not all) of his income, as well the sponsorship of his temporary work visa, from Essar Global and the Ruia family.  (AC ¶ 138.)  Bhartia's interest in maintaining his employment – and status in the U.S. – certainly raises doubt as to whether he considered the challenged transactions objectively.  *See Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 559 (D. Del. 2008) (declining to dismiss a fiduciary duty claim where the complaint alleged officer "lacked independence" as he was beholden to the controlling shareholder who "effectively determined [the officer's] compensation, including stock options and bonuses given to him"); *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993) (the complaint's allegations concerning a director's "substantial financial interest in maintaining [his] employment positions," raised a reasonable doubt as to whether he was able to act independently).  This is superfluous given that Vuppuluri is conflicted, and there was not a majority of disinterested directors and officers.

Defendants lacked independence. *See Calesa Assocs., L.P. v. Am. Capital, Ltd.*, No. CV 10557-VCG, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) (declining to dismiss fiduciary duty claim where officer was "beholden to . . . or so under [the controller's] influence that their discretion would be sterilized") (citation omitted); *In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 255 (Del. Ch. 2006) (declining to dismiss fiduciary duty claim where each director "was beholden to [controlling shareholder] in some fashion and was unable to exercise independent and disinterested judgment"). Accordingly, the Motions should be denied.

### C.     The D&O Defendants Were Self-Interested

As this Court previously recognized, "classic examples of a director's self-interest in a business transaction involves a director appearing on both sides of the transaction *or* a director receiving a personal benefit from a transaction not received by the shareholders generally." Decision at 16 (emphasis added); *see also Swanson v. Tomlinson Lumber Mills, Inc.*, 239 N.W.2d 216, 221 n.3 (Minn. 1976) ("Transactions involving corporations under the common control of the same officers or directors are to be regarded with skepticism by the courts and closely scrutinized."). This Court dismissed Plaintiff's prior complaint because it found the allegations concerning the D&O Defendants' alleged self-interest lacking. However, the AC now demonstrates that both of the D&O Defendants engaged in the "classic examples" of director self-interest in connection with several of the challenged transactions.

First, Vuppuluri was conflicted for each and every one of the challenged transactions because they all involved Essar Affiliates, and because of his status as a life-long employee of Essar Global and its affiliates. However, he also held overlapping directorships on both sides of challenged transactions. For instance, in March 2012, Vuppuluri authorized the transfer of over $5 million to Trinity for no consideration. (AC ¶¶ 22, 64.) Vuppuluri, was *a director for Trinity and only one of two directors of ESML* at the time of the transfer, and therefore, had an

irreconcilable conflict of interest.  (*Id.*)  Vuppuluri's participation in a fraudulent invoicing

scheme in 2015 for the benefit of Essar Projects-US is yet another example of his self-interest.

(*Id.* at ¶¶ 88-92.)  *Vuppuluri served as an officer of both ESML and Essar Projects-US* at the

time he knowingly approved of and facilitated the transfer of nearly $11 million to Essar

Projects-US *for work that was never performed.*  (*Id.* at ¶¶ 88-92.)[11]  Contrary to the D&O

Defendants' assertions, these allegations certainly exemplify a "classic" self-interested director.

*See* Decision at 16; *Cumming on behalf of New Senior Inv. Grp., Inc. v. Edens*, No. CV 13007-

VCS, 2018 WL 992877, at *13 (Del. Ch. Feb. 20, 2018) ("Because [the officer] stood on both

sides of the [transactions], it is reasonable to infer on that basis alone that [the officer] was

interested in the [transactions].");  *RCS Creditor Tr. v. Schorsch*, No. CV 2017-0178-SG, 2017

WL 5904716, at *10 (Del. Ch. Nov. 30, 2017), *reargument denied*, No. CV 2017-0178-SG, 2018

WL 1640169 (Del. Ch. Apr. 5, 2018) (denying dismissal where fiduciaries sat "squarely on both

sides" of challenged transactions); *In re Direct Response Media, Inc.*, 466 B.R. 626, 652 (Bankr.

D. Del. 2012) (directors' dual roles rendered them interested).

Second, Plaintiff specifically alleges that Vuppuluri and Bhartia received six-figure

"bonuses" the *same month* they participated in an invoicing scheme with Essar Construction.

(AC ¶¶ 11, 95-96.)  ESML's funds were all but depleted at the time of these "bonus" payments.

(*Id.*)  Significantly, the timing of these payments suggests that the payments were not related to

the D&O Defendants' salary or compensation, but rather were financial benefits gained from

---

[11]  Vuppuluri disputes that he was a *de facto* CEO of Essar Projects-US, contending that "this is a made-up characterization."  Vuppuluri ignores the AC's specific allegations concerning Vuppuluri's oversight of Essar Projects-US.  (*See* AC ¶ 92.) (referencing internal records which demonstrate that Vuppuluri managed and supervised the highest-ranking individual within Essar Projects-US, Steve Rutherford, and was specifically identified as Rutherford's manager).  Although Vuppuluri may dispute this inference, that dispute is factual and cannot be properly resolved on a motion to dismiss.  *See F.D.I.C. v. Milbauer*, 119 F. Supp. 3d 939, 942 (D. Minn. 2015) (declining to dismiss duty of loyalty claims where inferences raised by plaintiff's allegations were plausible).  In any event, his longstanding ties to the Essar Global conglomerate render him conflicted.

their facilitation of the $27 million fraudulent payment to Essar Constructions.  *See e.g. In re DSI Renal Holdings, LLC*, 574 B.R. 446, 472 (Bankr. D. Del. 2017) ("specific allegations of self-interest with regard to stock and cash bonuses received by [d]efendants" in connection with challenged transactions stated plausible fiduciary duty claims); *Frederick Hsu Living Tr. v. ODN Holding Corp.*, No. CV 12108-VCL, 2017 WL 1437308, at *39-40 (Del. Ch. Apr. 14, 2017), *as corrected* (Apr. 24, 2017) (directors' bonus incentives and reliance on the controlling stockholder for continued employment "call[ed] into question their independence"); *In re Inv'rs Bancorp, Inc. Stockholder Litig.*, 177 A.3d 1208, 1226 (Del. 2017), *as revised* (Dec. 19, 2017) (finding that directors "acted inequitably in granting themselves unfair and excessive awards"). While the D&O Defendants may dispute the inferences from these facts, the dispute is factual and cannot be properly resolved on a motion to dismiss.  *See DSI Renal Holdings*, 574 B.R. at 472 (viewing all "reasonable inferences in [plantiff's] favor," defendants' receipt of large bonuses in connection with their facilitation of transactions that left the company "an empty shell" stated a fiduciary duty claim); *Milbauer*, 119 F. Supp. at 942 (declining to dismiss duty of loyalty claims where inferences raised by plaintiff's allegations were plausible).

In light of the foregoing, Plaintiff's duty of loyalty claims should not be dismissed.

## III. PLAINTIFF STATES A CLAIM FOR BREACH OF A DUTY OF CARE

### A.     The D&O Defendants Are Not Shielded From Liability

By its terms, the exculpation provision in ESML's articles of organization does not shield the D&O Defendants from liability in their roles as *officers*.  This Court previously dismissed Plaintiff's duty of care claim against the D&O Defendants because it determined that the exculpation provision shielded the D&O Defendants from liability.  *See* Decision at 19.  Article 7 of the ESML's Articles of Organization ("Article 7") expressly provides:

> *[a] governor* . . . shall not be personally liable . . . for breach of fiduciary duty as a *governor*, except for liability (i) based on a breach of the *governor's duty* of loyalty . . . (ii) acts or omissions not in good faith or involve intentional misconduct or knowing violation of law . . . (iv) for any transaction from which such *governor* derived an improper personal benefit.

(ESML Articles of Organization, Art. 7) (emphasis added).)  Although the Court previously dismissed Plaintiff's duty of care claims in reliance on this provision, Plaintiff now asserts a *separate* cause of action (Count IV) against the D&O Defendants for breach of the duty of care in their capacity as *officers* of ESML.  (*See* AC ¶¶ 144-155.)

Although the D&O Defendants again claim that the exculpation provision protects the D&O Defendants from liability, they ignore that Count IV only relates to the D&O Defendants' conduct solely in their capacity as *officers* of ESML.  (*Id*.)  This is because almost all of the challenged transactions did not involve action by the defendants *qua* Directors.  *There are no board meetings, and no minutes of any such board meetings for the transactions referenced in these claims*.  Accordingly, when they facilitated, arranged, and approved the challenged fraudulent transactions in this matter, they acted in their capacity as officers.  (*Id.* at ¶¶ 9, 65, 71, 73, 77, 86, 121, 122.)

The D&O Defendants' reliance on Article 7's purported savings clause fails.  The D&O Defendants contend that Article 7 should be construed to shield them from liability in their capacity as governors *and* officers of ESML because Minnesota law was recently amended to protect "managers."  Contrary to the D&O Defendants' assertions, Article 7 does not state that liability is extended to "the fullest extent" permitted by Minnesota law.  Article 7 is clear that its limitations on liability under Article 7 are *only* extended if Minnesota law is amended to protect *governors*.  (ESML Articles of Organization, Art. 7.)  Specifically, Article 7 expressly provides:

> "*If [Minnesota law] is hereinafter amended to authorize the further elimination or limitation of the liability of governors, then* the liability of

19

a governors of this limited liability company, in addition to the limitation on personal liability as provided herein, shall be limited to the fullest extent permitted by [Minnesota law] as amended."

(*Id.*) (emphasis added).  Thus, even if the Minnesota statute was amended to include officers as the D&O Defendants suggest, the plain language of Article 7 still does not insulate the D&O Defendants from liability in their roles as *officers*.[12]  *See Yang v. Voyagaire Houseboats, Inc.*, 701 N.W.2d 783, 789 (Minn. 2005) (exculpatory clauses are "strictly construed *against* the benefited party") (emphasis added); *N. Sunrooms & Additions, LLC v. Dorstad*, No. A10-1217, 2011 WL 292160, at *2 (Minn. Ct. App. Feb. 1, 2011) (same).

As the plain language of Article 7 does not insulate Vuppuluri or Bhartia in their roles as *officers* of ESML, they cannot invoke the provision to dismiss Count IV.  *See, e.g.*, *In re Century Elecs. Mfg., Inc.*, 345 B.R. 33, 37 (Bankr. D. Mass. 2006) (an exculpatory clause does not shield officers who are also directors from breach of fiduciary duty claims under Delaware law arising from their acts taken as officers);  *In re Robotic Vision Sys., Inc.*, 374 B.R. 36, 52-53 (Bankr. D.N.H. 2007) (Delaware corporation's exculpatory clause did not warrant dismissal because the provision "offers protection for directors but not for officers"); *In re Fleming Packaging Corp.*, 351 B.R. 626, 634 (Bankr. C.D. Ill. 2006).

Accordingly, the Motions should be denied as the AC sufficiently alleges a breach of the duty of care.  *See Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985), *overruled on other grounds by Gantler*, 965 A.2d at 695 ("We think the concept of gross negligence is also the proper standard for [duty of care claims].").

---

[12]  The D&O Defendants incorrectly contend that their conduct is protected by Article 7 because Minnesota's statute was amended to protect managers.  *See* 322C.0110(7) (permitting the indemnification and exculpation of "members, governors, or officers" in an LLC ).  Under Minnesota law, however, the definition of "manager" only applies to a "*manager-managed limited liability company.*" 322C.0102, Definitions (Minn. 2019) (emphasis added).  That is not the case here as ESML is a *Board-managed limited liability company*.  Accordingly, any protections under Minnesota law for managers do not apply.  *See* 322C.0407(3) (defining rules for manager-managed LLCs); 322C.0407(3) (defining rules for Board-managed LLC).

B.    **The D&O Defendants Failed To Act On An Informed Basis**

Even if the exculpation clause applied to officer conduct (which it cannot), the clause cannot be considered on a motion to dismiss.  *In re Tower Air*, 416 F.3d 229, 238 (3d Cir. 2005).  Although the Court previously recognized this principle in the Decision, the Court held that the SAC failed to plead specific facts regarding the duty of care, duty of loyalty, or bad faith.[13]  With respect to the duty of care, the Court determined that the SAC "contained no facts relating to the Defendants' decision-making process."  Decision at 16.  Recognizing this Court's ruling, the AC is now replete with details concerning the D&O Defendants' decision-making process – in reality, the egregious lack thereof – for each of the challenged transactions.  (*See* AC ¶¶ 61- 104, 86, 115, 139.)[14]

First, the AC identifies "specific examples of the [D&O Defendants] failing to seek and consider relevant information."  Decision at 20.  For example, the AC's new allegations cite to internal discussions between the D&O Defendants to suggest that they adopted a "cavalier attitude to facts":

- In November 2014, the D&O Defendants authorized a $3.3 million transfer to Aegis solely in response to the demands of defendant Anshuman Ruia.  (AC ¶¶ 75-81.)  Significantly, the AC cites emails between the D&O Defendants demonstrating that they approved the transfer knowing that ESML did not owe the funds and that Aegis would not be able to repay them  (*Id.*)  Despite this, they did not require Aegis to enter into an agreement to return the funds to ESML.  (*Id.*)

- In 2015, Vuppuluri and Bhartia discussed Essar Projects' failure to pass on ESML's payments to Essar Projects-US.  Instead of considering or discussing whether to compel Essar Projects to make these payments, Vuppuluri and

---

[13]  As set forth in Section III(C), the AC demonstrates that the D&O Defendants acted in bad faith.

[14]  Bhartia incorrectly contends that the AC alleges no facts discussing his decision-making process as compared to Vuppuluri.  The AC specifically alleges that Bhartia disregarded material information.  (*See*, *e.g.*, AC ¶¶ 75-81, 88-97.)  That Vuppuluri separately failed to consider the same information does not absolve Bhartia from a breach of his fiduciary duties.

Bhartia agreed to pay Essar Projects-US directly for work that was never performed. (*Id.* at ¶¶ 88-97.)[15]

Indeed, the AC alleges that the D&O Defendants turned a blind-eye to explicit warnings that ESML could not withstand the siphoning of its assets. (*Id.* at ¶¶ 82-87.) At least one ESML finance employee cautioned the risk of transferring funds outside of ESML to non-project purposes:

> We already have a shortfall of $14 Million in closing cash balance as compared to forecast provided to lenders in June which can be questioned and any further shortfall could cause problems once we report August forecast later this month. . .
>
> Liquidity will go below $30 Million unless we reduce the construction spend. There is already a payable of more than $22 Million from [Essar Projects-US] to third parties out of which $14 Million is urgent for next week. These payables do not include the work done in July for which [Essar Projects-US] will be receiving invoices from contractors next week. Hence, the forecast $18 Million payment for construction is already less and if we further reduce payment to [Essar Projects-US], there is a risk of contractors reporting this. . .
>
> Contractually ***we are running out of contract amount to make payment for construction activities and any further payment to [Essar Projects] will only [accelerate] the contractual issue***.

(*Id.* at ¶ 86) (emphasis added).) The D&O Defendants, ignoring this warning, instructed ESML finance employees to coordinate disbursements to Essar Projects for no consideration the very next day, which only further added to ESML's financial distress. (*Id.* at ¶ 87.) The D&O Defendants' utter failure to implement any meaningful deliberative process to assess or review such risks unquestionably violated their duties of care. *In re W.J. Bradley Mortg. Capital, LLC*, 598 B.R. 150, 164 (Bankr. D. Del. 2019) (defendants violated duty of care "by ***failing to take affirmative action***" to ensure the transaction was in the debtors' "best interests" when defendants

---

[15] Remarkably, the D&O Defendants contend that they acted with due care because they implemented the fraudulent scheme after learning Essar Projects had an obligation to pay Essar Projects-US. *But that only supports the claims against them.* The D&O Defendants completely ignore the AC's allegations that they knowingly permitted Essar Projects-US to issue *fraudulent* invoices to support the transfers. (*Id.* at ¶¶ 88-97.)

knew debtor lacked sufficient cash flow at the time of the transfer) (emphasis added); *In re Tower Air, Inc.*, 416 F.3d at 240 (allegations that directors adopted a "we don't care about the risks attitude" sufficiently stated a claim for a violation of duty of care); *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 278-80 (Del. Ch. 2003) (allegations that directors acted without discussion or meaningful consultation with experts stated a due care claim).

Second, the AC now alleges that the D&O Defendants consistently disregarded rudimentary corporate principles by failing to seek Board approval – let alone a meaningful, informed deliberative process – for the challenged transactions.  For instance, the AC alleges:

- In or around June 2012, Vuppuluri authorized ESML to draw $79 million from ICICI Bank.  (*Id.* at ¶ 68.)  Instead of using the funds for Project purposes as required under the related credit agreement, Vuppuluri authorized the transfer of the funds to Essar Global as a "loan."  (*Id.*)  None of the 2012 or 2013 Board minutes discussed this transaction.  (*Id.* at ¶¶ 70-71.)

- On January 25, 2013, Vuppuluri authorized ESML to borrow $21 million for Essar Global.  (*Id.* at ¶ 73.)  Although Vuppuluri informed the bank that ESML needed the $21 million for "immediate project needs," he authorized the loan of $21 million to Essar Global instead.  (*Id.*)  There were no board meeting minutes or resolutions attesting to this transfer. (*Id.*)

- In January 2013, only four months after acknowledging that ESML's funds "reached an extremely critical stage," Vuppuluri authorized a transfer of $21 million dollars to Essar Global without Board approval.  (*Id.*)

- On January 4, 2013, under instruction from Essar Global, the D&O Defendants authorized a $325,000 "loan" to Essar Global without documentation or board consideration or approval.  (*Id.* at ¶ 74.)

- In November 2014, the D&O Defendants authorized a $3.3 million payment to Aegis for an engineering machine.  (*Id.* at ¶¶ 75-81.)  The D&O Defendants knew that ESML did not owe Aegis any money for this machine as it was not part of the project.  (*Id.*)  Nonetheless, the D&O Defendants authorized the transaction because, as Bhartia noted, "Anshuman Ruia called again today and was getting very angry that we are not paying."  (*Id.*)[16]

---

[16] The D&O Defendants contend that they acted with due care because the AC alleges they investigated whether ESML was obligated to pay this amount.  They ignore, however, the AC's allegations that they knew ESML did not owe the sums, authorized the transaction solely in response to Anshuman Ruia's demand, and never required Aegis to enter into an agreement to repay the loan.  (*Id.* at ¶¶ 75-81.)

Each of these allegations demonstrate that the D&O Defendants violated their duties of care by failing to exercise rudimentary corporate oversight and by dissipating ESML. *See, e.g.*, *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 560 (Bankr. D. Del 2012) (breach of the duty of care sufficiently pled where complaint alleged that directors failed to perform market research or engage in negotiations involving material business decisions); *In re Tower, Inc.*, 416 F.3d at 240 (lack of discussion concerning certain contracts and failure to make any actual inquiries into business decisions was sufficient to state a claim for breach of duty of care as "the directors' alleged rubber-stamping of major capital expenditures [was] consistent with bad faith"); *In re Walt Disney*, 825 A.2d at 278 (allegations that the directors failed to "act in good faith and meet minimal proceduralist standards of attention" in rendering business decisions precluded dismissal). Accordingly, the Court should decline to consider the exculpatory provision at this stage. *In re Tower Air*, 416 F.3d at 238; *Palmer*, 211 F. Supp. 3d at 666 ("Plaintiff alleges that defendants breached their duties of care in constructing forecasts and presenting these forecasts to the Board[.] Plaintiff alleges that defendants were grossly negligent, because the forecasts lacked a reasonable basis . . . . These facts as pled plausibly give rise to an entitlement for relief for breach of the duty of care.").

### C.    The D&O Defendants Acted In Bad Faith

Even if the Court determines that it is appropriate to consider the exculpatory provision on a motion to dismiss, it does not exculpate the D&O Defendants for "any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." *Bradley*, 598 B.R. at 165; *Direct Response Media*, 466 B.R. at 651 (exculpatory clause did not trigger dismissal of a duty of care claim where bad faith alleged); *Autobacs Strauss*, 473 B.R. at 561 (where plaintiff sufficiently alleged breach of the duty of loyalty in the complaint the

exculpatory provision would be rendered "impotent at the 12(b)(6) stage"); *In re Evergreen Energy, Inc.*, 546 B.R. 549, 561 (Bankr. D. Del. 2016).

Here, the AC alleges sufficient facts showing that the D&O Defendants acted in bad faith because they acted (i) with gross negligence and (ii) in "a conscious disregard for their responsibilities." *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 64 (Del. 2006) (describing "three different categories of fiduciary behavior [] for the bad faith pejorative label" including conduct (i) "taken solely by reason of gross negligence and without any malevolent intent;" (ii) in a conscious disregard for one's responsibilities;" or (iii) "motivated by an actual intent to do harm"); *In re Sols. Liquidation LLC*, No. 1:16-bk-10627-CSS, 2019 WL 5305517, at *16 (Bankr. D. Del. Oct. 21, 2019) (finding allegations of directors' gross negligence were sufficient to preclude dismissal under an exculpation provision).

The AC is replete with new details describing how the D&O Defendants consciously disregarded their duties, or at minimum, acted with gross negligence. Indeed, the AC's allegations that the D&O Defendants knowingly participated in a fraudulent invoicing scheme in 2015 resolves any doubt. (*See* AC ¶¶ 11-12, 88-97, 147.) Internal emails reveal that, in January 2015, the D&O Defendants authorized ESML to pay invoices totaling $11 million for the benefit of Essar Projects-US where no work was performed; instead, this was simply a ruse to allow Essar Projects-US badly needed liquidity. (*Id.* at ¶¶ 11, 91.) The scheme continued through late 2015 when, again, the D&O Defendants approved the payment of another $27 million on fraudulent invoices to Essar Constructions for no consideration. (*Id.*)

Moreover, the AC alleges that the D&O Defendants consciously disregarded warnings from ESML employees about ESML's dire financial condition when they transferred funds to Essar Affiliates for no consideration. (*See id.* at ¶¶ 82-87.) These facts alone should preclude dismissal of Plaintiff's claims based on the exculpation clause. *See Direct Response Media*, 466

B.R. at 651 (allegations that directors' transfer of subsidiary's funds to its parent at a time when they knew the subsidiary was insolvent supported a claim that the directors acted in bad faith); *Buckley v. O'Hanlon*, No. 1:04-00955-GMS, 2007 WL 956947, at *6 (D. Del. Mar. 28, 2007) (exculpation clause did not insulate defendants from liability where the complaint included allegations that defendants acted with "knowing and deliberate indifference" and "consciously disregarded red flags").

## IV.    PLAINTIFF'S DISALLOWANCE CLAIMS SURVIVE THE MOTIONS.

Plaintiff's sixth and seventh claims seek disallowance against the D&O Defendants under 11 U.S.C. § 502(b)(1). *Id.* (stating a court may disallow a claim to the extent "it is unenforceable against the debtor . . . under any agreement or applicable law."). Minnesota law is clear that an employee forfeits his agreed-upon compensation for conduct that is disobedient or in breach of his duty of loyalty. *See Stiff v. Associated Sewing Supply Co.,* 436 N.W.2d 777, 780 (Minn. 1989). The Court previously dismissed Plaintiff's disallowance claims because the SAC "failed to state a claim for breach of a fiduciary duty." Decision at 25. As articulated above (*see supra* Section II and III), the AC now sufficiently alleges that the D&O Defendants violated their fiduciary duties to ESML, and therefore has stated a basis to disallow D&O Defendants' claims under the Faithless Servant Doctrine. *See Goldie v. Cox*, 130 F.2d 695 (8th Cir. 1942) (disallowance of the managing officer's claim was justified where officer breached his fiduciary duties); *see In re Opus E., LLC*, 528 B.R. 30, 105 (Bankr. D. Del. 2015), *aff'd sub nom. In re Opus E. LLC*, 698 F. App'x 711 (3d Cir. 2017) (disallowing claims based on defendants' acts of fraud). Accordingly, the Motions to dismiss Plaintiff's disallowance claims should be denied.

## V.    MINNESOTA'S STATUTE OF LIMITATIONS APPLIES.

As a last ditch effort to dismiss the AC, the D&O Defendants ask this Court to vacate its prior determination that Plaintiff's claims are timely. Decision at 10-12. This Court may only

reconsider its prior holdings before final judgment under extraordinary circumstances which are absent here. *See* F.R.C.P. 54(b); *Jones Lang LaSalle Americas, Inc. v. Int'l Bhd. of Elec. Workers Local Union*, 338 F. Supp. 3d 381, 385 (D. Del. 2018) ("Absent extraordinary circumstances, the law of the case doctrine cautions against revisiting previously decided issues at later stages of a case."); *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997) (stating that a court reconsidering its prior decision must (i) explain the reasoning for the reversal and (ii) "take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling").

Significantly, the D&O Defendants raise no new arguments. Indeed, the parties extensively briefed this issue in connection with the D&O Defendants' Motions to Dismiss the SAC. Taking these arguments into account, this Court correctly determined that Minnesota's statute of limitations applies. *See* Decision at 10.

The D&O Defendants' reliance on this Court's reference to the internal affairs doctrine ignores the Court's careful analysis of this issue. Indeed, the Decision specifically relies upon *In re Mervyn's Holding LLC*, 426 B.R. 488, 502 (Bankr. D. Del. 2010) in support of its holding. *See* Decision at 10. Notably, the court in *In re Mervyn's Holding* declined to apply Delaware's borrowing statute because there was no threat of forum shopping. 426 B.R. at 503 (stating Delaware's borrowing statute was "designed to prevent forum shopping" for the most favorable forum, *i.e.* commencing an action in an unrelated forum to benefit from a longer statute of limitations); *see also Saudi Basic Indus. v. Mobil Yanbu Petrochemical Co.*, 866 A.2d 1, 16 (Del. 2005) ("Borrowing statutes . . . are typically designed to address a specific kind of forum shopping scenario – cases where a plaintiff brings a claim in a Delaware court that (i) arises under the law of a jurisdiction other than Delaware and (ii) is barred by that jurisdiction's [shorter] statute of limitations[.]"). As no such issues were present in *In re Mervyn's Holding*, the court applied the state of incorporation's statute of limitation. *Id.*; *see* Decision at 10-11.

Here, as in *In re Mervyn's Holding*, Delaware's borrowing statute is inapplicable because there are no allegations that Plaintiff engaged in forum shopping. In fact, ESML, the debtor in the underlying bankruptcy action, chose Delaware not to benefit from its statute of limitations, but to comply with the U.S. Bankruptcy Code's jurisdiction requirements. Contrary to the D&O Defendants' contentions, courts refuse to apply the Delaware's borrowing statute where "plaintiffs have come to a jurisdiction with a shorter, rather than a longer, limitations period" as Plaintiff did here. *See Juran v. Bron*, No. CIV. A. 16464, 2000 WL 1521478, at *11-12 (Del. Ch. Oct. 6, 2000) (declining to invoke borrowing statute because there was no evidence that plaintiff was forum shopping); *Furnari v. Wallpang, Inc.*, No. 13C-04-287-JRJ CCLD, 2014 WL 1678419, at *5 (Del. Super. Ct. Apr. 16, 2014) (holding that Florida's longer statute of limitations applies because the plaintiff only filed in Delaware to invoke jurisdiction over the parties).[17] Accordingly, Plaintiff timely commenced this action.

---

[17]  Even if Delaware's statute of limitations applies, and it does not, Delaware's doctrine of equitable tolling would toll the statute of limitations because the AC alleges an abuse of the fiduciary relationship through actionable self-dealing. *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 193 (D. Del. 2000) (invoking doctrine of equitable tolling where plaintiff alleged defendants engaged in self-dealing). Moreover, Plaintiff and ESML's creditors were not aware of, and would have no reason to suspect, that the D&O Defendants breached their fiduciary duties to ESML before the bankruptcy petition filing. *See, e.g., EBS Litig. LLC v. Barclays Glob. Invs., N.A.*, 304 F.3d 302, 306 (3d Cir. 2002) (statute of limitations was tolled until Reorganization Plan [] was confirmed). The Court is permitted to toll the statute of limitations under such circumstances.

## <u>CONCLUSION</u>

For all of the above reasons, the Court should deny the D&O Defendants' respective

Motions to Dismiss and grant such other and further relief in favor of Plaintiff as the Court

deems just and proper.  To the extent the Court grants the Motions in whole or in part, Plaintiff

requests that such dismissal be without prejudice and that leave to amend be granted.

Dated: October 24, 2019

**HOGAN McDANIEL**

By: */s/ Garvan F. McDaniel*
Garvan F. McDaniel (DE No. 4167)
Daniel K. Hogan (DE No. 2814)
1311 Delaware Avenue
Wilmington, Delaware 19806
Telephone:  (302) 656-7540
Facsimile:  (302) 656-7599
Email: gfmcdaniel@dkhogan.com
        dkhogan@dkhogan.com

-and-

**KASOWITZ BENSON TORRES LLP**
Andrew K. Glenn (admitted *pro hac vice*)
Stephen W. Tountas (admitted *pro hac vice*)
Robert M. Novick (admitted *pro hac vice*)
1633 Broadway
New York, New York 10019
Telephone:     (212) 506-1700
Facsimile:      (212) 506-1800
Email:  aglenn@kasowitz.com
         stountas@kasowitz.com
         rnovick@kasowitz.com

*Counsel to Kevin Nystrom, UC Litigation Trustee*